No. 26-1575

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

MEGAN JACKLER AND BRANDON JAROCH,
*Petitioners*,

*v.*

DEPARTMENT OF JUSTICE AND DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,
*Respondents*.

*On Petition for Review from the Merit Systems Protection Board*

# BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS

Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL
ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 26-1576 |
| **Short Case Caption** | Jackler v. DOJ |
| **Filing Party/Entity** | Constitutional Accountability Center |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/08/2026

Signature: /s/ Elizabeth B. Wydra

Name: Elizabeth B. Wydra

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Constitutional Accountability Center | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | iv |
| GLOSSARY | xii |
| INTEREST OF *AMICUS CURIAE* | 1 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 1 |
| ARGUMENT | 4 |
| I. The Executive Does Not Possess an Illimitable Power of Removal over Inferior Officers | 7 |
| II. Congress Has Regulated the Appointment and Removal of Inferior Officers Since the Founding | 14 |
| III. The Supreme Court Has Confirmed Congress's Power to Govern the Removal of Inferior Officers | 21 |
| CONCLUSION | 32 |

## TABLE OF AUTHORITIES

Cases

*Arnett v. Kennedy*,
416 U.S. 134 (1974) .......... 31

*Bush v. Lucas*,
462 U.S. 367 (1983) .......... 17

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 23

*Edmond v. United States*,
520 U.S. 651 (1997) .......... 5, 9

*Ex parte Hennen*,
38 U.S. 230 (1839) .......... 21

*Exum v. Dep't of Homeland Sec.*,
446 F. App'x 282 (Fed. Cir. 2011) .......... 30

*FCC v. Consumers' Rsch.*,
606 U.S. 656 (2025) .......... 24, 25

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) .......... 5, 23-25, 30, 31

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) .......... 5, 9, 24, 25, 27, 29, 30

*McIntosh v. Dep't of Def.*,
53 F.4th 630 (Fed. Cir. 2022) .......... 29

*Mistretta v. United States*,
488 U.S. 361 (1989) .......... 6

*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 22, 27, 28

*Myers v. United States*,
272 U.S. 52 (1926) .......... 4, 10, 22, 25

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... 23, 26, 27, 31

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .......... 4

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

*United States v. Arthrex*,
594 U.S. 1 (2021) ........ 27-31

*United States v. Fausto*,
484 U.S. 439 (1988) ........ 17, 18

*United States v. Perkins*,
116 U.S. 483 (1836) ........ 21, 27

*United States v. Wickersham*,
201 U.S. 390 (1906) ........ 16

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
413 U.S. 548 (1973) ........ 3, 15

*Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*,
144 F.4th 1315 (11th Cir. 2025) ........ 26

*Weiss v. United States*,
510 U.S. 163 (1994) ........ 9

CONSTITUTIONAL PROVISIONS

The Declaration of Independence (U.S. 1776) ........ 2

U.S. Const. art. I, § 8, cl. 18 ........ 7

U.S. Const. art. II, § 2, cl. 1 ........ 6, 7

U.S. Const. art. II, § 2, cl. 2 ........ 7-9

STATUTES AND LEGISLATIVE MATERIALS

Act of Sept. 24, 1789, ch. 20, 1 Stat. 73 ........ 14

Act of Feb. 27, 1801, ch. 15, 2 Stat. 103 ........ 14

Act of May 15, 1820, ch. 102, 3 Stat. 582 ........ 14

Act of July 2, 1836, ch. 270, 5 Stat. 80 ........ 14

Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 ........ 14

## TABLE OF AUTHORITIES – cont'd


| | Page(s) |
|---|---|
| Act of June 3, 1864, ch. 106, 13 Stat. 99 | 14 |
| Act of July 13, 1866, ch. 176, 14 Stat. 90 | 15 |
| Act of Mar. 3, 1871, ch. 114, 16 Stat. 495 | 16 |
| Act of Mar. 3, 1903, ch. 1012, Pub. L. No. 57-102, 32 Stat. 1213 | 19 |
| Civil Liberties Restoration Act, H.R. 1502, 109th Cong. (2005) | 20 |
| Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) | 17 |
| 31 Cong. Rec. (1897) | 19 |
| 48 Cong. Rec. (1912) | 17 |
| H.R. Rep. No. 62-388 (1912) | 13 |
| H.R. Rep. No. 101-328 (1989) | 4, 20 |
| Immigration Act of 1891, ch. 551, 26 Stat. 1084 (1891) | 18 |
| Immigration and Nationality Act of 1952, ch. 477, Pub. L. No. 414, 66 Stat. 163 | 19 |
| Lloyd-La Follette Act of 1912, Pub. L. No. 62-336, 37 Stat. 539 (1912) | 17 |
| Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883) | 15, 16 |
| Pub. L. No. 101-376, 104 Stat. 461 (1990) | 20 |
| S. Doc. No. 430, 24th Cong., 1st Sess. 26 (1836) | 13 |
| S. Rep. No. 95-969 (1978) | 18 |
| 5 U.S.C. § 2302(a)(2)(B) | 25 |
| 5 U.S.C. § 3302 | 25 |
| 5 U.S.C. § 7511(b)(2) | 25 |
| 5 U.S.C. § 7513(a) | 1 |
| 8 U.S.C § 1101(b)(4) | 1 |

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

BOOKS, ARTICLES, AND OTHER AUTHORITIES

1 Annals of Cong. (1789) (Joseph Gales ed., 1834) .................................. 3, 10, 11

*Appointment & Removal of Inspectors of Customs*, 4 U.S. Op. Atty. Gen. 165 (1843) .................................. 11

Aditya Bamzai & Saikrishna Bangalore Prakash, The *Executive Power of Removal*, 136 Harv. L. Rev. 1756 (2023) .................................. 13

