**Case No. 2026-1575**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners*,

v.

DEPARTMENT OF JUSTICE, DIRECTOR OF THE OFFICE OF PERSONNEL MANAGEMENT,

---

*Respondents*.

On Petition for Review from the
Merit Systems Protection Board in No. CF-0752-26-0069-I-1.

---

# (*Corrected*) BRIEF OF LAWYERS DEFENDING AMERICAN DEMOCRACY AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER's PETITION FOR REVERSAL OF THE DECISION OF THE MERITS SYSTEM PROTECTION BOARD

---

Aderson B. Francois
Georgetown Law Center
Civil Rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001-2022
(202) 661-6721
Aderson.francois@georgetown.edu

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Counsel for amicus Lawyers Defending American Democracy certifies the following:

1. The full names of every party represented by me are: Lawyers Defending American Democracy.

2. The full names of the real parties in interest represented by me are:
   **Not Applicable**.

3. Parent corporations and publicly held companies that own 10 percent or more of the stock of the parties represented by me.
   **Not Applicable**.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:
   **Not Applicable**.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. See Fed. Cir. R. 47.4(a)(5) and 47.5(b).
   **Not Applicable**.

*/s/ Aderson B. Francois*
Aderson B. Francois
Georgetown Law Center
Civil Rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001-2022
(202) 661-6721
Aderson.francois@georgetown.edu

# TABLE OF CONTENTS

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ........ iii**

**TABLE OF AUTHORITIES ........ ivv**

**STATEMENT OF AMICUS CURIAE ........ 1**

**ARGUMENT ........ 2**

**I. The Founding Generation Enshrined the Principle of Loyalty to the Law as an Overriding Obligation of All Officers ........ 4**

**II. The Spoils System, Which Arose in the Absence of a Statutory Scheme to Ensure Merit-Based Principles, Demonstrated the Dangers of Politicized Federal Employment and Underscored the Need for Reform ........ 6**

**III. For Nearly 150 Years, Congress Has Rejected Patronage in Favor of a Merit-Based Civil Service to Ensure Competence, Stability, and Integrity ........ 8**

A. The Pendleton Act and Early Reform Efforts ........ 8

B. The Civil Service Reform Act of 1978 ........ 10

C. The Civil Service Due Process Amendments of 1990 ........ 14

**IV. The CSRA Is a Valid Exercise of Congress's Article I Authority ........ 15**

**V. Abrogation of the CSRA Would Impose Far-Reaching Harms ........ 20**

A. Without Statutory Protections, Millions of Federal Employees Would Be Subject to Arbitrary and Politicized Personnel Actions ..21

B. Abrogation of the CSRA Would Deny the Public its Right to a Professional, Efficient, and Apolitical Civil Service ........ 24

**VI. Conclusion: The Court Should Preserve the Viability of the CSRA by Reversing the Board's Decision.................................. 31**

**CONCLUSION ....................................................................... 33**

**CERTIFICATE OF COMPLIANCE ................................................... 34**

**CERTIFICATE OF SERVICE ......................................................... 35**

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to FED. R. APP. P. 26.1, *Amicus Curiae* Lawyers Defending American Democracy (LDAD) submits this supplemental certificate of interested persons to provide the required information as to their corporate status and affiliations and fully disclose all those with an interest in this brief. LDAD is a non-partisan tax-exempt 501(c)(3) organization. LDAD is not owned by any parent corporation and no publicly held corporation has 10% or more ownership.

Pursuant to FED. R. APP. P. 29(a)(4)(D), *Amicus Curiae*, through their undersigned counsel, hereby certifies that, in addition to the persons and entities listed in the parties' certificates, the following entity has an interest in the outcome of this case.

**Amicus Curiae**

Lawyers Defending American Democracy

**Counsel for Amicus Curiae**

Aderson B. Francois

These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*/s/ Aderson B. Francois*

# TABLE OF AUTHORITIES

## CASES

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ....................22

*Kendall v. United States*, 37 U.S. 524 (1838) ....................19, 20

*Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748 (2025) ....................24

*Little v. Barreme,* 6 U.S. 170 (1804) ....................20

*Morrison v. Olson*, 487 U.S. 654 (1988) ....................23

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) ....................23

*United States v. Arthrex, Inc,* 594 U.S. 1 (2021). ....................24

*United States v. Perkins,* 116 U.S. 483 (1886). ....................22

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579 (1952) ....................21

## STATUTES

5 U.S.C. §§ 2301–2302 ....................13, 14, 17

5 U.S.C. §§ 7511–7513 ....................13, 14

Civil Service Due Process Amendments of 1990. Pub. L. No. 101-376, 104 Stat. 461 (codified at 5 U.S.C. § 7513). ....................17

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 .................... 3

Oath Act of 1789, ch. 1, 1 Stat. 23 (1789) .................... 5

Pendleton Civil Service Reform Act, Act of Jan 16, 1883 22 Stat. 403–07 ....................10

## OTHER


Adam Goldman, *The F.B.I. Is Using Polygraphs to Test Officials' Loyalty*, The New York Times (Jul. 10, 2025) ....................................27

