No. 26-1575

IN THE

# United States Court of Appeals for the Federal Circuit

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners*,

v.

MERIT SYSTEMS PROTECTION BOARD,

*Respondent,*

DEPARTMENT OF JUSTICE,

*Intervenor*.

On Petition for Review from the
Merit Systems Protection Board

## OPENING BRIEF FOR PETITIONERS

ROBERT P. ERBE
LAW OFFICE OF ROBERT P. ERBE,
 PLLC
Federal Employment Law Office
3361 E. Terra Alta Blvd.
Tucson, AZ 85716
520-309-0763
robert.erbe@erbelawoffice.com

NATHANIEL A.G.  ZELINSKY
SYDNEY FOSTER
JAMES I. PEARCE
ROSA L. BAUM
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, DC 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Petitioners*

July 14, 2026

## CERTIFICATE OF INTEREST

Counsel for Petitioners certifies the following pursuant to Federal Circuit Rule

47.4:

1.  Represented Entities (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

    **Megan Jackler**
    **Brandon Jaroch**

2.  Real Party in Interest (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

    **Not Applicable.**

3.  Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

    **Not Applicable.**

4.  Legal Representatives – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

    **In addition to the law firms, partners, and associates that have entered an appearance in this Court, Samantha Bateman and Kyle Freeny appeared on the papers in the Merit Systems Protection Board.**

5.  Related Cases – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

    **Not Applicable.**

6.    Organizational Victims and Bankruptcy Cases – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

**Not Applicable.**

Dated: July 14, 2026                                    /s/ Nathaniel A.G. Zelinsky
                                                        Nathaniel A.G. Zelinsky

ii

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ............................................................................ i

TABLE OF CONTENTS.................................................................................... iii

TABLE OF AUTHORITIES ...............................................................................v

INTRODUCTION ............................................................................................1

STATEMENT OF RELATED CASES ...............................................................7

STATEMENT OF JURISDICTION..................................................................7

STATEMENT OF THE ISSUE..........................................................................7

STATEMENT OF THE CASE.............................................................................8

      A. Statutory Background.................................................................8

      B. Factual Background..................................................................12

      C. Procedural History...................................................................14

SUMMARY OF THE ARGUMENT .................................................................19

STANDARD OF REVIEW ..............................................................................24

ARGUMENT ..................................................................................................25

  I. THE CIVIL SERVICE REFORM ACT IS CONSTITUTIONAL ...............................25

    A. Congress May Regulate The Removal Of Inferior Officers ..............25

    B. Civil Service Protections For Immigration Judges Are Constitutional ..........................................................................43

  II. THE MERIT SYSTEMS PROTECTION BOARD'S DECISION IS WRONG ...............52

  III. RULING FOR THE GOVERNMENT WOULD UNLEASH CHAOS ..........................58

CONCLUSION ..................................................................................................62

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*,
567 U.S. 387 (2012) .................................................................................57

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
941 F.3d 1320 (Fed. Cir. 2019) ...............................................................34

*Branti v. Finkel*,
445 U.S. 507 (1980) .................................................................................40

*Brown v. Gen. Servs. Admin.*,
425 U.S. 820 (1976) .................................................................................40

*Calcutt v. FDIC*,
37 F.4th 293 (6th Cir. 2022) ....................................................................51

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) .................................................................41

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021) ....................................................................51

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ........................................................................... 11, 12

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020) .................................................................................56

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................................................... 39, 40

*Esparraguera v. Dep't of the Army*,
981 F.3d 1328 (Fed. Cir. 2020) ...............................................................42

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
537 F.3d 667 (D.C. Cir. 2008) .................................................................51

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ...................................... 4, 26, 32, 33, 42, 49, 51, 57

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006) .......................................................................41

*In re Guzman-Arguera*,
22 I. & N. Dec. 722 (BIA 1999) ...........................................................53

*In re J.F.F.*,
23 I. & N. Dec. 912 (A.G. 2006) ..........................................................47

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022) ...............................................................51

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) .......................................25, 26, 35-37, 47-50, 55

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507  (2022) ..........................................................................40

*Lane v. Franks*,
573 U.S. 228 (2014) ............................................................................40

*Leachco, Inc. v. CPSC*,
103 F.4th 748 (10th Cir. 2024) ...........................................................51

*Lucia v. SEC*,
585 U.S. 237 (2018) .............................................................. 26, 27, 43

*Masias v. Sec'y of Health & Hum. Servs.*,
634 F.3d 1283 (Fed. Cir. 2011)...........................................................35

*Matter of M-S-*,
27 I. & N. Dec. 509 (A.G. 2019) ..................................... 46, 47, 55, 56

*Monasteri v. MSPB*,
232 F.3d 1376 (Fed. Cir. 2000)...........................................................24

*Montejo v. Louisiana*,
556 U.S. 778 (2009) ...................................................................... 59, 60

*Morrison v. Olson*,
487 U.S. 654 (1988)............................... 3, 21, 31, 32, 42, 44, 52, 57

*Myers v. United States*,
272 U.S. 52 (1926)............................................................. 3, 10, 29, 30

*NLRB v. Noel Canning*,
573 U.S. 513 (2014)............................................................................38

vi

*Parsons v. United States*,
  167 U.S. 324 (1897) ................................................................28

*Piano Factory Grp., Inc. v. Schiedmayer Celesta GmbH*,
  11 F.4th 1363 (Fed. Cir. 2021) ...............................................35

*Rabadi v. DEA*,
  122 F.4th 371 (9th Cir. 2024) .................................................51

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
  490 U.S. 477 (1989) ................................................... 6, 22, 54

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990) ..................................................................40

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
  591 U.S. 197 (2020) ................................ 18, 22, 23, 33, 52, 53

*Shurtleff v. United States*,
  189 U.S. 311 (1903) ................................................................28

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ................................................................41

*Trump v. Slaughter*,
  No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ............ 5, 26, 36, 37, 39, 43

*Trump v. United States*,
  603 U.S. 593 (2024) ................................................................38

*United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ....................................... 4-5, 21, 33-35, 37, 45-48

*United States v. Fausto*,
  484 U.S. 439 (1988) ................................................................10

*United States v. Perkins*,
  116 U.S. 483 (1886) ..................................2, 3, 8, 9, 20, 26-28, 42, 44

*Walmart, Inc. v. Chief Admin. L. Judge of Off.*
  *of Chief Admin. Hearing Officer*,
  144 F.4th 1315 (11th Cir. 2025) ............................. 50, 51, 53, 54, 57

*Wong Yang Sung v. McGrath*,
  339 U.S. 33 (1950) ..................................................................50

**CONSTITUTIONAL PROVISION**

U.S. Const. art. II, § 2, cl. 2 ............................................................. 2, 25-28

**STATUTES**

5 U.S.C. § 2015 ..................................................................................... 15

5 U.S.C. § 2301(b) ................................................................................ 10

5 U.S.C. § 2301(b)(2) ........................................................................... 10

5 U.S.C. § 2301(b)(6) ........................................................................... 10

5 U.S.C. § 2301(b)(8)(A) ...................................................................... 10

5 U.S.C. § 2301(b)(9) ........................................................................... 10

5 U.S.C. § 3592 ............................................................................... 11, 42

5 U.S.C. § 7511 ..................................................................................... 11

5 U.S.C. § 7511(a) ........................................................................... 14, 15

5 U.S.C. § 7511(a)(1)(B) ..................................................................... 7, 60

5 U.S.C. § 7511(b)(1) .................................................................. 11, 41, 42

5 U.S.C. § 7511(b)(3) .................................................................. 11, 41, 42

5 U.S.C. § 7511(b)(6) ........................................................................... 11

5 U.S.C. § 7511(b)(7) ....................................................................... 11, 42

5 U.S.C. § 7511(b)(8) ....................................................................... 11, 42

5 U.S.C. § 7512 ..................................................................................... 11

5 U.S.C. § 7513(a) ................................................................................ 11

5 U.S.C. § 7513(b) ....................................................................... 11, 15, 45

5 U.S.C. § 7513(d) ................................................................................ 11

5 U.S.C. § 7521(a) ................................................................................ 51

5 U.S.C. § 7702 ..................................................................................... 10

5 U.S.C. § 7703 ..................................................................................... 11

5 U.S.C. § 7703(b)(1)(A) ...........................................................................7

5 U.S.C. § 7703(d) ...................................................................................16

8 U.S.C. § 1101(b)(4)................................................. 21, 43, 44, 46, 55

8 U.S.C. § 1103(a)(1)...............................................................................46

8 U.S.C. § 1103(a)(2)...............................................................................23

8 U.S.C. § 1103(g)(2) ................................................... 21, 22, 46, 55

28 U.S.C. § 503 ........................................................................................43

28 U.S.C. § 1295(a)(9) ..............................................................................7

Act of 13 July 1866, 14 Stat. 90.................................................................8

Civil Service Due Process Amendments Act of 1990, Pub. L. 101-376,
    104 Stat. 461.........................................................................................41

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 ...................41

Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261,
    86 Stat. 103...........................................................................................40

Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259,
    88 Stat. 55....................................................................................... 40, 41

Lloyd–La Follette Act of 1912, 37 Stat. 555 ............................................9

Pendleton Act, Pub. L. No. 47-16, 22 Stat. 403 (1883).........................8, 9

Whistleblower Protection Act, Pub. L. No. 101-12, 103 Stat. 16 (1989)................41

Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199,
    126 Stat 1465........................................................................................41

**REGULATIONS**

5 C.F.R. § 1201.113 .................................................................................16

8 C.F.R. § 1003.10(b) ..............................................................................50

8 C.F.R. § 1003.10(d) ..............................................................................50

8 C.F.R. § 1003.1(h)(1)(i) ................................................................. 22, 46

8 C.F.R. § 1208.30(g)(2)(iv) ..................................................................56

OTHER AUTHORITIES

Appointment & Removal of Inspectors of Customs, 4 U.S. Op. Att'y.
    Gen. 165 (1843) ..........................................................................39

Chloe Atkins, *Former Federal Prosecutor Maurene Comey Sues Trump
    Administration Over Her Firing*, NBC News (Sep. 15, 2025),
    https://perma.cc/S39M-KNWM..................................................14

David J. Barron, *Best Practices for OLC Legal Advice and Written Opinions*
    (July 16, 2010), https://perma.cc/9DR2-LWD6 .......................... 16, 17

Jonah E. Bromwich, Michael S. Schmidt & Rebecca Davis O'Brien, *White House
    Secretly Swayed Board Meant to Stop Civil Service Politicization*, N.Y. Times
    (June 28, 2026), https://perma.cc/LX28-72Y9 ..............................17

Drew DeSilver, *What We Know About Veterans Who Work For The
    Federal Government*, Pew Rsch. Ctr. (Apr. 10, 2025), https://perma.cc/7HTT-
    C9TM ..........................................................................................60

Jacob Rosen & Scott MacFarlane, *Justice Department Purge Continues;
    Firings Include Trump Classified Document Case Investigators and
    Jan. 6 Prosecutors*, CBS News (July 12, 2025),
    https://perma.cc/H92R-BKZN ......................................................14

3 Joseph Story, *Commentaries on the Constitution of the United States*
    (1st ed. 1833)................................................................... 38, 39

Patricia Wallace Ingraham, *The Foundation of Merit: Public Service
    in American Democracy* (1995)..................................... 8, 9, 38, 39

Sirce E. Owen, Acting Director, Executive Office of Immigration Review,
    *U.S. Dep't of Justice, Neutrality and Impartiality in Immigration Court
    Proceedings* (June 27, 2025), https://perma.cc/8FFA-J7WB ................. 49, 50, 57

U.S. Dep't of Just., *The Merit Systems Protection Board's Authority to
    Adjudicate Constitutional Questions within an Administrative Proceeding*,
    (Sept. 26, 2025), https://perma.cc/5GKU-KVZ5................................16

Ximena Bustillo, *Trump Administration Fires More Immigration Judges*,
    NPR (Sep. 23, 2025), https://perma.cc/SM7J-2DBZ...........................14

## INTRODUCTION

In this appeal, the government asked—and the Merit Systems Protection Board (MSPB) agreed—to invalidate the Civil Service Reform Act (CSRA). This landmark statute is the centerpiece of a system of civil service laws protecting millions of federal workers from abuse, discrimination, and retaliation. But in this case, and others like it, the government has argued that the nation's civil service laws conflict with the President's Article II powers. That is wrong. The government's position defies a century and a half of Supreme Court precedent, threatens the foundations of the federal government, and has already done enormous damage to the civil service. The Court should reverse the MSPB's egregiously incorrect decision, decline the invitation to remake constitutional law, and restore basic legal protections for millions of federal workers.

Petitioners Megan Jackler and Brandon Jaroch are military veterans who became career civil servants and worked as immigration judges for the Department of Justice. Jackler and Jaroch each received superlative performance reviews and were exemplary career civil servants. But in February 2025, the Department of Justice terminated them, without any advance notice or justification, in plain violation of the CSRA. Subsequent documents revealed that the agency fired Jackler and Jaroch by mistake. The agency erroneously believed each was a probationary employee with fewer statutory protections against removal.

1

Instead of fixing its mistake, the government doubled down and argued that Article II of the Constitution affords the executive branch an absolute right to fire Jackler and Jaroch. This case is just the tip of the iceberg. Since entering office, the administration has targeted hundreds of civil servants, often for nakedly retaliatory reasons. In each instance, just as in this appeal, the government has invoked Article II as a talisman to violate federal workers' statutory and constitutional rights. At bottom, the government believes Article II means it may fire anyone, at any time, for any reason, without any notice or process—regardless of whatever laws Congress enacts or what else the Constitution says. These Article II firings have cast a dark pall over millions of hardworking public servants who now live in fear of arbitrary abuse, retaliation, and discrimination.

The government's Article II argument is wrong. Full stop. Nearly a century and a half ago, in *United States v. Perkins*, the Supreme Court held that Congress may enact civil service laws. In the Court's words, Article II's Appointments Clause provides Congress the authority to "limit and restrict the" "removal" of inferior officers—public servants, like Jackler and Jaroch, who are subordinate to high-ranking principal officers. 116 U.S. 483, 485 (1886). Under the Appointments Clause, Congress may vest the appointment of inferior officers in the heads of departments. *See* U.S. Const. art. II, § 2, cl. 2. That express "constitutional authority" to "vest" "appointment implies" a corresponding "authority to limit,

restrict, and regulate" "removal"—in other words, to enact civil service laws. *Perkins*, 116 U.S. at 485.

*Perkins* is settled precedent. Chief Justice Taft and Justice Scalia—arguably the two most ardent advocates of the removal power—endorsed *Perkins*. In *Myers v. United States*, 272 U.S. 52 (1926), which is considered the historical high water mark for the President's removal power, Chief Justice Taft's decision for the Court repeatedly confirmed that *Perkins* was correct and that Congress may enact civil service laws. In his dissent in *Morrison v. Olson*, 487 U.S. 654 (1988), the modern lodestar for proponents of a robust removal power, Justice Scalia likewise embraced *Perkins* and confirmed that the President does not have "plenary power to remove inferior officers," *id*. at 724 n.4 (Scalia, J., dissenting). Instead, Justice Scalia explained that, for Article II purposes, "it is enough" for inferior officers like Jackler and Jaroch to be "removable *for cause*," which includes "the failure to accept supervision" from superiors in the executive branch. *Id*. (emphasis in original).

