No. 26-1575

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

MEGAN JACKLER AND BRANDON JAROCH,
*Petitioners*,

*v.*

MERIT SYSTEMS PROTECTION BOARD,
*Respondent*,

DEPARTMENT OF JUSTICE,
*Intervenor.*

*On Petition for Review from the Merit Systems Protection Board*

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS
*AMICUS CURIAE* IN SUPPORT OF PETITIONERS**

Elizabeth B. Wydra
CONSTITUTIONAL
  ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW
Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, I certify the following:

1. The full names of all parties represented by me are: Constitutional Accountability Center.

2. The names of the real parties in interest, if different from the parties named above, are: Not applicable.

3. There are no parent corporations or publicly held companies that own 10% or more of the stock of any party represented by me.

4. There are no law firms, partners, or associates that have not entered an appearance in the appeal, appeared for the Constitutional Accountability Center in the lower tribunal, or are expected to appear for the Constitutional Accountability Center in this court.

5. Constitutional Accountability Center knows of no pending matters in this or any court that will directly affect or be directly affected by this Court's decision in this appeal.

Dated: July 27, 2026

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

GLOSSARY ............................................................................................... xii

INTEREST OF *AMICUS CURIAE* ............................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 1

ARGUMENT ............................................................................................. 7

    I.    The Executive Does Not Possess an Illimitable Power of Removal over Inferior Officers ........................................................................... 7

    II.    Congress Has Regulated the Appointment and Removal of Inferior Officers Since the Founding ................................................. 16

    III.    The Removal Protections that Congress Conferred on IJs Are Constitutional ............................................................................... 21

CONCLUSION ........................................................................................... 30

i

<u>Cases</u>

*Arnett v. Kennedy*,
    416 U.S. 134 (1974) ............................................................... 30

*Edmond v. United States*,
    520 U.S. 651 (1997) ............................................................... 5, 9

*Ex parte Hennen*,
    38 U.S. 230 (1839) ................................................................. 21, 22

*Exum v. Dep't of Homeland Sec.*,
    446 F. App'x 282 (Fed. Cir. 2011) ....................................... 29

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) .......................................... 5, 6, 24, 25, 29

*Kennedy v. Braidwood Mgmt., Inc.*,
    606 U.S. 748 (2025) ......................................... 5, 9, 26, 28

*McIntosh v. Dep't of Def.*,
    53 F.4th 630 (Fed. Cir. 2022) ............................................... 28

*Mistretta v. United States*,
    488 U.S. 361 (1989) ............................................................... 6

*Morrison v. Olson*,
    487 U.S. 654 (1988) ......................................................... 23, 27, 28

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................. 23, 25

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020) ....................................................... 23, 26, 27, 30

*Trump v. Slaughter*,
    No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) ....... 4, 5, 10, 12-14, 23, 24

*United States v. Arthrex*,
    594 U.S. 1 (2021) .............................................................. 26, 28, 30

*United States v. Fausto*,
    484 U.S. 439 (1988) ............................................................... 19

*United States v. Perkins*,
    116 U.S. 483 (1836) ............................................................... 22, 27

**Page(s)**

*United States v. Wickersham*,
  201 U.S. 390 (1906) ........................................................................ 18

*Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*,
  144 F.4th 1315 (11th Cir. 2025) ..................................................... 26

*Weiss v. United States*,
  510 U.S. 163 (1994) ......................................................................... 9


CONSTITUTIONAL PROVISIONS

The Declaration of Independence (U.S. 1776) ............................................ 2

U.S. Const. art. I, § 8, cl. 18 ........................................................................ 7

U.S. Const. art. II, § 2, cl. 1 ........................................................................ 7

U.S. Const. art. II, § 2, cl. 2 ........................................................................ 7-9


STATUTES AND LEGISLATIVE MATERIALS

Act of Sept. 24, 1789, ch. 20, 1 Stat. 73 ..................................................... 16

Act of Feb. 27, 1801, ch. 15, 2 Stat. 103 .................................................... 16

Act of May 15, 1820, ch. 102, 3 Stat. 582 .................................................. 16

Act of July 2, 1836, ch. 270, 5 Stat. 80 ....................................................... 16

Act of Feb. 24, 1855, ch. 122, 10 Stat. 612 ................................................ 17

Act of June 3, 1864, ch. 106, 13 Stat. 99 .................................................... 17

Act of July 13, 1866, ch. 176, 14 Stat. 90 ................................................... 17

Civil Liberties Restoration Act, H.R. 1502, 109th Cong. (2005) ............... 21

Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111 (1978) ........ 19

11 Cong. Deb. (1835) ................................................................................... 12

Cong. Globe, 31st Cong., 1st sess. (1850) ................................................... 12

|  | Page(s) |
|---|---|
| 31 Cong. Rec. (1897) | 20 |
| H.R. Rep. No. 101-328 (1989) | 4, 21 |
| Immigration Act of 1891, ch. 551, 26 Stat. 1084 (1891) | 19 |
| Immigration and Nationality Act of 1952, ch. 477, Pub. L. No. 414, 66 Stat. 163 | 20 |
| Lloyd-La Follette Act of 1912, Pub. L. No. 62-336, 37 Stat. 539 (1912) | 18 |
| Pendleton Act, Pub. L. No. 47-27, 22 Stat. 403 (1883) | 18 |
| Pub. L. No. 101-376, 104 Stat. 461 (1990) | 21 |
| S. Doc. No. 430, 24th Cong., 1st Sess. 26 (1836) | 15 |
| S. Rep. No. 95-969 (1978) | 19 |
| 5 U.S.C. § 7513(a) | 1 |
| 8 U.S.C. § 1101(b)(4) | 1 |

