**No. 26-1575**

# United States Court of Appeals for the Federal Circuit

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners*,

v.

MERIT SYSTEMS PROTECTION BOARD,

*Respondent,*

DEPARTMENT OF JUSTICE,

*Intervenor.*

On Petition for Review from the
Merit Systems Protection Board

**BRIEF OF THE AMERICAN IMMIGRATION LAWYERS ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF PETITIONERS AND REVERSAL**

JONATHAN WEINBERG
471 West Palmer Street
Detroit, MI 48202
Tel: (313) 577-4015
weinberg@wayne.edu

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1575

**Short Case Caption** Jackler v. MSPB

**Filing Party/Entity** American Immigration Lawyers Association

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/25/2026

Signature: /s/ Jonathan Weinberg

Name: Jonathan Weinberg

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| American Immigration Lawyers Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE……………………………………………………x

SUMMARY OF ARGUMENT ........................................................................ 1

ARGUMENT ................................................................................................ 2

I. IMMIGRATION JUDGES ARE SUBJECT TO SUPERVISION AND BROAD REVIEW BY THE ATTORNEY GENERAL ............................................................ 2

A. Immigration Judges' Decisions Are Broadly Reviewed by the Board of Immigration Appeals ........................................................................ 3

B. Immigration Judge and BIA Decisions Are Reviewed by the Attorney General, Essentially Without Limit........................................................................ 7

II. IMMIGRATION JUDGES' PROTECTION FROM AT-WILL TERMINATION PRESERVES THE FAIR ADJUDICATION OF REMOVAL PROCEEDINGS AND THE INTEGRITY OF THE IMMIGRATION COURT SYSTEM ............................. 11

A. Civil Service Protections Allow Immigration Judges to Fulfill Congress's and the Attorney General's Mandate to Serve as Neutral Adjudicators................................. 11

B. Recent EOIR Personnel Actions Illustrate Real-World Risks Created by At-Will Removal........................................................................................ 14

C. Permitting At-Will Termination of Immigration Judges Seriously Harms Due Process and the Integrity of the Immigration Courts................................................ 18

D. Civil Service Protections Promote Merit-Based Accountability Without Limiting the Attorney General's Supervisory Authority ......................................................... 21

CONCLUSION........................................................................................... 23

CERTIFICATE OF COMPLIANCE…………………………………………….25

# TABLE OF AUTHORITIES

## Cases

### *Supreme Court*

*Lucia v. SEC*, 585 U.S. 237 (2018) ........ 2

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ........ 19

### *Courts of Appeals*

*Abulashvili v. Att'y Gen. of the U.S.*, 663 F.3d 197 (3d Cir. 2011) ........ 13

*Aguilar-Solis v. INS*, 168 F.3d 565 (1st Cir. 1999) ........ 12

*Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155 (3d Cir. 1993) ........ 19

*Ali v. Mukasey*, 529 F.3d 478 (2d Cir. 2008) ........ 13

*Cano-Merida v. INS*, 311 F.3d 960 (9th Cir. 2002) ........ 13

*Castro-Cortez v. INS*, 239 F.3d 1037 (9th Cir. 2001) ........ 18

*Elias v. Gonzales*, 490 F.3d 444 (6th Cir. 2007) ........ 13

*Huang v. Gonzales*, 453 F.3d 142 (2d Cir. 2006) ........ 13

*Iliev v. INS*, 127 F.3d 638 (7th Cir. 1997) ........ 19

*Islam v. Gonzales*, 469 F.3d 53 (2d Cir. 2006) ........ 13

*LaSalle Nat'l Bank v. First Connecticut Holding Grp., LLC XXIII*, 287 F.3d 279 (3d Cir. 2002) ........ 19

*New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207 (2d Cir. 2021) ........ 10

*Wang v. Att'y Gen.*, 423 F.3d 260 (3d Cir. 2005) ........ 18

### *District Courts*

*Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, 822 F. Supp. 3d 119

(D.D.C. 2026) .......... 4

*Romero v. Hyde*, No. 25-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025) .......... 16

