No. 26-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

MEGAN JACKLER AND BRANDON JAROCH,
*Petitioners*,

v.

MERIT SYSTEMS PROTECTION BOARD,
*Respondent*,

Department of Justice,
*Intervenor*.

On Petition for Review from the
Merit Systems Protection Board

**BRIEF OF PROFESSOR NICHOLAS R. BEDNAR AND
PROFESSOR AMY J. WILDERMUTH AS AMICI CURIAE
IN SUPPORT OF PETITIONERS AND REVERSAL**

David Zimmer
ZIMMER, CITRON & CLARKE LLP
711 Atlantic Avenue, 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

July 28, 2026

# CERTIFICATE OF INTEREST

Undersigned counsel for Amici Curiae certifies as follows:

**1.     The full name of every entity represented by undersigned counsel is:**

Nicholas R. Bednar
Amy J. Wildermuth

**2.     The name of the real party in interest for the entities is:**

N/A.

**3.     All Parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities are:**

N/A.

**4.     The names of all law firms and the partners or associates that appeared for the entities in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance) are:**

N/A

**5.     Other than the originating case(s) for this case, related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a) are:**

N/A

**6.     Organizational victims and bankruptcy cases:**

N/A.

/s/ *David Zimmer*
David Zimmer

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE.......................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT...............................2

ARGUMENT..................................................................................................5

I. The MSPB's Test is Unconstitutional and Would Strike Down Civil Service Protections for Thousands of Federal Employees...5

    A. Article II Permits Congress to Provide Removal Protections for Lower-Level Officials.....................................5

    B. The MSPB's Test is Without Basis and Unconstitutional 10

        1. The MSPB's Second Prong Misunderstands Inferior Officer Status and Would Destabilize Personnel Management. ...............................................................11

            a. The Board's Test Results in No Removal Protections for Any Inferior Officers. ................12

            b. The "Area of Significant Consequence" Standard Has No Support in the Officer Cases. ..................................................................16

        2. The MSPB's First Prong Would Deny Tenure Protections to Most Federal Employees and Contradicts Supreme Court Precedent. ......................19

II. Recent Litigation Further Illustrates How the MSPB's Opinion Would Eviscerate the CSRA.............................................................23

    A. The MSPB's Standard Would Invalidate Tenure Protections for Senior Executive Service Members.............24

    B. The MSPB's Standard Would Undermine Existing Procedures for Reducing the Federal Workforce.................27

III. Adopting the MSPB's Standard Would Have a Detrimental Effect on State Capacity. ...................................................................29

CONCLUSION ............................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Arizona v. United States,*
   567 U.S. 387 (2012) ........................................................................... 16

*Bowsher v. Synar,*
   478 U.S. 714 (1986) ............................................................................. 7

*Buckley v. Valeo,*
   424 U.S. 1 (1976) .............................................................................. 12

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985) ............................................................................. 2

*Edmond v. United States,*
   520 U.S. 651 (1997) ........................................................................ 8, 15

*Freytag v. Commissioner,*
   501 U.S. 868 (1991) ...................................................................... 13, 14

*Jackler and Jaroch Consolidated v. Department of Justice,*
   2026 M.S.P.B. 3 (Mar. 20, 2026) ................................................... 10, 20

*Kennedy v. Braidwood Mgmt., Inc.,*
   606 U.S. 748 (2025) ................................................................. 8, 13, 15

*Lucia v. SEC,*
   585 U.S. 237 (2018) ...................................................................... 13, 14

*Morrison v. Olson,*
   487 U.S. 654 (1988) ....................................................................... 3, 11

*Myers v. United States,*
   272 U.S. 52 (1926) .............................................................................. 3

*Rutan v. Republican Party of Ill.,*
   497 U.S. 62 (1990) ............................................................................ 17

*Schroeder v. Dep't of Transp.,*
   60 M.S.P.R. 566 (M.S.P.B. 1994) ..................................................... 28

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ....................................................................... 3, 10

*Trump v. Cook,*
  No. 25A312, 609 U.S. __ (2026) ........................................................ 4

*Trump v. Slaughter,*
  No. 25-332, 609 U.S. __ (2026) ............................................ 4, 7, 8, 15

*United States v. Arthrex, Inc.,*
  594 U.S. 1 (2021) ......................................... 9, 14, 15, 19, 20

*United States v. Perkins,*
  116 U.S. 483 (1886) ............................................................. 3, 7

**Constitutional Provision**

U.S. Const. art. II, § 3 ............................................................. 29

**Statutes**

18 U.S.C. § 1865 .................................................................... 22

26 U.S.C. § 7803 .................................................................... 21

33 U.S.C. § 1342 .................................................................... 21

5 U.S.C. § 3131 ................................................................. 24, 25

5 U.S.C. § 3132 ................................................................. 24, 25

5 U.S.C. § 3134 .................................................................... 25

5 U.S.C. § 3393 .................................................................... 25

5 U.S.C. § 3502 .................................................................... 27

5 U.S.C. § 4303 .................................................................... 30

5 U.S.C. § 7511 .................................................................... 17

5 U.S.C. § 7513 ................................................................. 2, 5, 30

5 U.S.C. § 7543 ................................................................. 25, 26

54 U.S.C. § 100302 ................................................................. 22

8 U.S.C. § 1103 ...................................................................... 9

19 Stat. 143 (1876) ................................................................. 27

Lloyd-La Follette Act of 1912, 37 Stat. 555................................................2