Steven G. Calabresi & Joan L. Larsen, *One Person One Office: Separation of Powers or Separation of Personnel*, 79 Cornell L. Rev. 1045 (1994) .................................. 7

Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the First Half-Century*, 47 Case W. L. Rev. 1451 (1997) .................................. 12

Christine Kexel Chabot, *The Interstitial Executive: A View from the Founding* 52 B.Y.U. L. Rev. (forthcoming 2027), https://dx.doi.org/10.2139/ssrn.6156786 .................................. 14

*The Claim of Surgeon DuBarry for Back Pay*, 4 U.S. Op. Att'y Gen. 603 (1847) .................................. 11

*A Compilation of the Messages and Papers of the Presidents* (James D. Richardson ed., 1897) .................................. 12

*Documentary History of the First Federal Congress 1789-1791* (Charlene Bangs Bickford et al. eds., 2019) .................................. 10

*Duty of President as to a Reg. of Wills*, 1 U.S. Op. Atty. Gen. 212 (1818) 12

*The Federalist No. 69* (Alexander Hamilton) (Clinton Rossiter ed., 1961) 7

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) 8

Carl Russell Fish, *The Civil Service and the Patronage* (1905) .................................. 15, 16

Hon. Alberto R. Gonzales & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841 (2016) .................................. 30

Immigration Judge, 38 Fed. Reg. 8590 (Apr. 4, 1973) .................................. 19

Immigration Service, Annual Report of the Commissioner-General of Immigration (1895) .................................. 18

**TABLE OF AUTHORITIES – cont'd**


**Page(s)**

James Kent, *Commentaries on American Law* (1826) ................................ 11

Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* (2020)..................................... 2, 7, 8

*Mil. Power of the President to Dismiss from Serv*., 4 U.S. Op. Atty. Gen. 1 (1842) ........................................................................................... 12

Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205 (2014) ................................................................... 6, 9

Sidney B. Rawitz, *From Wong Yang Sung to Black Robes*, 65 Interpreter Releases 453 (1988) ........................................................................ 4, 19

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911). 2, 7

Paul P. Van Riper, *History of the United States Civil Service* (1958)......... 15, 16

Joseph Story, *Commentaries on the Constitution of the United States* (1st ed. 1833)........................................................................................... 11

Task Force on Personnel and Civil Service, *Report on Personnel and Civil Service Prepared for the Commission on Organization of the Executive Branch of the Government* (1955).......................................... 16

E. Garrett West, *Congressional Power over Office Creation*, 128 Yale L.J. 166 (2018) ........................................................................... 3, 8

Amy J. Wildermuth & Peyton C. Baker, *Protecting Perkins: Removal, Supervision, and Article II* (Mar. 19, 2026 draft), https://dx.doi.org/10.2139/ssrn.6447918 ................................................ 25

Alexandra Williams, *The Case for an Article I Immigration Court: How it Started, Why It's Needed More Than Ever, Moving Forward,* 2 The Green Card (Summer 2019)................................................................ 19

Gordon Wood, *The Creation of the American Republic, 1776-1787* (1972) .......................................................................................... 2, 3, 8

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Until February 14, 2025, petitioners Megan Jackler and Brandon Jaroch were Immigration Judges (IJs) charged with "conduct[ing] specified classes of proceedings" involving immigration law. 8 U.S.C § 1101(b)(4). On that day, each Petitioner was terminated in violation of 5 U.S.C. § 7513, which provides that IJs who have finished their probationary periods may be removed "only for such cause as will promote the efficiency of the service," *see* 5 U.S.C. § 7513(a), and entitles them to "30 days' advance written notice" of a proposed removal, "a reasonable time" to answer, and "a written decision" stating the "specific reasons" for the removal, *id.* § 7315(b). When Petitioners challenged their termination before the

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consent to its filing.

Merit Systems Protection Board ("the Board"), Respondents argued that section 7513 is unconstitutional as applied to Petitioners. The Board accepted this novel contention. It held that IJs are inferior officers who exercise "significant policymaking and administrative authority," Appx14-16, and therefore "no entity, including Congress or the Board," may restrict the Attorney General's ability to remove them, *id.* at 12. This conclusion is at odds with the text and history of the Constitution, as well as centuries of historical practice. This Court should reject it.

The Constitution's Framers gave Congress—not the executive—the power to structure the federal government. In the colonial era, British kings had used their power to create and fill offices to construct a "vast patronage network" that they then used to "bribe, threaten, and cajole" lawmakers. Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 152 (2020); *see also The Declaration of Independence* para. 12 (U.S. 1776) ("He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people . . . ."). The result was not only tyranny and corruption, but also bad government. Colonists complained that royalists filled the "'highest seats of justice with bankrupts, bullies, and blockheads'" and eliminated the "'most virtuous and exalting'" candidates from government office. Gordon Wood, *The*

*Creation of the American Republic, 1776-1787*, at 145 (1972) (quoting Philadelphia Packet, Mar. 4, 1777).

For this reason, when "defining the . . . powers" of the new nation, the Framers firmly denied the President any "prerogative" to create federal offices. 1 *The Records of the Federal Convention of 1787*, at 65 (Max Farrand ed., 1911) (hereinafter *Farrand's Records*). They instead insisted that Congress would exclusively enjoy this power. *See generally* E. Garrett West, Note, *Congressional Power over Office Creation*, 128 Yale L.J. 166 (2018). As early legislators explained, Congress's power to establish an office "implie[d] every thing relative to its formation, constitution, and termination," *see* 1 Annals of Cong. 503 (1789) (Joseph Gales ed., 1834) (Rep. Lawrence), and legislators' power over the creation of offices meant that they could "direct the[] appointment and removal" of officers "on what terms they pleased," *id.* at 569 (Rep. Smith).