Akhil Reed Amar, *America's Constitution: A Biography* 192–94 (2005). 5

American Historical Association, *History of the Federal Civil Service* ... 8

Andrew Kent et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019)...........................................................................5, 6

Ari Hoogenboom, *Outlawing the Spoils: A History of the Civil Service Reform Movement, 1865–1883* (University of Illinois Press 1961)....... 9

Carl R. Fish, *The Civil Service and the Patronage* 105-130 (New York Longmans, Green, and Co., 1905)....................................................... 7

Catherine L. Fisk, *Democracy and a Nonpartisan Civil Service*, 67 Ariz. L. Rev. 629 (2025) ............................................................................. 4

Chris Piper, *At-Will Employment: What the Federal Government Can Learn From States*, Partnership for Public Service (January 21, 2026) ..............................................................................34, 35, 36

Civil Service Reform Act of 1978: Hearings on S. 2640 Before the S. Comm. on Governmental Affairs, 95th Cong. (1978) ..........................16

Daniel P. G. Gibbs, *Civil Service Reform, Self-Selection, and Bureaucratic Performance* 32 (2020). ...............................................34

David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801* (1997) ........................................................................... 5

Eloy Oliveira et al., *What Does the Evidence tell us About Merit Principles and Government Performance?,* 102(2) Public Administration, 668 (2024)..............................................................32

*Expertise Replaced: The Politicization of Environmental, Health and Science Agencies*, Partnership for Public Service (May 13, 2026), ......38

H.R. Rep. No. 101-328 (1989) ...............................................................18

H.R. Rep. No. 95-1403 (1978). ............................................ 2, 13, 14, 15

H.R. Rep. No. 95-1717 (1977) ............................................................21

H.R. Rep. No. 95-2862 (1977) ............................................................21

Herbert A. Simon, *Administrative Behavior* (The Free Press, 4th ed. 1997) (1947)............................................................................11

John Adams, *Thoughts on Government* (Apr. 1776), *reprinted in Papers of John Adams* (Robert J. Taylor ed., 1979). ......................................25

*Justice Department struggles as thousands exit—and few are replaced*, A.B.A. (Nov. 19, 2025)..............................................................28

Nicholas Ryan Bednar, *Bureaucratic Autonomy and the Policymaking Capacity of United States Agencies, 1998-2021*, 112 Pol. Sci. Rsch. & Methods 652 (2024)...................................................................32

Partnership for Public Service, *Celebrating 143 Years of the Merit-Based Civil Service: the Pendleton Act*, (last visited May 27, 2026) .............11

Paul P. Van Riper, *History of the United States Civil Service* (Row, Peterson and Company 1958). ..........................................................10

*Records of the Federal Convention of 1787* (Max Farrand ed., 1911).....20

S. Rep. No. 95-969 (1978)........................................................passim

Sean Gailmard & John W. Patty, *Slackers and Zealots: Civil Service, Policy Discretion, and Bureaucratic Expertise*, 51 Am. J. Pol. Sci. 873 (2007) ..........................................................................33, 37

Special Message to the Congress on Civil Service Reform (Mar. 2, 1977) ..............................................................................................16

Statement on Signing S. 2640 into Law (Oct. 13, 1978)........................16

The Federalist No. 76 (Alexander Hamilton). ....................................... 2

*The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 49 Op. O.L.C. (Sept. 26, 2025), .......... 37

Thomas A. Berry et al., *The Pentagon's Retaliation Campaign Against Senator Kelly Is Unconstitutional*, Cato Institute (May 6, 2026) .......... 28

**REGULATIONS**

5 C.F.R. §210 (2026) .......... 25

5 C.F.R. §212 (2026) .......... 25

5 C.F.R. §213 (2026) .......... 25

5 C.F.R. §302 (2026) .......... 25

5 C.F.R. §432 (2026) .......... 25

5 C.F.R. §451 (2026) .......... 25

5 C.F.R. §752 (2026) .......... 25

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 18 .......... 19

U.S. Const. art. VI, cl. 2. .......... 20

U.S. Const. art. VI, cl. 3. .......... 4, 20

## STATEMENT OF *AMICUS CURIAE*

*Amicus Curiae* Lawyers Defending American Democracy (LDAD) is a non-profit, nonpartisan organization devoted to: encouraging the legal profession to enforce and uphold principles of democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them. Issues addressing executive authority and agency interpretation of statutes, especially when that interpretation contravenes decades of policy and practice, are of particular concern for LDAD.

No party's counsel has authored this brief either in whole or in part; no party or its counsel contributed money that was intended to fund the preparation or submission of the brief; and no person other than the amicus curiae or its members has contributed money intended to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E). Moreover, Petitioner and Respondent consent to the filing of this brief. Fed. R. App. P. 29(c).

*"It will readily be comprehended, that a man who had himself the sole disposition of offices, would be governed much more by his private inclinations and interests, than when he was bound to submit the propriety of his choice to the discussion and determination of . . . the legislature."*

Alexander Hamilton, The Federalist No. 76

*"The American public expects and deserves a nonpartisan career civil service."*

H.R. Rep. No. 95-1403, at 408 (1978).