In other words, to ensure the President can control the executive branch, Article II requires civil servants to follow the directions of their superiors. Those superiors can, in turn, fire civil servants if they refuse to do so. But the government does not possess a right to arbitrarily abuse—or worse, cruelly retaliate and discriminate against—federal workers.

More recently, the Supreme Court has confirmed the constitutionality of the "the civil service system." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 507 (2010).  Then, just a few years ago, the Supreme Court effectively upheld the CSRA in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), which addressed the constitutionality of the statutory scheme governing administrative patent judges.  The Supreme Court found that scheme unconstitutional because those hearing officers unlawfully functioned as principal officers despite not being appointed by the President and confirmed by the Senate.  The Court reached that conclusion based on two facts: that administrative patent judges (i) rendered decisions that no "principal officer in the Executive Branch" could review, and (ii) could be removed only for cause under the CSRA.  *Id*. at 14, 17.

But when it devised a remedy to render administrative patent judges inferior officers and thus eliminate the constitutional defect, the Supreme Court did *not* invalidate the CSRA, which was the remedy this Court had adopted when it heard *Arthrex*.  *Id*. at 26.  Instead, the Supreme Court subjected administrative patent judges' decisions to plenary review by the Director of the Patent and Trademark Office, a principal officer—intentionally leaving the CSRA intact.  The Court explained that this "tailored" remedy ensured a principal officer could review an administrative adjudicator's decision, simultaneously preserving the CSRA and

4

removing any concerns about the President's ability to control the executive branch. *Id*. at 25.

There is no way to rule for the government without overturning *Arthrex*. By law, the Attorney General has plenary power to review and reverse an immigration judge's decisions. Meanwhile, immigration judges may be removed only for cause under the CSRA. This is the precise system the Supreme Court blessed in *Arthrex* with respect to administrative patent judges. Moreover, if anything impedes the Attorney General's ability to review an immigration judge's decision (to be clear: nothing does), the appropriate remedy under *Arthrex* is to remove "the restraint on the review authority"—not invalidate civil service protections. *Id*. at 27.

Finally, the Supreme Court's recent decision in *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026), further confirms that the government's arguments are wrong. *Slaughter* struck down restrictions on the President's power to remove principal officers who led independent agencies in the executive branch. But in doing so, the Supreme Court extolled Chief Justice Taft's "landmark" and "scholarly" "decision" for the Court in *Myers*. *Id*. at *11. *Slaughter* thus stands for the proposition that "*Myers* was right all along," *id*. at *26 (Gorsuch, J., concurring), and that *Myers* reflects the Supreme Court's "best word" on the removal power, *id*. at 12 (majority op.). Given *Myers*'s emphatic endorsement of the civil service, there

should be no doubt about the constitutionality of the CSRA's procedural and substantive protections for federal workers.

But in the decision below, the MSPB rushed to strike down the CSRA based on a half-sentence of dictum from one Supreme Court decision. In doing so, the MSPB effectively overturned a mountain of precedent, from *Perkins* and *Myers* to *Morrison* and *Arthrex*. That was egregiously incorrect. The Supreme Court has warned that lower courts and agencies must "follow the [Supreme Court] case which directly controls." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Only the Supreme Court possesses "the prerogative of overruling" its precedent. *Id*. To be clear: The Supreme Court should not take that extraordinary step. But such a drastic alteration of our constitutional order may come only—if at all—from the Supreme Court.

The stakes could not be higher. In this appeal, the government fired two career civil servants, both military veterans, by accident because it refused to give them the most minimal pre-termination notice required by the CSRA. Elsewhere, the government has asserted an Article II right to discriminate against career civil servants based on race, sex, age, political affiliation, and constitutionally protected speech. This is unconscionable. But until this Court intervenes, the government will continue to defy settled precedent, and millions of federal workers will live in fear that they will be the next victim. Time is of the essence. Petitioners respectfully

6

urge the Court to swiftly reverse the MSPB's decision and preserve the nonpartisan, professional civil service that is a crown jewel of our government.

## STATEMENT OF RELATED CASES

There are no related cases within the meaning of Federal Circuit Rule 47.5(a).

## STATEMENT OF JURISDICTION

Petitioners are preference-eligible veterans with appeal rights to the MSPB under 5 U.S.C. § 7511(a)(1)(B)(i). *See* Appx036; Appx058. On February 14, 2025, each Petitioner received a termination letter, and each filed timely appeals with the MSPB. *See* Appx088-094; Appx095-101. Before the MSPB, Petitioners irrevocably waived any discrimination claims. *See* Appx291; Appx297. The MSPB consolidated Petitioners' appeals and issued a final decision resolving all issues on March 20, 2026. Appx001-032. Petitioners promptly petitioned this Court for review on March 23, 2026. This Court has jurisdiction pursuant to 5 U.S.C. § 7703(b)(1)(A) and 28 U.S.C. § 1295(a)(9).

## STATEMENT OF THE ISSUE

Whether the Civil Service Reform Act's procedural and substantive protections for federal workers conflict with the President's Article II removal powers.

## STATEMENT OF THE CASE

### A. Statutory Background

**1.** The legislation at the heart of this appeal—the Civil Service Reform Act—reflects the culmination of a centuries-long process to ensure a professional, merit-based civil service, free from political patronage, invidious discrimination, and arbitrary abuse.

At the Founding, George Washington embraced principles of merit-based service. Patricia Wallace Ingraham, *The Foundation of Merit: Public Service in American Democracy* 17 (1995). But by the Civil War, a spoils system had taken hold in the United States. The effects were "tragic," undermining "the effectiveness of the Union army" and the "federal government" during the war. *Id.* at 22.

In the years that followed, Congress began enacting—and the Supreme Court upheld—federal civil service laws. In 1866, Congress prohibited the dismissal of military officers during peacetime absent a sentence by a court-martial. *See* Act of 13 July 1866, 14 Stat. 90, 92. Two years later, President Grant "ran on a reform platform." Ingraham, *supra*, at 24. In 1871, Congress created a short-lived Civil Service Commission, but it shuttered in 1873. Finally, in 1881, a former supporter who had unsuccessfully sought a patronage appointment shot and killed President Garfield. *Id.* at 26. The assassination proved to be a galvanizing moment. Congress passed, and President Arthur signed, the Pendleton Act, Pub. L. No. 47-16, 22 Stat.

403 (1883), which established a system for merit-based hiring in federal employment and provided protections against partisan discrimination.

Three years later, in 1886, the Supreme Court upheld limitations on the executive branch's removal power in *Perkins*. 116 U.S. at 485. The Court specifically rejected the argument—which the government now embraces—that Congress's "restriction of the power of removal" was "an infringement upon the constitutional prerogative of the executive." *Id*. at 484. Instead, *Perkins* explained, "when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id*.

The civil service initially only encompassed a portion of the federal workforce and expanded significantly during the early Twentieth Century. Ingraham, *supra*, at 34. During the same period, Congress enacted additional legislation to protect civil servants. *See, e.g.*, Lloyd–La Follette Act of 1912, 37 Stat. 555 (providing that civil servants may "be removed" only "for such cause as will promote the efficiency of" the "service," must receive notice of proposed removals, and must have an opportunity to contest them). The Supreme Court also reconfirmed Congress's authority in this arena. In *Myers*, Chief Justice Taft wrote a "landmark decision" *Slaughter*, 2026 WL 1855612 at *11, in which the Supreme Court reiterated that, where civil servants are appointed by "the heads of departments," "the right to

9

remove may be restricted," and civil servants "could be entirely" insulated "from politics," *Myers*, 272 U.S. at 174, 192.

**2.**  In 1978, after abuses involving the civil service had come to light in the Watergate Era, Congress passed the CSRA, which "comprehensively overhauled the civil service system."  *United States v. Fausto*, 484 U.S. 439, 443 (1988) (citation modified).  This landmark statute replaced a "patchwork of statutes and rules" that had "built up over almost a century."  *Id*. at 444 (citation modified).

At the CSRA's core are the "merit system principles."  5 U.S.C. § 2301(b).  Agencies evaluate civil servants based on their "performance," correct "inadequate performance," and terminate those "who cannot or will not improve."  *Id*. § 2301(b)(6).  The law protects federal employees "against arbitrary action, personal favoritism, or coercion for partisan political purposes," and shields them from retaliation for engaging in lawful whistleblowing.  *Id*. §§ 2301(b)(8)(A), (9).  Federal employees "receive fair and equitable treatment" "without regard to political affiliation, race, color, religion, national origin, sex, marital status, age, or handicapping condition, and with proper regard for their privacy and constitutional rights."  *Id*. § 2301(b)(2).[1]

---

[1] Civil servants challenging adverse actions based on discrimination may assert their rights under anti-discrimination statutes, such as Title VII of the Civil Rights Act of 1964, by bringing a so-called "mixed case" before the MSPB.  *See* 5 U.S.C. § 7702.

The CSRA establishes mechanisms for covered employees to vindicate their rights and contest unlawful removals.  As relevant here, once a covered employee has completed a probationary period, an agency may remove her or take other major adverse action against her "only for such cause as will promote the efficiency of the service."  5 U.S.C. § 7513(a); *see also id.* §§ 7511, 7512 (defining terms and describing scope of Section 7513).  Such employees must receive "30 days' advance written notice" of the action, "a reasonable time" to answer, and "a written decision." *Id*. § 7513(b).  The employee may appeal such an action to the MSPB. *Id*. § 7513(d). After the MSPB decides the matter, the parties may seek review in an Article III court, which is generally, but not always, this Court.  *Id*. § 7703.

Congress crafted the CSRA to avoid entrenching on the President's core prerogatives.  For example, the MSPB lacks jurisdiction over appeals by Senate-confirmed officials and by officials appointed by the President.  *Id*. § 7511(b)(1), (b)(3).    The MSPB also lacks jurisdiction over employees in certain agencies performing sensitive functions, such as employees in the Central Intelligence Agency, the Federal Bureau of Investigation, and the Foreign Service.  *Id*. § 7511(b)(6)-(8).  The MSPB has limited authority when the executive branch removes the most senior civil servants—members of the Senior Executive Service— for poor performance.  *See id*. § 3592.  And the MSPB cannot second-guess the

11

executive branch's decision-making on national security related matters. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988).

## B. Factual Background

Petitioners Megan Jackler and Brandon Jaroch are military veterans who served this country with distinction in uniform. Each subsequently became a career civil servant, working for the Department of Justice as an immigration judge. Both were summarily dismissed without any due process or articulated cause in February 2025.

Petitioner Megan Jackler served on active duty in the Navy for twelve years. Appx337. She deployed to Afghanistan in support of Operating Enduring Freedom and assisted in evacuation efforts following the Fukushima nuclear disaster in Japan. Appx338. She is currently a Lieutenant Commander in the Navy Reserve. Upon leaving active duty in 2021, Jackler became an assistant chief immigration judge. Appx339. She received outstanding performance evaluations. *Id*. Her superiors described her as "creative" and "selfless," and credited her with streamlining the office's caseload. Appx352.

Petitioner Brandon Jaroch is a disabled veteran who served in the Air Force. Appx162; Appx404. After leaving the military, Jaroch worked in the Department of Homeland Security, served as a federal prosecutor, and was also a federal public defender. Appx404-405. In 2021, Jaroch became an assistant chief immigration

judge. Appx405. He received excellent or outstanding performance ratings. Appx406. His superiors praised his "hard work" and, like Jackler, credited him with streamlining the office's caseload. *Id*.

On February 14, 2025, both Jackler and Jaroch received letters informing them that they had been terminated effective immediately. Appx094; Appx101. Neither received the minimal advance notice of the removal as required by the CSRA, and neither was afforded an opportunity to respond. Appx344; Appx409. The letters did not provide any justification for the terminations. Appx094; Appx101.

Documents subsequently disclosed by the government indicated that the Department of Justice mistakenly believed Jackler and Jaroch were probationary employees, who have fewer protections against dismissal under the CSRA. Appx208-210; Appx254-256; Appx362. Because the agency never provided them with any due process, however, Jackler and Jaroch never had the opportunity to inform the agency of its mistake.

This appeal is the tip of the iceberg of so-called "Article II" firing cases, in which the government claims an absolute constitutional right to fire employees for any reason or no reason at all. The executive branch has fired numerous other career civil servants like Petitioners, including as many as one hundred immigration

13

judges,[2] employees previously assigned to Special Counsel Jack Smith, and prosecutors who handled January 6 cases.[3] The retaliation has been blatant: In July 2025, the government fired a career prosecutor apparently because she is the daughter of a former Director of the Federal Bureau of Investigation whom the President views as a vocal critic.[4]

In these cases, the government has consistently argued that Article II invalidates legal protections under the Civil Service Reform Act. The government has similarly argued that Article II invalidates other statutory protections that apply to federal workers, such as Title VII of the Civil Rights Act of 1964, and constitutional provisions, such as the First Amendment. *See, e.g.*, Mot. to Dismiss, Doc. 15, *Nemer v. Blanche*, No. 1:25-cv-4170 (D.D.C. Apr. 6, 2026).

### C. Procedural History

**1.** Following their removal, Jackler and Jaroch promptly filed MSPB appeals. Appx088-094; Appx095-101. Before the MSPB, the parties agreed that Jackler and Jaroch were inferior officers and that they fell within the CSRA's definition of a

---

[2] Ximena Bustillo, *Trump Administration Fires More Immigration Judges*, NPR (Sep. 23, 2025), https://perma.cc/SM7J-2DBZ.

[3] Jacob Rosen & Scott MacFarlane, *Justice Department Purge Continues; Firings Include Trump Classified Document Case Investigators and Jan. 6 Prosecutors*, CBS News (July 12, 2025), https://perma.cc/H92R-BKZN.

[4] Chloe Atkins, *Former Federal Prosecutor Maurene Comey Sues Trump Administration Over Her Firing*, NBC News (Sep. 15, 2025), https://perma.cc/S39M-KNWM.

covered "employee" in 5 U.S.C. § 7511(a).[5] *See* Appx433 (in *Jackler*, stating that the Agency "agrees with Appellant that as an immigration judge, she was an 'employee' who may appeal certain adverse actions to the Board"); Appx456 (same in *Jaroch*). The cases were assigned to the same administrative judge, who issued nearly identical initial decisions in their favor. Appx033-054; Appx055-076.

The administrative judge explained that there was no dispute that the Department of Justice had failed to provide Jackler and Jaroch with the minimal advance notice and opportunity to contest removal required by the CSRA. Appx037-039; Appx058-061; *see* 5 U.S.C. § 7513(b). Instead, the government challenged "the constitutionality of the removal protections afforded by" the CSRA. Appx038; Appx060. According to the government, "the Attorney General is authorized by Article II of the Constitution to appoint and remove Immigration Judges without restriction," meaning the agency did not need to comply with the law Congress enacted. Appx036; Appx058.

The administrative judge declined to consider the government's sweeping constitutional attack on the nation's civil service laws. Under longstanding precedent, the MSPB cannot invalidate statutes, let alone the MSPB's own organic

---

[5] The statutory definition of "employee" in the CSRA is distinct from the constitutional category of employees for the purposes of the Appointments Clause. *See* 5 U.S.C. § 7511(a) (statutory definition of employee); *cf.* 5 U.S.C. § 2015 (general definition of employee in Title 5 expressly includes "an officer").