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

| | Page(s) |
|---|---|
| 1 Annals of Cong. (1789) (Joseph Gales ed., 1834) | 3, 10, 11 |
| *Appointment & Removal of Inspectors of Customs*, 4 U.S. Op. Att'y Gen. 165 (1843) | 13 |
| Aditya Bamzai & Saikrishna Bangalore Prakash, The *Executive Power of Removal*, 136 Harv. L. Rev. 1756 (2023) | 16 |
| Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175 (2021) | 24 |
| Steven G. Calabresi & Joan L. Larsen, *One Person One Office: Separation of Powers or Separation of Personnel*, 79 Cornell L. Rev. 1045 (1994) | 7 |
| Andrea Scoseria Katz & Jane Manners, *"Lost to History": Uses and Abuses of the Past in* Slaughter *and* Cook, Just Security (July 10, 2026) | 13 |

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Christine Kexel Chabot, *The Interstitial Executive: A View from the Founding* 52 B.Y.U. L. Rev. (forthcoming 2027), https://dx.doi.org/10.2139/ssrn.6156786 .............................................. 16

*The Claim of Surgeon DuBarry for Back Pay*, 4 U.S. Op. Att'y Gen. 603 (1847) ...................................................................................... 13

*A Compilation of the Messages and Papers of the Presidents* (James D. Richardson ed., 1897) ................................................................ 15

*Documentary History of the First Federal Congress 1789-1791* (Charlene Bangs Bickford et al. eds., 2019) ............................................ 10, 11

*Duty of President as to a Reg. of Wills*, 1 U.S. Op. Att'y Gen. 212 (1818) ........ 14

*The Federalist No. 76* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ........ 8

Carl Russell Fish, *The Civil Service and the Patronage* (1905)................... 17, 18

Hon. Alberto R. Gonzales & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841 (2016) ...................................................... 29

Immigration Judge, 38 Fed. Reg. 8590 (Apr. 4, 1973)................................ 20

Immigration Service, Annual Report of the Commissioner-General of Immigration (1895) .............................................................. 20

James Kent, *Commentaries on American Law* (1826) ................................ 12

John Marshall, *The Life of George Washington* (1807) ............................. 12

Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* (2020)....................................... 2, 8

*Mil. Power of the President to Dismiss from Serv.*, 4 U.S. Op. Att'y Gen. 1 (1842) .......................................................................... 13

*Papers of James Madison* (David Mattern et al. eds., 2013)....................... 14

*Papers of John Adams* (Sara Georgini et al. eds., 2020) ........................... 14

Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205 (2014) ................................................. 6

# TABLE OF AUTHORITIES – cont'd

| | Page(s) |
|---|---|
| Sidney B. Rawitz, *From Wong Yang Sung to Black Robes*, 65 Interpreter Releases 453 (1988) | 4, 20 |
| *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911). | 7 |
| Paul P. Van Riper, *History of the United States Civil Service* (1958) | 17 |
| Joseph Story, *Commentaries on the Constitution of the United States* (1st ed. 1833) | 4 |
| E. Garrett West, Note, *Congressional Power over Office Creation*, 128 Yale L.J. 166 (2018) | 3 |
| Amy J. Wildermuth & Peyton C. Baker, *Protecting Perkins: Removal, Supervision, and Article II* (Mar. 19, 2026 draft), https://dx.doi.org/10.2139/ssrn.6447918 | 25 |
| Alexandra Williams, *The Case for an Article I Immigration Court: How it Started, Why It's Needed More Than Ever, Moving Forward,* 2 The Green Card (Summer 2019) | 20 |
| *Writings of James Madison* (Gaillard Hunt ed., 1908) | 14 |
| Gordon Wood, *The Creation of the American Republic, 1776-1787* (1998) | 2, 3, 8 |

**INTEREST OF *AMICUS CURIAE*[1]**

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees. CAC accordingly has an interest in this case.

**INTRODUCTION
AND SUMMARY OF ARGUMENT**

Until last February, Petitioners Megan Jackler and Brandon Jaroch were Immigration Judges (IJs) charged with "conduct[ing] specified classes of proceedings" involving immigration law. 8 U.S.C § 1101(b)(4). At that point, each Petitioner was terminated in violation of 5 U.S.C. § 7513, which both provides that IJs who have finished their probationary periods may be removed "only for such cause as will promote the efficiency of the service," *see* 5 U.S.C. § 7513(a), and entitles them to certain procedural protections before they can be removed, *id.* § 7315(b). When Petitioners challenged their terminations before the

---

[1] No person or entity other than *amicus* and its counsel assisted in or made a monetary contribution to the preparation or submission of this brief. All parties consented to its filing.

Merit Systems Protection Board ("the Board"), Respondents argued that Section 7513 is unconstitutional as applied to IJs.

The Board accepted this novel contention. It held that IJs are inferior officers who exercise "significant policymaking and administrative authority," Appx14-16, and therefore "no entity, including Congress or the Board," may restrict the Attorney General's ability to remove them, *id.* at 12. This conclusion is at odds with the text and history of the Constitution, as well as centuries of historical practice.

The Constitution's Framers gave Congress—not the executive—the power to structure the federal government. In the colonial era, British kings had used their power to create and fill offices to construct a "vast patronage network" that they then used to "bribe, threaten, and cajole" lawmakers. Michael W. McConnell, *The President Who Would Not Be King: Executive Power under the Constitution* 152 (2020); *see also The Declaration of Independence* para. 12 (U.S. 1776) ("He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our people …."). The result was not only tyranny and corruption, but also bad government. Colonists complained that royalists filled the "'highest seats of justice with bankrupts, bullies, and blockheads'" and eliminated the "'most virtuous and exalting'" candidates from government office. Gordon Wood, *The*

*Creation of the American Republic, 1776-1787*, at 145 (1998) (quoting *Speech of William Livingston*, Phila. Pa. Packet (John Dunlap ed., Mar. 4, 1777)).

For this reason, the Framers firmly denied the President any prerogative to create federal offices, instead insisting that Congress would exclusively enjoy this power. *See generally* E. Garrett West, Note, *Congressional Power over Office Creation*, 128 Yale L.J. 166 (2018). As early legislators explained, Congress's power to establish an office "implie[d] every thing relative to its formation, constitution, and termination," *see* 1 Annals of Cong. 503 (1789) (Joseph Gales ed., 1834) (Rep. Laurance), and legislators' power over the creation of offices generally meant that they could "direct the[] appointment and removal" of officers "on what terms they pleased," *id.* at 569 (Rep. Smith).