**Administrative Decisions**

*Matter of A-M-R-C-*, 28 I. & N. Dec. 7 (A.G. 2020) .......... 8

*Matter of Batista-Hernandez*, 21 I. & N. Dec. 955 (BIA 1997) .......... 4

*Matter of Cerda Reyes*, 26 I. & N. Dec. 528 (BIA 2015) .......... 6

*Matter of Coronado Acevedo*, 28 I. & N. Dec. 648 (A.G. 2022) .......... 8

*Matter of H-C-R-C-*, 28 I. & N. Dec. 809 (BIA 2024) .......... 3

*Matter of I-B-M-S-*, 29 I. & N. Dec. 628 (BIA 2026) .......... 6

*Matter of Ibarra Vega*, 29 I. & N. Dec. 476 (BIA 2026) .......... 6

*Matter of J-A-F-S-*, 29 I. & N. Dec. 195 (BIA 2025) .......... 6

*Matter of J-F-F-*, 23 I. & N. Dec. 912 (A.G. 2006) .......... 12

*Matter of Jin*, 29 I. & N. Dec. 441 (BIA 2026) .......... 4

*Matter of Kanagasundram*, 22 I. & N. Dec. 963 (BIA 1999) .......... 4

*Matter of Luis-Rodriguez*, 22 I. & N. Dec. 747 (BIA 1999) .......... 6

*Matter of M-D-*, 24 I. & N. Dec. 138 (BIA 2007) .......... 5

*Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019) .......... 8, 9

*Matter of Morales-Morales*, 28 I. & N. Dec. 708 (BIA 2023) .......... 4

*Matter of Negusie*, 28 I. & N. Dec. 399 (A.G. 2021) .......... 8

*Matter of Negusie*, 29 I. & N. Dec. 285 (A.G. 2025) .......... 8

*Matter of R-D-*, 24 I. & N. Dec. 221 (BIA 2007) .......... 4

*Matter of R-E-R-M- & J-D-R-M-*, 29 I. & N. Dec. 202 (A.G. 2025) .......... 9

*Matter of S-E-M-Z-*, 29 I. & N. Dec. 680 (BIA 2026) .......... 3

*Matter of S-S-F-M-*, 29 I. & N. Dec. 207 (A.G. 2025) .......... 9

*Matter of Silva-Trevino*, 26 I. & N. Dec. 550 (A.G. 2015) .......... 8

*Matter of T-A-G-*, 29 I. & N. Dec. 715 (BIA 2026) .......... 6

*Matter of Valdez-Valdez*, 21 I. & N. Dec. 703 (BIA 1997) .......... 5

*Matter of Y-S-L-C-*, 26 I. & N. Dec. 688 (BIA 2015) .......... 12, 13

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......... 2

**Statutes**

5 U.S.C. § 7513(a)-(b) .......... 21

5 U.S.C. § 7701 .......... 21

6 U.S.C. § 251 .......... 11

6 U.S.C. § 271(b) .......... 11

8 U.S.C. § 1101(b)(4) .......... 1, 3

8 U.S.C. § 1103(g) .......... 7, 9, 11

8 U.S.C. § 1229a .......... 11

8 U.S.C. § 1252 .......... 5

**Regulations**

8 C.F.R. § 1003.1(a)(1) .......... 7

8 C.F.R. § 1003.1(b)(1)-(3) .......... 5

8 C.F.R. § 1003.1(c) .......... 4

8 C.F.R. § 1003.1(d)(3) .......... 9

8 C.F.R. § 1003.1(f)-(g) ........................................................................................ 5

8 C.F.R. § 1003.1(h) ........................................................................................ 7, 9, 10

8 C.F.R. § 1003.10 ........................................................................................ 9, 11, 12, 21

8 C.F.R. § 1003.38 ........................................................................................ 4, 5

8 C.F.R. § 1240.26(c)(3) ........................................................................................ 5

**Other Authorities**

Hamed Aleaziz, Nicholas Nehamas & Steven Rich, *Judges Fired After Blocking Deportations of Pro-Palestinian Students*, N.Y. Times (Apr. 11, 2026) ..... 16

Geoff Bennett & Ali Schmitz, *Ousted Immigration Judge Describes Deepening Court Backlog*, PBS NewsHour (Nov. 12, 2025) ................................................ 16

Ximena Bustillo, *An Immigration Court Few Have Heard of Is Shaping Policy Behind the Scenes*, NPR (Mar. 20, 2026) ........................................................ 7

Ximena Bustillo & Scott Simon, *The Trump Administration Fired Nearly 100 Immigration Judges in 2025. What's Next?*, NPR (Jan. 10, 2026)............... 15

Exec. Office for Immigration Review, U.S. Dep't of Justice, *Ethics and Professionalism Guide for Immigration Judges* §§ V, VI (2011) .......................................... 12

Hilda Gutierrez et al., *"An All-Out Attack on Immigration Court": San Francisco Immigration Judges Speak Out After Firings*, NBC Bay Area (Nov. 25, 2025) ........................................................................................ 16

Letter from Sen. Richard Durbin et al. to Attorney General Pamela Bondi (Mar. 28, 2025) ........................................................................................ 16

Anusha Mathur & Ximena Bustillo, *U.S. Has a Quarter Fewer Immigration Judges Than It Did a Year Ago. Here's Why*, NPR (Feb. 23, 2026) ................................ 15

Nicholas Nehamas et al., *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026) ............................................ 15, 16

Emily Ngo, *Immigration Courts Thrown into Chaos as Trump Administration Purges*

*Dozens of Judges*, Politico (Dec. 6, 2025) .................................................. 15

Marco Poggio, *Judges See an Immigration Court Gutted from Inside*, Law360 (Oct. 31, 2025) .................................................................................................. 16

Reuters, *U.N. Experts Concerned by Trump's Removal of Immigration Judges* (July 16, 2026) .................................................................................................. 17

Betsy Woodruff Swan, *He Thought He Had Asylum. Now He Could Face a Death Sentence.*, Politico (July 24, 2020) .................................................................. 8

## INTEREST OF AMICUS CURIAE

The American Immigration Lawyers Association ("AILA") is a national, nonpartisan, nonprofit association with more than 18,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law.[1] AILA seeks to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration and nationality law and practice. AILA members regularly practice before immigration judges and appellate immigration judges whose long-standing civil service protections are at issue in this case. AILA has participated as amicus curiae in numerous cases before the U.S. Courts of Appeals and the U.S. Supreme Court.