**Regulations and Executive Orders**

36 C.F.R. § 1.3................................................................................22

36 C.F.R. § 4.21..............................................................................22

40 C.F.R. § 124.15...........................................................................21

40 C.F.R. § 124.19...........................................................................22

40 C.F.R. § 124.2.............................................................................22

5 C.F.R. § 351.201...........................................................................27

5 C.F.R. § 351.401...........................................................................28

5 C.F.R. § 351.402...........................................................................28

5 C.F.R. § 351.403...........................................................................28

5 C.F.R. § 351.404...........................................................................28

5 C.F.R. § 351.601...........................................................................28

5 C.F.R. § 351.602...........................................................................28

5 C.F.R. § 351.603...........................................................................28

5 C.F.R. § 351.604...........................................................................28

8 C.F.R. § 1003.1.............................................................................20

Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025)....................28

Exec. Order No. 14,242, 90 Fed. Reg. 13679 (Mar. 25, 2025).................29

**Other Authorities**

Peyton Baker, *Are Senior Executive Service Officials Officers?*, Yale J. on Reg: Notice & Comment (Feb. 23, 2026).........................................25

Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 Stan. L. Rev. 823 (2025).......................................................1, 30, 31

Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065 (2026) .................................................................1, 29

Nicholas R. Bednar, *The Public Administration of Justice*, 44 Cardozo L. Rev. 2139 (2023) ................................................................................30

Nicholas Bednar & Peyton Baker, *A Primer on the Senior Executive Service*, Lawfare (Sept. 2, 2025) ..............................................24, 25, 26

Nicholas Bednar, *A Primer on Reductions in Force*, Lawfare (Feb. 20, 2025) ...........................................................................................28, 29

Emily S. Bremer, *The Rediscovered Stages of Agency Adjudication*, 99 Wash. U. L. Rev. 377 (2021) ..............................................................23

David Capitant, *The Civil Service in France: The Evolution and Permanence of the Career System*, *in* The Civil Service in Europe: A Research Companion (Karl-Petter Sommermann et al., eds., 2025)..33

Claus Dieter Classen, *The Civil Service in Germany: A Service Based on Mutual Loyalty*, *in* The Civil Service in Europe: A Research Companion (Karl-Petter Sommermann et al., eds., 2025)..................33

Cong. Budget Off., *Comparing the Compensation of Federal and Private-Sector Employees in 2022* (2024) .............................................32

Env't Prot. Agency, NPDES Permit No. NH0109000 ...........................21

Peter Evans & James E. Rauch, Bureaucracy and Growth: A Cross-National Analysis of the Effects of ................................................31, 32

Sean Gailmard & John W. Patty, *Slackers and Zealots: Civil Service, Policy Discretion, and Bureaucratic Expertise*, 51 Am. J. Pol. Sci. 873 (2007) ...............................................................................................31

Sylvia Horton, *The Public Service Ethos in the British Civil Service: An Historical Institutional Analysis*, 21 Pub. Pol'y & Admin. 32 (2006) .33

Internal Revenue Service, Internal Revenue Manuals .........................21

Internal Revenue Service, Table 34: Personnel Summary, By Employment Status (2024)................................................................21

Internal Revenue Service, The Internal Revenue Service Data Book (2024) ...............................................................................................21

David E. Lewis, *Testing Pendleton's Premise: Do Political Appointees Make Worse Bureaucrats?*, 69 J. Pol. 1073 (2007) .............................31

Kenneth Prewitt, *The U.S. Decennial Census: Politics and Political Science*, 13 Ann. Rev. Pol. Sci. 237 (2010) ........................................... 18

Joseph Story, Commentaries on the Constitution of the United States, Volume III (1833) ................................................................. 3, 5, 6, 7

Amy J. Wildermuth & Peyton C. Baker, *Protecting Inferior Officers*, SSRN (Manuscript, July 12, 2026).................................................. 1, 16

Amy J. Wildermuth, *The Brave New World of Administrative Law*, 78 Admin. L. Rev. 309 (2026) ................................................................. 2

The Const. Separation of Powers Between the President & Cong., 20 Op. O.L.C. 124 (1996) ....................................................................... 14

XVIII Journal of the Continental Congress 878 (1780).......................... 27

# INTEREST OF AMICI CURIAE[1]

Professor Nicholas R. Bednar is the McKnight Land-Grant Professor at the University of Minnesota Law School. He is an expert in the civil service laws and the relationship between the President and the federal workforce. *See, e.g.*, Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065 (2026); Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 Stan. L. Rev. 823 (2025). He holds a Ph.D. in Political Science from Vanderbilt University and a J.D. from the University of Minnesota Law School.

Professor Amy J. Wildermuth is a Visiting Professor of Law at the University of Minnesota Law School and a Professor of Law at the University of Pittsburgh. She serves as the Chair of the American Bar Association's Administrative Law and Regulatory Practice Section and clerked for the Honorable Justice John Paul Stevens. She is an expert in the Appointments Clause and administrative law more generally. *See, e.g.*, Amy J. Wildermuth & Peyton C. Baker, *Protecting Inferior*

---

[1] Amici certify that no counsel for a party authored this brief in whole or in part and that no person other than these amici made a monetary contribution to its preparation or submission. All parties to this appeal have consented to the filing of this brief.

*Officers*, SSRN (2026),

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6447918; Amy J.

Wildermuth, *The Brave New World of Administrative Law*, 78 Admin.

L. Rev. 309 (2026). She holds a J.D. and an M.S. in Environmental

Engineering from the University of Illinois.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over a century, Congress has protected federal employees from

removal, replacing the nineteenth-century patronage system with a

merit-based system similar to that found in all modern democracies. *See*

Lloyd-La Follette Act of 1912 § 6, 37 Stat. 555. Section 7513 of Title 5

permits the removal of a federal employee "only for such cause as will

promote the efficiency of the service." 5 U.S.C. § 7513(a). Both the Civil

Service Reform Act of 1978 (CSRA) and the Constitution require an

agency to provide due process to an employee prior to their removal. *Id.*

§ 7513(b)-(e); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541

(1985).