Congress has long exercised these powers by creating inferior offices and regulating the manner in which inferior officers are appointed to and removed from service. In the nineteenth century, it used this authority to pass civil service laws. In addition to confirming the "judgment of history . . . that federal service should depend upon meritorious performance rather than political service," *see U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557 (1973), Congress's creation of the civil service reflected the longstanding interest

in professional, impartial leadership that motivated the Founding generation to give Congress the power to create offices in the first place, Wood, *supra*, at 267.

Congress has also used this authority to provide for the appointment and removal of officers who adjudicate cases involving immigration law. The officers were alternately called "immigrant inspectors," "special inquiry officers," and, finally, "immigration judges," after a "vigorous campaign" led by the judges themselves. Sidney B. Rawitz, *From Wong Yang Sung to Black Robes*, 65 Interpreter Releases 453, 454-58 (1988) (describing a campaign "to use the working title of Immigration Judge and to wear the traditional robes of the judiciary"). In 1990, Congress ensured that IJs would be subject to section 7513, protecting them from "arbitrary removal" and guaranteeing their ability to "defend themselves" when terminated. H.R. Rep. No. 101-328, at 3-4 (1989). *See infra* Part II.

Supreme Court precedent makes clear that Article II poses no bar to these modest limits on the removal of IJs. Although the Court has suggested that the executive's need to supervise may require some power of removal over certain "executive officers who exercise that power on his behalf," *see, e.g.*, *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025), it has never extended this suggestion to inferior officers like Petitioners. *See* Pet'rs Br. 13 (describing the parties' agreement that Petitioners are inferior officers). Even in *Myers v. United States*,

272 U.S. 52 (1926), a high-water mark in the Court's treatment of presidential removal power, the Court rejected any contention that the President could remove inferior officers he does not appoint, instead describing the removal power as "an incident to [the President's] specifically enumerated function of appointment by and with the advice of the Senate." *Id.* at 164. Similarly, the Court explained that Congress's power to "regulate removals" of inferior officers is "incidental" to its "constitutional power to vest appointments of inferior officers in the heads of departments." *Id.* at 161.

This treatment of removal makes sense. As the Supreme Court later explained, "[i]nferior officers are those 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). Thus, at-will removal is not necessary for presidential control of inferior officers because those officers' decisions remain subject to correction by a principal. *Id.* at 765 ("if an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will").

Respondents' argument to the contrary rests on a vision of the Constitution that the Supreme Court has rejected. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010) (confirming that the Court "has upheld

for-cause limitations" on removal of inferior officers). Indeed, the Court has only once limited a removal restriction implicating an officer who was not Senate-confirmed, and that case involved a "highly unusual" statute that insulated officers with significant policymaking authority using "double for-cause removal provisions." *Id.* at 505, 488 (internal quotations omitted). There, the Court limited its ruling to this "novel" provision and confirmed Congress's general authority to regulate executive officers and employees. *Id.* at 496.

This case does not involve a "highly unusual" scheme without a "historical analogue[]." *Id.* at 505. Courts and commentators have long assumed that the removability of IJs and similar adjudicators—officers whose decisions are subject to review and who do not act "largely independently" of their supervisors, *id.* at 504; Pet'rs Br. 51-54—is subject to congressional regulation. *See, e.g.*, Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1247 (2014) ("Congress may specify removal limits when it vests the appointment of inferior officers in someone other than the President."). The Board's decision takes aim at what has long been a "traditional way[] of conducting government." *Mistretta v. United States*, 488 U.S. 361, 401 (1989). This Court should reject it.

## ARGUMENT

### I. The Executive Does Not Possess an Illimitable Power of Removal over Inferior Officers.

**A.** The Constitution gives Congress great flexibility in determining how best to shape the federal government, as well as a unique authority over inferior officers. While the Framers anticipated the creation of "Departments," *see* U.S. Const. art. II, § 2, cl. 1, they left unspecified what those departments would be and how they would be organized. Likewise, while the Framers envisioned that "Officers of the United States" would be "established by Law," *id.* art. II, § 2, cl. 2, they provided few details concerning those officers' relationship with the President. *Cf. id.* art. II, § 2, cl. 1 (Opinions Clause). Instead, the Framers gave Congress the authority to make laws necessary and proper for carrying into execution "all" powers of "the Government of the United States," *id.* art. I, § 8, cl. 18, including the authority to "establish all offices," 2 *Farrand's Records*, *supra*, at 345.

It was no accident that the Framers empowered Congress in this way. In England, the King's ability to create offices and titles of nobility and fill them with hand-selected appointees had allowed monarchs to "'purchase' a reliable cadre" of supportive officers. Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 Cornell L. Rev. 1045, 1056 (1994). These "arbitrary exercises of royal power" left an "indelible

impression" on the founding generation. *Id.* at 1056-57. Seeking to avoid this type of patronage and the corruption it produced, the Framers ensured that, unlike the British King, the President was not permitted to create executive offices. McConnell, *supra*, at 153; *see The Federalist No. 69*, at 421 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("The king of Great Britain is emphatically and truly styled the fountain of honor. He not only appoints to all offices, but can create offices. . . . There is evidently a great inferiority in the power of the President, in this particular, to that of the British king.").

Instead, the Framers made Congress the "first among equals in the construction and definition of the federal government." West, *supra*, at 178. Indeed, by providing that the President's appointment power extended only to offices "which shall be established *by law*," U.S. Const. art. II, § 2, cl. 2 (emphasis added), the Framers reiterated that the President would have no role in office-creation, providing a "double-barreled repudiation of any presidential prerogative power to create offices," McConnell, *supra*, at 154. This would help to implement the founding generation's interest in a government directed by "disinterested men," devoted to "the public good," Wood, *supra*, at 59, rather than "obsequious

instruments of . . . [presidential] pleasure," *The Federalist No. 76*, *supra*, at 458 (Alexander Hamilton).