## ARGUMENT

This case implicates the continued viability of a longstanding legislative framework— grounded in core constitutional principles of checks and balances and endorsed on a bipartisan basis for more than a century— critical to the effective functioning of our nation's government. As this brief describes, the Board's decision is inconsistent with our country's basic constitutional design and a longstanding and widespread condemnation of a "spoils system" as the basis for federal employment.

For more than a century, Congress has worked to replace a patronage-driven federal workforce with a professional civil service

grounded in merit, expertise, and political neutrality. That effort emerged from hard historical lessons. A system that tied public employment to partisan loyalty proved corrosive to effective governance, undermining both public and administrative competence. The modern civil service framework—culminating in the Civil Service Reform Act of 1978 ("CSRA") and subsequent statutory refinements—reflects a deliberate and sustained legislative judgment that federal employment must be insulated from arbitrary or politically motivated personnel actions. Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.).

This amicus brief discusses the history of those legislative efforts —from the Oath Act of 1789 to the Civil Service Reform Act of 1978— and the enduring bi-partisan, cross-branch rejection of a politicized civil service system in favor of a merit-based system to promote professionalism, efficiency and public confidence. It also addresses the potentially devastating and wide-ranging impact of the Board's decision in this case.

## I. The Founding Generation Enshrined the Principle of Loyalty to the Law as an Overriding Obligation of All Officers

From our nation's founding onward, the framers and subsequent legislators have acted to ensure that the executive branch operates on principles of law, not on the personal or partisan loyalty that is emblematic of monarchies. *See* Catherine L. Fisk, *Democracy and a Nonpartisan Civil Service*, 67 Ariz. L. Rev. 629, 651 (2025) ("[T]he notion that government employees below the top levels should be nonpartisan is as old as the Republic").

The Constitution, for example, requires all executive and judicial officers to take an oath not to a person but to the law, "to support this Constitution." U.S. Const. art. VI, cl. 3. To implement this requirement, the First Congress passed the Oath Act of 1789, requiring federal officials to pledge fidelity solely "to the Constitution of the United States." Ch. 1, 1 Stat. 23 (1789). The oath's simple wording was intentional. Lawmakers wanted to avoid oaths that pledged loyalty to a person or party, fearing such pledges could be used to consolidate power or punish dissent. *See* David P. Currie, *The Constitution in Congress:*

*The Federalist Period, 1789–1801* 27–28 (1997); *See also* Andrew Kent et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019); Akhil Reed Amar, *America's Constitution: A Biography* 192-94 (2005).

It is important to appreciate the gravity of an oath for the Framers in understanding the significance of including it in the Constitution and legislation immediately after its ratification. As Andrew Kent, Ethan Leib, and Jed Shugerman note in their comprehensive historical analysis of the Take Care Clause and the Presidential Oath:

> Given the ubiquity of oaths of office in Anglo-American law, and widespread agreement that they should be included in the Constitution, it seems that many statesmen at the end of the eighteenth century still agreed with an earlier seventeenth-century author that an oath was "the safest knot of civil society, and the firmest band to tie all men to the performance of their several duties."

Kent et al, *supra* at 2124.

These early constitutional and legislative choices reflect a foundational principle that those who work for the federal government owe a duty to the Constitution that is free from personal or political

allegiance. Statutory protections that limit removals without cause—and instead require reasoned, lawful grounds for adverse actions—are thus firmly rooted in a tradition dating to the founding era.

## II. The Spoils System, Which Arose in the Absence of a Statutory Scheme to Ensure Merit-Based Principles, Demonstrated the Dangers of Politicized Federal Employment and Underscored the Need for Reform

Despite this early commitment to nonpartisan duty, in the early decades of the Republic a patronage-based system emerged in which public offices were distributed based on political loyalty. This "spoils system," associated most prominently with the Jacksonian era, treated government service as a reward for partisan support rather than as a public trust grounded in competence and responsibility to the public. *See* Carl R. Fish, *The Civil Service and the Patronage* 105-130 (New York Longmans, Green, and Co., 1905), https://archive.org/details/civilservicepatr00fishrich/civilservicepatr00fishrich/page/n11/mode/2up (last visited May 27, 2026).

The practical consequences were profound; the spoils system fostered instability, inefficiency, and corruption. Frequent turnover disrupted the continuity of government operations, and deprived agencies of institutional knowledge. Positions requiring technical expertise were filled without regard to qualifications, based on loyalty rather than competence, degrading administrative performance. Public administration became vulnerable to corruption, favoritism, and inefficiency. By the mid-nineteenth century, these problems were widely recognized as systemic, and criticism had become widespread. Reformers emphasized that modern governance required technical expertise and continuity—qualities incompatible with a system of wholesale political replacement. *See History of the Federal Civil Service,* American Historical Association (last visited May 27, 2026) https://www.historians.org/resource/history-of-the-federal-civil-service/ ) (noting that the spoils system was "chaotic, corrupt, and inefficient").

The assassination of President James Garfield in 1881 by a frustrated individual seeking political appointment crystallized public concern and accelerated reform efforts. This event underscored the dangers of a system in which access to government employment was

tied to political patronage rather than merit. *See* Ari Hoogenboom, *Outlawing the Spoils: A History of the Civil Service Reform Movement, 1865–1883* 223–45 (University of Illinois Press 1961).