15

statute.  Appx038; Appx060-061.  As a result, the administrative judge ordered Jackler and Jaroch reinstated.  Appx039; Appx061.

**2.**  When the administrative judge ruled, the MSPB lacked a quorum.  Under the Board's regulations, the administrative judge's decision would have become final, and the government could have petitioned this Court for review, after thirty-five days.  *See* 5 U.S.C. § 7703(d); 5 C.F.R. § 1201.113.  But instead, the Department of Justice filed a petition before the quorum-less MSPB.  This stalled judicial review for months and allowed the government to continue defying the law with respect to hundreds of civil servants in the interim, and to stoke fear of abuse and discrimination in millions more.

The same day the Department of Justice sought review before the MSPB, the Department's Office of Legal Counsel (OLC) issued an opinion concluding that the Board is "obligated to consider constitutional issues raised by" employing agencies "during these proceedings."  U.S. Dep't of Just., *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 42 O.L.C. __ (Sept. 26, 2025), slip op. at 1, https://perma.cc/5GKU-KVZ5.

The opinion was unusual.  "OLC generally avoids opining on questions likely to arise in pending or imminent litigation."  David J. Barron, *Best Practices for OLC Legal Advice and Written Opinions* 3 (July 16, 2010), https://perma.cc/9DR2-

16

LWD6.   What came next was even more unusual: The Department of Justice submitted a filing in these cases arguing that OLC's opinion "should be considered binding upon the Board."  Appx479; Appx501.  In addition, White House officials privately lobbied the MSPB's Acting Chairman as part of "a concerted pressure campaign" to dictate the outcome in these cases.  Jonah E. Bromwich, Michael S. Schmidt & Rebecca Davis O'Brien, *White House Secretly Swayed Board Meant to Stop Civil Service Politicization*, N.Y. Times (June 28, 2026), https://perma.cc/LX28-72Y9.

In the wake of OLC's opinion, MSPB administrative judges dismissed dozens of other "Article II firing" appeals without prejudice, pending the resolution of Petitioners' cases.

**3.**  The Board consolidated Petitioners' cases and issued a final decision in favor of the Department of Justice.  Appx001-032.  The Board explained that the administrative judge had found that Petitioners were "entitled to"—but deprived of—"the procedures set forth in 5 U.S.C. § 7513 prior to their terminations." Appx005.  The Board did not question, nor did the government dispute, the fact that the government failed to provide even the most minimal notice to Jackler and Jaroch. Instead, the Board determined that Article II "abrogates" Petitioners' "otherwise-applicable statutory removal protections."  Appx002.

The Board purported to conduct an analysis of the CSRA's constitutionality as applied to immigration judges, and disclaimed deciding "the validity of the larger statutory scheme." Appx009. But the substance of the Board's decision is sweeping. According to the MSPB, "[n]o entity, including Congress or the Board, may place restrictions on" the President's Article II authority to remove officers because "doing so would infringe upon the President's ability to faithfully execute the laws." Appx012.

The MSPB acknowledged exceptions to this rule, explaining that "the President's Article II removal authority does not necessarily invalidate removal restrictions for all inferior officers in the Executive Branch." Appx013. But the Board dismissed *Perkins* and its progeny—which upheld civil service laws governing inferior officers—based on a half-sentence of dictum from *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020). According to the Board, after *Seila Law*, if an inferior officer exercises "more than limited duties" or has "some level of policymaking or administrative authority," the CSRA "cannot be constitutionally applied" to that civil servant. Appx013-014. Applying that standard, the Board then concluded that Jackler and Jaroch are subject to the President's unfettered removal authority because—in its estimation—immigration judges are inferior officers who exercise significant policymaking and administrative authority. Appx014-016.

18

The Board then dismissed the appeals for lack of jurisdiction. The MSPB reasoned that once it "find[s] that a particular employee is subject to at-will Article II removal, [it] must dismiss their appeal for lack of jurisdiction because 5 U.S.C. § 7513, including the grant of Board jurisdiction in section 7513(d), cannot constitutionally apply to that employee." Appx016. The interim relief awarded by the MSPB's administrative judge—an order that Petitioners be reinstated—automatically terminated upon the issuance of the MSPB's decision.

Petitioners promptly filed a petition for review in this Court. Petitioners separately sought, and this Court granted, initial review en banc.

## SUMMARY OF THE ARGUMENT

**I.** The Civil Service Reform Act stands on exceptionally firm constitutional footing. Under longstanding precedent, Congress has wide latitude to enact civil service protections for federal workers, including inferior officers such as immigration judges.

**A.** The Constitution establishes three classifications of public servants. High-ranking *principal officers* must be appointed by the President and confirmed by the Senate. *Inferior officers* are supervised by principal officers. Congress may choose to vest the appointment of inferior officers in the President or in the heads of departments. Finally, ordinary *employees* need not be appointed by the head of department or the President. The constitutional dividing line between inferior

19

officers and employees is blurry, and some have suggested that wide swaths of the federal workforce are inferior officers.

The Supreme Court has long blessed civil service protections afforded to inferior officers. In *Perkins*, the Court explained that when Congress vests the appointment of an inferior officer in a head of department, Congress may also restrict the power of removal. 116 U.S. at 485. Chief Justice Taft in *Myers* and Justice Scalia in *Morrison* each endorsed *Perkins*. These two jurists are cited as leading proponents of the President's Article II removal power. That they rejected the argument the government advances underscores how wrong the government is.

The Supreme Court's decision in *Arthrex*—issued just a few years ago on review of a decision of this Court—puts the final nail in the coffin. In *Arthrex*, the Supreme Court concluded, in agreement with this Court, that administrative patent judges were improperly appointed principal officers because they (i) issued decisions that were not reviewable by a principal officer, and (ii) could be removed only for cause under the CSRA. What matters for this case is the remedy the Supreme Court chose: It preserved the CSRA, and subjected administrative patent judges' decisions to review by a principal officer, thus rendering them inferior officers. That remedy makes sense only if Congress can constitutionally provide inferior officers—like immigration judges—with for-cause removal protections. In the Supreme Court's words, the resulting statutory scheme ensured that "the

20

President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Arthrex*, 594 U.S. at 27. After *Arthrex*, the CSRA is unquestionably constitutional, particularly for executive branch adjudicators.

**B.** The CSRA's removal protections for immigration judges are plainly constitutional under this longstanding precedent. The parties agree that immigration judges are inferior officers appointed and supervised by the Attorney General. Under *Perkins*, Congress may therefore regulate their removal, such as by requiring minimal due process before a termination. As Justice Scalia explained in his opinion in *Morrison*, 487 U.S. at 724 n.4, such protections do not give rise to an Article II concern about the President's ability to control the executive branch. The President retains control over immigration judges because they are subject to supervision and are removable for cause by the Attorney General if they refuse to follow his directions.

If there were any doubt, the statutes governing immigration judges closely parallel the scheme that the Supreme Court blessed in *Arthrex*. Immigration judges are "subject to such supervision" "as the Attorney General shall prescribe," meaning the Attorney General may directly review and reverse their decisions. 8 U.S.C. § 1101(b)(4). The Attorney General has additional authority to review "administrative determinations in immigration proceedings" "and perform such

21

other acts" as he "determines to be necessary." *Id*. § 1103(g)(2); *see also id*. § 1103(a)(2). Moreover, by regulation, the Attorney General may transfer to himself matters decided by an immigration judge and appealed to the Board of Immigration Appeals. *See* 8 C.F.R. § 1003.1(h)(1)(i). In short, under *Arthrex*, the Attorney General's ability to review and reverse an immigration judge is—in and of itself— enough to decide this case and uphold the CSRA.

**II.** The MSPB adopted the government's theory of Article II root and branch. Its decision defies *Perkins* and its progeny, misapplies *Arthrex*, and is incompatible with our nation's history and tradition.

The crux of the MSPB's decision is a half-sentence of dictum from *Seila Law*, in which the Supreme Court characterized *Morrison* as having permitted for-cause removal protections for inferior officers with "limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. According to the government and the MSPB, that half-sentence narrowed *Perkins* into non-existence.

This logic is skin-deep. It flouts the Supreme Court's instruction to "follow the case which directly controls" and usurps the Supreme Court's "prerogative of overruling" its own precedent. *Rodriguez*, 490 U.S. at 484. Regardless, *Seila Law* confirmed that the civil service laws are constitutional. Indeed, the inferior officer at issue in *Morrison* was an independent counsel who investigated and prosecuted "crimes by high-ranking Government officials." *Seila Law*, 591 U.S. at 217. If that

22

powerful prosecutor can be said to have "limited duties" and lack "policymaking or significant administrative authority," so too can mid-level civil servants such as immigration judges. *Id.* at 218 (citation modified).

Tellingly, the MSPB consigned *Arthrex* to a footnote. *See* Appx015. But that case is fatal to the government's position. The MSPB attempted to distinguish *Arthrex* on the ground that, unlike in the remedial statutory scheme blessed by *Arthrex*, there might be some limitations on the Attorney General's ability to review decisions of immigration judges. To be very clear: There are no such limitations. But even if there were, *Arthrex* teaches that the appropriate remedy is to invalidate the limitation—not to strike down the CSRA. There is no way to decide this case for the government without overturning *Arthrex*.

Finally, the MSPB painted immigration judges as exercising an enormous amount of policymaking authority. This is nonsense. The government's own memoranda stress that immigration judges are not policymakers.

**III.** The stakes are extraordinary. The MSPB's decision calls into question civil service laws for millions of federal workers. If it stands, the decision will do enormous damage to the functioning of our government.

The government has argued that Article II invalidates any restrictions on removal enacted by Congress or enshrined elsewhere in the Constitution—including laws like Title VII that prohibit discrimination based on race and sex, and even the

First Amendment. If the government is correct, the President could fire all women or all African Americans, and Congress and the Constitution would have nothing to say about it. This is extraordinarily unjust and deeply troubling. It is also not the law.

The facts of this case underscore the equities. Megan Jackler and Brandon Jaroch were military veterans who were promised civil service protections by a grateful nation. The government terminated them by mistake after it failed to provide them with even the most minimal notice and an opportunity to respond before firing them. Affording Jackler and Jaroch those modest procedural protections, moreover, would in no way impede the President's ability to control the executive branch. This Court should reverse the MSPB's decision and swiftly send the message that the administration's abuse violates the law.

## STANDARD OF REVIEW

This Court reviews the MSPB's decision to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence." *Monasteri v. MSPB*, 232 F.3d 1376, 1378 (Fed. Cir. 2000). This appeal involves a pure question of law that this Court reviews *de novo*. *Id.*

24

## ARGUMENT

### I.    THE CIVIL SERVICE REFORM ACT IS CONSTITUTIONAL.

The Civil Service Reform Act should not be controversial.  Chief Justice Taft in *Myers* and Justice Scalia in *Morrison*—both ardent proponents of the executive branch's removal power—endorsed *Perkins* and agreed that civil service laws do not pose constitutional concerns.  Just a few years ago, in *Arthrex*, the Supreme Court reaffirmed that the CSRA is constitutional.  Meanwhile, historical practice is particularly important in separation-of-powers cases, and the CSRA reflects a longstanding national consensus in favor of a career, merit-based civil service.  The government asks this Court to defy nearly a century and a half of precedent and take a wrecking ball to the professional, nonpartisan federal workforce.  This Court should decline that extraordinary invitation.

### A.    Congress May Regulate The Removal Of Inferior Officers.

**1.** Because this appeal involves removal restrictions for immigration judges— who everyone agrees are inferior officers—a brief sketch of the relevant constitutional framework sets the stage.

The Constitution and precedent distinguish between three classifications within the executive branch.  *Principal officers* are high-ranking officials who report directly to the President.  *See Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025).  These few high-ranking officials—such as the Attorney General and other

25

cabinet officers—must be appointed by the President and confirmed by the Senate. *See* U.S. Const. art. II, § 2, cl. 2; *Braidwood*, 606 U.S. at 754. The Constitution requires nearly all principal officers to be removable at will. *See Slaughter*, 2026 WL 1855612, at *14, *18; *Free Enterprise Fund*, 561 U.S. at 483.

In contrast, Congress can vest the appointment of *inferior officers* in the President directly (with or without Senate confirmation), in the head of a department, and also in the courts of law. *See* U.S. Const. art. II, § 2, cl. 2. "Generally speaking, whether one is an 'inferior' officer depends on whether he has a superior other than the President, and how much power the officer exercises free from control by a superior." *Braidwood*, 606 U.S. at 761 (citation modified). Finally, non-officer *employees* need not be appointed by a department head. *Lucia v. SEC*, 585 U.S. 237, 245 (2018).

The distinction between inferior officers and employees is blurry. The Supreme Court has looked to whether an individual's "duties were occasional or temporary" and to "the extent of power an individual wields in carrying out his assigned functions." *Id*. (citation modified). But "[c]ourts and scholars have struggled for more than a century to" distinguish inferior officers from employees. *Free Enter. Fund*, 561 U.S. at 538 (Breyer, J., dissenting). The category of inferior officers "is unusually broad," *id*. at 539, and some have suggested it includes "all

federal civil officials who perform an ongoing, statutory duty—no matter how important or significant the duty." *Lucia*, 585 U.S. at 254 (Thomas, J., concurring).

**2.** Nearly a century and a half ago, *Perkins* upheld Congress's ability to "restrict the power of removal" for inferior officers appointed by the heads of departments. 116 U.S. at 485. That foundational precedent goes a long way toward resolving this appeal.

In *Perkins*, the Secretary of the Navy discharged a naval officer—a cadet engineer—because, in the Secretary's view, the officer's services were not needed. *Id*. at 483-484. The officer contested his removal based on a statute prohibiting dismissal in peacetime absent a sentence by a court martial. *Id*. The Supreme Court ruled the Secretary of the Navy violated that law, and the plaintiff should be deemed "still in office." *Id*. at 485.

Critically, *Perkins* expressly rejected the argument—advanced by the government in this and other Article II firing cases—that Congress's "restriction of the power of removal is an infringement upon the constitutional prerogative of the executive." *Id*. at 484. Instead, *Perkins* held that, "when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id*. at 485.

*Perkins* rooted its holding in the text of Article II's Appointments Clause. The Clause states: "Congress may by Law vest the Appointment of" "inferior Officers,

as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.  The Supreme Court explained that the express "constitutional authority" to "vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed." *Perkins*, 116 U.S. at 485.

Indeed, a head of department—here, the Attorney General—"has no constitutional prerogative of appointment to offices independently of the legislation of congress." *Id*.  The Attorney General "must be governed" by Congress's legislation "not only in making appointments, but in all that is incident thereto," such as how and when the inferior officer may be removed. *Id*.

Finally, *Perkins* distinguished cases involving an inferior officer appointed by the head of a department—in which there is "no doubt" that Congress may "restrict the power of removal"—from cases involving inferior officers appointed by the President with the Senate's advice and consent. *Id*. at 484-485.  The implication was that, in the narrow circumstances involving presidential appointees confirmed by the Senate, Congress may not be able to restrict removal. *Cf. Shurtleff v. United States*, 189 U.S. 311, 314-315 (1903) (construing statute governing removal of officer narrowly where officer was appointed by President and confirmed by the Senate); *Parsons v. United States*, 167 U.S. 324, 335 (1897) (same).

28

**3.** The Supreme Court reiterated *Perkins*'s holding in *Myers* and left no doubt that Congress may enact civil service laws for the many inferior officers in the federal government—such as Jackler and Jaroch—who are appointed by heads of departments.