Congress has long exercised these powers by creating inferior offices and regulating the manner in which inferior officers are appointed to and removed from service. In the nineteenth century, it used this authority to pass civil service laws, embracing the longstanding interest in professional, impartial leadership that motivated the Founding generation to give Congress the power to create offices in the first place, *see* Wood, *supra*, at 180-81.

Congress has also used this authority to provide for the appointment and removal of officers who adjudicate cases involving immigration law. These officers were alternately called "immigrant inspectors," "special inquiry officers,"

3

and, finally, "immigration judges"—after a "vigorous campaign" led by the judges themselves.  Sidney B. Rawitz, *From Wong Yang Sung to Black Robes*, 65 Interpreter Releases 453, 454-58 (1988) (describing a judge-led effort "to use the working title of Immigration Judge and to wear the traditional robes of the judiciary").  In 1990, Congress ensured that IJs would be subject to Section 7513, protecting them from "arbitrary removal" and guaranteeing their ability to "defend themselves" when terminated.  H.R. Rep. No. 101-328, at 3-4 (1989); *see infra* Part II.

Article II poses no bar to these modest limits on the removal of IJs.  Indeed, although the Supreme Court recently invalidated a statutory restriction on the President's ability to remove commissioners of federal agencies, the historical sources on which the Court relied addressed only the President's power to remove certain "principal officers," *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *19 (U.S. June 29, 2026) (quoting 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531, at 390 n.1 (1st ed. 1833)), and the Court explicitly declined to "determine the fate" of inferior officers, *see id.* at *18; *see also* Pet'rs Br. 21 (describing the parties' agreement that Petitioners are inferior officers).

Moreover, the Court in *Slaughter* relied heavily on *Myers v. United States*, its "best word" on the subject of the President's removal power, *see Slaughter*,

2026 WL 1855612, at \*12, and that case explicitly rejected the contention that the President could remove inferior officers he does not appoint, *see Myers*, 272 U.S 52, 164 (1926) (describing the removal power as "an incident to [the President's] specifically enumerated function of appointment by and with the advice of the Senate"). Instead, the Court explained that Congress's power to "regulate removals" of inferior officers is "incidental" to its "constitutional power to vest appointments of inferior officers in the heads of departments." *Id.* at 161.

This treatment of removal makes sense. "Inferior officers are those 'whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 761 (2025) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)). Thus, at-will removal is not necessary for presidential control of inferior officers because those officers' decisions remain subject to correction by a principal. *Id.* at 765 ("if an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will").

Respondents' argument to the contrary rests on a vision of the Constitution that the Supreme Court has rejected. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 493 (2010) (confirming that the Court "has upheld for-cause limitations" on the removal of inferior officers). Indeed, the Court has

only once invalidated a removal restriction implicating an officer who was not Senate-confirmed, and that case involved a "highly unusual" statute that used "two layers of for-cause removal" to insulate officers with significant policymaking authority, *Free Enter. Fund*, 561 U.S. at 505. There, the Court limited its ruling to this "novel" arrangement and confirmed Congress's general authority to regulate executive officers and employees. *Id.* at 496.

This case does not involve a "highly unusual" scheme without a "historical analogue[]." *Id.* at 505. Courts and commentators have long assumed that the removal of IJs and similar adjudicators—officers whose decisions are subject to review and who do not act "largely independently" of their supervisors, *id.* at 504; Pet'rs Br. 46-48, 54-57—is subject to congressional regulation. *See, e.g.*, Neomi Rao, *Removal: Necessary and Sufficient for Presidential Control*, 65 Ala. L. Rev. 1205, 1247 (2014) ("Congress may specify removal limits when it vests the appointment of inferior officers in someone other than the President."). The Board's decision thus takes aim at what has long been a "traditional way[] of conducting government." *Mistretta v. United States*, 488 U.S. 361, 401 (1989). This Court should reject it.

**ARGUMENT**

**I.      The Executive Does Not Possess an Illimitable Power of Removal over Inferior Officers.**

**A.**  The Constitution gives Congress great flexibility in determining how best to shape the federal government, as well as a unique authority over inferior officers.  While the Framers anticipated the creation of "Departments," *see* U.S. Const. art. II, § 2, cl. 1, they left unspecified what those departments would be and how they would be organized.  Likewise, while the Framers envisioned that "Officers of the United States" would be "established by Law," *id.* art. II, § 2, cl. 2, they provided few details concerning those officers' relationship with the President.  *Cf. id.* art. II, § 2, cl. 1 (Opinions Clause).  Instead, they gave Congress the authority to make laws necessary and proper for carrying into execution "all" powers of "the Government of the United States," *id.* art. I, § 8, cl. 18, including the authority to "establish all offices," 2 *The Records of the Federal Convention of 1787* 345 (Max Farrand ed., 1911).

It was no accident that the Framers empowered Congress in this way.  In England, the King's ability to create offices and titles of nobility and fill them with hand-selected appointees had allowed monarchs to "'purchase' a reliable cadre" of supportive officers.  Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 Cornell L. Rev. 1045, 1056 (1994).  These "arbitrary exercises of royal power" left an "indelible

7

impression" on the founding generation. *Id.* at 1056-57. Seeking to avoid this type of patronage and the corruption it produced, the Framers ensured that the President, unlike the British King, was not permitted to create executive offices. McConnell, *supra*, at 153.

The Framers instead made Congress the "first among equals in the construction and definition of the federal government." West, *supra*, at 178. Indeed, by providing that the President's appointment power extended only to offices "which shall be established *by law*," U.S. Const. art. II, § 2, cl. 2 (emphasis added), the Framers reiterated that the President would have no role in office-creation, providing a "double-barreled repudiation of any presidential prerogative power to create offices," McConnell, *supra*, at 154. This would help to implement the founding generation's interest in a government directed by "disinterested men," devoted to "the public good," Wood, *supra*, at 59 (citations omitted), rather than "obsequious instruments of ... [presidential] pleasure," *The Federalist No. 76*, *supra*, at 458 (Alexander Hamilton).