[1] No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person—other than the amicus curiae and its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E). This brief is filed under the authority of this Court's June 17, 2026, order, which states that briefs of amici curiae may be filed in this case without consent or leave of court.

## SUMMARY OF ARGUMENT

The Merit Systems Protection Board ("MSPB") issued a sweeping ruling finding that basic removal protections that immigration judges ("IJs) have had for decades are unconstitutional because they interfere with the President's Article II authority to execute the laws. It reasoned that, absent at-will removal power, the President will be unable to supervise and manage immigration judges within the Department of Justice's Executive Office for Immigration Review ("EOIR"). This is wrong. The Attorney General has long-standing, extremely broad statutory authority to supervise immigration judges and to remove them for cause. *See* 8 U.S.C. §§ 1101(b)(4), (g)(2). Essentially all decisions made by immigration judges in the cases before them, from decisions in asylum cases to a judge's docket management and courtroom behavior, are subject to review by the Board of Immigration Appeals ("BIA") and by the Attorney General himself. The scope of review of immigration judge decisions by the Attorney General is far broader than the scope of Article III judicial review and ensures that all immigration judges are subject to clear, transparent forms of supervision by the executive branch.

Nothing in the Constitution mandates that in addition to these broad tools of review, the President must also have unfettered authority to fire immigration judges without cause. Allowing the Department of Justice ("DOJ") to exercise such authority undermines immigration judges' ability to act as neutral

decisionmakers and severely undermines the integrity of the immigration court system. Immigration judges' neutrality in interpreting the law is required by statute, regulation, ethical obligations, and constitutional due process. Indeed, circuit courts of appeal have regularly remanded cases where immigration judges did not act as fair and neutral adjudicators. Yet the wave of firings of immigration judges without cause since 2025, in the context of public statements from DOJ and the White House about the need to quickly deport as many people as possible, has perverted that neutrality. It has exerted pressure on immigration judges to be outcome-driven so as to not lose their jobs. It has had serious and prejudicial impacts on the noncitizens relying on the immigration courts to decide life-and-death matters. It has led to increased litigation over court decisions. It has undermined confidence in the integrity of the court system. The Court should reverse the MSPB's decision.

## ARGUMENT

### I. IMMIGRATION JUDGES ARE SUBJECT TO SUPERVISION AND BROAD REVIEW BY THE ATTORNEY GENERAL

As the parties have agreed in this case, immigration judges are inferior officers under the Constitution. *See* U.S. Const. art. II, § 2, cl. 2; *Lucia v. SEC*, 585 U.S. 237, 245 (2018). They are inferior officers because they are appointed and supervised by a principal officer, the Attorney General of the United States. *See* 8

U.S.C. § 1101(b)(4) (holding immigration judges "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe").

An immigration judge presides over a docket of thousands of removal cases, making daily decisions as to whether noncitizens are removable as charged and whether they merit release on bond or are eligible for asylum or other forms of status. But all of those decisions, and countless other interim decisions immigration judges make on the way to a final resolution of a case, are subject to 1) review by the BIA, which is itself subject to review by the Attorney General; and/or 2) direct review by the Attorney General himself. Thus, the MSPB's statement that immigration judge decisions are subject to "limited" review is wrong in terms of both the governing law and the frequent exercise of that authority by the Department of Justice.

### A. Immigration Judges' Decisions Are Broadly Reviewed by the Board of Immigration Appeals

The BIA has wide authority to review immigration judge decisions, without most of the constraints of Article III judicial review. The BIA regularly reviews both the legal analysis issued by immigration judges as well as their courtroom behavior. *See, e.g., Matter of S-E-M-Z-*, 29 I. & N. Dec. 680, 681 (BIA 2026) (interpreting the meaning of "particular social group" in the Immigration and Nationality Act ("INA")); *Matter of H-C-R-C-*, 28 I. & N. Dec. 809, 814 (BIA

2024) (finding the IJ's comments appeared to pre-judge the respondent's claim and remanding to a new judge to avoid the appearance of bias). The BIA may adjudicate appeals from any "decision" of an immigration judge. Typically, those appeals are filed by either the noncitizen or Department of Homeland Security ("DHS") counsel within 30 days of a decision of an immigration judge. *See* 8 C.F.R. § 1003.38(b).[2] But the BIA also has the power to find that equitable tolling is warranted and accept a late-filed appeal. *Matter of Morales-Morales*, 28 I. & N. Dec. 708, 717 (BIA 2023) (finding the appeal deadline is a claims-processing rule subject to equitable tolling).