The power of Congress to restrict the removal of inferior officers

under Article II is well-established. Justice Joseph Story identified this

power in his influential 1833 *Commentaries on the Constitution of the*

*United States.*[2] The Supreme Court has repeatedly affirmed this rule. *See United States v. Perkins*, 116 U.S. 483, 485 (1886) ("We have no doubt that when Congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest."); *Myers v. United States*, 272 U.S. 52, 173 (1926) ("The evil of the spoils system aimed at in the Civil Service Law and its amendments is in respect to inferior offices. . . . The independent power of removal by the President alone under present conditions works no practical interference with the merit system."); *Morrison v. Olson*, 487 U.S. 654, 689 n.27 (1988) ("Indeed, this Court has never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive power.'" (citing *Perkins*, 116 U.S. at 485)); *see also id.* at 724 n.4 (Scalia, J., dissenting) (agreeing that *Perkins* remained good law and explaining that his view "does not require that [the President] have plenary power to remove inferior officers"); *Seila Law LLC v. CFPB*, 591 U.S. 197, 217–18 (2020)

---

[2] Available at: https://books.google.com/books/about/Commentaries_on_the_Constitution_of_the.html?id=1CATAAAAYAAJ.

(affirming that *Perkins* remains good law).

The Court's recent decision in *Trump v. Slaughter*, No. 25-332, 609 U.S. __ (2026), concluding that principal officers are subject to at-will removal in all but the most limited circumstances,[3] does not change this long-established rule. Instead, the Court's decision confirms that inferior officers and employees do not interfere with the President's control over the executive regardless of their removal protections, because they are supervised and their decisions may be overridden by principal officers.

The Merit Systems Protection Board's (MSPB) decision not only runs afoul of this longstanding construction of Article II but also utterly fails to engage with it. If left standing, it would extend far beyond the two immigration judges affected by this case. It would effectively eviscerate the civil service system. The end of tenure protections would

___

[3] The Court has identified only one example of an exception: members of the Federal Reserve Board of Governors. *Trump v. Cook*, No. 25A312, 609 U.S. __ (2026), slip op. at 22–23. The exact contours of the exception, however, were not well-defined. *See id.* at 2 (Barrett, J., dissenting) (objecting to the majority reaching the question and to its conclusion that removal protections for Governors of the Federal Reserve Board are constitutional, arguing "the issue warrants much more than a few paragraphs").

severely impede the recruitment and retention of qualified civil servants, undermining the President's obligation to faithfully execute the laws. The decision to strip federal employees of the protections afforded by 5 U.S.C. § 7513 must come from Congress—not the MSPB, the federal courts, or the President.

## ARGUMENT

**I. The MSPB's Test is Unconstitutional and Would Strike Down Civil Service Protections for Thousands of Federal Employees.**

### A. Article II Permits Congress to Provide Removal Protections for Lower-Level Officials.

Justice Joseph Story, writing in 1833, confirmed the correctness of removal protections for inferior officers in his famous *Commentaries*. In Section 1531, he provided the broad rule that Congress had the power to regulate the appointment and removal of inferior officers: "As far as congress constitutionally possess the power to regulate, and delegate the appointment of 'inferior officers,' so far they may prescribe the term of office, the manner in which, and the persons by whom, the removal, as well as the appointment to office, shall be made." III Joseph Story, *Commentaries on the Constitution of the United States*, § 1531, at 388.

He then turned to whether the President could unilaterally

remove other officers "in the absence of all such legislation," *id.* § 1531, at 388–89, and listed what he viewed as the many dangers of allowing at-will removal:

> [I]t is utterly impossible not to feel, that, if this unlimited power of removal does exist, it may be made, in the hands of a bold and designing man, of high ambition, and feeble principles, an instrument of the worst oppression, and most vindictive vengeance. Even in monarchies, while the councils of state are subject to perpetual fluctuations and changes, the ordinary officers of the government are permitted to remain in the silent possession of their offices . . . . [I]f fawning sycophants upon the popular leader of the day may gain his patronage, to the exclusion of worthier and abler men, it is most manifest, that elections will be corrupted at their very source; and those, who seek office, will have every motive to delude, and deceive the people.

*Id.* § 1533, at 390–91. Despite his strong views against permitting unilateral removal by the President, Story conceded that the country had acquiesced to it with respect to principal officers after the Decision of 1789. *See id.* § 1537, at 394–96. He nevertheless found a "consolation" in the protections that Congress could provide for inferior officers:

> [I]t will be a consolation to those, who love the Union, and honor a devotion to the patriotic discharge of duty, that in regard to "inferior officers," (which appellation probably includes ninety-nine out of a hundred of the lucrative offices in the government,) the remedy for any permanent abuse is still within the power of congress, by the simple expedient of requiring the consent of the senate to removals in such cases.

*Id.* § 1538, at 397.[4] Accordingly, while Story accepted that the President had the power to remove principal officers, *see Slaughter*, slip op. at 31 & n.6, he also maintained that Congress could protect the vastly more numerous officials operating subordinately to a principal officer.

In 1886, the Supreme Court adopted Justice Story's understanding of Article II in *United States v. Perkins*, 116 U.S. 483 (1886). *Perkins* explained that Congress's power to vest the appointment of inferior officers in heads of departments gives it the power to set the terms of both appointment and removal.