The Framers also granted Congress a unique power over the appointment of "inferior [o]fficers." U.S. Const. art. II, § 2, cl. 2. While the Appointments Clause required the President to appoint "Officers of the United States" with the advice and consent of the Senate, it provided that "Congress may by Law vest the Appointment" of "inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

The decision to vest that authority in Congress stemmed from the Framers' belief that a "degree of flexibility" was "appropriate in providing for the appointment of officers who, by definition, would have only inferior governmental authority." *Weiss v. United States*, 510 U.S. 163, 186-87 (1994) (Souter, J., concurring). Moreover, because inferior officers were subject to some amount of supervision by principals, the Framers concluded that allowing Congress additional flexibility in regulating their offices would not disturb "the chain of political accountability that was central to the Framers' design of the Appointments Clause." *Kennedy*, 606 U.S. at 794; *Edmond*, 520 U.S. at 662-63 (describing "the views of the first Congress" that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate"); Rao, *supra*, at

1247 ("[F]or inferior officers properly understood, removal at will may not be essential for control, as these officers will be subordinate to an officer who is within the control and direction of the President.").

**B.** Congress's authority to create inferior offices and provide for their appointment necessitated control over their removal. During what would later be called the "Decision of 1789," the First Congress's "discussion and decision" about whether the President could remove certain department heads without the Senate's approval, *see Myers*, 272 U.S. at 136, legislators explained that Congress's power to "organise [the government] by creating the necessary offices" entailed the power to "establish[] offices," and the "authority to declare by whom" officers should be removed, as "shall appear to be most conducive to the public good." 11 *Documentary History of the First Federal Congress 1789-1791*, at 1021 (Charlene Bangs Bickford et al. eds., 2019) (Rep. Vining).

Even lawmakers who disagreed about whether the President could remove department heads without the Senate's approval agreed that Congress had authority to regulate the removal of inferior officers. Indeed, when Rep. Smith posited that "the [C]onstitution had left it in the power of the Legislature" to dictate the appointment and removal of inferior officers "on what terms they pleased," James Madison did not object, instead responding that if Smith agreed "that the Legislature may vest the power of removal, with respect to inferior officers, he

must also admit that the constitution vests the President with the power of removal in the case of superior officers; because both powers are implied in the same words." 1 Annals of Cong. 569 (1789); *accord id.* at 503 ("the establishment of an office implies every thing relative to its formation, constitution, and termination" (Rep. Lawrence)).

Thus, the "debate in 1789" was understood not to disturb Congress's power to "regulate[] and delegate the appointment of 'inferior officers' . . . [and] the manner in which . . . *the removal . . . shall be made*." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531, at 388 (1st ed. 1833) (emphasis added). Rather, it was widely assumed that any presidential power of removal extended only to officers appointed by the President and confirmed by the Senate. *See* 1 James Kent, *Commentaries on American Law* 289 (1826) (describing the Decision of 1789 as applying "to every other officer of government *appointed by the president and senate*" (emphasis added)); 3 Story, *supra* § 1531, at 390 n.1 (describing the conclusion that "removal by the executive could not be abridged by the legislature; *at least, not in cases, where the power to appoint was not subject to legislative delegation*" (emphasis added)); *see* 1 Annals

of Cong. 637 (the President might not "have the power of dismissal" over the Comptroller because he was "an inferior officer" (Rep. Stone)).

The executive branch itself understood the decision of 1789 to address, at most, "every officer *appointed by the President*." *The Claim of Surgeon DuBarry for Back Pay*, 4 U.S. Op. Att'y Gen. 603, 612 (1847) (emphasis added); *see also Appointment & Removal of Inspectors of Customs*, 4 U.S. Op. Atty. Gen. 165, 166 (1843) (noting that the Attorney General was "not prepared positively to dissent" from Story's assessment of Congress's power to regulate inferior officers, and assuming that "Congress is competent to restrain the Executive in the exercise" of the power to remove inferior officers); *Mil. Power of the President to Dismiss from Serv.*, 4 U.S. Op. Atty. Gen. 1, 1 (1842) (quoting Story). Perhaps this is why Attorney General Wirt assumed that Congress could limit the removal of even a presidentially-appointed inferior officer and observed that Congress could give the Register of Wills "a more permanent tenure." *Duty of President as to a Reg. of Wills*, 1 U.S. Op. Atty. Gen. 212, 213 (1818).

Even champions of the executive's removal authority shared these assumptions about Congress's power over inferior officers. For example, President Jackson, one of the most "vigorous[] defend[ers of] presidential power in the direct context of removal authority," *see* Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive During the First Half-Century*, 47 Case W. L. Rev.

1451, 1531-59 (1997) (describing the role of removal in the conflict between Jackson and Congress over the Second Bank of the United States), disclaimed a right "to supervise or interfere with" the officers responsible for public money, unless their appointment was "devolved upon the President alone or in conjunction with the Senate." *See* Letter to Senate, Apr. 21, 1834, *in* 3 *A Compilation of the Messages and Papers of the Presidents* 1313 (James D. Richardson ed., 1897); *see also* Letter from Levi Woodbury to John Davis, May 5, 1836, *in* S. Doc. No. 430, 24th Cong., 1st Sess. 26, 30-31 (1836) (noting that Jackson's Secretary of the Treasury was "far from feeling objection to further legislation" on the subject of selecting and removing "candidates for inferior employments"); Andrew Johnson, Message to the Senate, Mar. 2, 1867, *in* 5 *Messages & Papers*, *supra*, at 3694 (noting that the power to remove "applies equally to every other officer of the government *appointed by the President, whose term of duration is not specially declared*" (emphasis added)).