## III. For Nearly 150 Years, Congress Has Rejected Patronage in Favor of a Merit-Based Civil Service to Ensure Competence, Stability, and Integrity

### A. The Pendleton Act and Early Reform Efforts

Congress responded to mounting concerns over patronage by enacting the Pendleton Civil Service Reform Act of 1883. The Act established competitive examinations for certain federal positions and provided protection against removal for political reasons. *See* Pendleton Act, 1883 22 Stat. at 403–07. Although the Pendleton Act initially covered only a small percentage of federal employees, it created the institutional framework for a merit-based system. Over time, Presidents of both parties expanded protections through executive orders, and Congress on a bi-partisan basis enacted additional protections reinforcing merit principles. *See* Paul P. Van Riper, *History*

*of the United States Civil Service* 86–135 (Row, Peterson and Company 1958).

As a result of this reform, the federal civil service evolved into a professionalized workforce characterized by standardized hiring, promotion, and disciplinary procedures. Scholars of public administration widely recognized that merit systems promote efficiency, neutrality, and accountability. Herbert A. Simon, *Administrative Behavior* 37–54, *The Free Press* (4th ed. 1997). By the mid-twentieth century, merit principles had become deeply embedded in federal personnel practices, reflecting a broad consensus that government functions are best carried out by trained professionals insulated from partisan pressures. Partnership for Public Service, *Celebrating 143 Years of the Merit-Based Civil Service: the Pendleton Act*, https://ourpublicservice.org/know-the-facts/blog/celebrating-143-years-of-the-merit-based-civil-service-the-pendleton-act (last visited May 27, 2026) (noting that the pre-1883 patronage system "bred corruption and did not serve Americans well," whereas the merit system by contrast "is a cornerstone of democracy and effective governance").

**B. The Civil Service Reform Act of 1978**

Although the Pendleton Civil Service Reform Act of 1883 established the foundational principle of merit-based federal employment, it did not create a comprehensive system to implement and enforce that principle across the modern administrative state. By the 1970s, federal personnel law had developed into a fragmented patchwork of statutes, regulations, and agency practices that produced inconsistent results, insufficient accountability, and inadequate protection against arbitrary or politically motivated actions.

Congress enacted the CSRA to replace that disjointed framework with a unified system governing federal employment. *See* S. Rep. No. 95-969, at 2–3 (1978) (describing the merit system's origins as a response to the spoils system and emphasizing the need for modernization); H.R. Rep. No. 95-1403, at 3–4 (1978) (identifying systemic inefficiencies and lack of accountability). The CSRA codified merit system principles, defined prohibited personnel practices, and established specialized institutions to ensure consistent enforcement. *See* 5 U.S.C. §§ 2301–2302, 7511–7513. In doing so, Congress converted

the merit system from an aspirational framework into an enforceable statutory regime.

Legislative history confirms that Congress viewed merit protections as essential to effective governance. Mindful of both executive branch equities and the need for an apolitical service, Congress sought to balance managerial flexibility in personnel decisions with robust protections against removals based on political loyalty, personal favoritism, or other arbitrary considerations. *See* S. Rep. No. 95-969, at 2–3 (1978); H.R. Rep. No. 95-1403, at 408 (1978). The statute accordingly provides that employees be selected based on merit, and that they "should be protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." S. Rep. No. 95-969, at 21; *See also* 5 U.S.C. § 2301(b)(8).

To implement this framework, Congress created the Merit Systems Protection Board ("MSPB") as an independent adjudicatory body to review covered employment decisions. *See* 5 U.S.C. §§ 2301–2302, 7511–7513. The Senate Report explained that the merit system arose "in protest against the 19th century spoils system," under which

public employment depended on political allegiance rather than competence. It emphasized the importance of ensuring "a work force in which employees were selected and advanced on the basis of competence rather than political or personal favoritism." S. Rep. No. 95-969, at 2–3. Congress further stressed that "[t]he American public expects and deserves a nonpartisan career civil service." H.R. Rep. No. 95-1403, at 408.

Congress rejected the premise that political officials should control career staffing decisions, stating that "[t]he notion that elected and other political officials ought to 'determine who gets what jobs' in the career merit system is simply wrong." *Id.* at 395. The law reflects Congress's considered judgment that personnel actions must be governed by defined standards and subject to uniform review.

The executive branch exercised sustained leadership in advancing the CSRA; the statute is thus not an encroachment on executive authority but a product of it. President Carter identified civil service reform as a central priority of his Administration, transmitting a comprehensive reform proposal to Congress and repeatedly

emphasizing that merit-based protections were essential to effective executive management and public confidence in government. *See* Special Message to the Congress on Civil Service Reform (Mar. 2, 1977); Statement on Signing S. 2640 into Law (Oct. 13, 1978); S. Rep. No. 95-969, at 3–9. Senior executive-branch officials echoed that view in testimony and submissions to Congress, emphasizing that effective management reforms must be coupled with merit-based protections to ensure accountability and the faithful execution of the laws. *See* S. Rep. No. 95-969, at 3–5; *Civil Service Reform Act of 1978: Hearings on S. 2640 Before the S. Comm. on Governmental Affairs*, 95th Cong. (1978).