*Myers* invalidated a law requiring the Senate to approve the removal of postmasters appointed by the President and confirmed by the Senate. 272 U.S. at 107. Today, Chief Justice Taft's "landmark" and "scholarly opinion" for the Court—which the Supreme Court recently lauded in *Slaughter*—is best remembered as the historical high water mark for the President's removal power over officers he has appointed. *Slaughter*, 2026 WL 1855612, at *11. It is therefore particularly notable that Chief Justice Taft embraced *Perkins* and civil service laws.

Indeed, Chief Justice Taft reiterated over, over, and over again that Congress may limit the removal of inferior officers appointed by the head of a department. *See Myers*, 272 U.S. at 127 (citing *Perkins* and explaining that Congress possesses "the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them"); *id*. at 161 (citing *Perkins* and stating, "Congress, in committing the appointment of such inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal"); *id*. at 162 ("The condition upon which the power

29

of Congress to provide for the removal of inferior officers rests is that it shall vest the appointment in some one other than the President with the consent of the Senate."); *id*. (explaining that Congress may combat "the evil of political executive removals of inferior offices" "by a simple expedient" of modifying "the power of appointment" away from the President with the consent of the Senate); *id*. at 163 (stating that "until" Congress "is willing to vest" "appointment in the head of the department," postmasters "will be subject to removal by the President alone"); *id*. at 164 ("Congress is only given power to provide for appointments and removals of inferior officers after it has vested, and on condition that it does vest, their appointment in other authority than the President with the Senate's consent . . . .").

*Myers* expressly bemoaned the "evil[s] of the spoils system" and extolled "the Civil Service Law," as it applied "to inferior offices." *Id*. at 173. By that time, the civil service laws encompassed "a vast majority of all the civil officers," and Chief Justice Taft confirmed those laws could "be enlarged by further legislation." *Id*. In Chief Justice Taft's words, where inferior officers are appointed by the heads of departments, "they could be *entirely removed from politics*." *Id*. at 174 (emphasis added).

**4.** Modern precedent confirms that Congress may enact protections for the nation's career civil servants.

30

In *Morrison v. Olson*, the Supreme Court upheld a law creating an independent counsel to investigate and prosecute certain "high-ranking Government officials for violations of federal criminal laws." 487 U.S. at 660. The majority opinion classified the independent counsel as an inferior officer, *id*. at 672, and upheld a for-cause removal restriction, *id*. at 687-697. In the process, the majority emphatically refuted the notion that "Article II" "requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President and be removable by him at will." *Id*. at 690 n.29. That argument is "more than the" Constitution's "text will bear," is "contrary to [the] holding in *United States v. Perkins*," and would invalidate the civil service protections for "tens of thousands of holders of offices neither known nor foreseen by the Framers." *Id*.

Justice Scalia dissented in *Morrison*, in an opinion that has become a north star for proponents of robust Article II removal powers. Justice Scalia disagreed with the *Morrison* majority because he concluded that the independent counsel was a principal officer whom Article II required be removable at will. 487 U.S. at 718-719 (Scalia J., dissenting). But Justice Scalia agreed with the majority that Congress could protect inferior officers from arbitrary removal. Citing *Perkins* and *Myers*, Justice Scalia explained that where "Congress ha[s] removed from the usual procedure of Presidential appointment with Senate consent," Congress can restrict the "power to remove." *Id*. at 723-724.

31

Like the majority, Justice Scalia expressly rejected the argument—again, the core thesis the government is advancing in this appeal—that Article II requires the President to "have plenary power to remove inferior officers" to retain "control over all exercises of the executive power." *Id*. at 724 n.4. Justice Scalia explained that this proposition is true for *principal officers*, and the President must have "plenary power to remove *principal officers*," *id.* (emphasis added), the thesis which *Slaughter* recently vindicated. But Article II does not require *inferior officers* to be removable at will. Instead, inferior officers are supervised by principal officers. Should inferior officers "fail[] to accept supervision," that failure will constitute "cause" justifying removal. *Id*. (emphasis omitted). The President therefore controls all exercises of executive power because inferior officers are subject to supervision and must follow the directions of principal officers. If inferior officers do not do so, they then may be removed. *Id*.

Over the last two decades, the Supreme Court pared back certain restrictions on the removal power, while taking pains not to cast doubt on the constitutionality of longstanding civil service protections that apply to countless inferior officers and employees across the federal government.

In *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Supreme Court struck down a "novel" dual layer of removal protections for board members within an independent agency. 561 U.S. at 496; *see also id.* at 502-503

32

(emphasizing that one of those layers of removal protections employed a standard that was unusually "rigorous"). But the Court stressed that it was not calling into question the constitutionality of the "civil service system," or for-cause removal protections for administrative law judges. *Id*. at 507 & n.10; *see also id.* at 483, 494 (reiterating the principles enunciated in *Perkins* and *Morrison*). In *Seila Law*, the Court invalidated for-cause removal protections for a principal officer—the director of an independent agency—that had "no foothold in history or tradition." 591 U.S. at 199, 222. But the Court reiterated that inferior officers need not be removable at will, and confirmed that *Perkins* and *Morrison* remain good law. *Id*. at 217.

Then, in 2021, the Supreme Court effectively upheld the Civil Service Reform Act in *Arthrex*. Indeed, there is no way to rule for the government in this case without overturning *Arthrex*.

*Arthrex* involved a challenge to the appointment of administrative patent judges. 594 U.S. at 13-14, 23. The Court concluded that these judges were functioning as principal officers—not inferior officers—because the statute allowed them to issue unreviewable decisions, and because they were subject to the CSRA, meaning they could be removed by principal officers only "for such cause as will promote the efficiency of the service." *Id*. at 14-17 (quoting 5 U.S.C. § 7513(a)). As a result, the judges' appointment by an agency head—and not the President with the Senate's consent—was inconsistent with the Appointments Clause. *Id*. at 12-13,

33

23. In the Court's words, "the insulation" of these principal officers' decisions "from any executive review" posed serious problems for the President's ability to "oversee" the executive branch. *Id*. at 17.

But here's the critical point: The remedy the *Arthrex* Court selected to address that constitutional problem confirmed that the CSRA is constitutional. The Supreme Court heard *Arthrex* on writ of certiorari from this Court. This Court had similarly concluded that the statutory structure was unconstitutional. This Court had cured that constitutional defect by invalidating the CSRA's removal protections, thereby subjecting administrative patent judges to at-will removal. *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1337 (Fed. Cir. 2019). The Supreme Court took an entirely different tack, however, and expressly declined to invalidate the CSRA. *Arthrex*, 594 U.S. at 25-26. Instead, the Court rendered administrative patent judges inferior officers—and thereby fixed the constitutional problem in *Arthrex*—by subjecting the judges' decisions to review by the Director of the Patent and Trademark Office, a principal officer. *Id.* at 23-26.

*Arthrex* could not have applied that "tailored" remedy—which preserved for-cause removal protections for administrative patent judges, but subjected their decisions to review by a principal officer—if those civil service protections ran afoul of Article II. *Id*. at 25. Indeed, the Supreme Court stressed that the remedy it chose ensured the President would remain in control of the executive branch. In the

Court's words, so long as the "Director ha[s] the discretion to review decisions," "the President" will "remain[] responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Id.* at 27; *see Piano Factory Grp., Inc. v. Schiedmayer Celesta GmbH*, 11 F.4th 1363, 1373-1374 (Fed. Cir. 2021) (applying *Arthrex* and upholding statute involving administrative trademark judges); *cf. Masias v. Sec'y of Health & Hum. Servs.*, 634 F.3d 1283, 1294-1295 (Fed. Cir. 2011) (upholding statute where special masters were removable for cause but reviewable by principal officer).

Last year in *Braidwood Management*, the Supreme Court once again reiterated that presidential control of adjudicative inferior officers turns on the reviewability of an administrative judge's decision, not on whether the administrative judge is removable at will. Citing *Arthrex*, the Court explained that "[i]f an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior *even if not removable at will*." *Braidwood*, 606 U.S. at 765 (emphasis added). The Court emphasized that when a principal officer has the authority to review a subordinate's work, the inferior officer "cannot make any legally binding, final decision on behalf of the United States" if the principal officer "disagrees and wants to block it." *Id.* at 766. Instead, the principal officer "retains ultimate responsibility." *Id.*; *see also id.* at 767, 769. This structure of "higher-level agency reconsideration by the agency head is the standard way to maintain political

35

accountability and effective oversight for adjudication." *Id.* at 775 (citation modified).

Finally, and most recently, *Slaughter* struck down restrictions on the President's ability to remove principal officers who head independent agencies. *See* 2026 WL 1855612, at *19 n.6 (recognizing the question before the court as limited to principal officers); *id.* at *22 (Gorsuch, J., concurring) ("[T]he President must have the ability to remove principal officers."). The government may invoke *Slaughter*—which disclaimed deciding matters regarding the removability of "officials not before" the Court, *id.* at *18—as support for its theory that the President possesses unlimited power to fire everyone who works in the executive branch. If the government relies on *Slaughter*, it will be wrong. *Slaughter* reinforces the constitutionality of civil service laws for lower-level federal workers who are not appointed by the President and who toil under the supervision of principal officers.

Start with the most obvious point. *Slaughter* extolled *Myers* as a "landmark decision," a "scholarly opinion," and the Court's "best word" on the removal power. *Id.* at *11, *12. As Justice Gorsuch explained, *Slaughter* stands for the proposition that "*Myers* was right all along." *Id.* at *26 (Gorsuch, J., concurring). After *Slaughter*, the government cannot "keep the parts of [*Myers*] it likes and discard the rest." *Id.* at *20 (majority op.). Put simply, *Slaughter* embraced *Myers*, and *Myers* teaches that civil service laws are constitutional.

36

The civil service laws *Myers* endorsed are also fully compatible with *Slaughter*'s theoretical underpinnings. *Slaughter* stressed that the President must be able to remove principal officers at will to ensure those high-ranking officials "remain accountable to the President, and the President to the people." *Id*. at *21. But that proposition is limited to officers appointed by the President. *See also id*. at *7 (explaining that those officers who "derive their offices from [the President's] appointment" "must be removable by the President" (quotation marks omitted)). For the mass of federal workers who are not appointed by the President, at-will removal is not necessary to ensure democratic accountability. Instead, supervision provides accountability. As the Court explained in *Arthrex*, when principal officers oversee the work of civil servants, the fact that civil servants' actions are supervised and can be overridden by principal officers "means the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Arthrex*, 594 U.S. at 27; *see Braidwood*, 606 U.S. at 775.

If that were not enough, in his separate concurrence in *Slaughter*, Justice Gorsuch took as a given that the Court's holding regarding principal officers would not invalidate "the civil service laws" that "afford rank-and-file agency employees" "protection against removal." *Slaughter*, 2026 WL 1855612, at *27 (Gorsuch, J.,

concurring) (citing 5 U.S.C. §§ 7511-7513).  The bottom line: *Slaughter* reinforces the conclusion that this Court should uphold the CSRA.[6]

**5.**  All that precedent confirms that civil service laws do not run afoul of Article II.  But the Civil Service Reform Act claims an even stronger constitutional pedigree.  In the separation-of-powers context, courts place "significant weight upon historical practice."  *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (emphasis omitted).  The nation's civil service laws reflect a unique history that has produced a shared consensus across all three branches.  The government thus bears an especially heavy burden to invalidate them.

Consider just a brief sketch of that rich history.  President Washington emphasized "competence and fitness of character" in federal employment, and patronage was practiced sparingly in the country's early years.  Ingraham, *supra*, at 17.  Meanwhile, early sources confirm Congress's authority to enact civil service laws.  For example, in his well-known treatise on the Constitution, Justice Story

---

[6] The Supreme Court's description of the President's Article II removal power in *Trump v. United States* reinforces the conclusion that that power extends only to officers appointed by the President—not inferior officers like Jackler and Jaroch who are appointed by the heads of departments.  603 U.S. 593, 621 (2024) (explaining that the President has unrestricted removal authority for "*the most important of his subordinates—such as the Attorney General*" (emphasis added) (citation omitted)); *see also id.* at 609 (explaining the President enjoys the "unrestricted power of removal with respect to executive officers" "whom *he has appointed*," and acknowledging the "exception[]" for inferior officers (citation modified) (emphasis added) (citing *Seila Law*, 591 U.S. at 215)).

stated Congress could regulate "the term of office" and "the manner" of "removal" for " 'inferior officers.' " 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1st ed. 1833); *see also, e.g.*, Appointment & Removal of Inspectors of Customs, 4 U.S. Op. Att'y. Gen. 165, 166 (1843) ("I am not prepared positively to dissent from any part of [Justice Story's] very sweeping proposition.").[7]

By the 1840s, a spoils system emerged in the United States, and "public jobs were openly bought and sold." Ingraham, *supra*, at 21. President Garfield's assassination by a disgruntled supporter who unsuccessfully sought a patronage appointment sparked reform. In 1883, Congress passed, and President Arthur signed into law, the Pendleton Act to combat the "vast public evil" plaguing the country. *Id*. at 26 (citation modified). Just three years later, the Supreme Court endorsed Congress's authority to enact this type of civil service legislation in *Perkins*. *See supra* pp. 27-28.

During the Twentieth Century, the Supreme Court recognized that constitutional provisions dating back to the Founding reinforced the national consensus that federal workers deserve protection from abuse, retaliation, and discrimination. For example, the Supreme Court recognized that "political

---

[7] *Slaughter*, notably, relied on this section of Story's treatise, once more underscoring that the government's position in this case is at odds with *Slaughter*. *See Slaughter*, 2026 WL 1855612, at *19 (citing Story, *supra*, at § 1531).

patronage" violates the First Amendment, *Elrod v. Burns*, 427 U.S. 347, 353, 360 (1976) (plurality op.), except in very narrow circumstances where "party affiliation is an appropriate requirement" for public employment. *Branti v. Finkel*, 445 U.S. 507, 518 (1980) (suggesting party affiliation may be appropriate, for example, for those who help an elected official "write speeches, explain his views to the press, or communicate with the legislature"); *see also, e.g.*, *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990).

The Court more broadly affirmed the religious, speech, and equal protection rights of public employees grounded in the First and Fifth Amendments. *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022); *Lane v. Franks*, 573 U.S. 228, 231 (2014) ("[C]itizens do not surrender their First Amendment rights by accepting public employment."); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825 (1976) (explaining that "federal employment discrimination clearly violate[s] . . . the Constitution").