The Framers also granted Congress a unique power over the appointment of "inferior [o]fficers." U.S. Const. art. II, § 2, cl. 2. While the Appointments Clause required the President to appoint "Officers of the United States" with the advice and consent of the Senate, it provided that "Congress may by Law vest the

Appointment" of "inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.*

The decision to vest that authority in Congress stemmed from the Framers' belief that a "degree of flexibility" was "appropriate in providing for the appointment of officers who, by definition, would have only inferior governmental authority." *Weiss v. United States*, 510 U.S. 163, 186-87 (1994) (Souter, J., concurring). Moreover, because inferior officers were subject to some amount of supervision by principals, the Framers concluded that allowing Congress additional flexibility in regulating their offices would not disturb "the chain of political accountability that was central to the Framers' design of the Appointments Clause." *Kennedy*, 606 U.S. at 794; *Edmond*, 520 U.S. at 662-63 (describing "the views of the first Congress" that "'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate"); Rao, *supra*, at 1247 ("[F]or inferior officers properly understood, removal at will may not be essential for control, as these officers will be subordinate to an officer who is within the control and direction of the President.").

**B.** Congress's authority to create inferior offices and provide for their appointment necessitated control over their removal. During what would later be called the "Decision of 1789," the First Congress's "discussion and decision"

about whether the President could remove certain department heads without the Senate's approval, *see Slaughter*, 2026 WL 1855612, at *9-10, many legislators explained that Congress's power to "organise [the government] by creating the necessary offices" entailed the power to "establish[] offices," and the "authority to declare by whom" officers should be removed, as "shall appear to be most conducive to the public good." 11 *Documentary History of the First Federal Congress 1789-1791*, at 1021 (Charlene Bangs Bickford et al. eds., 2019) (Rep. Vining); *see generally Slaughter*, 2026 WL 1855612, at *9 (describing the position of Rep. Sedgwick and others).

And even lawmakers who saw the President's power to remove department heads as a constitutional imperative, *see Slaughter*, 2026 WL 1855612 at *10-11, agreed that Congress had the authority to regulate the removal of inferior officers. Indeed, when Rep. Smith posited that "the [C]onstitution had left it in the power of the Legislature" to dictate the appointment and removal of inferior officers "on what terms they pleased," James Madison did not object, instead responding that if Smith agreed "that the Legislature may vest the power of removal, with respect to inferior officers, he must also admit that the constitution vests the President with the power of removal in the case of superior officers; because both powers are implied in the same words." 1 Annals of Cong. 569 (1789); *accord id.* at 502-03 (Rep. Laurance) (appointing power could remove an inferior officer unless a

10

"particular limitation was determined by the law"); *cf. id.* at 637 (Rep. Stone) (the President might not "have the power of dismissal" over the Comptroller because he was "an inferior officer").

Furthermore, because the debate concerned the removability of department secretaries, there was little discussion of any presidential power to remove anyone else, and many of the strongest advocates of presidential removal made arguments that only applied to Senate-confirmed officers. Madison, for example, emphasized that the President would be required to "consult the Senate" and obtain confirmation before a removed officer could be replaced, so the President could not use removal to appoint "unworthy favorite[s]" as officers. 11 *Documentary History*, at 897 (Rep. Madison); *see also id.* at 968 (Rep. Boudinot) ("If he removes a good officer, he can not appoint his successor without the consent of the senate; and … the evil will be small."); *id.* at 981-82 (Rep. Ames) (similar); 16 *id.* at 828-29 (Rep. Madison) (describing the appointments power as a limit on the removal power); 1 Annals of Cong. 508-09 (Rep. Clymer); *id.* at 500 (Rep. Hartley).

Thus, the "Decision of 1789" was understood not to disturb Congress's power to "regulate[] and delegate the appointment of 'inferior officers' … [and] the manner in which … *the removal … shall be made*." 3 Story, *supra* § 1531, at 388 (emphasis added). Rather, it was widely assumed by the commentators who

11

described the Decision of 1789 as "settl[ing]" the issue in the preceding decades, *see Slaughter*, 2026 WL 1855612, at *10 (citing 5 John Marshall, *The Life of George Washington* 199-200 (1807), 1 James Kent, *Commentaries on American Law* 289-290 (1826), and 3 Story, *supra* § 1537, at 395), that any presidential removal power extended only to officers appointed by the President and confirmed by the Senate. *See* 1 Kent, *supra*, at 289 (describing the Decision of 1789 as applying "to every other officer of government *appointed by the president and senate*" (emphasis added)); 3 Story, *supra*, § 1531, at 390 n.1 (describing the conclusion that "removal by the executive could not be abridged by the legislature; *at least, not in cases, where the power to appoint was not subject to legislative delegation*" (emphasis added)); Marshall, *supra*, at 196 (noting that the decision concerned the manner in which "high officers … should be removeable"). Indeed, when Daniel Webster twice observed that the President's removal power was "settled," *Slaughter*, 2026 WL 1855612, at *11, he assumed that the power applied to officers who were confirmed by the Senate. *See* 11 Cong. Deb. 461-69 (1835) (Sen. Webster) (emphasizing that the Decision of 1789 concerned officers for whom "it is the President and the Senate, and not the Senate alone, who hold the power of appointment"); Cong. Globe, 31st Cong., 1st sess. 1126 (1850) (Sen. Webster) (describing the practice of presidential removal of officers *covered by the Recess Appointments Clause*); *cf.* Cong. Globe App. 31st Cong., 1st sess. 1042

12

(1850) (Sen. Webster) (describing the perception that "the President possesses the power of removal" until "a law shall have passed [and] the power is restrained").