More than that, the BIA may certify an immigration judge's decision to itself without regard to these limits. 8 C.F.R. § 1003.1(c). The BIA may take a case on certification even where the case was filed well out of time, or even where neither party had filed an appeal. *See, e.g., Matter of Jin*, 29 I. & N. Dec. 441, 442 (BIA 2026) (taking an appeal filed over two years late on certification); *Matter of R-D-*, 24 I. & N. Dec. 221, 222 (BIA 2007) (describing two rounds of certification); *Matter of Kanagasundram*, 22 I. & N. Dec. 963, 963 (BIA 1999) (taking case on

[2] DOJ issued an interim final rule in March 2026 that would have, among other changes to BIA review, shortened the appeal period to only 10 days, but most of the rule was vacated under the Administrative Procedure Act as unlawfully promulgated. Thus, the prior version of the regulation remains in effect. *See Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, 822 F. Supp. 3d 119, 158 (D.D.C. 2026).

certification without reference to party appeals); *Matter of Batista-Hernandez*, 21 I. & N. Dec. 955 (BIA 1997) (same); *Matter of Valdez-Valdez*, 21 I. & N. Dec. 703 (BIA 1997) (taking case on certification notwithstanding a request by the legacy Immigration and Naturalization Service ("INS") to withdraw its appeal). The BIA may issue an unpublished decision, affecting only the parties in that case, or a published decision, which will bind every immigration judge in the United States. *See* 8 C.F.R. § 1003.1(f)-(g) (procedures for publication of BIA decisions).

The BIA is also not limited to reviewing "final" decisions of immigration judges, or limited only to reviewing orders of removal. Its power is thus broader than that of Article III circuit court judges, who are expressly limited to reviewing only final orders of removal. *See* 8 C.F.R. § 1003.38(a) ("Decisions" of immigration judges may be appealed); 8 C.F.R. § 1003.1(b)(1)-(3) (same, with one minor exception regarding the length of a voluntary departure period)[3]; *compare* 8 U.S.C. 1252(a)(1), (b)(1) (requiring a "final order of removal"). The BIA has broad discretion to accept interlocutory appeals from interim decisions by immigration judges for reasons including – but not limited to – its desire to correct "recurring problems in the handling of cases by Immigration Judges." *Matter of M-D-*, 24 I. &

---

[3] The BIA does not review the length of a voluntary departure period granted by an immigration judges only because, by the time it reaches the other merits of the appeal, that period has often expired, and the BIA can use its independent authority to "reinstate" a new voluntary departure period. 8 C.F.R. § 1240.26(c)(3).

N. Dec. 138, 139 (BIA 2007).

At the time of filing this brief, the BIA has issued 14 precedential decisions from interlocutory appeals since June 2025 alone. Instead of reviewing an immigration judge's ultimate order of removal or grant of relief, these appeals reviewed immigration judges': grants of continuances, *see Matter of J-A-F-S-*, 29 I. & N. Dec. 195, 199-200 (BIA 2025); administrative closure, *see Matter of Ibarra Vega*, 29 I. & N. Dec. 476, 483 (BIA 2026); denials of DHS motions, see *Matter of T-A-G-*, 29 I. & N. Dec. 715, 716 (BIA 2026); and changes of venue, *see Matter of I-B-M-S-*, 29 I. & N. Dec. 628, 623 (BIA 2026) (ordering the case re-assigned to a new IJ mid-case). Given the BIA's frequent use of this authority, immigration judges are on notice that all their substantive decisions may be reviewed, including decisions they make on apparently "minor" docket management issues.

Finally, the BIA can review immigration judge decisions even when the controversy is moot or would not satisfy the Article III "case in controversy" requirement. *See, e.g., Matter of Luis-Rodriguez*, 22 I. & N. Dec. 747, 753 (BIA 1999) (holding that the BIA's jurisdiction "is not governed or restricted by constitutional 'mootness doctrine' jurisprudence," and reviewing legacy INS's appeal where noncitizen had already departed the U.S.); *Matter of Cerda Reyes*, 26 I. & N. Dec. 528, 528 n.3 (BIA 2015) (publishing case on jurisdictional issue even

though it was moot).

### B. Immigration Judge and BIA Decisions Are Reviewed by the Attorney General, Essentially Without Limit

While the BIA's authority to review immigration judge decisions is significant, the Attorney General's authority to review immigration judge *and* BIA decisions is even broader. This makes sense, given that the Attorney General's explicit statutory authority over immigration judges is sweeping. 8 U.S.C. § 1101(b)(f) ("An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe."); 8 U.S.C. § 1103(g)(2) (the Attorney General shall "review such administrative determinations in immigration proceedings" as necessary to implement the INA). It also makes sense since the appellate immigration judges on the BIA are themselves inferior officers subject to Attorney General supervision. *See* 8 C.F.R. § 1003.1(a)(1) (Board members or appellate immigration judges are "attorneys appointed by the Attorney General").[4]

Both the statute and the regulations give the Attorney General authority to

---

[4] Appellate immigration judges are not more "senior" than immigration judges; while they have different job duties, they are both classified as immigration judges by DOJ. Indeed, in 2025 DOJ terminated multiple appellate immigration judges appointed by the Biden administration from the BIA and also raised Article II arguments in their MSPB appeals. *See* Ximena Bustillo, *An immigration court few have heard of is shaping policy behind the scenes*, NPR, Mar. 20, 2026, *available at* https://www.npr.org/2026/03/20/nx-s1-5707535/trump-immigration-detention-appeals-board-deportation.

refer immigration cases to himself for review. 8 U.S.C. § 1103(g)(2); 8 C.F.R. § 1003.1(h)(1). This authority has been used for decades by administrations of both parties to publish case law binding all immigration judges and the BIA. *See, e.g., Matter of Negusie*, 29 I. & N. Dec. 285 (A.G. 2025) (second Trump administration); *Matter of Coronado Acevedo,* 28 I. & N. Dec. 648 (A.G. 2022) (Biden administration); *Matter of M-S-*, 27 I. & N. Dec. 509 (A.G. 2019) (first Trump administration); *Matter of Silva-Trevino*, 26 I. & N. Dec. 550 (A.G. 2015) (Obama administration).