This straightforward rule might, at first glance, seem inconsistent with the Court's recent decisions limiting Congress's ability to protect principal officers from removal. In *Slaughter*, for example, the Court broadly stated that "[s]ubordinates who exercise the President's power are subject to removal by him." *Slaughter*, slip op. at 36. But the holding in that case must necessarily be limited to the principal officer

---

[4] Consistent with practices of the time, Story imagined the power to regulate removal of executive officers as including tapping the Senate to play a role in removal. Although the Court, as a matter of separation-of-powers concerns, has limited the ability of the Senate to play such a role, *see Bowsher v. Synar*, 478 U.S. 714, 726 (1986), the central point remains: Congress can restrict the removal of lower-level officials.

involved in the case, for the Court was not deciding "the fate of officials not before us." *Id.* at 28. More importantly, *Perkins* is fully consistent with the unitary executive imagined in *Slaughter*. Inferior officers do not independently "exercise the President's power." They instead operate under the supervision and control of superior officers who do exercise that power.

Appreciating the chain-of-command structure of federal employment is critical because, as Justice Scalia often reminded readers, it requires that inferior officers and employees operate subordinately to a principal officer. In this structure, principal officers, who are answerable to the President, retain final decision-making authority, or "final say." Those who are not principal officers are "directed and supervised" by those above them in the chain of command. *Edmond v. United States*, 520 U.S. 651, 663 (1997); *see Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 765 (2025).

While inferior officers and employees may make recommendations and even render decisions, a principal officer—directly accountable to and removable by the President—exercises the final say and is therefore responsible for all final decisions. As such, removal

protections for those who are inferior in the chain of command do not infringe on the Executive's ability to perform his constitutional duty. So long as an inferior officer or employee remains subject to supervision and review, Congress may provide removal restrictions.[5] *Cf. United States v. Arthrex*, 594 U.S. 1, 25–26 (2021) (holding that the proper remedy for the Appointments Clause violation was to provide supervisory review of the inferior officers' decisions rather than invalidate removal restrictions).

In this case, the application of the *Perkins* rule is easy: Immigration judges are not principal officers. They are therefore properly protected by Section 7513. The reason is obvious: The Attorney General, a principal officer, has the final say in any case decided by an immigration judge. 8 U.S.C. § 1103(g)(2). Accordingly, because immigration judges remain fully supervised by a principal officer, Congress has the authority to provide limits on their removal.

---

[5] The distinction between "inferior officers" and "employees" comes from the Supreme Court, not the civil service laws. The civil service laws do not cleanly distinguish between inferior officers and employees.

### B. The MSPB's Test is Without Basis and Unconstitutional

Despite this clear law, the MSPB adopted an entirely new test. The Board held that inferior officers may only be protected from removal if they have "limited duties and no policymaking or administrative authority." *Jackler and Jaroch Consolidated v. Department of Justice*, 2026 M.S.P.B. 3, 12–13 (Mar. 20, 2026). It concluded that immigration judges fail that standard because their decisions *may* "remain the final decision of the United States" and because they "wield[] administrative authority in an area of significant consequence." *Id.* at 15–16. In essence, the Board adopted a two-prong test: (1) whether the inferior officer's decision has the potential to become the final decision of the United States without review by a principal officer, and (2) whether the officer wields administrative authority in an area of significant consequence.

In support of its new test, the Board appears to have drawn on an isolated passage from *Seila Law*, a case that did not involve inferior officers. There, the Court described those eligible for removal protections as "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law LLC v. CFPB*, 591 U.S. 197,

10

218 (2020). The statement from *Morrison* that *Seila Law* referenced, however, was only to serve as a description of the independent counsel, not as a general rule for eligibility for removal protections: "[T]he independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691. And even this characterization of Morrison as an inferior officer—despite the fact that she had final say in filing cases in court—would not stand under the Court's current tests for who qualifies for what kind of officer. The government nevertheless relies on a single conclusory phrase without examining the cases it purports to reflect.

As a result, while *Seila Law* may have led to its misunderstanding, the MSPB's error is clear. It utterly failed to engage with and explain its decision within this full landscape of the Court's cases. When examined within that more comprehensive context, the MSPB's test cannot stand.

### 1. The MSPB's Second Prong Misunderstands Inferior Officer Status and Would Destabilize Personnel Management.

The Board's test for whether removal protections are appropriate

asks, as its second factor, whether the individual wields administrative authority in an area of significant consequence. That framing is mistaken for two reasons.

First, officer status itself requires the exercise of "significant authority pursuant to the laws of the United States." *Buckley v. Valeo,* 424 U.S. 1, 126 (1976). Every inferior officer, by definition, has the sort of authority that the Board has deemed ineligible for removal protections, directly contradicting what has been understood at least since 1833 and affirmed in *Perkins*. Even if the rule somehow did not apply to all inferior officers, it would create a two-tier system of inferior officers not found in the Constitution.

Second, any effort to differentiate the Board's second prong on the ground that the area must be one of "significant consequence" is without basis in the relevant case law. Moreover, such a test ultimately proves to be a meaningless exercise.

### a. The Board's Test Results in No Removal Protections for Any Inferior Officers.

*Buckley* confirmed that "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States.'" *Buckley*, 424 U.S. at 126. In several recent cases, the

Court has provided examples of such officers. In *Lucia v. SEC*, the Court concluded that, just as in *Freytag v. Commissioner*, an official presiding over an adjudication who exercises the power to "ensure fair and orderly adversarial hearings," including taking testimony, receiving evidence, examining witnesses, administering oaths, ruling on motions, and regulating the conduct of proceedings, parties, and counsel, is exercising significant authority and is accordingly an inferior officer. 585 U.S. 237, 247–49 (2018); 501 U.S. 868, 881–82 (1991). Likewise, in *Kennedy v. Braidwood Management*, the members of the U.S. Preventive Services Task Force were officers because they exercised the power to recommend preventive services that insurers must cover at no cost, and those recommendations became final and binding unless the Secretary blocked them. *Kennedy*, 606 U.S. at 768.