* * *

The Framers of the Constitution believed Congress should have the authority to regulate federal offices and dictate the terms on which the removal of inferior officers could be made. Since then, Congress has exercised this power to prevent

patronage, protect employees' free speech, and determine how important immigration decisions would be adjudicated, as the next Section discusses.

## II. Congress Has Regulated the Appointment and Removal of Inferior Officers Since the Founding.

**A.** The removal of inferior officers has long been the subject of congressional regulation. Early in the nation's history, both Congress and the President understood that the removal power was something to be granted—it had to be specified or it did not exist. Thus, despite the "dominant pattern" of legislative silence on removal in the early Republic, Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1776 (2023), whenever Congress gave officers fixed terms, it took pains to specify that they were removable at "pleasure," *see* Act of Sept. 24, 1789, ch. 20, § 27, 1 Stat. 73, 87; *see also* Act of Feb. 27, 1801, ch. 15, § 7, 2 Stat. 103, 106; Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582; Act of July 2, 1836, ch. 270, § 33, 5 Stat. 80, 87-88. Presidential commissions for these officers also indicated that service was "during pleasure." *See generally* Christine Kexel Chabot, *The Interstitial Executive: A View from the Founding* 52 B.Y.U. L. Rev. (forthcoming 2027), https://dx.doi.org/10.2139/ssrn.6156786. When presidents issued commissions for the few officers who were not removable at pleasure, such as the commissioners of the Revolutionary War debt, they removed the "during pleasure"

language and instead indicated that the officers would serve for a fixed term. *Id.* at 30-34.

As the nineteenth century progressed, Congress began regulating removals more frequently. It conferred tenure "during good behaviour," Act of Feb. 24, 1855, ch. 122, § 1, 10 Stat. 612, 612 (Court of Claims judges), demanded "reasons" for removals, Act of June 3, 1864, ch. 106, § 1, 13 Stat. 99, 100 (Comptroller of the Currency), and required court-martials before removal, Act of July 13, 1866, ch. 176, § 5, 14 Stat. 90, 92 (military officers).

After the Civil War, Congress took aim at the "spoils system," in which lawmakers "us[ed] the public offices openly and continuously as ammunition in party warfare," and distributed appointments as "spoils" to the victors of political contests. Carl Russell Fish, *The Civil Service and the Patronage* 155, 79 (1905). By many accounts, the system had produced a predictable diminution of public services. It also imposed burdens of "intolerable proportions" on the presidency, causing "unrelenting pressure brought by seekers of public office," Paul P. Van Riper, *History of the United States Civil Service* 50-51 (1958), and leading the chief executive to cede control of many appointments to party leaders, Fish, *supra*, at 165.

It was this situation that led Congress to develop the civil service system. Van Riper, *supra*, at 51, 66-69. In the Pendleton Act of 1883, legislators sought to

limit the "mixing of partisan politics and routine federal service," *Letter Carriers*, 413 U.S. at 557, providing that prospective employees should be evaluated by competitive exam, prohibiting political discharges for covered employees, and barring employees from "coerc[ing] the political action of any person or body," Pendleton Act, Pub. L. No. 47-27, §§ 7, 2, 22 Stat. 403, 404-06 (1883). By many reports, the law produced results within decades, creating "more equal sharing of positions between the different states and parties." Fish, *supra*, at 236.

The Act laid the foundation for the modern civil service and provided the mechanisms for its growth. It allowed the President and the Civil Service Commission to designate which positions would fall within the civil service. Pendleton Act, § 6, 22 Stat. at 406; *see also* Act of March 3, 1871, ch. 114, § 9, 16 Stat. 495, 515. As a result of various exercises of this authority, nearly half of federal positions were included within the civil service merit system by 1896, so that "the spoils system was on the defensive." Van Riper, *supra*, at 130.

As the civil service system expanded, the executive further protected inferior officers and employees from arbitrary removal. In 1897, President McKinley issued an executive order preventing removals of civil servicemembers without "just cause," "full notice," and "opportunity to make defense." *United States v. Wickersham*, 201 U.S. 390, 398 (1906); *see id.* (concluding that the removal of a covered employee in violation of the Order "was without legal effect"); Task Force

on Personnel and Civil Service, *Report on Personnel and Civil Service Prepared for the Commission on Organization of the Executive Branch of the Government* 187, 188 n.30 (1955) (describing a rule preventing removal for "political reasons" applicable even to positions that were exempt from examination).

Soon, Congress wrote these protections into law. In 1912, seeking to prevent removal of federal employees for "protesting," 48 Cong. Rec. 10732 (1912) (Sen. LaFollette), publicizing government mismanagement, *id.*, and petitioning Congress, *id.* at 10728 (Sen. Reed), Congress passed the Lloyd-LaFollette Act. That Act provided that "no person in the classified Civil Service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service." *Bush v. Lucas*, 462 U.S. 367, 383 (1983) (quoting Lloyd-La Follette Act of 1912, Pub. L. No. 62-336, § 6, 37 Stat. 539, 555 (1912)). The statute also entitled employees to notice of charges regarding their removal and an opportunity to contest those charges in writing—an important component of the Act's protection against "politically motivated removals," *id.* at 382-83, and preservation of "the right of free speech," *id*. at 384 (quoting H.R. Rep. No. 62-388, at 7 (1912)).