Immigration judges fall within this comprehensive framework as federal personnel exercising significant adjudicatory authority, which is especially important in order to ensure basic due process rights for those who participate in proceedings before them. Unless expressly exempted, they remain subject to the CSRA's merit system principles and procedural protections. *See* 5 U.S.C. §§ 2301–2302. Accordingly, removals must proceed under the CSRA's procedures and standards. Allowing removal outside that framework for reasons unrelated to performance or misconduct would undermine Congress's carefully

calibrated scheme and risk reviving the very patronage-based system the CSRA was enacted to eliminate.

### C. The Civil Service Due Process Amendments of 1990

Congress further strengthened procedural protections through the Civil Service Due Process Amendments of 1990. Pub. L. No. 101-376, 104 Stat. 461 (codified in relevant part at 5 U.S.C. § 7513). The amendments clarified and reinforced procedural rights of federal personnel in adverse action proceedings, including notice and an opportunity to respond. They were intended to achieve interagency consistency while strengthening confidence in the fairness and integrity of administrative adjudication. *See* H.R. Rep. No. 101-328, at 3–5 (1989).

Enacted with broad bipartisan support and signed into law by President George H.W. Bush without constitutional objection, the amendments reflected a shared judgment that incremental refinement of CSRA procedures was necessary to promote uniformity, predictability, and fundamental fairness. *See id.* Neither Congress nor the Executive Branch characterized the legislation as implicating

Article II removal authority or raising separation-of-powers concerns. Instead, the amendments were uniformly treated as uncontroversial technical refinements to the existing CSRA framework. Their broad support reflects an enduring bipartisan consensus of the executive and legislative branches that the statutory scheme is both necessary to the effective functioning of the federal civil service and consistent with constitutional design.

## IV. The CSRA Is a Valid Exercise of Congress's Article I Authority

Since our founding, legislators have relied on Article I authorities —in particular the Necessary and Proper Clause which explicitly authorizes Congress to legislate with respect to executive branch personnel and functions—to prescribe duties, channel discretion, and impose statutory limits on executive personnel as a means of ensuring faithful execution of the laws. U.S. Const. art. I, § 8, cl. 18. The Supreme Court has repeatedly upheld such enactments. *See, e.g.*, *Kendall v. United States*, 37 U.S. 524, 610–13 (1838) (upholding Congress's authority to impose mandatory duties on executive officers).

These authorities reflect a core constitutional premise: executive power is the power to execute the law, not to be unconstrained by it. The Oath Clause, referenced above, requires that all executive and judicial officers take an oath not to a person but to the law, specifically the Constitution. U.S. Const. art. VI, cl. 3. Article VI also establishes federal statutes as the "supreme Law of the Land," binding all federal officials. U.S. Const. art. VI, cl. 2. At the Constitutional Convention, delegates consistently defined executive authority as the duty to "carry into effect the laws," not as an independent prerogative. Records of the Federal Convention of 1787 65–67 (Max Farrand ed., 1911).

Consistent with that design, the Supreme Court has affirmed that executive officials must comply with statutory limits. In *Little v. Barreme*, the Court held that officers may not rely on presidential instructions that conflict with statute. 6 U.S. 170, 179 (1804). In *Kendall*, the Court warned that permitting executive officers to disregard statutory commands would effectively subject legislation to presidential control. 37 U.S. at 613. And in *Youngstown Sheet & Tube Co. v. Sawyer*, the Court reaffirmed that presidential authority "must stem either from an act of Congress or the Constitution itself." 343 U.S.

579, 585 (1952). Where, as here, the President's authority to hire federal employees stems not directly from the Constitution but rather from an act of Congress, it is inconsistent with this principle to insist that Congress may not limit the very authority it grants.[1]

While the Supreme Court has upheld Presidential removal without cause of certain principal officers, it also has long recognized that removal of inferior officers and employees is subject to congressional limitations. In *United States v. Perkins*, the Court held unequivocally that "when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict

[1] Legislative history makes clear that Congress viewed the CSRA as granting the President authorities beyond those directly conveyed by the Constitution. "The Senate Bill authorizes the President*, pursuant to his authority under this title*, to take such actions . . . as necessary to assure that personnel management . . . is based on and embodies the merit system principles." H.R. Rep. No. 95-1717, 2862 (emphasis added). Legislative history also demonstrates that, without the assurance that civil servants would be unbiased professional actors as required by the CSRA, Congress might not have granted executive agencies such broad authorities as it has over the decades. For example, as the final CSRA Senate Report states, "absent such a mandate for independence for the merit board, it is unlikely that the [Senate] committee would have granted the office of personnel management the power it has or the latitude to delegate personnel management authority to the agencies." S. Rep. No. 95-969, 7.

the power of removal as it deems best for the public interest . . ." explaining that the "constitutional authority in Congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed." 116 U.S. 483, 485 (1886). The Court further emphasized that the "head of a department has no constitutional prerogative of appointment to offices independently of the legislation of Congress, and by such legislation he must be governed not only in making appointments, but in all that is incident thereto," including removal. *Id.; see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 495 (2010) (reaffirming that "Congress can, under certain circumstances, create independent agencies run by principal officers removable only for good cause," and recognizing the permissibility of removal protections for inferior officers); *Seila Law LLC v. CFPB*, 591 U.S. 197, 215–16 (2020) (distinguishing permissible removal protections for inferior officers from restrictions on principal officers); cf. *Morrison v. Olson*, 487 U.S. 654, 689–91 (1988) (Scalia, J., dissenting) (acknowledging that precedent permits restrictions on removal of inferior officers).