Meanwhile, Congress and the President continued to enact a series of landmark civil service statutes to vindicate federal workers' constitutional rights and otherwise protect them from abuse and discrimination. The more recent examples of these efforts include: (i) extending Title VII and other antidiscrimination statutes to federal workers, *see, e.g.*, Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, § 11, 86 Stat. 103, 111-112 (Title VII); Fair Labor Standards

Amendments of 1974, Pub. L. No. 93-259, § 28(b)(2), 88 Stat. 55, 74-75 (Age

Discrimination in Employment Act); (ii) enacting comprehensive civil service

reform through the CSRA, *see* Civil Service Reform Act of 1978, Pub. L. No. 95-

454, 92 Stat. 1111; (iii) bolstering protections for whistleblowers in 1989, *see*

Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16; (iv) further

expanding federal civil service protections the following year, *see* Civil Service Due

Process Amendments Act, Pub. L. 101-376, 104 Stat. 461 (1990); and (v) again

revamping whistleblower protections in 2012, Whistleblower Protection

Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465. [8]

Ruling for the government would require running roughshod over that history

and would mean upsetting a settled inter-branch consensus that has withstood the

test of time. But it also bears emphasis: In exercising its authority to enact civil

service laws, Congress carefully tailored these statutes to avoid running afoul of the

executive's core prerogatives. For example, consistent with *Perkins* and *Myers*, the

---

[8] Congress thus acted well within its constitutional remit when it enacted the Civil Service Reform Act because the CSRA is a statutory mechanism for federal employees to vindicate their constitutional rights, *see Hankins v. Lyght*, 441 F.3d 96, 106 (2d Cir. 2006), and also because the Act's whistleblower protections vindicate Congress's authority to gather information necessary to legislate and perform oversight. *See Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020); *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 760 (D.C. Cir. 2020) (en banc).

CSRA does not apply to those appointed by the President. 5 U.S.C. § 7511(b)(1), (b)(3). The MSPB lacks jurisdiction over employees in certain agencies performing sensitive functions, such as the Central Intelligence Agency and the Federal Bureau of Investigation. *Id*. § 7511(b)(7)-(8). And the MSPB has limited authority when the executive branch removes members of the Senior Executive Service for poor performance. *Id.* § 3592; *Esparraguera v. Dep't of Army*, 981 F.3d 1328, 1334-1336 (Fed. Cir. 2020); *see also Free Enter. Fund*, 561 U.S. at 506 (describing additional mechanisms in the CSRA to exempt certain positions and "ensure Presidential control"). That careful tailoring puts the lie to the government's suggestion, in this case and others like it, that the CSRA improperly impinges on the executive branch's Article II removal powers.

* * *

In short, for more than a century and a half, the Supreme Court has upheld civil service laws in accordance with a national consensus endorsed by all three branches of government. When it comes to inferior officers appointed by the heads of a department, Congress "may limit and restrict the power of removal as it deems best for the public interest." *Perkins*, 116 U.S. at 485. As Justice Scalia explained, the CSRA does not prevent the President from controlling the executive branch because inferior officers must follow the instructions of their superiors and are removable if they do not. *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

Moreover, as *Arthrex* teaches, so long as a principal officer can review and overturn an inferior officer's decisions issued in adjudications, the inferior officer remains accountable to the President and, by extension, to the people. Should a law prevent such review, the appropriate remedy under *Arthrex* is to invalidate the law— not blow up the landmark statute protecting our nation's public servants from discrimination and abuse. Finally, *Slaughter* only confirms that the Court should follow Chief Justice Taft's "landmark" and "scholarly" decision in *Myers*, and affirm the constitutionality of the nation's non-partisan, professional civil service. *Slaughter*, 2026 WL 1855612, at \*11.

**B.    Civil Service Protections For Immigration Judges Are Constitutional.**

**1.** Before their abrupt and unjustified terminations, Jackler and Jaroch were career civil servants working in the Department of Justice as immigration judges. The civil service protections that applied to them—in particular, the modest procedural protections they should have received before their terminations—are plainly constitutional under the legal framework just described.

In this case, the parties agree that immigration judges are appropriately classified as inferior officers. *See Lucia*, 585 U.S. at 248. By statute, immigration judges are appointed by the Attorney General—the head of a department. *See* 8 U.S.C. § 1101(b)(4); 28 U.S.C. § 503. Immigration judges "shall be subject to

43

such supervision and shall perform such duties as the Attorney General shall prescribe."  8 U.S.C. § 1101(b)(4).

Because immigration judges are inferior officers appointed and supervised by the Attorney General, the Constitution empowers Congress to regulate their removal. *See Perkins*, 116 U.S. at 485.  Congress has done so through statutory provisions that generally require minimal notice and an opportunity to be heard before removal; that bar removals in the absence of cause; that ensure all promotions and evaluations are based on merit; that prohibit partisan patronage; and that outlaw discrimination based on constitutionally protected activity, race, sex, religion, age, and other characteristics.  *See supra* pp. 10-12.

As Justice Scalia explained, these restrictions on the Attorney General's ability to fire immigration judges do not entrench on the President's ability to "control" "the executive power."  *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting); *see also id.* at 695-696 (majority op.).  Immigration judges can be removed by the Attorney General if they "fail[] to accept supervision," which is more than enough to ensure that immigration judges remain accountable to the President, and by extension to the people.  *Id.* at 724 n.4 (Scalia, J., dissenting).

Indeed, it would be laughable to think that the President's ability to control the executive branch is impeded, in the slightest, by prohibiting discrimination against Jackler and Jaroch in ways, such as based on their partisan affiliation, sex,

or religion, that have no bearing on their ability to perform their jobs. Yet that is precisely the argument the government has made in this case and others like it. *See supra* pp. 13-14.

Consider what happened here. The government brazenly violated Jackler's and Jaroch's statutory rights to minimal notice prior to their terminations. *See* 5 U.S.C. § 7513(b). Based on the documents the government disclosed, however, it is clear the government fired Jackler and Jaroch *by mistake* because it thought they were probationary employees. The government would have discovered that mistake if it had—as required by the CSRA—provided Jackler and Jaroch notice and an opportunity to respond before terminating them. *See supra* p. 13. Let's be clear: This case is not about a President attempting to control the exercise of executive power in any meaningful way. It is about an executive branch acting with impunity, firing two exemplary employees by accident, and claiming the Constitution allows it to blow past the modest procedural guardrails Congress enacted to ensure our nation's public servants receive a basic measure of fairness.

**2.** The Court could stop here. But *Arthrex* puts the matter to bed. In *Arthrex,* the Supreme Court held that it was enough for a principal officer to review decisions of administrative patent judges, even if those inferior officers could be removed only for cause under the CSRA. 594 U.S. at 17, 23-27.

In all pertinent respects, the statutory scheme that applies to immigration judges looks like the scheme that the Supreme Court fashioned in *Arthrex*. By law, immigration judges "shall be subject to such supervision . . . as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4). This broad grant of authority alone permits the Attorney General to review and revise an immigration judge's decision. The Attorney General also has additional express statutory authority to review decisions issued by immigration judges. By law, the Attorney General may "review such administrative determinations in immigration proceedings" "and perform such other acts" as he "determines to be necessary." *Id*. § 1103(g)(2); *see also id*. § 1103(a)(1) (providing that any "determination . . . by the Attorney General with respect to all questions of law shall be controlling"); *Matter of M-S-*, 27 I. & N. Dec. 509, 519 n.6 (A.G. 2019) (citing 8 U.S.C. § 1103(g)(2) as authority for Attorney General to review directly an immigration judge's "bond order").

To top it off, the Attorney General has promulgated regulations permitting him to transfer to himself for plenary review any matter decided by an immigration judge and appealed to the Board of Immigration Appeals. *See* 8 C.F.R. § 1003.1(h)(1)(i). Indeed, in *Arthrex*, the Supreme Court identified the "Executive Office for Immigration Review"—the office in which Jackler and Jaroch worked— as an "example[]" of a situation involving "inferior officers whose decisions a

46

superior executive officer can review or implement a system for reviewing." 594 U.S. at 20.

The Department of Justice normally takes the position that the Attorney General possesses sweeping authority to review and revise an immigration judge's decision. Here is what one Attorney General opinion said in 2006, when reviewing an immigration judge's decision: "I review de novo all aspects of the Board's and Immigration Judge's decisions in this case." *In re J.F.F.*, 23 I. & N. Dec. 912, 913 (A.G. 2006). The Attorney General "retains full authority to receive additional evidence and to make de novo factual determinations." *Id.* (citation modified). "The Executive Office for Immigration Review, which includes the Board and Immigration Judges, is subject to the direction and regulation of the Attorney General." *Id.* "While Attorneys General have delegated their authority to the Board and Immigration Judges in the first instance, [they] retain the power to exercise full decisionmaking upon review." *Id.*; *see also Matter of M-S-*, 27 I. & N. Dec. at 519 n.6 (stating that Attorney General has statutory authority to review directly an immigration judge's "bond order").

This scheme—under which the Attorney General may review and reverse immigration judges' decisions—is not unusual. Quite the opposite. As the Supreme Court recently explained, it reflects the "longstanding model of agency

adjudications" "throughout the Executive Branch." *Braidwood*, 606 U.S. at 775-776.

Under *Arthrex*, a principal officer "need not review every decision" to ensure an immigration judge remains "accountable to the people." *Arthrex*, 594 U.S. at 27. "What matters is that the" principal officer has "the discretion to review decisions rendered by" immigration judges. *Id*. "In this way, the President remains responsible for the exercise of executive power." *Id*. And to the extent there is any ambiguity as to whether the Attorney General has authority to review certain decisions issued by immigration judges, the "constitutional avoidance" canon counsels in favor of construing the "ambiguity" in favor of the Attorney General's "authority to review and block" immigration judges' decisions. *Braidwood*, 606 U.S. at 775-776. In short, there is no Article II concern with civil service laws applying to Jackler and Jaroch because the Attorney General has complete discretion to review their actions.

Finally, *Arthrex* teaches that if there were some statutory or regulatory impediment to the Attorney General's review (to be clear: there is none), the appropriate remedy would be to sever that impediment, not to subject these civil servants to at-will removal. *Arthrex*, 594 U.S. at 25-27 (explaining this "tailored approach" as better reflecting "the structure of supervision" and "the nature of" the adjudicatory "duties" administrative patent judges perform).

48

**3**. Three last points.

*First*, it bears repeating: Any Article II concerns are at their lowest ebb when it comes to the procedural protections that Jackler and Jaroch failed to receive prior to their termination. There is no reason that the government could not have provided Petitioners with minimal notice before terminating them. That the government resists even commonsense procedural measures, which place de minimis requirements on the government, puts a lie to the claim that this appeal is about the President needing to control the executive branch.

*Second*, any Article II concerns are also at their nadir when it comes to executive branch adjudicators, including immigration judges, because adjudication is not "enforcement or policymaking." *Free Enter. Fund*, 561 U.S. at 507 n.10. Indeed, the government itself stressed in a recent memorandum that immigration judges must not make decisions based on "policy preferences," and instead must always base their determinations on an "evenhanded application of the law." Sirce E. Owen, Acting Director, Executive Office of Immigration Review, *U.S. Dep't of Justice, Neutrality and Impartiality in Immigration Court Proceedings* 1 n.1 (June 27, 2025), https://perma.cc/8FFA-J7WB.

*Third* and relatedly, modest civil service protections for executive branch adjudicators secure critical due process values—which are essential for adjudication—by ensuring that a "federal hearing examiner or administrative law

judge generally exercises his independent judgment on the evidence before him." *Braidwood*, 606 U.S. at 774 (citation modified). That promise of independence, in turn, ensures public confidence in executive branch hearings. *See Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*, 144 F.4th 1315, 1344 (11th Cir. 2025).

Such public confidence is important in the immigration context, which implicates questions of "human liberty and happiness." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950). Again, the government's own memorandum stresses that "parties in immigration court are entitled to a neutral, impartial adjudicator." Owen, *supra*, at 2; *see* 8 C.F.R. § 1003.10(b), (d) (providing that "immigration judges shall exercise their independent judgment," "subject to" directives from their superiors, and shall "resolve the questions before them in a timely and impartial manner"). The Civil Service Reform Act ensures that Jackler, Jaroch, and their colleagues may deliver on the promise of impartiality when they evaluate the matters before them.

To be sure, any "independent judgment" immigration judges exercise remains fully subject to "political accountability" because the Attorney General may review immigration judges' decisions. *Braidwood*, 606 U.S. at 774-775 (citation modified). But ensuring that immigration judges can exercise a measure of independence in issuing decisions—a result that flows in part from civil service protections—serves

important due process values that benefit the government, individuals appearing before immigration judges, and the public at large.

* * *

In short, civil service protections are plainly permissible, especially for the many inferior officers like Jackler and Jaroch who "perform adjudicative" functions. *Free Enter. Fund*, 561 U.S. at 507 n.10; *see Walmart*, 144 F.4th at 1349 (upholding civil service protections for administrative law judges in 5 U.S.C. § 7521(a)); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024) (same), *cert. denied*, 145 S. Ct. 1047 (2025); *Rabadi v. DEA*, 122 F.4th 371, 375 (9th Cir. 2024) (same), *cert. denied*, 145 S. Ct. 2846 (2025); *Calcutt v. FDIC*, 37 F.4th 293, 319 (6th Cir. 2022) (same), *rev'd on other grounds*, 598 U.S. 623 (2023); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133 (9th Cir. 2021) (same); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (confirming constitutionality of removal protections for administrative law judges).  *But see Jarkesy v. SEC*, 34 F.4th 446, 463 (5th Cir. 2022) (invalidating protections for administrative law judges, over a vigorous dissent), *aff'd on other grounds*, 603 U.S. 109 (2024).

## II.    THE MERIT SYSTEMS PROTECTION BOARD'S DECISION IS WRONG.

The MSPB rushed to invalidate the Civil Service Reform Act and parroted the government's Article II arguments.  In the process, the MSPB ran roughshod over constitutional text, history, structure, and precedent.

The core of the MSPB's decision rests on a half-sentence of dictum from *Seila Law*, in which the Supreme Court noted that *Morrison* had permitted removal protections "for inferior officers with limited duties and no policymaking or administrative authority."  *Seila Law*, 591 U.S. at 218.  *Seila Law*'s half-sentence mirrored nearly identical language from *Morrison* describing the duties of the independent counsel.  *See Morrison*, 487 U.S. at 691 (describing the independent counsel as having "limited jurisdiction" and "lacking policymaking or significant administrative authority").  The government has argued in pending Article II firing cases, and the MSPB concluded, that *Seila Law*'s description of *Morrison* radically cabined *Perkins* and its progeny—indeed, so much so that civil service laws may now apply only to a vanishingly small subset of inferior officers.  *See* Appx013.

The MSPB could not be more wrong.  For one thing, *Seila Law* elsewhere confirmed that "history and precedent" are the lodestars in evaluating the scope of the President's Article II removal power.  591 U.S. at 214.  By that metric, the Civil Service Reform Act passes in spades.  Civil service laws are far from "novel."  *Id.* at 215.  Their roots go back at least a century and a half, if not more, and the Founders

52

recognized Congress's authority in this arena. *See supra* pp. 8-9, 38-39. For another, *Seila Law* concerned the President's authority to remove a principal officer, not "an inferior officer." 591 U.S. at 219, 238. The half-sentence in *Seila Law* discussed inferior officers and was therefore dictum with no with no relevance to *Seila Law*'s outcome.

But even if *Seila Law* meant to articulate a new legal test for when civil service protections may apply to inferior officers (it did not), the test would be capacious— not narrow. *Seila Law* was describing an independent counsel who investigated and tried "crimes by high-ranking Government officials." *Id*. at 217. If that powerful prosecutor could be said to have "limited duties and no policymaking or administrative authority," the same can be said of middle-management career civil servants like Jackler and Jaroch who had more modest responsibilities. *See also id*. at 219 (describing the independent counsel as wielding "significant" "core executive power").