The executive branch itself understood the Decision of 1789 to address, at most, "every officer *appointed by the President*." *The Claim of Surgeon DuBarry for Back Pay*, 4 U.S. Op. Att'y Gen. 603, 612 (1847) (emphasis added). Perhaps this is why Attorney General Wirt assumed that Congress could limit the removal of even a presidentially appointed inferior officer and observed when evaluating the tenure of a Register of Wills that Congress could give such an officer "a more permanent tenure." *Duty of President as to a Reg. of Wills*, 1 U.S. Op. Att'y Gen. 212, 213 (1818); *see also Appointment & Removal of Inspectors of Customs*, 4 U.S. Op. Att'y Gen. 165, 166 (1843) (noting that the Attorney General was "not prepared positively to dissent" from Story's assessment of Congress's power to regulate inferior officers, and assuming that "Congress is competent to restrain the Executive in the exercise" of the power to remove inferior officers); *Mil. Power of the President to Dismiss from Serv.*, 4 U.S. Op. Att'y Gen. 1, 1 (1842) (quoting Story on inferior officers).

Presidents, too, understood the removal power to apply only to higher-level offices. According to the Supreme Court, "[e]arly Presidents ... hewed to the Decision of 1789," *see Slaughter*, 2026 WL 1855612, at *12; *but see* Andrea Scoseria Katz & Jane Manners, "*Lost to History": Uses and Abuses of the Past*

13

*in* Slaughter *and* Cook, Just Security (July 10, 2026) (suggesting that "the figures [*Slaughter*] enlists in support of an at-will removal power neither argued for it nor exercised it"), but many of these Presidents described that decision as relating to Senate-confirmed officers.  For example, when James Madison mentioned the President's power over "subordinates," *see Slaughter*, 2026 WL 1855612, at *10 (referencing 2 *Papers of James Madison* 192 (David Mattern et al. eds., 2013)), he was discussing officers who were appointed by "the joint act of the President & Senate."  2 Madison Papers, *supra*, 192; *see also* 4 *Writings of James Madison* 78-79 (Gaillard Hunt ed., 1908) (opining in discussion of the President's removal power that "the heads of departments at least, who are at once the associates and the organs of the Chief Magistrate, ought to be ... not independent of him").  And John Adams, when describing his support for the "President['s] Power of Removal," *Slaughter*, 2026 WL 1855612, at *10 (alteration in original) (citing 20 *Papers of John Adams* 150-51 (Sara Georgini et al. eds., 2020)), referred only to the department heads at issue in the Decision of 1789, *see* 20 *Adams Papers*, *supra*, at 150 (noting his "[v]ote for the Presidents [sic] Power of Removal").

Even champions of the executive's removal authority shared these assumptions about the limits of the Decision of 1789.  President Jackson, who was unsparing in his use of the removal power, *see Slaughter*, 2026 WL 1855612, at *11, disclaimed a right "to supervise or interfere with" officers whose appointment

14

was not "devolved upon the President alone or in conjunction with the Senate." Letter to the Senate, Apr. 21, 1834, *in* 3 *A Compilation of the Messages and Papers of the Presidents* 1313 (James D. Richardson ed., 1897); Letter to the Senate, Apr. 15, 1834, *in* 3 *id.* at 1306 ("[T]he constitutional right of the President to appoint, control, and remove the *head of the Treasury as well as all other Departments* seems to have been universally conceded." (emphasis added)); Letter from Levi Woodbury to John Davis, May 5, 1836, *in* S. Doc. No. 430, 24th Cong., 1st Sess. 26, 30-31 (1836) (noting that Jackson's Secretary of the Treasury was "far from feeling objection to further legislation" on the subject of selecting and removing "candidates for inferior employments"); *see also* Message from Andrew Johnson to the Senate, Mar. 2, 1867, *in* 5 *Messages & Papers*, *supra*, at 3694 (noting that the power to remove "applies equally to every other officer of the government *appointed by the President, whose term of duration is not specially declared*" (emphasis added)).

* * *

The Framers of the Constitution believed Congress should have the authority to regulate federal offices and dictate the conditions under which inferior officers and employees could be removed. Congress has exercised this power to prevent

15

patronage, protect employees' free speech, and determine how important immigration questions would be adjudicated, as the next Section discusses.

**II.     Congress Has Regulated the Appointment and Removal of Inferior Officers Since the Founding.**

**A.**  The removal of inferior officers has long been the subject of congressional regulation.  Early in the nation's history, both Congress and the President understood that the removal power was something to be granted—it had to be specified or it did not exist.  Thus, despite the "dominant pattern" of legislative silence on removal in the early Republic, Aditya Bamzai & Saikrishna Bangalore Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1776 (2023), whenever Congress gave officers fixed terms, it took pains to specify that they were removable at "pleasure," *see* Act of Sept. 24, 1789, ch. 20, § 27, 1 Stat. 73, 87; *see also* Act of Feb. 27, 1801, ch. 15, § 7, 2 Stat. 103, 106; Act of May 15, 1820, ch. 102, § 1, 3 Stat. 582, 582; Act of July 2, 1836, ch. 270, § 33, 5 Stat. 80, 87-88.  Presidential commissions for these officers also indicated that service was "during pleasure."  *See generally* Christine Kexel Chabot, *The Interstitial Executive: A View from the Founding* 52 B.Y.U. L. Rev. (forthcoming 2027), https://dx.doi.org/10.2139/ssrn.6156786.  When presidents issued commissions for the few officers who were not removable at pleasure, such as the commissioners of the Revolutionary War debt, they removed the "during pleasure"

16

language and instead indicated that the officers would serve for a fixed term. *Id.* at 30-34.

As the nineteenth century progressed, Congress began regulating removals more frequently. It conferred tenure "during good behaviour," Act of Feb. 24, 1855, ch. 122, § 1, 10 Stat. 612, 612 (Court of Claims judges), demanded "reasons" for removals, Act of June 3, 1864, ch. 106, § 1, 13 Stat. 99, 100 (Comptroller of the Currency), and required court-martials before removal, Act of July 13, 1866, ch. 176, § 5, 14 Stat. 90, 92 (military officers).