The Attorney General's referral authority is general and imposes no limitation on his ability to take cases. In *Matter of A-M-R-C-*, 28 I. & N. Dec. 7 (A.G. 2020), the Attorney General asked for briefing in a case that had been closed for almost fifteen years.[5] The Attorney General may also hold a case in abeyance seemingly without limit while deciding whether to review it. *See, e.g., Matter of Negusie*, 28 I. & N. Dec. 399, 399 (A.G. 2021) (Attorney General Garland referring a closed asylum case to himself to consider the interpretation of the "persecutor" bar to asylum, and staying proceedings); *Matter of Negusie*, 29 I. & N. Dec. 285, 286 (A.G. 2025) (Attorney General Bondi vacating the *Negusie* stay

---

[5] *See* Betsy Woodruff Swan, *He thought he had asylum. Now he could face a death sentence.*, Politico, July 24, 2020, available at https://www.politico.com/news/2020/07/24/rashed-chowdhury-asylum-death-sentence-381075.

four years later in light of Garland's inaction on the case).

While Attorney General referrals often pertain to cases that have been decided by the BIA, and his referral authority is described in the BIA's implementing regulations, the statute does not require the BIA to have taken jurisdiction of the referred case or to have issued a decision that the Attorney General is directly reviewing. *See* 8 C.F.R. § 1003.10(d)(i) (explaining that "decisions of the Attorney General" may come in multiple ways: "through review of a decision of the Board, by written order, *or* by determination and ruling pursuant to section 103 of the Act") (emphasis added). *See also Matter of M-S-*, 27 I. & N. Dec. at 515 n.6 (Attorney General stating that he can address the legal issue in the case "by reviewing either the Board's decision *or the [immigration judge's] second bond order*," and citing not 8 C.F.R. § 1003.1(h) but the broader authority in 8 U.S.C. § 1103(g)(2)) (emphasis added); *Matter of S-S-F-M-*, 29 I. & N. Dec. 207, 208 (A.G. 2025) (self-referring the case after the U.S. Court of Appeals for the Fifth Circuit granted a joint motion to remand, and issuing a decision before the BIA had issued any decision on remand to review); *Matter of R-E-R-M- & J-D-R-M-*, 29 I. & N. Dec. 202, 203 (A.G. 2025) (same, on remand from the Ninth Circuit).

Finally, while the regulations specify specific standards governing the BIA's review of immigration judge decisions, the Attorney General's review is subject to

no such standards. Compare 8 C.F.R. § 1003.1(d)(3) (outlining when the BIA must use clear error versus *de novo* review and barring appellate fact-finding); with 8 U.S.C. § 1103(g)(2); 8 C.F.R. § 1003.1(h)(1) (containing no such restrictions on Attorney General review). Thus, the Attorney General has wide-ranging authority to review immigration judge actions at any point in a case or after a case has concluded, with a seemingly unlimited scope to that review.

While the scope of BIA and Attorney General review, certification, and referral mechanisms is broad, those mechanisms share an important feature: transparency. They result either in published decisions or unpublished decisions that are publicly accessible through the Freedom of Information Act ("FOIA"). *See* 8 C.F.R. § 1003.1(h)(2) ("In any case the Attorney General decides, the Attorney General's decision shall be stated in writing and shall be transmitted" for service); *New York Legal Assistance Grp. v. Bd. of Immigr. Appeals*, 987 F.3d 207, 225 (2d Cir. 2021) (S.D.N.Y. 2022) (requiring disclosure of all BIA unpublished decisions through the agency's online FOIA reading room).[6] As a result, the American public can see for itself whether a particular BIA or Attorney General decision affirming or correcting an immigration judge appears to be based in legal principles. In that way, the system manifests a measure of accountability. In contrast, a system in

[6] The portal EOIR operates as a result of a settlement in the *NYLAG* litigation is available at https://foia.eoir.justice.gov/app/ReadingRoom.aspx .

which the Attorney General can terminate immigration judges with no explanation, without regard to the quality of their work, lacks that transparency and undermines the integrity of the immigration court system, as discussed below.

## II. IMMIGRATION JUDGES' PROTECTION FROM AT-WILL TERMINATION PRESERVES THE FAIR ADJUDICATION OF REMOVAL PROCEEDINGS AND THE INTEGRITY OF THE IMMIGRATION COURT SYSTEM

### A. Civil Service Protections Allow Immigration Judges to Fulfill Congress's and the Attorney General's Mandate to Serve as Neutral Adjudicators

As discussed above, IJs are subject to extensive supervision by the Attorney General. But that supervisory authority exists alongside an equally important legal requirement: Immigration judges must serve as neutral adjudicators exercising independent legal judgment in the cases before them. Congress deliberately separated the Executive Branch's prosecutorial and adjudicative functions by transferring responsibility for immigration enforcement to the Department of Homeland Security while leaving the adjudication of removal proceedings within EOIR under supervision of the Attorney General. *See* 6 U.S.C. §§ 251, 271(b); 8 U.S.C. §§ 1103(g), 1229a; *see also* 8 C.F.R. § 1003.10(b).