The common thread is that these individuals exercise power and authority in making decisions: their decisions will become binding unless overridden by a principal officer. That kind of significant power is, in fact, what qualifies them for officer status in the first place.

Under the MSPB's test, however, that same authority would disqualify them from removal protections. The adjudicators in *United*

*States v. Arthrex, Inc.*, *Lucia*, and *Freytag*, all of whom exercised powers nearly identical to those exercised by immigration judges, would be ineligible for removal protections precisely because they exercised officer-level authority. *See Arthrex*, 594 U.S. at 24; *Lucia*, 585 U.S. at 247–49; *Freytag*, 501 U.S. at 881–82.

It also suggests that Lyman Perkins, the officer at the center of the *Perkins* case, would not qualify for the removal protections upheld in his case. Perkins exercised authority in conducting his usual duties, but, critically, he, like any other military officer, could be a potential commander of U.S. forces in combat and thus "wield vast administrative authority." The Const. Separation of Powers Between the President & Cong., 20 Op. O.L.C. 124, 144 n.54 (1996). Yet the Supreme Court upheld Congress's authority to protect him from at-will removal.

Even if there were some way to distinguish between those who are inferior officers who "wield vast administrative authority in an area of significant consequence" and those who exercise "significant authority under the laws of the United States," the Board did not explain what that might be. The Board's test appears to contemplate some "lesser"

inferior officer who exercises "significant" but not "vast" authority, but even that does not help draw any clearer line. The confusion the Board's test creates emphasizes what is obvious: a two-tier system of inferior officers is flatly inconsistent with the language of Article II, which is why the Supreme Court has never held that such tiers of inferior officers exist.

More fundamentally, the Court's decisions have already provided the necessary ingredients for the requisite executive control. First, the Court has restricted removal protections for principal officers. *See Slaughter*, slip op. at 36. Second, the Court has repeatedly required principal officers to supervise and exercise hierarchical control over those who report to them by, critically, retaining final say. *See Kennedy*, 606 U.S. at 765; *Arthrex*, 594 U.S. at 26; *Edmond*, 520 U.S. at 665. Taken together, these cases indicate that all decisions made by an inferior officer must be subject to override by a principal officer, who, in turn, is answerable to the President. An inferior officer thus cannot bind the Executive Branch against the will of a superior. As a result, protected or not, an inferior officer cannot impede the President's ability to perform his constitutional duty.

### b. The "Area of Significant Consequence" Standard Has No Support in the Officer Cases.

While the Board may have drawn some of its misguided test from loose language in *Seila Law*, it wholly invented the examination of whether the officer acts in an "area of significant consequence." The only case it cites in support of this proposition is *Arizona v. United States*, 567 U.S. 387 (2012), a federal preemption case that does not address Article II and is relevant only insofar as it suggests that "[f]ederal governance of immigration and alien status is extensive and complex." *See id.* at 395.

The Supreme Court has never treated the policy domain in which an official works as relevant to whether Congress may restrict removal. The Court's key inferior officer removal case, *Perkins*, upheld removal protections for a naval officer without asking whether the military constituted an "area of significant consequence." 116 U.S. at 484–85; *see* Amy J. Wildermuth & Peyton C. Baker, *Protecting Inferior Officers*, SSRN at 67 (Manuscript, July 12, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6447918 ("*Perkins* itself does not rely on any military-specific reasoning, nor does it invoke

Congress's Article I power over the armed forces. Instead, it articulates a general principle about Congress's authority to condition the removal of inferior officers.").

In fact, Congress itself has determined which employees should fall outside section 7513. *See* 5 U.S.C. § 7511(b). Employees in the Central Intelligence Agency and employees in the Federal Bureau of Investigation, for example, are all excluded from Section 7513. *See id.* § 7511(b)(3), (6), (8). The determination of which employees should receive removal protections is a policy choice that is part and parcel of Congress's legislative power. *See* Nicholas R. Bednar, *Presidential Control of the Civil Service*, 110 Minn. L. Rev. 2065, 2140 (2026). As Justice Scalia noted, the decision of whether to provide removal protections is best "left to the judgment of the people's elected representatives." *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 (1990) (Scalia, J., dissenting).

Moreover, the "significant consequence" standard would inject instability into the personnel system. Whether a policy area has "significant consequence" changes over time. For decades, census methodology was seen as highly technical and apolitical. *See* Kenneth

Prewitt, *The U.S. Decennial Census: Politics and Political Science*, 13 Ann. Rev. Pol. Sci. 237, 243 (2010). In the 1990s, the "census design became a target of partisan animosities" after members of Congress realized that the Census's methodology would affect the drawing of districts following the 2000 election. *See id.* at 244. Yet no one argued that heightened congressional interest in the Census somehow compelled the Constitution to strip Census Bureau statisticians of their removal protections. Allowing such a central feature of the employment contract to fluctuate over time would make it difficult for the federal government to recruit and retain employees.

The "significant consequence" standard also lacks a limiting principle. Congress creates agencies precisely because it has determined that a given function—tax collection, food and drug safety, environmental protection—carries "significant consequence" and warrants sustained attention from a permanent, professional workforce. If "significant consequence" is enough to defeat removal protections, every employee would be at risk because Congress does not legislate in areas it regards as insignificant.