These developments were buttressed by the passage of the Civil Service Reform Act of 1978 (CSRA). In that Act, Congress sought to "balance the legitimate interests of the various categories of federal employees with the needs of

sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988); *see* Civil Service Reform Act, Pub. L. No. 95-454, §§ 7503, 7513, 92 Stat. 1111, 1135-36 (1978). While agencies would generally need to use the "efficiency of the service" standard to justify removals, they could use a more streamlined set of procedures for actions based on an employee's "unacceptable performance." *Fausto*, 484 U.S. at 446-48. In this way, the Act sought to "simplify and expedite" the procedures for dismissing ineffective federal employees while protecting against arbitrary or politically motivated removal. *See* S. Rep. No. 95-969, at 2-9 (1978) (describing a desire for treatment "on the basis of competence rather than political or personal favoritism").

**B.** Immigration adjudicators are not exempt from this long history of regulating inferior officers. Early immigration laws allowed for the hiring of federal officers to enforce immigration law. *See, e.g.*, Immigration Act of 1891, ch. 551, §§ 7-8, 26 Stat. 1084, 1085 (1891) (creating an "office of superintendent of immigration" and permitting the hiring of "clerks" and "inspection officers"). Both Congress and the executive embraced the conclusion that the civil-service rules should extend to their positions. This would ensure that "only the most efficient and experienced clerks and officials [w]ould be employed in such an important branch of the Governmental service" and "placed in contact with hundreds and often thousands of persons who should be handled with the utmost

tact and good judgment." Immigration Service, Annual Report of the Commissioner-General of Immigration 28 (1895); 31 Cong. Rec. 164-65 (1897) (statement of Sen. Lodge) (describing the beneficial impact of the "present system of the civil service" on the employment of immigrant inspectors); *see* Act of March 3, 1903, ch. 1012, Pub. L. No. 57-102, § 24, 32 Stat. 1213, 1219 (mandating the application of civil-service hiring provisions to "immigrant inspectors" in the Department of Commerce and Labor).

As the immigration system developed, the adjudicatory officers within immigration agencies began to command Congress's attention. In 1952, Congress created the position of "special inquiry officer" (SIO) and required these SIOs to be "specially qualified to conduct specified classes of proceedings." Immigration and Nationality Act of 1952, ch. 477, Pub. L. No. 414, 66 Stat. 163, 171, § 101(b)(4). Although most SIOs were exempt from civil-service hiring rules because they were attorneys, *see* Rawitz, *supra*, at 458; Alexandra Williams*, The Case for an Article I Immigration Court: How it Started, Why It's Needed More Than Ever, Moving Forward,* 2 The Green Card, 14 n.22 (Summer 2019) (IJs hold "career attorney positions" under "Schedule A"), their positions were constantly subject to congressional regulation. Indeed, Congress repeatedly considered proposals to insulate SIOs—later called immigration judges, *see* Immigration Judge, 38 Fed. Reg. 8590 (Apr. 4, 1973)—from the officers responsible for

enforcing the nation's immigration laws throughout the twentieth century, Williams, *supra*, at 11 (describing Congress's consideration of proposals "for an independent immigration court"). Notably, many of these proposals involved changes to the tenure of IJs. *See, e.g.*, Civil Liberties Restoration Act, H.R. 1502, § 204, 109th Cong. (2005).

While considering proposals relating to the independence of immigration adjudicators, Congress also gave these officers certain rights pertaining to their removal. In 1990, it enacted the Civil Service Due Process Amendments, under which employees who were hired outside of the civil service merit examination process, including IJs, would still receive certain rights when subject to removal or other adverse employment actions. *See* Pub. L. No. 101-376, § 2, 104 Stat. 461, 462 (1990). In doing this, Congress made clear that federal employees who were exempt from competitive examination should "feel no less secure in their positions than competitive service employees," and enjoy "the same right to be free from arbitrary removal." H.R. Rep. No. 101-328, at 4 (1989). These provisions also ensured that IJs would enjoy "due process rights in removal actions," *id.* (explicitly describing the law's applicability to "Schedule A positions includ[ing] attorneys"), and confirmed the longstanding assumption that Congress could regulate the appointment and removal of IJs.

## III. The Supreme Court Has Confirmed Congress's Power to Govern the Removal of Inferior Officers.

**A.** Consistent with this long history, the Supreme Court has repeatedly recognized Congress's power to govern the removal of inferior officers. In *Ex parte Hennen*, 38 U.S. 230 (1839), the Court made a distinction between the President's power to remove principal and inferior officers. *Id.* at 260. *Hennen* concerned a judge's removal of a clerk who was appointed under a statute that did not specify how the clerk could be removed. *Id.* at 257. The Court distinguished the clerk from "officers appointed with the concurrence of the Senate," *id.* at 259, and disavowed any suggestion that the President could presumptively remove inferior officers, *id.* at 260 ("the President has certainly no power to remove"). The removal of inferior officers, the Court explained, depends "upon the authority of law," and thus entails "an inquiry into the meaning and intention of the statute" creating the office. *Id.* The Court then supplied a default rule that would apply "[i]n the absence of . . . statutory regulation": unless Congress provided otherwise, the Court would "consider the power of removal as incident to the power of appointment." *Id.* at 259.

In *United States v. Perkins*, 116 U.S. 483 (1836), the Court reiterated Congress's power to "limit and restrict the power of removal as it deem[ed] best for the public interest" in the case of inferior officers. *Id.* at 485. There, the Court upheld a statute providing that certain inferior officers could not be dismissed

"except upon" the "sentence of a court-martial." *Id.* at 484. Once again, the Court distinguished Congress's power to regulate the removal of an inferior officer from "the power of removal . . . of those officers who are appointed by the President by and with the advice and consent of the Senate." *Id.* It explicitly denied the existence of any "constitutional prerogative of appointment to offices independently of the legislation of Congress," confirming that Congress's authority to "vest the appointment [of inferior officers] implies authority to limit, restrict, and regulate the[ir] removal." *Id.* at 485.