Recent precedent confirms Congress's authority to structure federal offices—including by prescribing removal protections and adjudicatory frameworks—as long as it does not eliminate presidential oversight altogether. Where Congress speaks clearly, it may insulate inferior officers from at-will removal without violating Article II. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 771 (2025). In *United States v. Arthrex, Inc.*, the Court reaffirmed that Congress may create adjudicatory officers and define their tenure, while ensuring appropriate executive oversight. 594 U.S. 1, 12–15 (2021). This principle reflects a longstanding distinction between principal and inferior officers.

The CSRA fits comfortably within this tradition: it structures federal employment, channels personnel decisions through defined procedures, and provides for review within an integrated statutory framework, all while leaving ultimate executive supervision intact. Such statutes operationalize rather than diminish executive authority. By ensuring that federal activities are carried out according to law rather than partisan or personal considerations, such statutes assist the President in fulfilling the constitutional duty of faithful execution and

reinforce the founders' vision of a government "of laws, and not of men." John Adams, *Thoughts on Government* (Apr. 1776), *reprinted in Papers of John Adams* 86, 89 (Robert J. Taylor ed., 1979).[2]

## V. Abrogation of the CSRA Would Impose Far-Reaching Harms

This case is about more than the rights of two litigants. It is about the rights of the approximately two million civil servants[3] whose careers and livelihoods are currently subject to CSRA protections, and the expectation of all Americans to a non-partisan, professional civil service focused on their interests, not the partisan or personal interests of one temporary office holder.

[2] The Appointments Clause—which permits Congress to vest the appointment of inferior officers even beyond the Executive Branch and thus further supports the CSRA—is discussed more fully in Plaintiffs' brief.

[3] The federal government remains the single largest employer in the United States, and commands roughly 2.2 million civil servants. 5 C.F.R. §§ 210, 212, 213, 302, 432, 451, 752 (2026).

### A. Without Statutory Protections, Millions of Federal Employees Would Be Subject to Arbitrary and Politicized Personnel Actions

If the CSRA were substantially curtailed in the way that the MSPB has done, the consequences would extend far beyond the parties before the Court. The federal government employs millions of individuals across a vast array of functions, from national security and public health to environmental protection and benefits administration. The MSPB's basis for invalidating CSRA protections in this case could subject those personnel to removal at any time, for any reason—or for no reason at all—including reasons that are arbitrary, discriminatory, or overtly political. This would inflict substantial harms on huge numbers of federal personnel, while making recruitment and retention of qualified people exceedingly difficult.

A consequence of striking down application of the CSRA on the ground identified by the Board would be that someone who refuses to carry out an unlawful order regarding an adjudication, or many others confronted with such an order in other matters—or who even raises

potential concerns about such an order—could be summarily dismissed without recourse. This would predictably chill the willingness of others to question or report illegality. Whistleblower statutes, anti-discrimination laws based on categories such as age or gender, and safeguards against retaliation would become effectively unenforceable.

The threat here is not merely hypothetical. Recent reports describe the use of polygraph examinations within the FBI to inquire into whether employees have criticized administration leadership, as well as efforts within the Department of Defense to reduce the rank or compensation of officials who spoke about the obligation not to follow unlawful orders. *See, e.g.*, Adam Goldman, *The F.B.I. Is Using Polygraphs to Test Officials' Loyalty*, The New York Times (July 10, 2025), https://www.nytimes.com/2025/07/10/us/politics/fbi-polygraph-kash-patel.html; Thomas A. Berry et al., *The Pentagon's Retaliation Campaign Against Senator Kelly Is Unconstitutional*, Cato Institute (May 6, 2026), https://www.cato.org/blog/pentagons-retaliation-campaign-against-senator-kelly-unconstitutional. Similarly, as the American Bar Association reported in November 2025:

> [T]op Justice Department officials have pushed out veteran prosecutors across the department who worked on cases during the Biden administration that they viewed as anti-Trump. Employees who prosecuted the hundreds of cases against the rioters who stormed the U.S. Capitol on Jan. 6, 2021, have been especially targeted. Others were given no explanation as to why they were fired. The Washington Post has reported that other prosecutors have been ousted after they refused to bring cases to grand juries that they believed had insufficient evidence."

*Justice Department struggles as thousands exit—and few are replaced*, A.B.A. (Nov. 19, 2025), https://www.americanbar.org/advocacy/governmental_legislative_work/publications/washingtonletter/november-25-wl/outside-the-gao-1125wl/.