Indeed, the Eleventh Circuit recently explained that administrative law judges who adjudicate civil immigration proceedings against employers perform "limited duties" without policymaking or administrative authority as those terms were used in *Seila Law*. As that court explained, the administrative law judges "conduct only adjudicative tasks"; their exercise of those narrow duties "is limited by the published rules of the agency"; and they "cannot initiate investigations or bring an enforcement

action." *Walmart*, 144 F.4th at 1343 (citation modified).  The exact same is true of immigration judges, who likewise perform only adjudicative tasks, are bound by the Attorney General's regulations and directives, and may not initiate investigations or bring enforcement actions.  To top it off, *Arthrex* confirmed that it is permissible to apply civil service laws to administrative adjudicators, and *Arthrex* never suggested administrative adjudicators exercised more than "limited duties" or wielded "policymaking or administrative authority."   It was not the MSPB's role to effectively "overrul[e]" binding Supreme Court precedent and hamstring a landmark statute, let alone based on such a flimsy rationale.  *Rodriguez*, 490 U.S. at 484.

The MSPB dismissed *Arthrex* in a footnote stating that "immigration judge decisions" are subject to only "limited and conditional review."  Appx015.  But that is not true.  For all the reasons just described, immigration judges are subject to broad review by the Attorney General.  *See supra* pp. 46-48.  Indeed, the MSPB itself acknowledged that decisions made by immigration judges are "subject to review by both the Board of Immigration Appeals and the Attorney General."  Appx015.

To suggest otherwise, the MSPB noted that if a noncitizen chooses not to appeal an immigration judge's decision, the decision will become final.  *Id*.  The implication seems to be that, if the noncitizen does not appeal to the Board of Immigration Appeals, the regulations might not permit the Attorney General to transfer the case to himself and block the decision.  But the regulations do not say

54

that, and the plain language of 8 U.S.C. §§ 1101(b)(4) and 1103(g)(2) permits the Attorney General to always review *any* decision issued by an immigration judge without limit. The Attorney General may "prescribe" whatever "supervision" he deems appropriate, *id*. §1101(b)(4), may "review administrative determinations in immigration proceedings," and may "perform" any "such other acts" he "determines to be necessary," *id*. § 1103(g)(2). If the Attorney General disagrees with a decision by an immigration judge, the Attorney General retains statutory authority to revise it, even if the noncitizen does not appeal. *See Matter of M-S-*, 27 I. & N. Dec. at 519 n.6 (citing 8 U.S.C. § 1103(g)(2) as authority to review an immigration judge's un-appealed bond order). In short, an immigration judge "cannot make any legally binding final decision on behalf of the United States if the" Attorney General "disagrees and wants to block it." *Braidwood*, 606 U.S. at 776.[9]

Moreover, in the circumstances in which an immigration judge's decision becomes final by regulation because a noncitizen does not appeal, the immigration judge would have ruled *for the government*. This is hardly a circumstance in which the immigration judge is acting against the executive branch's wishes, thus triggering meaningful Article II concerns.

---

[9] If the regulations or statutes are at all ambiguous on that point (they are not), the canon of constitutional avoidance requires that they be construed in favor of review by the Attorney General. *Braidwood*, 606 U.S. at 776.

55

The MSPB additionally concluded—without any elaboration—that "even if [a noncitizen] does appeal a decision, that right to appeal *may* be limited in scope." Appx015 (emphasis added). But the MSPB notably did not articulate any such limitations, and even more importantly did not explain how anything constrains the Attorney General's broad statutory authority to review an immigration judge's decision directly. *See Matter of M-S-*, 27 I. & N. Dec. at 519 n.6. This lack of analysis is astonishing and betrays the MSPB's rush to judgment. Meanwhile, the MSPB completely ignored the central remedial holding in *Arthrex*: If something limits the Attorney General's review (nothing does), the appropriate response is to invalidate *that* limitation—not invalidate the civil service laws.[10]

Finally, in an attempt to bolster its decision, the MSPB stated that "immigration judges wield[] vast administrative authority in an area of significant consequence," "have a major impact on a significant area of our nation's domestic

---

[10] Below, the government argued that immigration judge decisions are unappealable to the Board and thus effectively unreviewable by the Attorney General in two exceedingly narrow circumstances. First, according to the government, in absentia removal orders are unappealable. Not so. Procedurally, the noncitizen "file[s] a motion to reopen," after which "she file[s] an appeal." *In re Guzman-Arguera*, 22 I. & N. Dec. 722, 723 (BIA 1999). Second, the government observed noncitizens cannot appeal certain immigration judge decisions agreeing with an asylum officer finding a lack of credible fear of persecution under 8 C.F.R. § 1208.30(g)(2)(iv). But *another* executive branch entity, U.S. Citizenship and Immigration Services, "may nevertheless reconsider a negative credible fear finding." *Id*. Regardless, the Attorney General may always reverse an immigration judge's decision directly. *Cf*. *DHS v. Thuraissigiam*, 591 U.S. 103, 140 n.28 (2020).

56

and foreign policy," and make "policy choices that bear on this Nation's international relations." Appx015-016 (citation modified).

This effort to paint immigration judges as uber foreign policymakers is a canard. The current administration itself has stressed that immigration judges do *not* make policy. Instead, immigration judges act as neutral arbiters in the matters before them. *See* Owen, *supra*, at 1-2. As the Supreme Court has explained, the case-by-case "evenhanded application of the law," *id*. at 2 n.1, which is what the government says immigration judges do, is *not* "policymaking," *Free Enter. Fund*, 561 U.S. at 507-508; *see Walmart*, 144 F.4th at 1343. Meanwhile, the Supreme Court confirmed that the independent counsel in *Morrison*, who prosecuted high ranking government officials, "lack[ed] policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691. The MSPB's suggestion that individual immigration judges—who decide discrete cases under the complete supervision of the Attorney General—somehow wield "vast administrative authority" is ludicrous.[11]

---

[11] The lone citation the MSPB provided disproves its argument. In *Arizona v. United States*, the Supreme Court struck down a state law that criminalized certain immigration offenses. 567 U.S. 387 (2012). In its analysis, the Court noted that "[i]mmigration *policy* can affect trade, investment, tourism, and diplomatic relations for the entire Nation." *Id*. at 395 (emphasis added). But, as explained above, immigration judges do not *make* federal immigration *policy*.

## III.    RULING FOR THE GOVERNMENT WOULD UNLEASH CHAOS.

If it stands, the MSPB's decision will cause—indeed, already is causing—devastating consequences.  The MSPB adopted a sweeping view of Article II removal power that provides a roadmap for the executive branch to gut our nation's civil service laws.  The executive branch can escape the statutes Congress passed by: (i) characterizing a civil servant's job duties as insufficiently "limited," or as involving "policymaking or administrative authority" under its cramped reading of *Seila Law*; and (ii) asserting Article II power to remove them.

This is not a hypothetical concern.  It is happening *right now* and is causing enormous damage to the civil service with each passing day.  This appeal is just one of many "Article II" firing matters before the MSPB.  In case after case, the government has submitted materially identical briefing, adopting the same formulaic arguments and asserting a talismanic Article II right to defy the law.

Affirming the decision in this case would provide the government with a green light to accelerate its abuse and could irrevocably shatter the civil service.  As a result of the government's lawless firings and the MSPB's decision, countless federal workers already live in fear of arbitrary dismissal, partisan discrimination, and whistleblower retaliation—without any confidence that they can vindicate their rights.

The final result of the government's Article II theory is a world without *any* protections for civil servants. Indeed, the government is elsewhere arguing, based on the same Article II arguments it advanced in this case, that Article II invalidates federal workers' rights under the First Amendment, Title VII, and other antidiscrimination statutes. *See supra* p. 14. The ramifications of that sweeping constitutional theory are bleak. An incoming Democratic administration could direct the removal of federal workers who were registered Republicans—asserting inherent Article II authority to remove civil servants at will. The executive branch could target African Americans, women, or individuals over 60 years old—and the dismissed civil servants would have no recourse. A President could remove all Evangelical Christians, Muslims, or atheists working in the federal government— and the law would have nothing to say about it. Those deeply troubling results, which have nothing to do with the President's ability to control the executive branch, are as wrong as they sound. But it is all the direct consequence of the government's flawed conception of an unfettered Article II removal power that nothing may check.

This Court should not send shockwaves through the law and upset the settled reliance interests of millions of civil servants. The men and women of the civil service accepted government jobs under the explicit promise that they would be protected from abuse and retaliation. Now, the government is trying to change the rules for millions of federal workers, not by legislation but by fiat. *Cf. Montejo v.*

59

*Louisiana*, 556 U.S. 778, 792 (2009) (noting that the Court considers "reliance interests at stake" in weighing *stare decisis* factors).

The facts of this case illustrate the problem.  The government expressly told Jackler and Jaroch that they would receive CSRA protections.  *See* Appx139; Appx342; Appx388; Appx408.  Indeed, veterans like Jackler and Jaroch often transition into civilian service precisely because of the civil service's preferences and protections for those who served in uniform.  *See, e.g.*, 5 U.S.C. § 7511(a)(1)(B) (providing shorter probationary periods for preference-eligible veterans).[12]  Now the government is pulling the rug out from underneath Jackler, Jaroch, and countless other veterans.  Meanwhile, Jackler's and Jaroch's firings were totally senseless.  Their superiors terminated them *by mistake*.  Jackler and Jaroch could not fix that mistake because they never received the most minimal notice prior to their termination.  This is profoundly unjust.

If the MSPB's decision stands, the government will suffer.  Once the federal government cannot promise basic dignity in the workplace, it will become increasingly difficult to recruit and retain talented professionals to staff numerous agencies across the federal government.  In the end, democracy will suffer.

---

[12] "As of September 2024, more than 700,000 veterans worked in various federal departments and agencies," comprising 24% of all federal workers.  Drew DeSilver, *What We Know About Veterans Who Work For The Federal Government*, Pew Rsch. Ctr. (Apr. 10, 2025), https://perma.cc/7HTT-C9TM.

Presidents can implement their agendas when they enter office—and exercise Article II executive power—only because each successive administration may call upon a cadre of experienced, nonpartisan civil servants to execute their policies. If the civil service is gutted, however, Presidents will lose the skilled human capital they need to fulfill the mandates they were elected to accomplish. In the worst-case scenario, an outgoing administration could sabotage an incoming President's agenda, and frustrate a successor's exercise of executive power, by strategically removing workers in critical agencies to cripple the government prior to the peaceful transfer of power. Put differently, the government's theory is plainly incompatible with Article II precisely because ruling for the government now would severely threaten a future President's ability to exercise executive power.

That way lies chaos. None of it is required or authorized by the Constitution. Every day, honorable civil servants perform their jobs under the supervision of the President and his principal officers. They deserve better than this. In light of the enormous harm from the government's actions, which will only grow more acute with the passage of time, Petitioners respectfully urge the Court to act quickly, reverse the MSPB's decision, and reject the government's attempt to turn back the clock. Unless and until this Court intervenes, Petitioners' rights will go unprotected, and America's upstanding public servants will live in fear.

61

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the Merit Systems Protection Board.

July 14, 2026                              Respectfully submitted,

                                          /s/ Nathaniel A.G. Zelinsky

ROBERT P. ERBE                            NATHANIEL A.G. ZELINSKY
LAW OFFICE OF ROBERT P. ERBE,             SYDNEY FOSTER
  PLLC                                    JAMES I. PEARCE
Federal Employment Law Office             ROSA L. BAUM
3361 E. Terra Alta Blvd.                  WASHINGTON LITIGATION GROUP
Tucson, AZ 85716                          1717 K St. NW, Suite 1120
520-309-0763                              Washington, D.C. 20006
robert.erbe@erbelawoffice.com             202-521-8750
                                          nzelinsky@washingtonlitigationgroup.org

*Counsel for Petitioners*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit through the appellate CM/ECF system on July 14, 2026. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Nathaniel A.G. Zelinsky</u>
Nathaniel A.G. Zelinsky

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1).  Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), this brief contains 13,930 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally spaced font.

/s/ Nathaniel A.G. Zelinsky
Nathaniel A.G. Zelinsky

**Addendum**

*Jackler v. DOJ*, 2026 M.S.P.B. 3 (Mar. 20, 2026) .................................................Appx001

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

**2026 MSPB 3**

---

Docket No. CF-0752-26-0069-I-1

---

**Jackler and Jaroch Consolidation,**

**Appellant,**

**v.**

**Department of Justice,**

**Agency,**

**and**

**Director of the Office of Personnel**

**Management,**

**Intervenor.**

March 20, 2026

---

Robert P. Erbe, Esquire, Tucson, Arizona, for the appellant.

Nathaniel A.G. Zelinsky, Esquire, Washington, D.C., for the appellant.

Lourdes M. Guillaume, Esquire, New York, New York, for the agency.

Matthew Tanny Pizzo, Esquire, and Robert Ley, Esquire,
    Falls Church, Virginia, for the agency.

Patrick Alexander Ehler, Esquire, and Jordan Lee Perkins, Esquire,
    Washington, D.C., for the intervenor.


**BEFORE**

Henry J. Kerner, Vice Chairman
James J. Woodruff II, Member


**Appx001**

2

**OPINION AND ORDER**

¶1    The agency has filed petitions for review of the initial decisions, which reversed the appellants' removals and ordered the agency to retroactively restore the appellants effective February 14, 2025. For the reasons discussed below, we CONSOLIDATE these appeals,[1] GRANT the agency's petitions for review, VACATE the initial decisions, and DISMISS these appeals for lack of jurisdiction. We hold that the Attorney General's exercise of constitutional Article II removal authority in relation to these appellants—whom we determine, based on their duties, are inferior officers who exercise significant adjudicative and policymaking authorities on behalf of the United States—abrogates otherwise-applicable statutory removal protections and thus deprives the Board of jurisdiction.

BACKGROUND

¶2    On June 21, 2021, the agency appointed appellant Jackler to the position of Assistant Chief Immigration Judge in the agency's Executive Office for Immigration Review (EOIR) in its New Orleans office.[2] *Jackler v. Department of*

---

[1] Pursuant to 5 C.F.R. § 1201.36(a)(1), because appellant Jackler and appellant Jaroch occupied identical positions for the agency and were removed by the agency utilizing the same legal theory, we hereby consolidate the appellants' appeals, MSPB Docket No. DA-0752-25-0330-I-1 and MSPB Docket No. DA-0752-25-0328-I-1, respectively, into one collective appeal, identified as MSPB Docket No. CF-0752-26-0069-I-1. Additionally, we acknowledge that the agency moved to consolidate the appellants' appeals along with three other appeals on the basis that they dealt with similar factual and legal issues. *Jackler v. Department of Justice*, MSPB Docket No. DA-0752-25-0330-I-1, Initial Appeal File (Jackler IAF), Tab 9; *Jaroch v. Department of Justice*, MSPB Docket No. DA-0752-25-0328-I-1, Initial Appeal File (Jaroch IAF), Tab 9. The administrative judge denied the agency's motion due to distinctions in factual records and legal theories between the five appeals. Jackler IAF, Tab 11 at 2; Jaroch IAF, Tab 12 at 2. Despite this matter being consolidated now, we are not revisiting or reversing the ruling of the administrative judge declining to consolidate the five appeals at that time.

[2] Appellant Jackler was initially appointed to the position on June 21, 2021, for a period not to exceed 24 months. Jackler IAF, Tab 5 at 5-6. On May 31, 2023, the Attorney General appointed appellant Jackler to the same position effective June 19, 2023, on a permanent basis. *Id*. at 6.