After the Civil War, Congress took aim at the "spoils system," in which lawmakers "us[ed] the public offices openly and continuously as ammunition in party warfare," and distributed appointments as "spoils" to the victors of political contests. Carl Russell Fish, *The Civil Service and the Patronage* 155, 79 (1905). By many accounts, the system had produced a predictable diminution of public services. It also imposed burdens of "intolerable proportions" on the presidency, causing "unrelenting pressure brought by seekers of public office," Paul P. Van Riper, *History of the United States Civil Service* 50-51 (1958), and leading the chief executive to cede control of many appointments to party leaders, Fish, *supra*, at 165.

It was this situation that led Congress to develop the civil service system. Van Riper, *supra*, at 51, 66-69. In the Pendleton Act of 1883, legislators sought to

limit the mixing of partisan politics and federal employment, providing that prospective employees should be evaluated by a competitive exam, prohibiting political discharges for covered employees, and barring employees from "coerc[ing] the political action of any person or body," Pendleton Act, Pub. L. No. 47-27, §§ 7, 2, 22 Stat. 403, 404-06 (1883). By many reports, the law produced results within decades, creating "more equal sharing of positions between the different states and parties." Fish, *supra*, at 236.

As the civil service system expanded, covered employees enjoyed further protection from arbitrary removal. In 1897, President McKinley issued an executive order preventing removals of civil service members without "just cause," "full notice," and "opportunity to make defense." *United States v. Wickersham*, 201 U.S. 390, 398 (1906); *see id.* (concluding that the removal of a covered employee in violation of the Order "was without legal effect"). Soon, Congress wrote this policy into the Lloyd-La Follette Act, which provided that civil servants could not be removed except for "such cause as will promote the efficiency of the service." Lloyd-La Follette Act of 1912, Pub. L. No. 62-336, § 6, 37 Stat. 539, 555 (1912).

These developments were buttressed by the passage of the Civil Service Reform Act of 1978 (CSRA). In that Act, Congress sought to "balance the legitimate interests of the various categories of federal employees with the needs of

18

sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988); *see* Civil Service Reform Act, Pub. L. No. 95-454, §§ 7503, 7513, 92 Stat. 1111, 1135-36 (1978). While agencies would generally need to use the "efficiency of the service" standard to justify removals, they could use a more streamlined set of procedures for actions based on an employee's "unacceptable performance." *Fausto*, 484 U.S. at 446-48. In this way, the Act sought to "simplify and expedite" the procedures for dismissing ineffective federal employees while protecting against arbitrary or politically motivated removal. *See* S. Rep. No. 95-969, at 2-9 (1978) (describing a desire for treatment "on the basis of competence rather than political or personal favoritism").

**B.** Immigration adjudicators are not exempt from this long history. Early immigration laws allowed for the hiring of federal officers to enforce immigration law. *See, e.g.*, Immigration Act of 1891, ch. 551, §§ 7-8, 26 Stat. 1084, 1085 (1891) (creating an "office of superintendent of immigration" and permitting the hiring of "clerks" and "inspection officers"). Both Congress and the executive embraced the conclusion that the civil-service rules should extend to their positions because doing so would ensure that "only the most efficient and experienced clerks and officials [w]ould be employed in such an important branch of the Governmental service" and "placed in contact with hundreds and often thousands of persons who should be handled with the utmost tact and good judgment."

19

Immigration Service, Annual Report of the Commissioner-General of Immigration 28 (1895); 31 Cong. Rec. 164-65 (1897) (statement of Sen. Lodge) (describing the beneficial impact of the "present system of the civil service" on the employment of immigrant inspectors).

As the immigration system developed, the adjudicatory officers within immigration agencies began to command Congress's attention. In 1952, Congress created the position of "special inquiry officer" (SIO) and required these SIOs to be "specially qualified to conduct specified classes of proceedings." Immigration and Nationality Act of 1952, ch. 477, Pub. L. No. 414, § 101(b)(4), 66 Stat. 163, 171. Although most SIOs were exempt from civil-service hiring rules because they were attorneys, *see* Rawitz, *supra*, at 458; Alexandra Williams, *The Case for an Article I Immigration Court: How it Started, Why It's Needed More Than Ever, Moving Forward,* 2 The Green Card 14 n.22 (Summer 2019) (IJs hold "career attorney positions" under "Schedule A"), their positions were constantly subject to congressional regulation. Indeed, Congress repeatedly considered proposals to insulate SIOs—later called immigration judges, *see* Immigration Judge, 38 Fed. Reg. 8590 (Apr. 4, 1973)—from the officers responsible for enforcing the nation's immigration laws, Williams, *supra*, at 11 (describing Congress's consideration of proposals "for an independent immigration court"). Notably, many of these

proposals involved changes to the tenure of IJs.  *See, e.g.*, Civil Liberties Restoration Act, H.R. 1502, § 204, 109th Cong. (2005).

While considering proposals relating to the independence of immigration adjudicators, Congress also gave these officers certain rights pertaining to their removal.  In 1990, it enacted the Civil Service Due Process Amendments, under which employees who were hired outside of the civil service merit examination process, including IJs, would still receive certain rights when subject to removal or other adverse employment actions.  *See* Pub. L. No. 101-376, § 2, 104 Stat. 461, 462 (1990).  In doing this, lawmakers made clear that federal employees who were exempt from competitive examination should "feel no less secure in their positions than competitive service employees," and enjoy "the same right to be free from arbitrary removal."  H.R. Rep. No. 101-328, at 4 (1989).  These provisions also ensured that IJs would enjoy "due process rights in removal actions," *id.* (explicitly describing the law's applicability to "Schedule A positions includ[ing] attorneys"), and confirmed the longstanding assumption that Congress could regulate the appointment and removal of IJs.