That division reflects Congress's recognition that the fair administration of the immigration laws depends upon adjudicators who are institutionally distinct from the government officials responsible for investigating, charging, and prosecuting removal cases. Consistent with that structure, the Attorney General's

regulations require immigration judges to "exercise their independent judgment and discretion" and to resolve cases in a "timely and impartial manner consistent with the [INA] and regulations," although their decisions are "governed by…decisions of the [BIA], and by the Attorney General." *See* 8 C.F.R. § 1003.10(b), (d).

The Attorney General and the BIA have repeatedly stressed that immigration judges occupy a unique adjudicative role within the Executive Branch. Although immigration judges are expected to develop a complete record and ensure that proceedings are fairly conducted, they remain neutral decisionmakers rather than advocates for either party. *See Matter of J-F-F-*, 23 I. & N. Dec. 912, 922–23 (A.G. 2006); *Matter of Y-S-L-C-*, 26 I. & N. Dec. 688, 690–91 (BIA 2015). EOIR's own Ethics and Professionalism Guide reinforces this principle, directing IJs to maintain impartiality, eliminate both actual and apparent impropriety, and conduct proceedings in a manner that preserves public confidence in the integrity of the immigration courts. *See* Exec. Office for Immigration Review, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges §§ V, VI (2011).[7]

The federal courts have recognized the same obligation. Because removal

---

[7] *Available at* https://www.justice.gov/sites/default/files/eoir/legacy/2013/05/23/EthicsandProfessionalismGuideforIJs.pdf

proceedings must satisfy the requirements of due process, IJs must "function as neutral and impartial arbiters." *See Aguilar-Solis v. INS*, 168 F.3d 565, 569 (1st Cir. 1999). Courts have repeatedly vacated removal orders where an immigration judge abandoned that role by demonstrating bias, prejudging the merits of a claim, or otherwise denying a respondent a full and fair opportunity to present evidence. *See, e.g.*, *Islam v. Gonzales*, 469 F.3d 53, 55 (2d Cir. 2006) (noting that the immigration judge's job is to be neutral rather than an advocate, and finding that the IJ's overly hostile and argumentative manner required remand); *Huang v. Gonzales*, 453 F.3d 142, 148–51(2d Cir. 2006) (describing in detail the IJ's bias against and prejudgment of Chinese asylum claims); *Abulashvili v. Att'y Gen. of the U.S.*, 663 F.3d 197, 207 (3d Cir. 2011) (stating that "[t]he Due Process Clause cannot tolerate a situation where a supposedly neutral fact finder interjects herself into the proceedings to the extent of assuming the role of opposing counsel"); *Elias v. Gonzales*, 490 F.3d 444, 451 (6th Cir. 2007) ("An immigration judge has a responsibility to function as a neutral, impartial arbiter and must refrain from taking on the role of advocate for either party."); *Cano-Merida v. INS*, 311 F.3d 960, 964–65 (9th Cir. 2002) (finding due process violation where the IJ prejudged a pro se asylum application); *Ali v. Mukasey*, 529 F.3d 478, 493 (2d Cir. 2008) (remanding where the IJ inappropriately engaged in speculation about gay men, noting the case must continue until the respondent receives an unbiased hearing);

*Matter of Y-S-L-C-*, 26 I. & N. Dec. 688, 690 (BIA 2015) (finding "bullying or hostile" conduct by an IJ has a chilling effect on the testimony of a minor respondent). These decisions reflect a consistent principle: impartiality is not aspirational; it is a legal requirement governing the conduct of immigration judges.

Civil-service removal protections reinforce, rather than conflict with, that framework. They do not limit the Attorney General's authority to supervise IJs, establish binding legal standards, or correct factual or legal error through administrative review. Instead, they help preserve the institutional conditions Congress created. They allow IJs to exercise the independent judgment that the regulations require without the reasonable concern that their honest application of the law in a particular case could jeopardize their continued employment. A system that requires adjudicators to exercise independent judgment while simultaneously permitting their summary removal through unexplained employment decisions brings judges' legal duty in tension with their self-interest. Civil-service protections reduce that tension by ensuring that IJs remain accountable for their competence, ethics, professionalism, and adherence to the law, rather than the outcomes they reach in individual cases.

### B. Recent EOIR Personnel Actions Illustrate Real-World Risks Created by At-Will Removal

Recent events demonstrate that the danger of employment-based pressure is not fanciful or abstract. Since early 2025, the Trump administration has undertaken

an unprecedented series of personnel actions affecting the immigration courts, including: termination of over one hundred immigration judges and Board of Immigration Appeals members; the removal of judges who had previously adjudicated high-profile immigration matters; the replacement of experienced adjudicators with new appointees; and the expanded use of temporary immigration judges. These actions occurred while the immigration courts are facing historically high backlogs and increasing enforcement demands. *See* Ximena Bustillo & Scott Simon, *The Trump Administration Fired Nearly 100 Immigration Judges in 2025. What's Next?*, NPR (Jan. 10, 2026); Anusha Mathur & Ximena Bustillo, *U.S. Has a Quarter Fewer Immigration Judges Than It Did a Year Ago. Here's Why*, NPR (Feb. 23, 2026); Emily Ngo, *Immigration Courts Thrown into Chaos as Trump Administration Purges Dozens of Judges*, Politico (Dec. 6, 2025).