## 2. The MSPB's First Prong Would Deny Tenure Protections to Most Federal Employees and Contradicts Supreme Court Precedent.

The MSPB also suggested that removal protections were not permissible when an inferior officer's decision could become the final decision. The Supreme Court, however, has never required principal officers to review *every* decision of inferior officers to sustain removal protections. It has instead held that the *availability* of review, even if not exercised in every case, is what matters.

*Arthrex* is decisive on this point. There, the Court held that Administrative Patent Judges (APJs) were improperly appointed under the Appointments Clause because the Secretary of Commerce lacked adequate supervision over their adjudicatory decisions. 594 U.S. at 17. According to the Court, "[o]nly an officer properly appointed to a principal office may issue a final decision binding the Executive Branch in a proceeding before us." *Id.* at 23. In remedying the violation, however, the Court rejected the government's proposal to sever the APJ's removal protections. Instead, it permitted the Director of the Patent and Trademark Office to review the APJ's decisions. *Id.* at 25–26. In doing so, it noted:

> To be clear, the Director need not review every decision of the PTAB. What matters is that the Director have the discretion to review decisions rendered by APJs. In this way, the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people.

*Id.* at 27.

The MSPB nevertheless claims that the "limited and conditional review of immigration judge decisions makes this case distinguishable from *Arthrex.*" *Jackler*, 2026 M.S.P.B. at 15. That is simply wrong. The Attorney General may review and issue a decision in any case pending before the Executive Office for Immigration Review. *See* 8 C.F.R. § 1003.1(h)(1). And the Attorney General's decision is final and precedential. *See id.* § 1003.1(d)(7), (g). This supervision, in fact, neatly mirrors the review structure the Supreme Court adopted to remedy the Appointments Clause violation in *Arthrex.* Just as the Constitution does not compel the Director to review every PTAB decision, the Constitution does not require the Attorney General to review every immigration judge's decision in order for them to enjoy removal protections.

If the MSPB were correct that a principal officer *must* review each decision for tenure protections to survive, the consequences would be staggering. The IRS has two principal officers overseeing 44,525

20

examination, collection, and investigation employees who examined approximately four million tax returns in FY 2024. *See* 26 U.S.C. § 7803(a)(1)(A), (b)(1); Table 34: Personnel Summary, By Employment Status, IRS (2024), https://www.irs.gov/statistics/irs-budget-and-workforce; IRS, The Internal Revenue Service Data Book, 2024, at 33 (2024). Examiners exercise independent judgment throughout the audit process to determine whether to continue an examination, identify deficiencies, and assess penalties. *See* Internal Revenue Service, Internal Revenue Manuals § 4.10.3.3 (May 3, 2023); *id.* § 4.10.6.1.3 (Aug. 25, 2025). No principal officer reviews the vast majority of these decisions.

The EPA presents a similar problem. When the EPA acts as a permitting authority under the Clean Water Act, 33 U.S.C. § 1342, Regional Administrators—who are not principal officers—decide whether to issue permits and routinely subdelegate those decisions to lower-level employees. 40 C.F.R. § 124.15; *see, e.g.*, NPDES Permit No. NH0109000, Env't Prot. Agency, https://www.epa.gov/system/files/documents/2023-04/draftnh0109000permitmod.pdf (approving a permit without the

signature of the Regional Administrator). Permit applicants may appeal the denial to the Environmental Appeals Board, 40 C.F.R. § 124.19, which in turn may refer the permit to the EPA Administrator, *id.* § 124.2.

If the applicant does not appeal, the initial decision becomes the final, unreviewable decision of the United States. Under the MSPB's standard, the absence of routine review by the Administrator would render Section 7513 unconstitutional as applied to the Regional Administrators and their subordinate employees.

The Board's logic extends to the most mundane government activities. The National Park Service has one principal officer: the Director. 54 U.S.C. § 100302(a)(1). Park Service employees assess speed-limit violations under 36 C.F.R. § 4.21 and issue citations carrying criminal penalties. *See* 18 U.S.C. § 1865; 36 C.F.R. § 1.3. If the cited individual pays the fine and does not challenge their conviction, no principal officer—let alone the Director—will ever review the enforcement decision. Under the Board's approach, these employees would lose the protections of Section 7513.

Every day, federal employees make thousands of decisions that go

unreviewed by a principal officer: issuing passports, approving camping permits, classifying goods as duty-free, denying disability benefits, granting social security benefits, permitting visa-holders to enter the country, to name just a few. Emily S. Bremer, *The Rediscovered Stages of Agency Adjudication*, 99 Wash. U. L. Rev. 377, 393–94 (2021). The MSPB's standard presents Congress with a Hobson's choice: require a principal officer to review every decision made by a federal employee or deny those employees removal protections. The former is infeasible and, therefore, the MSPB's standard would invalidate the civil service laws as applied to most—if not all—federal employees. The Constitution, Supreme Court case law, and common sense make clear there is simply no basis for the MSPB's test and that it will cause enormous impacts on our system of administrative governance.

## II. Recent Litigation Further Illustrates How the MSPB's Opinion Would Eviscerate the CSRA.

The MSPB's decision does not operate in a vacuum. The Trump administration has already invoked Article II to remove career employees without regard for the CSRA's protections. In each setting, the government's legal arguments depend on the same doctrinal framework that the Board adopted here. Two categories of ongoing

litigation illustrate how the Board's holding, if affirmed, would provide the constitutional predicate for dismantling the civil service system.