The Court has affirmed the continuing relevance of the *Perkins* rule. In *Myers*, it explained that the "legislative power" to regulate "removals in the case of inferior executive officers" flows from the Appointments Clause itself. 272 U.S. at 127. Just as the "power to remove" is traditionally considered "an incident of the power to appoint," "the power of Congress to regulate removals" is "incidental to the exercise of its constitutional power to vest appointment[]" of officers in the heads of departments. *Id.* at 161; *Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988) (observing that "*Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the

head of a department" and citing *Perkins*); *id.* at 724 n.4 (Scalia, J., dissenting) ("*Perkins* is in no way inconsistent with my views").

Even in more recent cases, the Supreme Court has explained that any presidential power of removal does not extend to inferior officers. In *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), for example, the Court held that a for-cause removal restriction on the head of the Consumer Financial Protection Bureau violated the separation of powers because the Bureau was "led by a single Director and vested with significant executive power." *Id.* at 220. Distinguishing the cases of inferior officers, who had "limited jurisdiction and tenure and lack[ed] policymaking or significant administrative authority," *id.* at 217-18 (citation omitted), the Court held that Congress could not restrict the removal of the director of a single-director agency, reasoning that the single-director structure posed an "impediment to the President's oversight of the Executive Branch," by "foreclos[ing] certain indirect methods of Presidential control," *id.* at 215, 225; *see also Collins v. Yellen*, 594 U.S. 220, 250-51, 256 (2021) (declining to "revisit our prior decisions" involving inferior officers when invalidating removal provision concerning "the head of an agency with a single top officer" (quotation marks omitted)).

The Supreme Court has only once invalidated a removal restriction on an inferior officer who was not subject to Senate confirmation. *Free Enter. Fund*, 561

U.S. at 494-95. In *Free Enterprise Fund*, the Court invalidated a "highly unusual" statute that "committ[ed] substantial executive authority" to inferior officers who could only be removed for cause by Securities Exchange Commission commissioners who themselves enjoyed for-cause removal protection. *Id.* at 505; *id.* at 484 (explaining that the President was "restricted in his ability to remove a principal officer, who [was] in turn restricted in his ability to remove an inferior officer"). There, the Court focused on the "unusually high standard" protecting the officers from removal, as well as the "significant independence" and authority that they enjoyed, *id.* at 503, 505-06. It was these features that led the Court to conclude that the scheme was invalid because the inferior officer could not be held "fully accountable" by the executive. *Id.* at 496.

Given the "novel" and "unusual" nature of the statute, the Court took pains to cabin its decision to cases in which inferior officers wield "substantial executive authority" and enjoy "significant" powers." *Id.* at 505-07; *see also FCC v. Consumers' Rsch.*, 606 U.S. 656, 696 (2025) (describing *Free Enterprise Fund* as concerning officers with "super-charg[ed] . . . independence"). Indeed, it explicitly confirmed that Congress generally has the "power to impose good-cause

restrictions" on the removal of inferior officers. *Free Enter. Fund*, 561 U.S. at 494-95.

In these cases, the Court explicitly recognized that any presidential power of removal does not extend to "what is colloquially known as the civil service system." *Id.* at 507. In *Free Enterprise Fund*, the Court emphasized that it was not making a "general pronouncement[]" that "two levels of good-cause tenure" are always unconstitutional, and it did not question the "civil service system within independent agencies." *Id*. at 505-07. The Court explained that civil servants, even those within independent agencies, did not "enjoy the same significant and unusual protections from Presidential oversight" as the inferior officers at issue in that case. *Id*. at 506 (discussing 5 U.S.C. §§ 2302(a)(2)(B), 3302, 7511(b)(2)). And in *Myers*, when the Court held that Congress could not reserve a role for itself in the removal of Senate-confirmed inferior officers, it made clear that its holding "work[ed] no practical interference with the merit system" because that system exempted officers appointed by the president with the consent of the Senate, *Myers*, 272 U.S. at 173-74; *see also* Amy J. Wildermuth & Peyton C. Baker, *Protecting Perkins: Removal, Supervision, and Article II*, at 38 (Mar. 19, 2026 draft), https://dx.doi.org/10.2139/ssrn.6447918 (describing Chief Justice Taft's rejection of a colleague's repeated suggestion that he "explicitly hold" in *Myers*

that Congress could not regulate the removal of inferior officers appointed by heads of departments).

**B.** Despite all of this, the Board read the Supreme Court's case law to prevent any "entity, including Congress or the Board" from "plac[ing] restrictions" on the Attorney General's ability to remove inferior officers, or even to "subject that decision [to remove an inferior officer] to subsequent review." Appx12. This is wrong.

The Board acknowledged that many inferior officers can be protected from removal under the Supreme Court's case law, *see id.* at 13, but held that Congress can only regulate a *subset* of "inferior officers"—those with "limited duties and no policymaking or administrative authority," *id*. at 13-15 (citing *Seila*, 591 U.S. at 218). Whether or not the Board was right to conclude that IJs would fall outside of this subset, *but see, e.g.*, *Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*, 144 F.4th 1315, 1343 (11th Cir. 2025) (ALJs whose decisions can be overturned by the Attorney General are inferior officers with "limited duties and no policymaking or administrative authority" (citation omitted)), it was wrong to conclude that *Seila Law* limited Congress's ability to regulate "inferior officers" in that way.