These and other actions reflect a determined and coordinated effort by the executive branch to assert expansive removal authority untethered from the statutory limits that Congress has enacted. Displacing the CSRA's comprehensive framework under such circumstances would erode longstanding protections, force routine employment disputes into constitutional litigation, and undermine both the stability of the federal workforce and the rule-of-law values those protections are designed to secure.

### B. Abrogation of the CSRA Would Deny the Public its Right to a Professional, Efficient, and Apolitical Civil Service

The CSRA's merit-based framework does more than protect individual employees from arbitrary action; it sustains the competence, continuity, and institutional integrity of the federal government itself. If large portions of the federal government reverted back to the spoils system, the consequences would extend far beyond the workplace to the larger public. It would directly impair the Government's ability to execute the laws faithfully and effectively, and to serve the public interest. Absent statutory protections, the federal workforce could be subject to wholesale turnover based on political considerations, with personnel removed at any time, for any reason, or for no reason at all. Such a system would seriously undermine the competent administration of federal programs on which the American people depend.

The federal government performs a vast array of technically complex and often life-critical functions that depend on sustained expertise, institutional memory, and professional continuity rather than

political turnover. Much of this work is invisible precisely because it is performed successfully—by career civil servants rather than political appointees. These duties include safeguarding the nation's nuclear weapons stockpile; maintaining the reliability and safety of the electrical grid and energy infrastructure; administering lifesaving disaster prediction and response systems; and ensuring the integrity of food, water, and drug safety systems that protect millions of Americans daily. *See* Michael Lewis, *The Fifth Risk* (2018); Michael Lewis, *Who Is Government?* (2023). They also encompass the administration of Social Security, Medicare, veterans' benefits, aviation safety, disease monitoring and response, and environmental and workplace safety enforcement—systems in which small errors can have catastrophic consequences at national or even worldwide scale.

These functions depend on sustained expertise, stable implementation of law, and insulation from political volatility. A workforce subject to abrupt and politically motivated turnover would necessarily struggle to perform these duties with the reliability and technical competence the public reasonably expects.

Perhaps even more chilling is the potential that the absence of CSRA protections could facilitate the misuse of coercive law enforcement authority over disfavored individuals. Agencies such as the Department of Justice (DOJ) and the Department of Homeland Security wield powers of investigation, prosecution, detention, and removal that directly affect the liberty and property of millions of people. A civil service system stripped of merit-based protections would heighten the risk that these authorities could be exercised vindictively, unevenly or in a manner perceived as targeting disfavored individuals or groups. By insulating line officials from undue political pressure, the CSRA is one layer of protection to help ensure that the Government's most consequential powers are exercised with the neutrality, consistency, and legality that the Constitution requires.

Empirical research confirms what administrative experience already demonstrates. Merit-based civil service systems "are strongly associated with higher government performance and lower corruption." Eloy Oliveira et al., *What Does the Evidence tell us About Merit Principles and Government Performance?,* 102(2) Public Administration, 668, 668–69; *see also* Nicholas Ryan Bednar, *Bureaucratic Autonomy*

*and the Policymaking Capacity of United States Agencies, 1998-2021*, 112 Pol. Sci. Rsch. & Methods 652, 653 (2024) (analysis of aggregated data across 261 government agencies from 1998 to 2021 demonstrates that job protection for government employees produces better governance).

By contrast, patronage-based or at-will systems tend to prioritize loyalty over competence and can drive highly motivated bureaucrats to leave government service while making it harder to recruit top talent, reducing expertise, and elevating the risk of politicized administration. *See* Sean Gailmard & John W. Patty, *Slackers and Zealots: Civil Service, Policy Discretion, and Bureaucratic Expertise*, 51 Am. J. Pol. Sci. 873, 881 (2007); Daniel P. G. Gibbs, *Civil Service Reform, Self-Selection, and Bureaucratic Performance*, 279 (2020). The non-partisan Partnership for Public Service has similarly warned that converting civil service employment into at-will positions would risk reviving the "chaotic, corrupt, and inefficient" spoils system of the nineteenth century, in which government employment turned on political affiliation rather than merit. Chris Piper, *At-Will Employment: What the Federal Government Can Learn From States*, Partnership for Public

Service (Jan. 21, 2026), https://ourpublicservice.org/know-the-facts/resource-library/reports/at-will-employment-what-the-federal-government-can-learn-from-states. Such a system would expose federal employees to termination "not for poor performance, but rather for offering professional advice or perspectives that political leaders do not want to hear." *Id.*

These risks and undue costs are compounded by the documented effects of high turnover. Frequent removal and replacement of employees impose substantial training and recruitment costs and loss of institutional knowledge. *Id.* Private-sector estimates put replacement costs at 50% to 400% of salary depending on specialization, with significantly higher costs for technical roles. *Id.* Scaled to the federal workforce, even modest increases in turnover would impose hundreds of millions of dollars in annual costs, while simultaneously degrading program effectiveness. *Id.*

By contrast, merit-based protections promote public trust. When government decisions are made by qualified professionals insulated from undue pressures rather than by political loyalists, the public can

have greater confidence that laws are being administered fairly and equally.[4]