3

*Justice*, MSPB Docket No. DA-0752-25-0330-I-1, Initial Appeal File (Jackler IAF), Tab 5 at 28.  On September 26, 2021, the agency appointed appellant Jaroch to the position of Assistant Chief Immigration Judge in EOIR's Buffalo office.[3] *Jaroch v. Department of Justice*, MSPB Docket No. DA-0752-25-0328-I-1, Initial Appeal File (Jaroch IAF), Tab 7 at 30.  Appellant Jaroch subsequently relocated to the agency's Houston office, holding the same position.  Jaroch IAF, Tab 4 at 13-14.

¶3    As immigration judges, the appellants conducted "proceedings for deciding the inadmissibility or deportability of an alien," 8 U.S.C. § 1229a(a)(1), which proceedings are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or . . . removed from the United States," 8 U.S.C. § 1229a(a)(3).  When conducting these proceedings, the appellants were empowered to "administer oaths; receive evidence; interrogate, examine, and cross-examine . . . witnesses"; "issue subpoenas"; and "sanction . . . any action or inaction in contempt of the judge's proper exercise of authority."  8 U.S.C. § 1229a(b)(1).  At the close of proceedings, the appellants issued decisions determining "whether an alien is removable from the United States."  8 U.S.C. § 1229a(c)(1)(A).

¶4    As immigration judges, the appellants acted as delegates of the Attorney General in cases before them.  8 C.F.R. § 1003.10(a).  In doing so, they exercised their independent judgment and discretion in conducting hearings and issuing decisions.  8 C.F.R. § 1003.10(b).  Their decisions were not subject to unlimited appellate review and could potentially become the final order of the United States if not appealed.  8 C.F.R. §§ 1003.1(b), 1241.1.  They also had authority to grant aliens a wide range of immigration benefits, including asylum. 8 C.F.R. § 1208.2(b).

---

[3] Appellant Jaroch was initially appointed to the position on September 26, 2021, for a period not to exceed 24 months.  Jaroch IAF, Tab 1 at 2.  On September 25, 2023, the Attorney General appointed appellant Jaroch to the same position on a permanent basis. Jaroch IAF, Tab 4 at 27.

4

¶5     On February 14, 2025, the Acting Director of EOIR informed both appellants that their employment was being terminated effective that day. Jackler IAF, Tab 1 at 7; Jaroch IAF, Tab 1 at 7. On February 20, 2025, appellant Jaroch timely appealed his termination to the Board. Jaroch IAF, Tab 1. On February 21, 2025, appellant Jackler timely appealed her termination to the Board. Jackler IAF, Tab 1.

¶6     Before the administrative judge, the appellants' litigation proceeded on parallel and largely identical tracks. The appellants argued that they met the requirements to qualify as employees under 5 U.S.C. § 7511, and thus were entitled to—but did not receive—the pretermination procedures set forth in 5 U.S.C. § 7513(b). Jackler IAF, Tab 3 at 6-12; Jaroch IAF, Tab 4 at 6-12. The agency argued that Article II of the U.S. Constitution authorized the Attorney General to remove individuals qualifying as inferior officers, such as the appellants, without restriction; and that the exercise of this authority abrogated otherwise applicable statutory removal protections. Jackler IAF, Tab 23 at 6-20; Jaroch IAF, Tab 25 at 6-20. The agency argued that the Board has jurisdiction to hear the appellants' removal appeals, but that section 7513 could not restrict the President of the United States' Article II authority to remove the appellants, and that the appellants were therefore at-will employees. *Id.* The agency argued that it thus had provided the appellants all the pretermination process they were due: none.[4] *Id.*

¶7     The Office of Personnel Management (OPM) notified the Board of its intent to exercise its statutory right to intervene in these appeals. Jackler IAF,

_____

[4] The agency initially argued that the Board lacks jurisdiction over the appeals because the Board has authority only to hear actions taken under specific statutes, including Title 5, and the agency took the removal action under constitutional, not statutory, authority. Jackler IAF, Tab 5 at 5, 7-9; Jaroch IAF, Tab 7 at 6, 8-10. Subsequently, the agency withdrew this argument and took the position that the Board has jurisdiction to hear the appeals. Jackler IAF, Tab 23 at 6; Jaroch IAF, Tab 25 at 6. However, the Board is not bound by litigants' concessions regarding jurisdiction; the issue of jurisdiction is always before the Board, and the Board has a duty to determine its jurisdiction in each case before it. *Waldrop v. U.S. Postal Service*, 72 M.S.P.R. 12, 15 (1996).

5

Tab 16; Jaroch IAF, Tab 17.  OPM filed a separate brief in both appeals supporting the agency's position, arguing in pertinent part that Article II of the Constitution vests the full executive power in the President; that the President cannot fully "take Care that the Laws be faithfully executed" if he is unable to remove constitutional inferior officers at will; and that the Civil Service Reform Act (CSRA) cannot be read to preclude an Article II removal by the head of a Department.  Jackler IAF, Tab 22 at 5-14; Jaroch IAF, Tab 24 at 5-14.  The appellants contested the agency's and OPM's arguments regarding the effect of the Article II removals.  Jackler IAF, Tab 24 at 4-13; Jaroch IAF, Tab 26 at 4-13.

¶8    The administrative judge issued initial decisions finding jurisdiction and reversing the appellants' removals.  Jackler IAF, Tab 28, Initial Decision (Jackler ID); Jaroch IAF, Tab 30, Initial Decision (Jaroch ID).  The administrative judge found that the appellants' tenures at the agency qualified them as employees under 5 U.S.C. § 7511, and thus they were entitled to the procedures set forth in 5 U.S.C. § 7513 prior to their terminations.  Jackler ID at 2-5; Jaroch ID at 3-5.  Because the agency concededly did not provide those procedures to the appellants, the administrative judge reversed their terminations and ordered them restored to employment.  Jackler ID at 2-5, 7-8; Jaroch ID at 3-5, 7-8.  Regarding the agency's and OPM's arguments that termination of inferior officers pursuant to Article II invalidates section 7513's removal protections, the administrative judge held that, as an administrative agency, the Board "has long recognized" that it lacks the authority to invalidate statutory provisions, and the administrative judge therefore declined to address the agency's and OPM's arguments.  Jackler ID at 6; Jaroch ID at 6-7.

¶9    The agency has filed petitions for review of the initial decisions. *Jackler v. Department of Justice*, MSPB Docket No. DA-0752-25-0330-I-1, Petition for Review (Jackler PFR) File, Tab 1; *Jaroch v. Department of Justice*, MSPB Docket No. DA-0752-25-0328-I-1, Petition for Review (Jaroch PFR) File, Tab 1.  The agency argues in both petitions for review that the administrative judge

**Appx005**

erred in declining to consider its constitutional defense as an "as-applied challenge," which does not require that the Board overturn a statutory provision, but that it merely find its application invalid in particular circumstances. Jackler PFR File, Tab 1 at 8-12; Jaroch PFR File, Tab 1 at 8-12. The agency reiterated its agreement with the appellants that the Board has jurisdiction over their appeals. Jackler PFR File, Tab 1 at 8; Jaroch PFR File, Tab 1 at 8. OPM exercised its statutory authority to intervene in the petitions for review and attached and incorporated its briefs before the administrative judge for consideration by the Board. Jackler PFR File, Tab 10; Jaroch PFR File, Tab 10.

## ANALYSIS

### The Board has authority to consider constitutional challenges as part of its jurisdictional analysis.

¶10    We begin by clarifying our authority to address constitutional challenges as part of our jurisdictional analysis. We have previously held that the Constitution is not an independent source of jurisdiction, and as such we lack jurisdiction to evaluate a constitutional challenge if we do not otherwise have jurisdiction over the appeal. *Riddick v. Department of the Navy*, 41 M.S.P.R. 369, 371-72 (1989) ("[W]e find that constitutional allegations of due process and equal protection do not confer upon the Board an independent jurisdictional basis to review matters outside our statutory jurisdiction."). This remains true for constitutional challenges to *actions* that are appealable to the Board—we may adjudicate allegations that an action was unconstitutional only if we have jurisdiction over the appeal pursuant to statute or regulation. However, with respect to constitutional challenges that themselves relate to our jurisdiction over certain appeals, we must be able to consider such challenges to determine whether we have jurisdiction over those appeals.

¶11    As noted, the agency argues that the administrative judge should have considered its constitutional arguments, which the agency explains are threefold:

(1) the Board has authority to consider whether the procedural and substantive protections afforded to employees under section 7513, as applied in this particular case, are consistent with constitutional requirements (specifically Article II exercise by an agency head), Jackler PFR File, Tab 1 at 8-12; Jaroch PFR File, Tab 1 at 8-12; (2) the appellants were inferior officers removable at will under the Constitution, and thus lacked the property interest in their employment that otherwise would attach via section 7513(b), Jackler PFR File, Tab 1 at 13-22; Jaroch PFR File, Tab 1 at 13-22; and (3) the Board must rule on these issues to comply with its statutory mandate to issue a complete decision on all legal issues raised by the parties. Jackler PFR File, Tab 1 at 8-12; Jaroch PFR File, Tab 1 at 8-12. The appellants oppose these arguments. Jackler PFR File, Tab 3 at 6-9, Tab 7 at 8-22; Jaroch PFR File, Tab 3 at 6-9, Tab 7 at 8-22. We consider them carefully below.

¶12     In support of its argument, the agency submitted a September 26, 2025 memorandum opinion from the Department of Justice's Office of Legal Counsel (OLC). *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, 49 Op. O.L.C. __ (Sep. 26, 2025), https://www.justice.gov/olc/media/1415466/dl (last visited Mar. 20, 2026) (OLC Opinion). In its memorandum, OLC opines, as pertinent to the arguments made by the agency in this petition for review,[5] that the Board has

---

[5] Although the OLC opinion appears to diverge from Board precedent regarding facial constitutional challenges, the agency, on petition for review, insists that it challenges only the administrative judge's rejection of its as-applied constitutional challenge. Jackler PFR File, Tab 1 at 8 ("But while the Agency recognizes the Board's longstanding view that it lacks 'authority to determine the constitutionality of statutes,' the Agency's argument does not require such a determination. Rather, the Agency's position requires only that the Board consider its constitutional arguments regarding the '*application* of a statute.'") (internal citation omitted; emphasis in original); Jackler PFR File, Tab 13 at 10-11 ("[C]ontrary to Appellant's claims, the Agency did not request that the Board invalidate the CSRA or any other statute . . . . As consistently held by the Agency, the Board need only determine whether the CSRA's principles and protections would be unconstitutional *as applied to Appellant*, rather than whether any CSRA provision is facially unconstitutional.") (emphasis in original); Jaroch PFR File, Tab 1 at 8, Tab 13

8

authority to consider "as-applied" constitutional arguments, such as the argument made by the agency in this appeal. *Id.* The agency argues that the OLC opinion is the legal position of the Executive Branch and thus is binding upon the Board. Jackler PFR File, Tab 2 at 6-7; Jaroch PFR File, Tab 2 at 6-7. The appellants dispute the agency's contention about the binding nature of the OLC opinion and the opinion's characterization of the agency's argument as an "as-applied" constitutional argument, but they do not object to the Board considering it as supplemental authority. Jackler PFR File, Tab 3 at 6-9, Tab 7 at 8-22; Jaroch PFR File, Tab 3 at 6-9, Tab 7 at 8-22.

¶13   We need not address the parties' contentions about the OLC opinion because, as explained below, we resolve the dispositive issues through application of long-established Board case law. Additionally, we note that to the extent the agency cites the OLC opinion in support of its arguments that the Board may resolve as-applied constitutional challenges and must resolve all dispositive legal issues raised in an appeal, the OLC opinion recites Board case law and regulations for these propositions. OLC Opinion at *4-*9.

The Board has the authority to consider the agency's constitutional defense as an as-applied challenge.

¶14   The Board has held that it lacks authority to adjudicate the constitutionality of statutes. *Special Counsel v. Gallagher*, 44 M.S.P.R. 57, 73 (1990). However, the Board does have authority to adjudicate a constitutional challenge to an agency's application of a statute. *May v. Office of Personnel Management*, 38 M.S.P.R. 534, 538 (1988). Although we heed the U.S. Supreme Court's caution that "the distinction between facial and as-applied challenges is not so well defined . . .[,]" *Citizens United v. Federal Election Commission*, 558 U.S. 310, 331 (2010), we hold that, in this appeal, the agency has brought an as-applied

at 10-11. Thus, the agency waived any facial constitutional challenge it might have maintained, and such challenge is not before us. 5 C.F.R. § 1201.114(b); *see McCoy v. U.S. Postal Service*, 108 M.S.P.R. 160, ¶ 16 n.4 (2008) (the Board will not consider issues not raised in a petition for review).

**Appx008**

9

challenge within our authority to address. Indeed, the agency expressly disclaims any intention of presenting a facial challenge, arguing that it challenges only the constitutional applicability of section 7513 removal protections *to the appellants*, not the validity of the larger statutory scheme. Jackler PFR File, Tab 1 at 8, Tab 13 at 11-12; Jaroch PFR File, Tab 1 at 8; Tab 13 at 11-12.

¶15    The appellants argue that, despite this framing, the agency in fact presents a facial challenge to the statutory removal provisions, because it seeks to invalidate statutory removal protections as incompatible with the Constitution. Jackler PFR File, Tab 7 at 10; Jaroch PFR File, Tab 7 at 10. The administrative judge agreed with the appellants, holding that the agency's argument presented a facial and not an as-applied challenge. Jackler ID at 5-6; Jaroch ID at 5-6. We disagree.

¶16    The agency does not contend that Article II of the Constitution renders section 7513 removal protections invalid as a matter of law or in all circumstances. The agency argues only that the removal protection provisions cannot be constitutionally applied to the appellants, whom the agency argues are inferior officers under the Constitution, because doing so would impinge on the President's authority under Article II of the Constitution to manage the Executive Branch. The agency's argument hinges on the nature of the appellants' positions (an issue we address below) and does not apply to the broad swath of section 7513-protected employees who are not inferior officers.

¶17    The closest analogue to this situation arises out of recent, related Article II litigation regarding the Appointments Clause. In *Lucia v. Securities and Exchange Commission,* 585 U.S. 237 (2018), and subsequent cases, parties challenged the validity of various Executive Branch adjudicatory officials' appointments, arguing that they were invalid under the Appointments Clause of the Constitution. *See, e.g.*, *Brooks v. Kijakazi*, 60 F.4th 735, 739-44 (4th Cir. 2023) (challenging the appointment status of an administrative law judge (ALJ) employed by the Social Security Administration); *Joseph Forrester Trucking v. Director,*

**Appx009**

10

*Office of Workers' Compensation Programs*, 987 F.3d 581, 585 (6th Cir. 2021) (challenging the appointment status of a Department of Labor ALJ). Although the adjudicatory officials at issue in those cases all operated under the same statute and were appointed under the same statutory authority, courts did not treat these Appointments Clause challenges as facial challenges to the entire statutory adjudication structure of an agency; instead, they treated them as as-applied challenges to the appointment of the particular individual official charged with overseeing the adjudication at issue. *Joseph Forrester Trucking*, 987 F.3d at 591. When courts found violations, they ordered remedies for the individual cases at issue; they did not invalidate statutory provisions. *See, e.g.*, *Cody v. Kijakazi*, 48 F.4th 956, 963 (9th Cir. 2022) (ordering new hearing for violation of the Appointments Clause).