## III. The Removal Protections that Congress Conferred on IJs Are Constitutional.

**A.**  Consistent with this long history, the Supreme Court has repeatedly recognized Congress's power to govern the removal of inferior officers.  In *Ex parte Hennen*, 38 U.S. 230 (1839), the Court emphasized the difference between

principal officers and inferior ones. *Id.* at 260. *Hennen* concerned a judge's

removal of a clerk who was appointed under a statute that did not specify how the

clerk could be removed. *Id.* at 257. The Court distinguished the clerk from

"officers appointed with the concurrence of the Senate," *id.* at 259, and disavowed

any suggestion that the President could presumptively remove inferior officers, *id.*

at 260 ("the President has certainly no power to remove"). The removal of inferior

officers, the Court explained, depends "upon the authority of law," and thus entails

"an inquiry into the meaning and intention of the statute" creating the office. *Id.*

The Court then supplied a default rule that would apply "[i]n the absence of ...

statutory regulation": unless Congress provided otherwise, the Court would

"consider the power of removal as incident to the power of appointment." *Id.* at

259.

In *United States v. Perkins*, 116 U.S. 483 (1836), the Court reiterated

Congress's power to "limit and restrict the power of removal as it deem[ed] best

for the public interest" in the case of inferior officers. *Id.* at 485. There, the Court

upheld a statute providing that certain inferior officers could not be dismissed

"except upon" the "sentence of a court-martial." *Id.* at 484. Once again, the Court

distinguished Congress's power to regulate the removal of an inferior officer from

"the power of removal ... of those officers who are appointed by the President by

and with the advice and consent of the Senate." *Id.* It confirmed that Congress's

authority to "vest the appointment [of inferior officers] implies authority to limit, restrict, and regulate the[ir] removal." *Id.* at 485.

The Court has affirmed the continuing relevance of the *Perkins* rule. In *Myers*, it explained that the "legislative power" to regulate "removals in the case of inferior executive officers" flows from the Appointments Clause itself. 272 U.S. at 127. Just as the "power to remove" is traditionally considered "an incident of the power to appoint," "the power of Congress to regulate removals" is "incidental to the exercise of its constitutional power to vest appointment[]" of officers in the heads of departments. *Id.* at 161; *Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988) (observing that "*Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the head of a department" and citing *Perkins*); *id.* at 724 n.4 (Scalia, J., dissenting) ("*Perkins* is in no way inconsistent with my views"); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020) (describing an exception for inferior officers, who have "limited jurisdiction and tenure and lack policymaking or significant administrative authority").

And while the Supreme Court in *Slaughter* overruled the precedent holding that Congress can create "expert agencies led by a group of principal officers removable by the President only for good cause," *id.* at 204, it explicitly declined to "determine the fate of officials not before [it]," *Slaughter*, 2026 WL 1855612, at

*18; *id*. at *22 (Gorsuch, J., concurring) ("the President must have the ability to remove principal officers who exercise executive power in his name").  Moreover, the theory and history that *Slaughter* embraced—that the President's removal power stems from *Myers*, the Decision of 1789, and the government practice that followed—provides no basis for extending that power to inferior officers.  *See supra* Part II.B; *cf.* Daniel D. Birk, *Interrogating the Historical Basis for a Unitary Executive*, 73 Stan. L. Rev. 175, 218 (2021) (describing historical support for a "residual royal prerogative" to remove "chief ministers," but not for a corresponding power to remove "officers of the central government," "prosecutors, [or] law enforcement officers").

The Supreme Court has only once invalidated a removal restriction on an inferior officer who was not subject to Senate confirmation.  *Free Enter. Fund*, 561 U.S. at 494-95.  In *Free Enterprise Fund*, the Court addressed a "highly unusual" statute that "committ[ed] substantial executive authority" to inferior officers who could only be removed for cause by Securities and Exchange Commission commissioners who themselves enjoyed for-cause removal protection.  *Id.* at 505.  There, the Court focused on the "unusually high standard" protecting the officers from removal, as well as the "significant independence" and authority that they enjoyed.  *Id.* at 503, 505-06.  It took pains to cabin its decision to the "novel" and "highly unusual" situation in which an inferior officer was protected by "two

24

layers of for-cause removal" protections. *Id.* at 505-07. The second layer of tenure protection "transform[ed]" the inferior officers' independence and "change[d] the nature of the President's review." *Id*. at 496.

Indeed, *Free Enterprise Fund* specifically distinguished the case where—as here—an inferior officer is protected by only one layer of for-cause removal protection. *Id.* at 494-95. And it recognized, as it did in *Myers*, that any presidential power of removal does not extend to "what is colloquially known as the civil service system." *Id.* at 507; *Myers*, 272 U.S. at 173-74 (emphasizing that its holding "work[ed] no practical interference with the merit system" because that system exempted officers appointed by the president with the consent of the Senate); *see also* Amy J. Wildermuth & Peyton C. Baker, *Protecting Perkins: Removal, Supervision, and Article II*, at 38 (Mar. 19, 2026 draft), https://dx.doi.org/10.2139/ssrn.6447918 (describing Chief Justice Taft's rejection of a colleague's repeated suggestion that he "explicitly hold" in *Myers* that Congress could not regulate the removal of inferior officers appointed by heads of departments).

**B.** Despite all of this, the Board read the Supreme Court's case law to prevent any "entity, including Congress or the Board" from "plac[ing] restrictions" on the Attorney General's ability to remove inferior officers, or even to "subject

that decision [to remove an inferior officer] to subsequent review." Appx12. This is wrong.

According to the Board, Congress can only regulate a *subset* of "inferior officers"—those with "limited duties and no policymaking or administrative authority." *Id*. at 13-15 (citing *Seila*, 591 U.S. at 218). Whether or not the Board was right to conclude that IJs would fall outside of this subset, *see, e.g.*, *Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*, 144 F.4th 1315, 1343 (11th Cir. 2025) (ALJs whose decisions can be overturned by the Attorney General are inferior officers with "limited duties and no policymaking or administrative authority" (citation omitted)), it was wrong to conclude that *Seila Law* limited Congress's ability to regulate "inferior officers" in that way.