The dismissals have been accompanied by repeated public statements emphasizing the Administration's single-minded focus on increasing removals and expediting immigration proceedings. The Administration has systematically replaced numerous IJs appointed during the prior administration, many of whom previously represented noncitizens or had asylum grant rates exceeding those of their colleagues. *See* Nicholas Nehamas et al., *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026). In April 2026, two immigration judges were removed without public explanation shortly after they

had issued decisions dismissing highly publicized removal proceedings against pro-Palestinian student activists. *See* Hamed Aleaziz, Nicholas Nehamas & Steven Rich, *Judges Fired After Blocking Deportations of Pro-Palestinian Students*, N.Y. Times (Apr. 11, 2026).

Current and former immigration judges have articulated precisely that concern. One former immigration judge stated that judges increasingly understood that the expectation was to "deport as many people as possible as quickly as possible," and characterized IJs as becoming "puppets for the administration" if they wished to remain employed. *See* Nicholas Nehamas et al., *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. Times (Apr. 9, 2026). Another former immigration judge alleged that he "was told to rule in a certain way" by supervisors who themselves faced pressure from higher levels of DOJ. *See Romero v. Hyde*, No. CV 25-11631-BEM, 2025 WL 2403827, at *7 (D. Mass. Aug. 19, 2025). Former immigration judges interviewed by national media similarly described an atmosphere in which adjudicators perceived pressure to prioritize speed and enforcement outcomes over fair, individualized adjudication. *See* Geoff Bennett & Ali Schmitz, *Ousted Immigration Judge Describes Deepening Court Backlog*, PBS NewsHour (Nov. 12, 2025); Hilda Gutierrez et al., *"An All-Out Attack on Immigration Court": San Francisco Immigration Judges Speak Out After Firings*, NBC Bay Area (Nov. 25, 2025); Marco Poggio, *Judges*

*See an Immigration Court Gutted from Inside*, Law360 (Oct. 31, 2025).[8]

The firings have even drawn international concern. In July 2026, United Nations human rights experts warned that the dismissal of more than one hundred Immigration Judges threatened judicial independence and risked undermining the fairness of removal proceedings. Reuters, *U.N. Experts Concerned by Trump's Removal of Immigration Judges* (July 16, 2026).

This Court need not investigate every account of judge terminations or determine the subjective motivation underlying any individual personnel decision. The legal significance of these events is structural. Due process depends not only upon actual impartiality, but also upon maintaining public confidence that adjudicators decide cases according to law rather than fear of firing. An immigration judge who observes many colleagues removed without explanation, hears repeated public statements emphasizing deportation targets and expedited case completion, and lacks meaningful protection against at-will removal, may reasonably perceive that continued employment depends, at least in part, on

[8] Members of Congress likewise questioned the dismissals of both IJs and AIJs, emphasizing that they occurred while the immigration courts faced unprecedented backlogs and Congress had authorized substantial expansion of the immigration judiciary. *See Letter from Sen. Richard Durbin et al. to Attorney General Pamela Bondi* (Mar. 28, 2025), available at https://www.durbin.senate.gov/newsroom/press-releases/durbin-leads-letter-to-bondi-admonishing-trump-administration-for-firing-immigration-court-judges-replacing-them-with-military-attorneys.

reaching pre-determined outcomes regardless of the facts or law. Even if no individual adjudicator alters a single decision as a result, that perception alone threatens the appearance of neutrality that Congress, the Attorney General's regulations, and due process require.

### C. Permitting At-Will Termination of Immigration Judges Seriously Harms Due Process and the Integrity of the Immigration Courts

The consequences of permitting immigration judges to be removed at will extend well beyond the individual employee. Congress entrusted IJs with deciding whether an individual may remain in the United States, whether an individual should remain in custody, obtain humanitarian protection, or be removed to a country where persecution or torture is alleged. These are not light decisions. The legitimacy of those decisions depends upon confidence that they reflect the IJ's independent application of law to fact rather than concerns over maintaining their employment.

That independence serves the interests of all participants in the system. Respondents are entitled to a neutral adjudicator. *See Castro-Cortez v. INS*, 239 F.3d 1037, 1049 (9th Cir. 2001). *See also Wang v. Att'y Gen.*, 423 F.3d 260, 267–68 (3d Cir. 2005) (noting the duty of IJs to remain neutral and impartial when they conduct immigration hearings). The Government likewise has a substantial interest in removal orders that are legally sound and capable of withstanding judicial review. Courts of appeal depend upon records developed by impartial adjudicators

exercising independent legal judgment. The public benefits from confidence that immigration decisions are the product of fair application of law rather than institutional pressure. By contrast, a system in which the public perceives immigration judges' decisions as opaquely driven by the Administration's desire for particular outcomes invites additional litigation, undermines confidence in the immigration courts, and diminishes respect for the judgments those courts produce.

The Supreme Court has long recognized that adjudicators occupy a fundamentally different role than enforcement officials. While prosecutors are expected to advocate on behalf of the Government, adjudicators must remain impartial. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 248–50 (1980) (explaining that adjudicators are held to far more demanding standards of neutrality because of their obligation to decide disputes impartially). That distinction is especially important in immigration proceedings, where IJs function as neutral decisionmakers under the supervision of an executive agency charged with enforcing the immigration laws.