### A. The MSPB's Standard Would Invalidate Tenure Protections for Senior Executive Service Members.

Career members of the Senior Executive Service would be the most obvious casualties of the MSPB's framework. SES appointees occupy the top tier of federal management, serving directly below Senate-confirmed officials. They direct agency operations, implement high-level policy, and ensure continuity across presidential administrations. *See* 5 U.S.C. §§ 3131, 3132 (establishing the SES to "ensure that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation"). Today, approximately 7,482 of the government's 8,000-plus SES appointees are career employees. *See* Nicholas Bednar & Peyton Baker, *A Primer on the Senior Executive Service*, Lawfare (Sept. 2, 2025), https://www.lawfaremedia.org/article/a-primer-on-the-senior-executive-service.

Congress carefully calibrated SES tenure protections. Career SES appointees may be removed only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment." 5 U.S.C.

24

§ 7543(a). To guard against politically motivated removals, the CSRA bars the removal of a career SES appointee for 120 days after the appointment of a new agency head or a new noncareer supervisor. *See id.* § 3393(g). At the same time, Congress preserved flexibility by permitting up to 10 percent of SES positions governmentwide to be filled by noncareer appointees who serve at will. *See id.* § 3134(b). These noncareer appointees provide Presidents with a cadre of low-level political appointees who may be selected and removed at will.

The MSPB's standard would nullify this design. Congress created the SES to vest its members with policymaking and administrative authority, *see id.* §§ 3131, 3132(a)(2), and their decisions routinely become the final position of the United States without individualized review by a principal officer. Under existing precedent, however, not all SES positions exercise the level of authority indicative of officer status. *See* Peyton Baker, *Are Senior Executive Service Officials Officers?*, Yale J. on Reg: Notice & Comment (Feb. 23, 2026), https://www.yalejreg.com/nc/are-senior-executive-service-officials-officers.

The threat to the SES is not hypothetical. In at least four MSPB

cases, the Justice Department has argued that removal protections for career SES appointees violate Article II. *See* Bednar & Baker, *supra* (summarizing the filings in these cases). In *Twomey v. Department of Justice*, the DOJ argued that "Article II of the Constitution allows the President and heads of departments exercising his power to remove inferior officers without cause, subject to only narrow exceptions that do not apply to Appellant's former position." Agency's Closing Brief at 3, *Twomey*, M.S.P.B. (2025) (No. DC-0752-25-1950-I-1). The Office of Personnel Management went further, asserting that "[f]or-cause removal protections for civil service employees—as defined by the Legislature and applied by the [MSPB]—cannot limit the President's Article II power to execute the law." *See* Brief of OPM Director, *Twomey*, M.S.P.B. (2025) (No. DC-0752-25-1950-I-1).

Congress designed the SES precisely to vest career executives with policymaking and administrative authority—the very characteristics that, under the MSPB's test, would disqualify them from statutory tenure protections. Because the CSRA's removal safeguards for career SES appointees under 5 U.S.C. § 7543 are inseparable from their exercise of that authority, the MSPB's standard would require

courts to conclude that Congress created a personnel system whose defining feature renders its own protections constitutionally infirm.

### B. The MSPB's Standard Would Undermine Existing Procedures for Reducing the Federal Workforce.

The MSPB's standard also poses a distinct threat to the procedural protections governing reductions in force (RIF). A RIF is the procedure by which agencies reduce their workforce during reorganizations, budget cuts, or changes in workload. *See* 5 U.S.C. § 3502; 5 C.F.R. § 351.201(a)(2). The RIF process predates the modern civil service system. *See* 19 Stat. 143 (1876). The earliest examples of these procedures emerged during the Revolutionary War when the Continental Congress sought to reduce the size of the Hospital Department. *See* XVIII Journal of the Continental Congress 878 (1780). When performing a RIF, civil service laws require agencies to consider an employee's tenure, veteran status, length of service, and performance. *See* 5 U.S.C. § 3502(a).

Congress and OPM designed the RIF process with elaborate procedural safeguards. Agencies must identify a bona fide reason for the reduction, properly define the competitive area and competitive level, assemble retention orders based on tenure, and reassign displaced

employees to other positions through the complex mechanisms of "bumping" and "retreating." *See* 5 C.F.R. §§ 351.401–404, 351.601–604; *see generally* Nicholas Bednar, *A Primer on Reductions in Force*, Lawfare (Feb. 20, 2025), z.umn.edu/lawfarerif. Employees have a substantive right to a properly performed RIF. *Schroeder v. Dep't of Transp.*, 60 M.S.P.R. 566, 577 (M.S.P.B. 1994) ("The proper application of the RIF regulations is a substantive right.").

The MSPB's decision would enable the government to bypass this entire framework. If the President may invoke Article II to remove any inferior officer exercising "policymaking or administrative authority" in an area of "significant consequence," which encompasses most of the civil service under the MSPB's definition, the government need not follow RIF procedures at all. Rather than assemble retention registers, honor veterans' preference, or offer reassignment rights, it could remove targeted employees individually under Article II.

The scale of this threat is immense. Executive Order 14,210 instructed agencies to "initiate large-scale reductions in force." *See* 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025). By one estimate, the order could reach more than 700,000 employees, close to 30 percent of the civilian

28

workforce. *See* Bednar, *A Primer on Reductions in Force, supra.* Shortly thereafter, the President ordered the Secretary of Education to "take all necessary steps to facilitate the closure of the Department." Exec. Order No. 14,242, 90 Fed. Reg. 13679, 13680 (Mar. 25, 2025). Agencies perceived as implementing policies disfavored by the administration have been disproportionately targeted. *See* Bednar, *Presidential Control of the Civil Service, supra*, at 2132.

The MSPB's standard thus creates a path for the President to abolish entire agencies outside the legislative process. The entire architecture of the civil service laws—designed over more than a century to prevent the return of the spoils system—becomes optional.