In *Seila Law*, the Supreme Court explained that Congress could constitutionally restrict the president's ability to remove "inferior officers with

limited duties and no policymaking or administrative authority." 591 U.S. at 218. And, contrary to the Board's conclusion, this sentence in the Court's opinion was describing inferior officers generally, not identifying a subset of inferior officers. After all, it later explained that an inferior officer is one whose "work is 'directed and supervised' by a principal officer," *id*. at 217 n.3, meaning that the authority of all inferior officers is limited relative to that of their supervisors, *see Kennedy*, 606 U.S. at 765 (emphasizing that an inferior officer cannot "render a final decision on behalf of the United States without review by a principal officer" (quotation marks omitted)), and their "duties" are inherently constrained by supervisory review, *see United States v. Arthrex,* 594 U.S. 1, 23 (2021) (explaining that inferior officers "exceed[] the permissible scope of their duties" under the Appointments Clause when they can issue an unreviewable "final decision"). That is why, in other parts of the opinion, the Court described an "exception for *inferior* officers," without qualification. *Seila*, 591 U.S. at 217 (citing *Perkins*, 116 U.S. at 485, and *Morrison*, 487 U.S. at 662-63).

The Board's reading of *Seila Law* is also inconsistent with *Morrison*—the case the Court was summarizing when it used the duties-and-authority language. In *Morrison*, the Court upheld a provision granting good-cause tenure protection to an independent counsel appointed by a court to investigate and prosecute particular crimes. The Court held that the independent counsel was an "inferior officer,"

relying on the fact that she was "empowered . . . to perform only certain, limited duties," did not formulate policy, and was "limited in jurisdiction." *Morrison*, 487 U.S. at 671-72. Because the independent counsel was an inferior officer, the Court held that the provisions restricting the Attorney General's ability to remove her did not "impermissibly interfere[] with the President's exercise of his constitutionally appointed functions." *Id*. at 685-94; *id*. at 691 (noting that the independent counsel was "an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority"). That is why the Court underscored Congress's authority to "limit, restrict, and regulate the removal" of "inferior officers [appointed by] the heads of departments." *Id.* at 689 n.27 (quoting *Perkins v. United States*, 20 Ct. Cl. 438, 444 (1885)). In other words, it referred to the independent counsel's duties and authority to reason that she *was* an inferior officer, not to articulate a constitutionally significant subset of inferior officers to which she belonged.

This reading of *Seila Law* is consistent with the Supreme Court's decision in *Arthrex.* There, the Court held that Congress could not vest the appointment of patent judges in the Secretary of Commerce because their decisions were not sufficiently reviewable by a principal officer. *Arthrex*, 594 U.S. at 14-17. But it held that those judges could "properly function as inferior officers" so long as a principal officer had a statutory "means of reviewing" their decisions, *id.* at 25,

even if they were not removable at will, *id.* at 26 (declining to invalidate for-cause removal provision); *see also Kennedy*, 606 U.S. at 765 (citing *Arthrex* to explain that "[i]f an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will"); *McIntosh v. Dep't of Def.,* 53 F.4th 630, 640-41 (Fed. Cir. 2022) (rejecting Appointments Clause challenge to a "statutory structure [that] mirror[ed] that of the PTAB following the *Arthrex* remedy," because "even if . . . administrative judges [were] protected by the § 7513 removal standard, they [were] subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate" (quotation marks omitted)).

The Board acknowledged *Arthrex*, but distinguished it because of what it viewed as "the limited and conditional review of immigration judge decisions." Appx15 n.6. But *Arthrex* itself referenced the Executive Office of Immigration Review as an example of an agency in which inferior officers' decisions are subject to review by a "superior executive officer." *Arthrex*, 594 U.S. at 20. And the Supreme Court has explained that any opportunity for principal officer review—even if that review is "limited" or "conditional" (and it is not)—is sufficient for Appointments Clause purposes. It may be true that "many circumstances exist where an immigration judge's decision will remain the final decision of the United States" if not appealed or reviewed, Appx15, but what

matters is that the Attorney General has the "statutory authority to directly review—and, if necessary, block" the decision, *Kennedy*, 606 U.S. at 766; *id*. at 767-68 (a principal officer "'need not review every decision'" (quoting *Arthrex*, 594 U.S. at 27)); *see* Hon. Alberto R. Gonzales & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841, 856 (2016) (describing the Attorney General's authority to review IJ decisions, including "de novo review of factual findings and the receipt of additional evidence not considered by the Board or the [IJ]"); Pet'rs Br. 51-54.

Moreover, section 7513's "efficiency-of-the-service" standard is significantly less constraining than the "rigorous" limitations on removal at issue in *Free Enterprise Fund*—the one case in which the Court invalidated a provision restricting the removal of non-principal officers who were not subject to Senate confirmation. *Free Enter. Fund*, 561 U.S. at 503; *compare id.* (noting that the statutory scheme provided that inferior officers could only be removed upon willful violations of certain laws, willful abuses of authority, or "unreasonable failure to enforce compliance—as determined in a formal Commission order"), *with Exum v. Dep't of Homeland Sec.*, 446 F. App'x 282, 283-84 (Fed. Cir. 2011)

(per curiam) (upholding removal of immigration adjudicator for refusing to follow agency policy under the efficiency-of-the-service standard).

Nor does section 7513 create a "novel" standard with no "historical precedent." *See Free Enter. Fund*, 561 U.S. at 505 (quotation marks omitted). Indeed, the Supreme Court declined to invalidate exactly the same removal standard in *Arthrex*, 594 U.S. at 26, and has acknowledged its historical pedigree, *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) ("the language 'such cause as will promote the efficiency of the service' . . . does not appear on a clean slate").

* * *

The Board's decision is at odds with Supreme Court precedent and "historical practice," *Seila*, 591 U.S. at 204, and it undermines Congress's constitutional authority over inferior offices. This Court should reverse it.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the Merit Systems Protection Board.

Respectfully submitted,

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra
Brianne J. Gorod
Smita Ghosh
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: June 8, 2026

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 26-1575

**Short Case Caption:** Jackler v. DOJ

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6979 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 06/08/2026

Signature: /s/ Elizabeth B. Wydra

Name: Elizabeth B. Wydra