More fundamentally, high turnover and politicized employment practices distort incentives in recruitment and retention. As scholarship in political economy explains, reducing civil service protections discourages highly motivated and highly skilled individuals from entering or remaining in public service. *See* Gailmard & Patty, *supra* at

[4] While nothing in this critique is intended to question the good faith of the Board or its members, the circumstances surrounding the MSPB decision under review in this case underscore the institutional stakes. The MSPB departs from longstanding precedent that the MSPB lacks authority to determine the constitutionality of statutes, and its ultimate holding in favor of the Government sits in tension with centuries of practice and with Supreme Court precedent recognizing Congress's authority to impose removal restrictions on inferior officers. The appearance of independence is particularly crucial to foster public confidence in the outcome. Yet, the decision follows the summary removal of the MSPB's former Chair prior to the expiration of her statutory term, and the MSPB's decision to rule on the constitutional question at all comes at the apparent direction of the Government who is a party to Board proceedings. *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 49 Op. O.L.C. at 1 (Sept. 26, 2025), https://www.justice.gov/olc/media/1415466/dl. In this context, reversing the Board's holding would bolster both the actual and appearance of independence, and thus public confidence in the decisions of MSPB members and immigration judges.

873. The result is a decline in bureaucratic expertise precisely in those domains where expertise is most critical.

We are already witnessing the loss of expertise predicted by the studies described. Federal agencies that monitor disease outbreaks, ensure food safety, protect the environment and fund the nation's scientific research have lost career senior leadership at disproportionately high rates—while political appointments have surged to unprecedented levels in the modern era. *See Expertise Replaced: The Politicization of Environmental, Health and Science Agencies*, Partnership for Public Service (May 13, 2026), https://ourpublicservice.org/know-the-facts/blog/politicization-environmental-health-and-science-agencies (noting that the loss of senior career expertise and its replacement by partisan loyalists "threatens public health, economic competitiveness and scientific innovation that American communities and industries depend on").

It is not difficult to imagine the devastating impact—on hiring, retention, professionalism, and all the government services Americans rely on, from securing nuclear materials to ensuring timely postal service—if the Court were to affirm the MSPB's decision. Nor is it

difficult to foresee the potential loss of life that could occur when, for example, an expert who has spent years researching how to prevent roof cave-ins in coal mines or an expert on Hantavirus gets fired because they happen to be a Democrat and the President is Republican (or vice versa).

In short, a non-partisan and professional civil service—consistent with both statutory design and the constitutional promise that federal employees take an oath to support the law, not any individual officeholder—is a cornerstone of the federal government's ability to promote economic prosperity, safeguard national security, and ensure basic freedoms and fairness for its people. The potential elimination of merit protections for millions of federal workers poses an existential threat to all of those public benefits.

## VI. Conclusion: The Court Should Preserve the Viability of the CSRA by Reversing the Board's Decision

For nearly a century and a half, our nation has moved deliberately away from a system of patronage and toward one grounded in merit,

professionalism, and the rule of law. From the abuses of the spoils system to the enactment of the Pendleton Act and, ultimately, the CSRA, Congress—across parties and with the sustained participation of the executive branch and concurrence of the courts—has constructed a framework designed to ensure that federal employment rests on competence and fidelity to the law rather than political allegiance.

The CSRA embodies that settled tradition. It preserves Congress's authority to enact laws necessary and proper to carry into execution the powers of the Government, while also respecting the President's authority to manage the executive branch.

The Board's decision would open the door to the revival of a spoils system in which expertise is displaced by allegiance, employees are deterred from speaking candidly or resisting unlawful directives, and the administration of federal programs becomes contingent on shifting political winds. The consequences would not be confined to the workforce; they would be felt by the hundreds of millions of Americans who rely every day on the integrity, continuity, and competence of federal institutions. To significantly weaken the CSRA as the Board has done would therefore unsettle a cornerstone of modern governance and

discard a rare and enduring consensus spanning generations, political parties, and all branches of government. It would mark a return to the very dangers that prompted reform: arbitrariness, politicization, and the erosion of public trust in the fair administration of the law.

## CONCLUSION

For these reasons, the Court should overrule the MSPB decision and uphold the constitutionality of the CSRA.

Respectfully submitted,

*/s/ Aderson B. Francois*

Aderson B. Francois
Georgetown Law Center
Civil Rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001-2022
(202) 661-6721
Aderson.francois@georgetown.edu

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word limit of Fed. R. App. P. 32(a)(7)(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 5425 words. I further certify that this response complies with Fed. R. App. P. 32(a)(5)-(6), because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Aderson B. Francois*

Aderson B. Francois
Georgetown Law Center
Civil Rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001-2022
(202) 661-6721
Aderson.francois@georgetown.edu

## **CERTIFICATE OF SERVICE**

I hereby certify that June 15, 2026, I electronically filed the foregoing Corrected Brief of Amicus Curiae Lawyers Defending American Democracy with the Clerk of the Court by using the appellate CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Aderson B. Francois*

Aderson B. Francois
Georgetown Law Center
Civil Rights Clinic
600 New Jersey Avenue, NW
Washington, DC 20001-2022
(202) 661-6721
Aderson.francois@georgetown.edu

*Counsel for Amicus Curiae*