¶18    The same is true here. Nowhere does the agency (or OPM) argue that section 7513's removal protections are invalid on their face for all Federal employees. The agency argues only that the specific nature of the appellants' positions and duties elevate them to a status where these protections cannot constitutionally be applied to them. Jackler PFR File, Tab 13 at 11-12; Jaroch PFR File, Tab 13 at 11-12. This is a classic as-applied challenge.

¶19    The appellants argue that the agency's challenge is more similar to one addressed in a recent Board decision, *Davis-Clewis v. Department of Veterans Affairs*, 2024 MSPB 5. This comparison is inapposite. In *Davis-Clewis*, the appellant challenged not just the particular administrative judge adjudicating her appeal, but instead the removal protections for *all* of the Board's administrative judges, arguing that the statutory removal protections provided to Board administrative judges made its entire adjudication structure constitutionally deficient. *Davis-Clewis*, 2024 MSPB 5, ¶7. Therefore, the appellant in *Davis-Clewis* raised a facial challenge, and the Board's holding in *Davis-Clewis* that it could not adjudicate the appellant's constitutional challenge in that case does not support the appellants' position here.

**Appx010**

¶20    Accordingly, we reverse the initial decisions' holdings on this issue and determine that the agency's constitutional challenge to the appellants' section 7513 protections was within the Board's adjudicatory authority as an as-applied challenge.

<u>The Constitution abrogates the application of section 7513 to inferior officers such as the appellants, and therefore, the Board lacks jurisdiction over these appeals.</u>

¶21    We now address the agency's and OPM's specific constitutional challenges in these appeals:  whether as applied to the appellants, Article II abrogates the removal protections 5 U.S.C. § 7513 otherwise provides to employees covered under 5 U.S.C. § 7511, and therefore deprives the Board of jurisdiction over adverse actions brought under section 7513(d).  We hold that it does.

¶22    The Supreme Court first addressed the legality of removal restrictions for Executive Branch officers in *U.S. v. Perkins*, 116 U.S. 483 (1886).  There, the Court held that "[w]e have no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Id*. at 485.  In other words, the Court held that Congress could establish removal restrictions for inferior officers in the Executive Branch. *Id.*  Approximately 40 years later, the Court clarified that such removal restrictions could not, however, require the President to obtain Senate approval for such removals; the power to remove a constitutional officer in the Executive Branch remains within the exclusive domain of the President. *Myers v. United States*, 272 U.S. 52, 176 (1926).  Another 60 years later, as pertinent here, the Court further clarified that the standard for whether inferior officers' statutory removal restrictions are constitutional is whether the limitation deprives the President of control over the official such as to interfere impermissibly with his constitutional obligation to ensure faithful execution of the laws. *Morrison v. Olson*, 487 U.S. 654, 685-93 (1988) (permitting removal restrictions for independent counsel, whose position had limited jurisdiction and tenure, combined with lack of policymaking or significant

administrative authority).    The Court recently reaffirmed this holding in *Seila Law, L.L.C. v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020) (observing that at-will removal should be considered the default position for officers in the Executive Branch, except for "inferior officers with limited duties and no policymaking or administrative authority . . . ."), and *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 762-64 (2025) (discussing removability at will as "the default presumption" for inferior officers in the Executive Branch").

¶23    It is in view of this full landscape that we consider the agency's challenge to the applicability of the removal restrictions contained at 5 U.S.C. § 7513 to the appellants—and specifically, consider this challenge as it pertains to our jurisdiction.    While the agency asserts that the appellants met the definition of "employee" under 5 U.S.C. § 7511 and thus were entitled to appeal certain adverse actions to the Board, Jackler IAF, Tab 23 at 5-6; Jaroch IAF, Tab 25 at 5-6, the Board nevertheless must satisfy itself that it has jurisdiction over these appeals. *Waldrop v. U.S. Postal Service*, 72 M.S.P.R. 12, 15 (1996).

¶24    The agency argues that the Board lacks authority to review the Attorney General's exercise of Article II authority to remove inferior officers such as the appellants.    Jackler IAF, Tab 23 at 10-20; Jaroch IAF, Tab 25 at 10-20.    For the reasons set forth below, and in consideration of the particular duties and authorities of these appellants, we agree.

¶25    As established in *Myers* and reiterated in *Seila Law* and *Braidwood Management, Inc.*, the default rule is that the President possesses unfettered removal authority over certain constitutional officers in the Executive Branch. *Myers*, 272 U.S. at 176; *Seila Law*, 591 U.S. at 213-18; *Braidwood Management, Inc.*, 606 U.S. at 762-64.    Per the Supreme Court, no entity, including Congress or the Board, may place restrictions on such authority, nor may they subject that decision to subsequent review, for doing so would infringe upon the President's ability to faithfully execute the laws.    *Id.*    While the Court has allowed exceptions

for certain officers, it has generally emphasized that any restriction imposed by Congress upon the President's authority to remove officers is an unconstitutional interference with the President's constitutional obligation to ensure faithful execution of the laws. *Morrison*, 487 U.S. at 685-93. Accordingly, for any removal taken pursuant to Article II authority against an individual subject to at-will removal under *Perkins/Morrison/Seila Law*, the Constitution prohibits the Board from reviewing any aspect of the removal, including whether the removal was taken for the efficiency of the service, as well as whether the proper pre-removal procedures were provided, because doing so would impermissibly interfere with the President's Article II removal authority. Thus, for any individual meeting these criteria, the Board necessarily lacks jurisdiction over an appeal of an Article II-based removal.

¶26    However, notwithstanding the above discussion, the Supreme Court made clear in *Seila Law* that the President's Article II removal authority does not necessarily invalidate removal restrictions for all inferior officers in the Executive Branch. Rather, the President's Article II removal may still be restricted for individuals meeting the criteria described in *Seila Law*—those with limited duties and no policymaking or administrative authority. *Seila Law*, 591 U.S. at 218. Thus, to determine whether the agency is correct with respect to the appellants, we must answer two separate but related questions. First, we must determine whether the appellants qualify as inferior officers under the Constitution. If they do, then as *Perkins*, *Morrison*, and *Seila Law* teach, we must determine whether they are inferior officers with limited duties and no policymaking or administrative authority. If the second question is answered in the affirmative, then their statutory removal restrictions are constitutionally permissible, and we have jurisdiction to review the agency's removal actions. However, if they have more than limited duties, or some level of policymaking or administrative authority, then the exceptions from *Perkins* and *Morrison* do not apply, the restrictions contained

14

within section 7513 cannot be constitutionally applied to them, and we lack jurisdiction to review the agency's removal actions.

*The appellants were inferior officers under the Constitution.*

¶27    In *Lucia*, and previously in *Freytag v. Commissioner*, 501 U.S. 868 (1991), the Supreme Court found similar types of non-Article III adjudicatory officials to be inferior officers. *Lucia*, 585 U.S. at 247-50; *Freytag*, 501 U.S. at 880-82. The appellants' immigration judge positions share many of the same pertinent characteristics and duties as the ALJs in *Lucia* and the special trial judges (STJs) in *Freytag*. Like those positions, the appellants' positions were continuing and permanent. Jackler IAF, Tab 5 at 28; Jaroch IAF, Tab 7 at 30. As immigration judges, the appellants conducted proceedings "for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). In carrying out these proceedings, the appellants must "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). The appellants may also issue subpoenas for the attendance of witnesses and presentation of evidence and can sanction by civil money penalty any action in contempt of their proper exercise of authority under the law. *Id.* Finally, at the end of a proceeding, the appellants issue a decision as to whether an alien is removable from the United States. 8 U.S.C. § 1229a(c)(1)(A). Thus, in conducting adversarial inquiries, immigration judges have duties and powers equivalent to those of SEC ALJs and U.S. Tax Court STJs. *See Lucia*, 585 U.S. at 248; *Freytag*, 501 U.S. at 880-82. Accordingly, because SEC ALJs and Tax Court STJs are considered inferior officers, we find that the appellants also qualify as inferior officers. *See Duenas v. Garland*, 78 F.4th 1069, 1072-74 (9th Cir. 2023) (finding immigration judges to be inferior officers).

*The appellants exercised significant duties, including policymaking and administrative authority.*

¶28    With the question of the appellants' officer status settled, we must now determine whether they meet the *Perkins/Morrison/Seila Law* exception

allowing removal restrictions for inferior officers who have only limited duties and no policymaking or administrative authority.  We conclude that they do not meet this exception because they exercised significant policymaking and administrative authority.  As immigration judges, the appellants were charged with making decisions regarding the inadmissibility or deportability of an alien.  8 U.S.C. § 1229a(a)(1).  By regulation, they exercised their "independent judgment and discretion and may take any action consistent with [their] authorities under the Act and regulations that is necessary or appropriate for the disposition or alternative resolution of" cases before them—including conducting hearings and exercising the adjudicative authorities described above.  8 C.F.R. § 1003.10(b).  While it is true that their decisions were subject to review by both the Board of Immigration Appeals and the Attorney General, 8 C.F.R. §§ 1003.1(h)(1)(i), 1003.10(c), and that only the Board and the Attorney General are empowered to issue binding, precedential decisions in immigration decisions, 8 C.F.R. § 1003.1(g)(2), their decisions could still become the final decisions of the United States if not appealed. 8 C.F.R. § 1241.1.  Additionally, even if an alien does appeal a decision, that right to appeal may be limited in scope.  Thus, many circumstances exist where an immigration judge's decision will remain the final decision of the United States. 8 C.F.R. § 1003.1(b).[6]

¶29   Moreover, an immigration judge's decisions can have a major impact on a significant area of our nation's domestic and foreign policy.  As the Supreme Court stated in *Arizona v. United States*, "[i]mmigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws . . . . Perceived mistreatment of aliens in the United States may lead to

---

[6] We note that in *United States v. Arthrex*, 594 U.S. 1, 26 (2023), the Supreme Court allowed administrative patent judges (APJs) to retain for-cause removal protections as inferior officers provided that all APJ decisions are subject to review by the Director of the U.S. Patent and Trademark Office.  The limited and conditional review of immigration judge decisions makes this case distinguishable from *Arthrex*.

harmful reciprocal treatment of American citizens abroad." 567 U.S. 387, 395 (2012). Essentially, the appellants as immigration judges wielded vast administrative authority in an area of significant consequence, and the decisions entrusted to their discretion can "involve policy choices that bear on this Nation's international relations." *Id.* at 396. The authority provided to them thus placed them in a position that had the potential to dramatically impact the rights of those inside our borders, as well as the nation's standing in the world. Their positions are not comparable to the independent prosecutor in *Morrison*, who exercised limited jurisdiction and had no ability to affect policy. Thus, the appellants cannot fit within the exception for inferior officers established in *Morrison* and *Perkins*, and reaffirmed by *Seila Law* and *Braidwood*, and the Constitution requires that they be removable at will.

¶30 Because we find that the appellants do not meet the requirements necessary to allow removal restrictions for their positions, we find that 5 U.S.C. § 7513 cannot be applied to them, as doing so would unconstitutionally infringe upon the President's ability to faithfully execute the laws. We therefore must dismiss these appeals for lack of jurisdiction.

¶31 Our holding in this case does not mean that an agency can deprive the Board of jurisdiction over an adverse action merely by invoking Article II authority. However, if we find that a particular employee is subject to at-will Article II removal, we must dismiss their appeal for lack of jurisdiction because 5 U.S.C. § 7513, including the grant of Board jurisdiction in section 7513(d), cannot constitutionally apply to that employee. An individual who otherwise meets the definition of an employee under 5 U.S.C. § 7511 is entitled to come before the Board for a determination of whether the section 7513 protections apply.

We deny the agency's request to vacate the interim relief orders.

¶32 The agency requests that we vacate the interim relief awarded to appellants by the initial decisions. Jackler PFR File, Tab 1 at 12; Jaroch PFR File, Tab 1 at 12. We decline to do so. Under 5 U.S.C. § 7701(b)(2), an initial decision

17

will provide appropriate interim relief to a prevailing appellant "effective upon the date of the initial decision and remaining in effect until the date of the final order of the Board on any petition for review, unless the judge determines that the granting of interim relief is not appropriate." 5 C.F.R. § 1201.111(c)(1). The agency may decline to return the appellants to their place of employment if it determines that the return or presence of the appellants will be unduly disruptive to the work environment but must provide pay and benefits. *Id.* The initial decisions here ordered interim relief consistent with their reversal of the appellants' removals. Jackler ID at 8; Jaroch ID at 8-9.

¶33    The agency certified that it properly complied with the interim relief order by reinstating the appellants to their positions of record effective the date of the initial decisions, maintaining them in a non-duty status based on its determination that returning them to duty would cause an undue disruption to the work environment, and paying them appropriate pay and benefits from the date of the initial decisions. Jackler PFR File, Tab 1 at 24; Jaroch PFR File, Tab 1 at 24.

¶34    As set forth in the applicable statute and regulation, the agency's interim relief obligations automatically terminate upon the issuance of this final Opinion and Order. 5 U.S.C. § 7701(b)(2)(A); 5 C.F.R. § 1201.111(c)(1); *see* Jackler ID at 8; Jaroch ID at 8-9. Nothing in the statute or the regulation authorizes the Board to vacate properly awarded interim relief. *Cf. Bruneau v. Department of the Navy*, 73 M.S.P.R. 308, 311 (1997) (vacating interim relief as improperly granted where the agency had already, independent of interim relief, returned the appellant to duty and restored his pay, compensation, and benefits). Indeed, the purpose of interim relief is to maintain a prevailing appellant in a financial and employment status that permits them to await the outcome of the Board's final order, whether or not the Board ultimately affirms the initial decision. Interim relief thus is distinct from back pay, which restores appellants to the status quo ante before the agency action at issue, and so—unlike interim relief—back pay is retroactive to the date of the reversed agency action. *See* 5 U.S.C. § 7701(b)(2)(C)

18

(providing interim relief does not require payment of back pay prior to issuance of a final decision); 5 C.F.R. § 772.102.  The agency has not argued that the interim relief awards here were improper for any reason other than that the agency disagreed with the initial decisions' reversal of the removal actions, Jackler PFR File, Tab 1 at 12; Jaroch PFR File, Tab 1 at 12, and we find that the interim relief awards were consistent with statute, regulations, and our precedent.  *E.g.*, *Stewart v. Department of Transportation*, 2023 MSPB 18, ¶ 7.

## ORDER

**¶35**    For the foregoing reasons, we dismiss these appeals for lack of jurisdiction.  This is the final decision of the Merit Systems Protection Board in these appeals.  Title 5 of the Code of Federal Regulations, section 1201.113 (5 C.F.R. § 1201.113).

## NOTICE OF APPEAL RIGHTS[7]

You may obtain review of this final decision.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

---

[7] Since the issuance of the initial decisions in this matter, the Board may have updated the notice of review rights included in final decisions.  As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

19

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in

**Appx019**

part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

**Appx020**

21

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) <u>Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012</u>**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[8]  The court of appeals must <u>receive</u> your petition for review within **60 days** of the <u>date of issuance</u> of this decision.  5 U.S.C. § 7703(b)(1)(B).

---

[8]  The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.  The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

**Appx021**

22

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

_Gina K. Grippando_
Gina K. Grippando
Clerk of the Board
Washington, D.C.

**Appx022**