In *Seila Law*, the Supreme Court explained that Congress could constitutionally restrict the president's ability to remove "inferior officers with limited duties and no policymaking or administrative authority." 591 U.S. at 218. Contrary to the Board's conclusion, this sentence in the Court's opinion was describing inferior officers generally, not identifying a subset of inferior officers. After all, it later explained that an inferior officer is one whose "work is 'directed and supervised' by a principal officer," *id*. at 217 n.3, meaning that the authority of all inferior officers is limited relative to that of their supervisors, *see Kennedy*, 606 U.S. at 765 (emphasizing that an inferior officer cannot "render a final decision on

26

behalf of the United States without review by a principal officer" (quotation marks omitted)), and their "duties" are inherently constrained by supervisory review, *see United States v. Arthrex,* 594 U.S. 1, 23 (2021) (explaining that inferior officers "exceed[] the permissible scope of their duties" under the Appointments Clause when they can issue an unreviewable "final decision"). That is why, in other parts of the opinion, the Court described an "exception for *inferior* officers," without qualification. *Seila*, 591 U.S. at 217 (citing *Perkins*, 116 U.S. at 485, and *Morrison*, 487 U.S. at 662-63).

The Board's reading of *Seila Law* is also inconsistent with *Morrison*—the case the Court was summarizing when it used the duties-and-authority language. In *Morrison*, the Court upheld a provision granting good-cause tenure protection to an independent counsel appointed by a court to investigate and prosecute particular crimes. The Court held that the independent counsel was an "inferior officer," relying on the fact that she was "empowered … to perform only certain, limited duties," did not formulate policy, and was "limited in jurisdiction." *Morrison*, 487 U.S. at 671-72. Because the independent counsel was an inferior officer, the Court held that the provisions restricting the Attorney General's ability to remove her did not "impermissibly interfere[] with the President's exercise of his constitutionally appointed functions." *Id*. at 685-94; *id*. at 691 (noting that the independent counsel was "an inferior officer under the Appointments Clause, with limited jurisdiction

27

and tenure and lacking policymaking or significant administrative authority").

That is why the Court underscored Congress's authority to "limit, restrict, and

regulate the removal" of "inferior officers [appointed by] the heads of

departments." *Id.* at 689 n.27 (quoting *Perkins v. United States*, 20 Ct. Cl. 438,

444 (1885)). In other words, it referred to the independent counsel's duties and

authority to reason that she *was* an inferior officer, not to articulate a

constitutionally significant subset of inferior officers to which she belonged.

This reading of *Seila Law* is consistent with the Supreme Court's decision in

*Arthrex.* There, the Court held that Congress could not vest the appointment of

patent judges in the Secretary of Commerce because their decisions were not

sufficiently reviewable by a principal officer. *Arthrex*, 594 U.S. at 14-17. But it

held that those judges could "properly function as inferior officers" so long as a

principal officer had a statutory "means of reviewing" their decisions, *id.* at 25,

even if they were not removable at will, *id.* at 26 (declining to invalidate for-cause

removal provision); *see also Kennedy*, 606 U.S. at 765 (citing *Arthrex* to explain

that "[i]f an adjudicative officer's decisions are reviewable by a superior, then the

officer may be considered inferior even if not removable at will"); *McIntosh v.

Dep't of Def.,* 53 F.4th 630, 640-41 (Fed. Cir. 2022) (declining Appointments

Clause challenge to a "statutory structure [that] mirror[ed] that of the PTAB

following the *Arthrex* remedy," because "even if … administrative judges [were]

protected by the § 7513 removal standard, they [were] subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate" (quotation marks omitted)); Pet'rs Br. 46-48, 54-57 (describing the Attorney General's authority to review IJ decisions); Hon. Alberto R. Gonzales & Patrick Glen, *Advancing Executive Branch Immigration Policy Through the Attorney General's Review Authority*, 101 Iowa L. Rev. 841, 856 (2016) (describing the Attorney General's authority to review IJ decisions, including "de novo review of factual findings and the receipt of additional evidence not considered by the Board or the [IJ]").

Moreover, Section 7513's "efficiency-of-the-service" standard is significantly less constraining than the "rigorous" limitations on removal at issue in *Free Enterprise Fund*. 561 U.S. at 503; *compare id.* (noting that the statutory scheme provided that inferior officers could only be removed upon willful violations of certain laws, willful abuses of authority, or "unreasonable failure to enforce compliance—as determined in a formal Commission order"), *with Exum v. Dep't of Homeland Sec.*, 446 F. App'x 282, 283-84 (Fed. Cir. 2011) (per curiam) (upholding removal of an immigration adjudicator for refusing to follow agency policy under the efficiency-of-the-service standard). Nor does Section 7513 create a "novel" standard with no "historical precedent." *See Free Enter. Fund*, 561 U.S. at 505 (quotation marks omitted). Indeed, the Supreme Court declined to

29

invalidate exactly the same removal standard in *Arthrex*, 594 U.S. at 26, and has acknowledged its historical pedigree, *Arnett v. Kennedy*, 416 U.S. 134, 160 (1974) ("the language 'such cause as will promote the efficiency of the service' … does not appear on a clean slate").

* * *

The Board's decision is at odds with Supreme Court precedent and "historical practice," *Seila*, 591 U.S. at 204, and it undermines Congress's constitutional authority over inferior offices.  This Court should reverse it.

**CONCLUSION**

For the foregoing reasons, this Court should reverse the decision of the Merit Systems Protection Board.

Respectfully submitted,

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra
CONSTITUTIONAL ACCOUNTABILITY CENTER
1730 Rhode Island Ave. NW, Suite 1200
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

Dated: July 27, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,805 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that the attached brief of *amicus curiae* complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Executed this 27th day of July, 2026.

*/s/ Elizabeth B. Wydra*
Elizabeth B. Wydra

*Counsel for Amicus Curiae*