As the Third Circuit has explained, public confidence in the judicial system depends upon "the appearance of neutrality and impartiality in the administration of justice." *LaSalle Nat'l Bank v. First Connecticut Holding Group, LLC XXIII*, 287 F.3d 279, 292 (3d Cir. 2002) (quoting *Alexander v. Primerica Holdings, Inc.*, 10 F.3d 155, 167 (3d Cir. 1993)). The Seventh Circuit has likewise observed that

"even the appearance of partiality is destructive of confidence in the judicial system" and that every litigant is entitled to "fair, even-handed treatment by whoever exercises judicial authority of any kind." *Iliev v. INS*, 127 F.3d 638, 643 (7th Cir. 1997). Those principles apply with equal force in the immigration courts, where public confidence depends upon the public's understanding that IJs are free to decide cases according to law rather than employment-based pressure.

Permitting at-will removal threatens that confidence. Immigration judges already operate within a system in which the Attorney General exercises extensive supervisory authority through regulations, precedential decisions, certification, administrative review, and oversight of EOIR. *See* supra Part I. Allowing the same officials to remove adjudicators summarily and without explanation adds little to the Government's ability to supervise the immigration courts. It does, however, create a structure in which adjudicators may reasonably perceive that their continued employment is dependent on their contorting the facts and the law in a given case to achieve a preferred result.

Whether or not that perception ever influences any particular decision, the possibility of removal without civil -service protections undermines confidence in the entire immigration court system. Because immigration judges occupy an adjudicative role within the Executive Branch, maintaining public confidence requires not only actual impartiality but also institutional safeguards that

reasonably assure litigants and reviewing courts that decisions are rendered according to law rather than employment considerations. Civil-service protections are one of the structural safeguards that help preserve that confidence.

### D. Civil Service Protections Promote Merit-Based Accountability Without Limiting the Attorney General's Supervisory Authority

The Government contends that at-will removal is necessary to ensure accountability. But civil service protections and accountability are not opposites. The Civil Service Reform Act permits agencies to discipline and remove employees for cause; it requires only that adverse employment actions be based on legitimate service-related reasons and accompanied by the process Congress prescribed. *See* 5 U.S.C. §§ 7513(a)-(b), 7701. Immigration judges therefore remain fully accountable for following binding law, conducting fair and orderly hearings, treating litigants professionally, managing their dockets, and performing the duties of office competently.

Civil service protections do not diminish the Attorney General's supervisory authority. As discussed above, the Attorney General retains sweeping authority to direct immigration policy through regulations, precedential decisions, administrative review, and supervision of EOIR. Those authorities provide ample means to ensure the consistent application of the immigration laws. The civil-service framework simply requires the Department of Justice to justify adverse employment actions on grounds related to performance, competence, ethics, or

misconduct rather than disagreement with the lawful exercise of independent judgment that otherwise has followed the "governing standards" in 8 C.F.R. § 1003.10(d).

That distinction is particularly important for adjudicators. The Department may appropriately evaluate whether an IJ follows controlling law, issues reasoned decisions, conducts hearings professionally, and resolves cases efficiently. It should not, however, be permitted to evaluate judicial performance based on whether IJs reach seemingly preferred outcomes regardless of the facts or law, or on discriminatory bases. Civil service protections preserve that distinction by requiring DOJ to articulate a legitimate basis for discipline or termination. In doing so, they help ensure that discipline targets genuine performance deficiencies rather than appropriate adjudicative independence.

At-will removal, by contrast, undermines meaningful accountability. When an IJ may be removed without explanation, neither the judge nor the public can determine whether the action resulted from misconduct, poor performance, or dissatisfaction with case outcomes. The result is not greater accountability, but less. Without a requirement that employment decisions be tied to merit or performance, legitimate personnel actions become indistinguishable from actions that may reasonably be perceived as politically motivated.

The question, therefore, is not whether immigration judges should be

supervised or disciplined if warranted. They unquestionably should. It is whether that supervision is better served by a system that requires the Department to justify employment decisions on the basis of merit and performance, or one that permits unexplained removals untethered to either. Congress chose the former and that choice reinforces the impartial adjudication that Congress, the Attorney General's regulations, and due process require.

For those reasons, the civil service protections applicable to Petitioners advance the impartial adjudication that Congress, the Attorney General's regulations, and due process require. They reduce the risk that employment pressure will influence individual cases, preserve confidence in the immigration courts, and promote a form of accountability grounded in competence, ethics, and adherence to law. Put differently, civil service protections do not make Immigration Judges less accountable. Rather, they require the Department to be more accountable for the employment decisions it makes.

## CONCLUSION

For the above reasons, this Court should reverse the decision of the Merit Systems Protection Board.

Dated: July 28, 2026

Respectfully submitted,

*/s/ Jonathan Weinberg*
JONATHAN WEINBERG
471 West Palmer Street
Detroit, MI 48202
Tel: (313) 577-4015
weinberg@wayne.edu

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), this brief contains 5,380 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally spaced font.

*/s/ Jonathan Weinberg*
Jonathan Weinberg