## III. Adopting the MSPB's Standard Would Have a Detrimental Effect on State Capacity.

Providing the President with the unfettered ability to remove career employees creates a tension with the President's own constitutional duties. Article II requires the President to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The ability to faithfully execute the laws depends on the existence of a professional, stable, and expert workforce. State capacity—the administrative infrastructure necessary to implement the laws enacted

29

by Congress—requires that career employees possess the institutional memory, technical expertise, and professional independence to carry out complex regulatory, adjudicatory, and enforcement functions across successive administrations. *See generally* Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 Stan. L. Rev. 823 (2025) (empirically showing that the quality of the agency's workforce influences its ability to engage in rulemaking); Nicholas R. Bednar, *The Public Administration of Justice*, 44 Cardozo L. Rev. 2139 (2023) (empirically showing how low staffing in the Executive Office of Immigration Review affects the accuracy of removal proceedings).

Tenure protections are the linchpin of this system. By limiting removal to cases of "unacceptable performance" or "only for such cause as will promote the efficiency of the service," 5 U.S.C. §§ 4303(a), 7513(a), Congress created the conditions under which career employees could invest in developing agency-specific expertise, offer candid legal and scientific advice to political superiors, and adjudicate individual cases on the merits without fear that an unfavorable outcome would cost them their careers. Empirical evidence consistently shows that a professionalized civil service improves government performance,

strengthens the broader economy, and reduces corruption. *See* David E. Lewis, *Testing Pendleton's Premise: Do Political Appointees Make Worse Bureaucrats?*, 69 J. Pol. 1073, 1074 (2007) (finding career managers significantly outperform political appointees); Peter Evans & James E. Rauch, *Bureaucracy and Growth: A Cross-National Analysis of the Effects of "Weberian" State Structures on Economic Growth*, 64 Am. Socio. Rev. 748, 748–50 (1999).

Focusing on the President's ability to remove poor performers ignores how the removal power affects recruitment and retention. Bednar, *Presidential Control and Administrative Capacity*, *supra* at 909–12 ("Large-scale reforms to agency design or the civil service may increase turnover, creating problems for agency recruitment and retention, with only marginal improvements in presidential control."). Without tenure protections, the federal government cannot recruit and retain the expert workforce that modern administrative governance demands. *See generally* Sean Gailmard & John W. Patty, *Slackers and Zealots: Civil Service, Policy Discretion, and Bureaucratic Expertise*, 51 Am. J. Pol. Sci. 873, 875 (2007) (proving that tenure protections are necessary to induce employees to enter government service); Cong.

Budget Off., Comparing the Compensation of Federal and Private-Sector Employees in 2022, at 23 (2024), https://z.umn.edu/cbo2024comp (discussing the value that federal employees place on job security). The threat of at-will removal would return the civil service to the conditions of the spoils era, when "the temporary and partisan nature of federal employment prevented agencies from developing the institutional memory and expertise needed to regulate the emerging businesses of the Industrial Revolution." Bednar, *Presidential Control of the Civil Service, supra*, at 2083. Without the ability to recruit and retain a qualified workforce, the President cannot fulfill his obligation to faithfully execute the laws enacted by Congress.

The United States is not alone in recognizing that a professional, insulated civil service is essential to execution of the laws. Countries with strong civil service laws experience significantly higher rates of economic growth. *See* Evans & Rauch, *supra*, at 748–50. The United Kingdom established the principle of appointment by competitive examination and advancement by merit in the mid-nineteenth century, and the modern British civil service continues to operate under statutory protections that insulate career officials from politically

motivated dismissal. *See* Sylvia Horton, *The Public Service Ethos in the British Civil Service: An Historical Institutional Analysis*, 21 Pub. Pol'y & Admin. 32, 33–34 (2006). France guarantees career tenure through a statutory framework dating to 1946, and Germany's professional civil service is constitutionally protected. *See generally* David Capitant, *The Civil Service in France: The Evolution and Permanence of the Career System*, *in* The Civil Service in Europe: A Research Companion (Karl-Petter Sommermann et al., eds., 2025) (discussing France's civil service system); Claus Dieter Classen, *The Civil Service in Germany: A Service Based on Mutual Loyalty*, *in* The Civil Service in Europe: A Research Companion (Karl-Petter Sommermann et al., eds., 2025) (discussing Germany's civil service system). The MSPB's decision in *Jackler* places the United States outside this international consensus by creating a framework under which the most consequential positions in the federal government—the very positions requiring the greatest expertise and independence—are the least protected from political removal.

As the empirical evidence confirms, the erosion of merit-based protections degrades the economy and government performance, and invites the very corruption and incompetence that the civil service

system was designed to prevent. Neither the President nor a court has the authority to make such a profound structural change. The MSPB certainly does not.

## CONCLUSION

The MSPB's standard has no basis in existing law or Supreme Court precedent. Adopting the standard would eviscerate the civil service laws and erode administrative capacity. For these reasons, we urge the Court to reverse and remand the MSPB's decision.

July 28, 2026

Respectfully submitted,

*/s/ David Zimmer*
David Zimmer
Zimmer, Citron & Clarke LLP
711 Atlantic Avenue, 6th Floor
Boston, MA 02111
(617) 676-9421
dzimmer@zimmercitronclarke.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Circuit Rule 32(b)(1) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2), it contains 6,395 words.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point Century Schoolbook, a proportionally spaced typeface.

*/s/ David Zimmer*
David Zimmer

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2026, I caused the foregoing brief to be filed via the Court's CM/ECF system and served on all counsel of record via CM/ECF.

*/s/ David Zimmer*
David Zimmer