No. 26-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners,*

v.

MERIT SYSTEMS PROTECTION BOARD,

*Respondent,*

DEPARTMENT OF JUSTICE,

*Intervenor.*

*On Petition for Review from the Merit Systems Protection Board*

# Brief of Amicus Curiae Association of Administrative Law Judges in Support of Petitioners and Reversal of the MSPB

Dana Kaersvang
Hyland Hunt
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 888-0404
dkaersvang@deutschhunt.com

Counsel for Amicus Curiae

# CERTIFICATE OF INTEREST

Counsel for Amicus Curiae certifies the following pursuant to Federal Circuit Rule 47.4:

1. The full name of every entity represented in the case by the counsel filing the certificate.

   **Association of Administrative Law Judges.**

2. For each entity, the name of every real party in interest, if that entity is not the real party in interest.

   **None.**

3. For each entity, that entity's parent corporation(s) and every publicly held corporation that owns ten percent (10%) or more of its stock. This satisfies the disclosure statement requirement of Federal Rule of Appellate Procedure 26.1(a).

   **Not applicable. But the Association of Administrative Law Judges is associated with the International Federation of Professional and Technical Engineers, AFL-CIO.**

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal and appeared below or are expected to appear in this Court.

   **None. All counsel for amicus have appeared and are listed on this brief.**

5. An indication as to whether there are any related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5.

   **None.**

6. All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

   **Not applicable.**

July 28, 2026

/s/ Dana Kaersvang
Dana Kaersvang

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... iv

INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 3

ARGUMENT .......... 6

I. Plenary principal-officer supervision ensures that the President retains full constitutional responsibility and accountability for agency adjudicators' acts. .......... 6

A. Supreme Court precedent and historical tradition have approved for-cause removal coupled with principal-officer control over decisions. .......... 6

B. The APA embodies Congress's model for structuring agency adjudications to guarantee impartial initial adjudications while protecting presidential control over policy. .......... 10

C. Some agency adjudicators, including immigration judges, are subject to supervisory control that exceeds the APA baseline. .......... 14

D. The Court should take care not to invalidate removal protections for agency adjudicators that are not before the Court. .......... 21

II. Jettisoning for-cause removal for agency adjudicators would severely harm constitutional interests. .......... 25

A. Independent initial decisions coupled with principal-officer review promote fairness and accountability. .......... 25

B. At-will removal threatens basic adjudicative competence. .......... 28

CONCLUSION .......... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Abrams v. Soc. Sec. Admin.*,
703 F.3d 538 (Fed. Cir. 2012)....................12

*Block v. U.S. Int'l Trade Comm'n*,
777 F.2d 1568 (Fed. Cir. 1985)....................11

*Butz v. Economou*,
438 U.S. 478 (1978)....................27

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................7

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*,
561 U.S. 477 (2010).................... 7, 26
537 F.3d 667 (D.C. Cir. 2008) ....................7

*Heckler v. Campbell*,
461 U.S. 458 (1983)....................23

*Kennedy v. Braidwood Mgmt.*,
606 U.S. 748 (2025).................... 3, 4, 9, 10

*Lucia v. SEC*,
585 U.S. 237 (2018).................... 22, 24, 30

*Marcello v. Bonds*,
349 U.S. 302 (1955)....................14

*Mobility Workx, LLC v. Unified Patents, LLC*,
15 F.4th 1146 (Fed. Cir. 2021)....................26

*Morrison v. Olson*,
487 U.S. 654 (1988)....................3, 7, 11, 12, 30

*Morton v. Ruiz*,
415 U.S. 199 (1974)....................11

*Myers v. United States*,
272 U.S. 52 (1926).................... 3, 6, 8, 28

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
584 U.S. 325 (2018)....................25

*Ramspeck v. Fed. Trial Exam'rs Conf.*,
345 U.S. 128 (1953)....................26

*Richardson v. Perales*,
402 U.S. 389 (1971).................... 20, 23

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947)....................17

*SEC v. Jarkesy*,
603 U.S. 109 (2024)....................27

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020).................... 6, 23

*Shapiro v. Soc. Sec. Admin.*,
800 F.3d 1332 (Fed. Cir. 2015)....................12

*Sims v. Apfel*,
530 U.S. 103 (2000)....................23

*Trump v. Slaughter*,
225 L. Ed. 2d 664 (2026).................... 3, 4, 8, 9

*Tumey v. Ohio*,
273 U.S. 510 (1927)....................25

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021).................... 3, 6, 8, 9, 10, 12, 17, 25, 26, 27, 28

*United States v. Perkins*,
116 U.S. 483 (1886) ... 3, 6

*Wiener v. United States*,
357 U.S. 349 (1958) ... 3, 8

*Withrow v. Larkin*,
421 U.S. 35 (1975) ... 25

*Wong Yang Sung v. McGrath*,
339 U.S. 33 (1950) ... 13, 25, 27

**STATUTES**

5 U.S.C.
§ 557 ... 22
§ 557(b) ... 7, 11
§ 3105 ... 20
§ 7513(a) ... 15
§ 7521(a) ... 12, 17

8 U.S.C.
§ 1101(b)(4) ... 15
§ 1103(g)(2) ... 15

15 U.S.C.
§ 77h-1 ... 24

42 U.S.C.
§ 904(c) ... 20

47 U.S.C.
§ 309(k) ... 22
§ 312 ... 22

Act of July 9, 1798, 1 Stat. 580 ... 9, 10

**REGULATIONS**

8 C.F.R.
§ 1003.1(b) ... 16
§ 1003.1(c) ... 16
§ 1003.1(e) ... 16
§ 1003.1(g) ... 17
§ 1003.10 ... 15

18 C.F.R.
§ 385.206 ... 22

20 C.F.R.
§ 402.160(b) ... 19
§ 404.956 ... 18
§ 404.969(a) ... 18
§ 404.969(b) ... 18
§ 404.970(a) ... 18
§ 404.1456(a) ... 18
§ 416.1469(a) ... 18
§ 416.1469(b) ... 18
§ 416.1470(a) ... 18
pt. 404, subpt. P ... 19

57 Fed. Reg. 61759 (Dec. 29, 1992) ... 11

84 Fed. Reg. 38927 (Aug. 8, 2019) ... 22

**OTHER AUTHORITIES**

Administrative Management in the Government of the United States, *Report of the President's Committee on Administrative Management* (1937) ... 25

*Administrative Procedure: Hearings before the H. Comm. on the Judiciary*, 79th Cong. (1945) ... 13

*Administrative Procedure: Hearings on S. 674, S. 675, and S. 918 Before a Subcomm. of the S. Comm. on the Judiciary*, 77th Cong. (1941) ... 13

Annals of Cong. (1789) (Joseph Gales ed., 1834) ....................7

Kent H. Barnett, *Against Administrative Judges*, 49 U.C. Davis L. Rev. 1643 (2016) ....................22

Kent Barnett, *Regulating Impartiality in Agency Adjudication*, 69 Duke L.J. 1695 (2020) ....................30

Frederick F. Blachly & Miriam E. Oatman, *Administrative Legislation and Adjudication* (1934) ....................13

Br. for Petitioner, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859) ....................27

James Bryce, *The American Commonwealth* (1st ed. 1889) ....................29

Exec. Off. for Immigr. Rev., *Adjudication Statistics* ....................16

Exec. Off. for Immigr. Rev., *Adjudication Statistics: Immigration Judge (IJ) Hiring* .................... 16, 20

The Federalist No. 70 (Alexander Hamilton) (C. Rossiter ed., 1961) .................... 9, 28

Final Report of the Attorney General's Committee on Administrative Procedure (1941) ....................28

*Fourth in a Hearing Series on Securing the Future of the Social Security Disability Insurance Program: Hearing Before the Subcomm. on Social Security of the H. Comm. on Ways and Means*, 112th Cong. (2012) .................... 23, 27

Anthony J. Gaughan, *Chester Arthur's Ghost: A Cautionary Tale of Campaign Finance Reform*, 71 Mercer L. Rev. 779 (2020) ....................29

HALLEX 01105.003 ....................19

HALLEX 01220.040 ....................19

*In re J.F.F.*, 23 I. & N. Dec. 912 (A.G. 2006) ....................15

Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Rsrv. L. Rev. 1083 (2015) ............................12

James E. Moliterno, *The Administrative Judiciary's Independence Myth*, 41 Wake Forest L. Rev. 1191 (2006) ............................11

Thomas C. Reeves, *Gentleman Boss: The Life of Chester Alan Arthur* (1975) ............................29

Noah A. Rosenblum, *A Body Without a Head: Revisiting James Bryce's The American Commonwealth on the Place of the President in the 19th Century Federal Government*, 2 J. Am. Const. Hist. 575 (2024) ............................ 5, 29

SEC, *ALJ Initial Decisions* ............................17

Daniel F. Solomon, *Summary of Administrative Law Judge Responsibilities*, 31 J. Nat'l Ass'n of Admin. L. Judiciary 475 (2011) ............................22

SSA, Off. of Inspector Gen., No. A-07-12-21234, *Congressional Response Report: The Social Security Administration's Review of Administrative Law Judges' Decisions* (March 2012) ............................18

Werner Troesken, *Patronage and Public-Sector Wages in 1896*, 59 J. Econ. Hist. 424 (1999) ............................29

Mark Twain, *Mark Twain in Politics*, N.Y. Times, Oct. 2, 1876 ............................6

U.S. Office of Personnel Mgmt., *Federal Workforce Data: Workforce Size and Composition* ............................ 16, 20

Paul R. Verkuil et al., Admin. Conf. of the U.S., Recommendations and Reports, *The Federal Administrative Judiciary* (1992) ............................ 14, 26

## INTEREST OF AMICUS CURIAE[1]

The Association of Administrative Law Judges (AALJ) represents the interests of approximately 800 non-supervising ALJs employed by the Social Security Administration (SSA)—accounting for about three-quarters of all ALJs serving across the federal government. Founded in 1971 as a professional association, AALJ has affiliated since 1999 with the International Federation of Professional and Technical Engineers, AFL-CIO.

AALJ aims to preserve the integrity and independence of the administrative judiciary. Its objectives include securing the guarantees of the U.S. Constitution, the Administrative Procedure Act (APA), the Social Security Act, and all other federal laws; supporting the professional growth of ALJs; and improving the working conditions of ALJs through collective bargaining, political action, and other means, such as participating in important court cases that implicate their independence (like this one). All of AALJ's activities, including the filing of this brief, further the Association's goal of protecting adjudicators' independence and preserving due process in administrative adjudication.

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus curiae, its members, or its counsel contributed money that was intended to fund this brief's preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E). All parties have consented to the filing of this amicus brief.

AALJ agrees with Petitioners that civil service protections for immigration judges are fully constitutional. Such protections have deep historical roots. They safeguard essential adjudicative functions, including impartiality and credibility, without undermining presidential control. Their functions are consistent with a limited, adjudicatory role. This is so for agency adjudicators in general, but particularly apt for agency adjudicators like immigration judges and Social Security ALJs who are barred from engaging in any policymaking and handle high-volume caseloads on narrow issues. All of their decisions are governed by detailed policy guidance and—most critically for constitutional purposes—subject to review and reversal by both principal officers and an intermediate level of superior executive officers that further effectuates principal-officer control.

The supervisory mechanisms for immigration judges amply clear the constitutional bar for assuring presidential control and responsibility. Indeed, they foster political accountability, rather than hindering it. At the same time, they secure the fairness essential to administrative due process. There is thus no reason for jettisoning more than a century of tradition and precedent, and every reason not to. But should the Court take that step, the upheaval that would result counsels strongly in favor of the Court wielding a scalpel rather than a hatchet. AALJ cautions against an overly broad holding that assumes all agency adjudicators are the same.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Over and over, the Supreme Court has recognized that for-cause removal protections for inferior officers and employees are fully consistent with Article II. From *United States v. Perkins*, 116 U.S. 483 (1886), to its "scholarly" opinion in *Myers v. United States*, 272 U.S. 52 (1926) (*see Trump v. Slaughter*, 225 L. Ed. 2d 664, 683 (2026)), to *Morrison v. Olson*, 487 U.S. 654 (1988) (including Justice Scalia's dissent), to its recent opinion in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), the Court has blessed for-cause removal restrictions for inferior officers and employees, especially those engaged in adjudicative functions. This protection is essential because agency adjudicators cannot act with impartiality while the "Damocles' sword of removal" without cause hangs over their heads. *See Wiener v. United States*, 357 U.S. 349, 356 (1958).

Article II allows Congress to create structures where "an initial 'impartial decision'" is "followed by a final 'transparent decision for which a politically accountable officer must take responsibility.'" *Kennedy v. Braidwood Mgmt.*, 606 U.S. 748, 775 (2025) (quoting *Arthrex*, 594 U.S. at 16). From the founding generation to the modern era, Congress has combined for-cause removal with an array of other supervisory measures to provide for independent initial factfinding while protecting executive control over both policy and final outcomes.

This structure, embodied in the APA and used as a model throughout the government—albeit with variation from agency to agency—"preserves both expertise and accountability." *Id*. When the President or his principal officers dictate a result that matches their policy preferences, everyone knows it. The public is not left to wonder whether behind-the-scenes threats to adjudicators' employment shaded their supposedly neutral factual determinations to match their superiors' preferences.

The statute and regulations governing immigration judges, and the APA on which they were modeled, ensure that the buck never stops with these agency adjudicators. Immigration judges, like ALJs, operate under a framework of controlling agency regulations and guidance established by agency policymakers. These adjudicators do not set agency policy, and principal officers can review and replace any decision with which they disagree. Should immigration judges or ALJs resist this guidance, they can be fired for cause.

While most, if not all, agency adjudicators share these essential characteristics, there is considerable variation in the statutory regimes under which agency adjudicators operate. Should this Court conclude that these criteria alone are constitutionally insufficient, care would be needed to avoid "determin[ing] the fate of officials not before" the Court. *Slaughter*, 225 L. Ed. 2d at 692. Other types of

agency adjudicators, including Social Security ALJs, operate under agency-specific constraints on proceedings that would be better considered in the appropriate case.

Even a narrow decision jettisoning removal protections for immigration judges would have sweeping implications, undermining due process and the appearance of fairness without any accompanying Article II benefit. Both Article II and due process interests are advanced when the public can distinguish between the President's political decisions and neutral factfinding. But the MSPB's decision would allow senior government officials to exercise behind-the-scenes influence on adjudicators' decisions by threatening their livelihoods and then attribute the decisions to these no-longer-independent adjudicators. This is the opposite of the politically accountable presidency envisioned by the Founders.

A broad decision would further harm the presidency and the country by leaving Congress helpless to battle the evils of the spoils system. Sixty years of experimentation with that system in the nineteenth century established that—far from advancing the President's ability to take care that the laws be faithfully executed—it saddled presidents with an Executive Branch that was "weak and staffed with hacks." *See* Noah A. Rosenblum, *A Body Without a Head: Revisiting James Bryce's The American Commonwealth on the Place of the President in the 19th Century Federal Government*, 2 J. Am. Const. Hist. 575, 609 (2024). Or, as Mark Twain memorably put it, a civil system "so idiotic, so contemptible, so

grotesque, that it would make the very savages of Dahomey jeer and the very gods of solemnity laugh." Mark Twain, *Mark Twain in Politics*, N.Y. Times, Oct. 2, 1876. The Constitution does not mandate this result.

## ARGUMENT

### I. Plenary principal-officer supervision ensures that the President retains full constitutional responsibility and accountability for agency adjudicators' acts.

Civil service protections for agency adjudicators generally—and immigration judges and Social Security ALJs in particular—are fully consistent with Article II. These agency adjudicators have "limited duties and no policymaking or administrative authority." *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 218 (2020). Crucially, they and their decisions are subject to a web of control mechanisms that ensure "the President remains responsible for the exercise of executive power." *Arthrex*, 594 U.S. at 27.

#### A. Supreme Court precedent and historical tradition have approved for-cause removal coupled with principal-officer control over decisions.

**1.** As Petitioners explain (Br. 27-38), the Supreme Court has long made clear that "Congress, in committing the appointment of … inferior officers to the heads of departments, may prescribe incidental regulations controlling and restricting the latter in the exercise of the power of removal," including by specifying for-cause removal. *Myers*, 272 U.S. at 161 (citing *Perkins*, 116 U.S. 483). This presents no

barrier to presidential control over the Executive Branch because inferior officers are "subject to the supervision of[] principal officers who (being removable at will) have the President's complete confidence." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting). For-cause removal "is enough" for these inferior officers because it enables removal for "the failure to accept supervision." *Id.*

This is true for inferior officers generally, but especially so for agency adjudicators. The Framers understood that adjudicative and policymaking functions stand on a different footing vis-à-vis the exercise of executive power, presenting distinct separation of power concerns. As James Madison explained during the first Congress, an officer whose duties "partake[] strongly of the judicial character" "should not hold his office at the pleasure of the executive branch." 1 Annals of Cong. 636 (1789) (Joseph Gales ed., 1834).

Although agency adjudications are "exercises of … the 'executive Power,'" *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013), the Supreme Court has distinguished between "adjudicative" and "enforcement or policymaking functions" when assessing structural constitutional limits on removal provisions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 507 n.10 (2010).[2] In *Myers*, which the Supreme Court views as "perhaps [its] best word on the subject," *see*

[2] *See also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*, 537 F.3d 667, 699 n.8 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("ALJs perform only adjudicatory functions that are subject to review by agency officials." (citing 5 U.S.C. § 557(b))).

*Slaughter*, 225 L. Ed. 2d at 684, the Court recognized that there may be adjudicative officers whose "decisions after hearing affect interests of individuals, the discharge of which the President can not in a particular case properly influence or control." *Myers*, 272 U.S. at 135. In *Wiener*, the Court again stressed that the President's removal power over an "adjudicatory body" was more limited because of "the intrinsic judicial character of the task with which [it] was charged." 357 U.S. at 355-56.

This distinction was on display in *Arthrex*. There, the Supreme Court recognized that the work of administrative patent judges, although properly located in the Executive Branch, "partake[s] of a Judiciary quality as well as Executive." 594 U.S. at 17. This informed the Court's conclusion that constitutional defects in their supervision would be fully and better remedied by principal-officer review, with no need for at-will removal. *Id.* at 23-26 (Roberts, C.J., plurality op.); *id.* at 27 (Breyer, J., concurring in the judgment in part and dissenting in part).

The Court's most recent foray into removal authority in *Slaughter* left this landscape unchanged. There, considering the removal of principal officers, the Court took care not to "determine the fate of officials not before" it, and noted that non-Article III courts "pose[] a 'different set of questions.'" *Slaughter*, 225 L. Ed. 2d at 692.

**2.** These decisions reflect a history going back to early statutes in which Congress provided for supervision of inferior officers, including agency adjudicators, through the "direction and control" of agency heads coupled with for-cause removal. *See Arthrex*, 594 U.S. at 19. The Supreme Court has repeatedly recognized Congress's power to provide for an "initial 'impartial decision' … followed by a final 'transparent decision for which a politically accountable officer must take responsibility.'" *Braidwood Mgmt.*, 606 U.S. at 775 (quoting *Arthrex*, 594 U.S. at 16). This structure "preserves both expertise and accountability." *Id*. Expertise, because initial determinations are independent, rather than made by individuals who may be swayed by fear of termination. Accountability, because if the President or his principal officers make a different choice, they do so in the public view and cannot hide behind the decision of the agency adjudicator. *See Slaughter*, 225 L. Ed. 2d at 678 (noting the Founders did not want an Executive who could "'conceal [his] faults'" behind others) (quoting The Federalist No. 70, at 427 (Alexander Hamilton) (C. Rossiter ed., 1961)).

This structure would have been familiar to the founding generation. A 1798 law, for example, provided for a "principal assessor" appointed by the district commission (who, in turn, was presidentially appointed) "authorized to … hear and determine … any and all appeals" challenging assessors' judgments. Act of July 9, 1798, §§ 3, 7, 19, 1 Stat. 580, 584-85, 588. This assessor was bound by regulations

promulgated by the commissioners, who also reviewed the results. *Id.* §§ 8, 22, 1 Stat. at 585, 589. But, unlike the commissioners' clerks, who served "at the pleasure of" the commissioners, *id.* § 5, 1 Stat. at 584, the commissioners could "remove from office" an assessor if "manifest error or imperfection shall appear in" his work, *id.* § 22, 1 Stat. at 589, or if he "fail[ed] to perform any duty assigned by this act, within the time prescribed" unless "prevented … by sickness, or other unavoidable accident," *id.* § 17, 1 Stat. at 588.

Congress "carried" this early approach of "principal officer review" as the means of executive supervision into "the modern administrative state" by enshrining it in the APA. *Arthrex*, 594 U.S. at 19. The APA, in turn, became the model for many agency adjudications (including for immigration judges), making "'higher-level agency reconsideration' by the agency head … the standard way to maintain political accountability and effective oversight for adjudication." *Id.* at 20.

### B. The APA embodies Congress's model for structuring agency adjudications to guarantee impartial initial adjudications while protecting presidential control over policy.

**1.** Congress took pains in the APA to preserve presidential control over policymaking, while ensuring the goal of both real and apparent adjudicative impartiality for initial decisions. The APA's three-pronged strategy for control of agency adjudicators "preserv[es] the chain of command in Article II," *see Braidwood*, 606 U.S. at 754, leaving no concern that the removal restrictions will

"impede the President's ability to perform his constitutional duty." *See Morrison*, 487 U.S. at 691.

*First,* under the APA, ALJ decisions are tightly constrained by comprehensive agency regulations and guidelines. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures."). ALJs "have no independent authority to divine policy." James E. Moliterno, *The Administrative Judiciary's Independence Myth*, 41 Wake Forest L. Rev. 1191, 1199 (2006). ALJs must follow previously established rules, policies, and interpretations thereof by agency policymakers. *See* Recommendations and Statements of the Administrative Conference Regarding Administrative Practice and Procedure, 57 Fed. Reg. 61759, 61763 (Dec. 29, 1992) ("Where the agency has made its policies known in an appropriate fashion, ALJs … are bound to apply them in individual cases.").

*Second*, the APA makes clear, too, that agencies—not ALJs—control agency policy, even in the context of analyzing the facts of a specific case. Agency policymakers can review and, if necessary, completely replace every ALJ decision with which they disagree. 5 U.S.C. § 557(b). Because the employing agency has authority to review, modify, or vacate an ALJ decision before it becomes final agency action, *see Block v. U.S. Int'l Trade Comm'n*, 777 F.2d 1568, 1571 (Fed. Cir. 1985), the agency head—and by extension, the President—is completely accountable within the Executive Branch for any ALJ decision.

*Third*, should ALJs "fail[] to accept supervision," they can be fired for "good cause." *Morrison,* 487 U.S. at 724 n.4 (Scalia, J., dissenting); 5 U.S.C. § 7521(a). This good-cause removal "is enough." *Morrison,* 487 U.S. at 724 n.4 (Scalia, J., dissenting); *see also id.* at 692 (majority opinion). When coupled with the review of agency adjudicator decisions by a principal officer who is removable at will, good-cause removal amply clears the constitutional bar for assuring "the President remains responsible for the exercise of executive power." *Arthrex*, 594 U.S. at 27.

The good-cause standard has teeth. To illustrate from AALJ's experience, Social Security ALJs have been removed for being absent for extended periods, declining to set hearing dates, having a high rate of significant adjudicatory errors, not following mandatory rules, and deciding too few cases. *See* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Rsrv. L. Rev. 1083, 1109 & nn.134-36 (2015); *see also, e.g.*, *Shapiro v. Soc. Sec. Admin.*, 800 F.3d 1332, 1334 (Fed. Cir. 2015) (sustaining good-cause removal because an ALJ's "production was dramatically lower than" his peers'); *Abrams v. Soc. Sec. Admin.*, 703 F.3d 538, 543 (Fed. Cir. 2012) (sustaining good-cause removal because of ALJ's long delays and "failure to follow directions").

**2.** These measures to ensure Executive Branch control and accountability for policymaking—while protecting adjudicative neutrality and transparency—were

grounded in careful study and enacted only after a "long period of study and strife." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 40 (1950).

Before the APA, there was widespread dissatisfaction with the lack of fairness and transparency of agency adjudications. The Judiciary Committee, in working on the APA, heard "a good deal of complaint" that pre-APA hearing examiners were "not free to make an independent report" because of behind-the-scenes pressure from agency superiors. *Administrative Procedure: Hearings before the H. Comm. on the Judiciary*, 79th Cong. 98-99 (1945) (question of Rep. Hatton Sumners, Chairman). The lack of transparency led to public concern that the government "may be consciously favoring its friends and injuring its enemies." Frederick F. Blachly & Miriam E. Oatman, *Administrative Legislation and Adjudication* 246 (1934).

But some agencies had arrived at a solution: civil service protections. The Judiciary Committee heard testimony that several agencies—including the Social Security Board—had adopted a system of placing "initial hearing officers, or referees, under the civil service laws." *See Administrative Procedure: Hearings on S. 674, S. 675, and S. 918 Before a Subcomm. of the S. Comm. on the Judiciary*, 77th Cong. 249 (1941) (testimony of Secretary McNutt). The Social Security Board's system, which was "adopted after months of study," "operated efficiently and without public criticism." *Id.*

A committee under the auspices of the Attorney General undertook "the most extensive study of administrative procedure ever conducted" and concluded that "use of independent hearing examiners would not divest the agencies of their control over policy, since the agencies retained the power to reverse hearing examiner decisions upon review." 2 Paul R. Verkuil et al., Admin. Conf. of the U.S., Recommendations and Reports, *The Federal Administrative Judiciary* 801-03 (1992), https://tinyurl.com/474m6eat. On the contrary, the revisions would create the transparency needed to restore public trust. When "the agency … reverse[s] [an ALJ] decision for policy reasons, the parties and the public" doubly benefit. *Id.* at 802. There is first "the benefit of a visibly independent determination of the evidentiary facts"—from the ALJ exercising an adjudicative function. *Id*. In addition, the "application of policy at the agency level would then be seen for what it was: a policy determination rather than a skewing of evidentiary factfinding for policy reasons." *Id*.

**C. Some agency adjudicators, including immigration judges, are subject to supervisory control that exceeds the APA baseline.**

**1.** When Congress created the "specialized administrative procedure applicable to deportation hearings" in the Immigration and Nationality Act of 1952, it "dr[e]w[] liberally on the analogous provisions of the Administrative Procedure Act," which it "used as a model." *Marcello v. Bonds*, 349 U.S. 302, 308-09 (1955). To address the unique needs of the immigration context, however, Congress

authorized the agency to vary the template, and the agency elected to adopt additional supervisory control and to reinforce limits on policymaking. *See* Opening Br. 46-48. Immigration judges are thus not created by the APA but by an immigration-specific statute, 8 U.S.C. § 1101(b)(4), and are governed by agency-specific regulations, *see*, *e.g.,* 8 C.F.R. § 1003.10.

In their modern form, immigration judges are under the control of the Attorney General in the same ways that the APA provides: *ex ante* policy control and supervision, principal-officer review of decisions, and for-cause termination for failure to comply with supervision. Immigration judges "shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe." 8 U.S.C. § 1101(b)(4). The Attorney General "retains full authority to receive additional evidence and to make de novo factual determinations." *In re J.F.F.,* 23 I. & N. Dec. 912, 913 (A.G. 2006) (citation modified); Opening Br. 54-57. The Attorney General can exercise this review *sua sponte* in the absence of an appeal. *See* 8 U.S.C. §§ 1101(b)(4), 1103(g)(2). And the Attorney General can terminate immigration judges "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a).

In addition, unlike many other types of administrative adjudicators, immigration judge decisions are subject to an additional level of review—the Board of Immigration Appeals. To ensure that immigration judges do not attempt to make

policy, the Board has broad authority to review immigration judge decisions with or without an appeal. 8 C.F.R. § 1003.1(b), (c). This review includes—but is not limited to—cases of "major national import," those involving a "complex, novel, unusual, or recurring issue of law or fact," those implicating a "need to establish a precedent construing the meaning of laws, regulations, or procedures," those where immigration judges have reached inconsistent rulings, and those where an immigration judge's decision "is not in conformity with the law or with applicable precedents." *Id*. § 1003.1(e)(6)(i)-(iv), (vii).

This extra review helps ensure supervision of immigration judges across their vast caseload, which is much greater than for most other agency adjudicators. There are over 600 immigration judges who issued over 400,000 decisions in the second quarter of 2026 alone. Exec. Off. for Immigr. Rev., *Adjudication Statistics*, https://tinyurl.com/yynpkjk9; Exec. Off. for Immigr. Rev., *Adjudication Statistics: Immigration Judge (IJ) Hiring*, https://tinyurl.com/mrydufca (*Immigration Judge Hiring*). The staggering number of decisions each immigration judge issues every day underscores their limited role—not setting policy, but merely applying to discrete facts the binding agency policies made by distinct, supervisory agency policymakers.[3]

[3] By comparison, there are only two ALJs at the SEC, and they issued only two decisions in 2025. U.S. Office of Personnel Mgmt., *Federal Workforce Data:*

Unlike ALJs in other agencies, then, such as the SEC's ALJs who refine "statutory standards" through "case-by-case evolution," *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947), immigration judges cannot and do not set standard-refining precedents, even as an initial matter. Only the Board and Attorney General can do that. 8 C.F.R. § 1003.1(g)(2). This level of supervisory control meets, if not exceeds, the APA-model baseline that the Supreme Court found constitutionally sufficient in *Arthrex*. 594 U.S. at 27. Indeed, *Arthrex* highlighted the Executive Office for Immigration Review—where Petitioners worked—as exemplifying "inferior officers whose decisions a superior executive officer can review or implement a system for reviewing." *Id*. at 20. Given the extensive web of control, supervision, and review, the buck never stops with an immigration judge.

**2.** Although the distinct removal protections for ALJs, such as those for Social Security ALJs, are not before the Court, *see* 5 U.S.C. § 7521(a), examining the supervisory controls that constrain the duties and authorities of Social Security ALJs illustrates that immigration judges are not unique in terms of plenary supervision and policymaking restrictions. Like immigration judges, Social Security ALJs are subject to an intermediate level of review, superior-officer ability to take cases before decision, and a lack of policymaking authority, though the specific control

---

*Workforce Size and Composition*, https://tinyurl.com/m79m3hea (search for agency: Securities and Exchange Commission; occupational series: Administrative Law Judge); SEC, *ALJ Initial Decisions*, https://tinyurl.com/2w6x8rhe.

mechanisms vary within those categories. These mechanisms provide for more than sufficient presidential control through both principal-officer review of any ALJ decision and additional supervision by an intermediate level of superior officers to implement principal-officer control.

For Social Security ALJs, the intermediate review level is called the Appeals Council—though like the Board, it performs much broader supervisory functions than the "appeals" name would suggest. It can review Social Security ALJ decisions without an appeal, 20 C.F.R. §§ 404.969(a), 416.1469(a), and take over cases at the hearing stage, before an ALJ issues a decision, *id.* §§ 404.956, 416.1456(a).

In addition, as with immigration judges, the high caseloads for Social Security ALJs have driven procedures whereby the Appeals Council, which is under the full control of the Commissioner of Social Security, can review any Social Security ALJ decision implicating a broad policy or procedural issue that may affect the general public interest, with or without an appeal. *Id*. §§ 404.970(a)(4), 416.1470(a)(4). Moreover, Appeals Council review is not limited to situations where there is an identified case-specific disagreement. Rather, the Appeals Council also performs generalized quality review by sampling cases to review on its own motion *before* a decision is effectuated. *See id*. §§ 404.969(b), 416.1469(b). The agency also undertakes special studies based on anomalies identified. *See generally* SSA, Off. of Inspector Gen., No. A-07-12-21234, *Congressional Response Report: The Social*

*Security Administration's Review of Administrative Law Judges' Decisions*, at 6-7 (March 2012), https://tinyurl.com/4dxwhchw. Through these various review processes, the SSA ensures that ALJ decisions, overall, are subject to the Commissioner's control and do not stray from mandated regulatory policy, which is set by other agency actors—not Social Security ALJs.

In addition to substantial pre- and post-decisional review, Social Security ALJs must work within comprehensive agency policy guidelines when making decisions. SSA policymakers provide extensive internal guidance tools like binding Social Security Rulings. 20 C.F.R. § 402.160(b)(1). Binding guidelines include Listings of Impairments that would direct a finding of disability and medical-vocational grids that provide detailed schedules on vocational criteria for different levels of impairment. *See id*. pt. 404, subpt. P, apps. 1 & 2. SSA has also issued other sub-regulatory guidance, such as the Hearings, Appeals and Litigation Law (HALLEX) manual, which "communicates guiding principles and procedures" to SSA adjudicators. HALLEX 01105.003, https://tinyurl.com/bdhh6kfj. One such guideline urges ALJs to refer novel policy issues to their agency supervisors, rather than decide the question themselves in the first instance, recognizing that such referrals will be rare given the comprehensive guidelines already provided. *See* HALLEX 01220.040, https://tinyurl.com/2zpwfmj4.

Congress has locked down Social Security policymaking authority in other ways, too. By statute, policy decisions at SSA must be controlled by a small group of appointees. 42 U.S.C. § 904(c) (limiting to 20 the number of positions of a "confidential, policy-determining, policy-making, or policy-advocating character"). ALJs are subordinate to this small number of policymakers, and ALJs themselves are forbidden by law from assuming policymaking roles. *Id.*; *see also* 5 U.S.C. § 3105.

These controls are essential for Social Security ALJs, much like for immigration judges, because of the size of the undertaking. The disability programs administered by SSA are of "a size and extent difficult to comprehend." *Richardson v. Perales*, 402 U.S. 389, 399 (1971). The ALJs working for SSA far outnumber their peers in other agencies. *See Federal Workforce Data*, *supra* (search for agency: Social Security Administration; occupational series: Administrative Law Judge) (over 900 Social Security ALJs out of nearly 1200 total federal ALJs); *Immigration Judge Hiring*, *supra* (there are almost half again as many Social Security ALJs as immigration judges). And their workload is immense. Social Security ALJs issued approximately 400,000 hearing level dispositions in fiscal year 2025, amounting to about 33 to 41 hearing dispositions per ALJ per month that year.

Fulsome superior-officer review under the control of the agency head, extensive decision-making constraints, and policymaking prohibitions—driven by

the imperative of ensuring consistency across staggeringly high caseloads—collectively assure presidential responsibility for the exercise of executive power within the agencies these administrative adjudicators serve.

### D. The Court should take care not to invalidate removal protections for agency adjudicators that are not before the Court.

History, precedent, and constitutional values all point in one direction here: maintaining for-cause removal protections for immigration judges. Because of the extensive superior-officer supervision over immigration judges described above—which in many ways exceeds the clearly constitutional APA baseline—any decision rejecting removal protections for immigration judges is likely to wreak havoc on civil service protections for agency adjudicators more broadly. Such a decision also will impede fairness, political accountability, and competence across the government—no matter how constrained the Court makes its reasoning.

Still, constraint in such a scenario would be crucial, because the historical pedigree, duties, and restrictions applicable to agency adjudicators vary greatly across agencies. Thus, even if this Court were to hold that Article II requires at-will removal for immigration judges, it should take care not to reach other agency adjudicators not before the Court.

**1.** Agency adjudicators are created by a multitude of statutes and governed by a variety of agency-specific regulations and policies. The APA served as a model, but as this case and *Arthrex* demonstrate, Congress chose different approaches for

different situations. Some—but likely not all—agency adjudicators qualify as inferior officers rather than mere employees. *See Lucia v. SEC*, 585 U.S. 237, 246-50 (2018). And roles and authorities differ widely, even when considering only ALJs governed by the APA.

These differences start before an ALJ is hired. There "is no 'one-size-fits-all' procedure for appointing ALJs." Adoption of Recommendations of the Administrative Conference, 84 Fed. Reg. 38927, 38931 (Aug. 8, 2019).

Once placed within a given agency, the duties ALJs perform vary considerably, as does the degree of review and oversight within the agency. Some, like those at the SEC, preside over adversarial enforcement proceedings, while others, like Social Security ALJs, determine eligibility for government benefits through non-adversarial proceedings under strictly circumscribed agency criteria. Still others hear regulatory matters, *e.g.*, FCC hearings on licenses under 47 U.S.C. §§ 309(k), 312, or FERC hearings resolving rate disputes, 18 C.F.R. § 385.206. *See generally* Daniel F. Solomon, *Summary of Administrative Law Judge Responsibilities,* 31 J. Nat'l Ass'n of Admin. L. Judiciary 475 (2011); *see also* Kent H. Barnett, *Against Administrative Judges*, 49 U.C. Davis L. Rev. 1643, 1652 & n.42 (2016). Thus, no ALJ makes policy, but within their limited statutory authority, there is a wide spectrum of ALJ duties and responsibilities. *See* 5 U.S.C. § 557.

**2.** Social Security ALJs are arguably the quintessential ALJs, serving paradigmatic adjudicative functions with no policymaking duties and protected by limitations on removal that predated and guided the APA. *See Richardson*, 402 U.S. at 409. As described above, Social Security ALJs are barred from policymaking and their decisions are subject to extensive supervisory control going beyond what the APA generally provides. *See supra* Section I.C.2.

In addition, Social Security ALJs preside over non-adversarial hearings. *See Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (plurality op.). Their independent "duty to inquire," *Heckler v. Campbell,* 461 U.S. 458, 471 (1983) (Brennan, J., concurring), exemplifies the core ALJ factfinding and record-building functions contemplated under the APA. Social Security ALJs thus play an essential role in an important factfinding phase, the third stage of a four-stage agency review process. *See generally Fourth in a Hearing Series on Securing the Future of the Social Security Disability Insurance Program: Hearing Before the Subcomm. on Social Security of the H. Comm. on Ways and Means*, 112th Cong. 11-13 (2012), https://tinyurl.com/2rn484k6 (Astrue Testimony) (explaining the four-stage administrative review process). But ALJs do not have final say on the exercise of executive power in any particular case, and they have no say on disability-benefit policy more broadly—an area that the Supreme Court has emphasized is relatively constrained, even as to the authority exercised by the head of the agency. *See Seila*

*Law*, 591 U.S. at 222 (noting that the agency "lacks the authority to bring enforcement actions against private parties" and its "role is largely limited to adjudicating claims for Social Security benefits").

Comparing Social Security ALJs to the SEC ALJs at issue in *Lucia* highlights the broad spectrum of ALJ duties and authorities. SEC ALJs "exercise[] authority comparable to that of a federal district judge conducting a bench trial." *Lucia*, 585 U.S. at 242 (internal quotation marks omitted). Social Security ALJs preside over non-adversarial hearings. SEC ALJs have cease-and-desist powers—that is, powers prohibiting licensed firms and persons from violating the securities laws—and the ability to revoke licenses or bar defendants from doing securities-industry work. 15 U.S.C. § 77h-1. Social Security ALJs neither make enforcement decisions nor impose civil penalties. And, while both SEC and SSA ALJ decisions are subject to plenary principal-officer review—which means removal protections are constitutional in both cases—the opportunity for SEC ALJs to make interpretive determinations and establish penalties in the first instance is significantly different than the roles and duties of Social Security ALJs. If the Court were to invalidate any removal protections, it should not resolve the status of widely varying types of administrative adjudicators in a case that does not present that question.

## II. Jettisoning for-cause removal for agency adjudicators would severely harm constitutional interests.

Removal protections for agency adjudicators are not just a good idea. They are an expression of principles woven into our constitutional fabric. Ultimately, invalidating for-cause restrictions for the removal of agency adjudicators would enable behind-the-scenes pressure, creating "a roadmap" for principal officers to review ALJ decisions without "tak[ing] responsibility for the ultimate decision." *Arthrex*, 594 U.S. at 16. Both public faith in the fairness of executive adjudications and the President's faithful execution of the laws would corrode as a result.

### A. Independent initial decisions coupled with principal-officer review promote fairness and accountability.

**1.** Not every adjudication requires an Article III court. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 333-34 (2018). But every adjudication implicates due process concerns. "Pressures and influences" that are "properly … directed toward officers responsible for" policy "constitute an unwholesome atmosphere" for adjudication. *Wong Yang Sung*, 339 U.S. at 42 (quoting Administrative Management in the Government of the United States, *Report of the President's Committee on Administrative Management* 36-37 (1937)). Financial incentives to decide cases in a particular way give rise to due process concerns. *Withrow v. Larkin*, 421 U.S. 35, 46-47 (1975); *Tumey v. Ohio*, 273 U.S.

510, 531 (1927); *see also Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1156 (Fed. Cir. 2021).

While this does not necessarily mean that tenure protections are constitutionally required, *see Ramspeck v. Fed. Trial Exam'rs Conf.*, 345 U.S. 128, 133 (1953), such protections advance strong interests in fairness and in the appearance of fairness. The benefit of independent initial decisions is that "the public has assurance the facts are found in the first instance by an official not subject to agency coercion." 2 Verkuil, *supra*, at 803; *see also Free Enter. Fund,* 561 U.S. at 507 n.10. It is thus for good reason that "'higher-level agency reconsideration' by the agency head is the standard way to maintain political accountability and effective oversight for" agency adjudicators. *Arthrex*, 594 U.S. at 20 (citation omitted).

History confirms that the need for both impartiality and the appearance of impartiality is particularly pressing when an agency decides cases that implicate the agency's own interests. As explained above, before the APA, the predecessors to ALJs were seen as "mere tools of the agency concerned and subservient to the agency heads in making their proposed findings of fact and recommendations." *Ramspeck*, 345 U.S. at 131; *supra* Sec. I.B. As recounted in the government's brief in *Jarkesy*, "[t]he APA's good-cause provision addresses those complaints" and "[i]nvalidating the provision … could recreate the problems that the APA was meant to solve, thereby undermining both the 'fairness' of agency hearings and 'public

confidence in that fairness.'" Br. for Petitioner at 66, *SEC v. Jarkesy*, 603 U.S. 109 (2024) (No. 22-859) (quoting *Wong Yang Sung*, 339 U.S. at 42).

As at other agencies, a "key component of the integrity of [the SSA] hearings process is that ALJs act as independent adjudicators—who fairly apply the standards in the Act and … regulations." Astrue Testimony, *supra*. This "qualified decisional independence … is integral to the ALJ's role as an independent adjudicator." *Id.*

Jettisoning removal protections would impair administrative adjudicators' basic duty to "exercise[] … independent judgment on the evidence before [them], free from pressures by the parties or other officials within the agency." *Butz v. Economou*, 438 U.S. 478, 513 (1978). And doing so is unnecessary to the President's ability to secure executive prerogatives, because the President can take care that the law is faithfully executed by controlling, and as necessary removing, the principal officer who sets the rules *ex ante* and who can reverse any decision *ex post*.

**2.** If principal officers resort to behind-the-scenes threats to the livelihood of administrative adjudicators, their policy choices are hidden behind the mask of supposedly independent decision making, advancing neither fairness nor democratic accountability. As the Supreme Court has explained, behind-the-scenes pressure on agency adjudicators "is not the solution. It is the problem." *Arthrex,* 594 U.S. at 16. Regardless of whether the principal officer succeeds in controlling the outcome, "such machinations blur the lines of accountability demanded by the Appointments

Clause." *Id*. "The parties are left with neither an impartial decision by a panel of experts nor a transparent decision for which a politically accountable officer must take responsibility." *Id.* The public is thereby left to wonder "'on whom the blame or the punishment of a pernicious measure … ought really to fall.'" *Id*. (quoting The Federalist No. 70, at 428).

Article II permits Congress to adopt a structure that fosters both fairness and greater political accountability, as Congress has done since the earliest days: For-cause removal coupled with principal-officer review and other forms of supervision collectively allow the President to take care that the laws are faithfully executed. Article II does not require Congress to acquiesce in behind-the-scenes threats to the livelihood of agency adjudicators intended to sway the outcome of purportedly unbiased initial factfinding determinations.

**B. At-will removal threatens basic adjudicative competence.**

Besides undermining fairness and political accountability, an unduly expansive view of removal authority would risk reintroducing the "evil of the spoils system" that civil service reform was designed to combat. *See Myers*, 272 U.S. at 173. This would harm both the public and the presidency.

As Congress recognized when enacting the APA—and as it had recognized with civil service reform overall—removal and tenure protections are critical to hiring high-quality agency adjudicators. *See* Final Report of the Attorney General's

Committee on Administrative Procedure 46 (1941). By contrast, in the words of President Grant, the spoils system "does not secure the best men, and often not even fit men, for public place." Anthony J. Gaughan, *Chester Arthur's Ghost: A Cautionary Tale of Campaign Finance Reform*, 71 Mercer L. Rev. 779, 787 (2020) (quoting Thomas C. Reeves, *Gentleman Boss: The Life of Chester Alan Arthur* 63 (1975)). Once hired, "their work in office would almost certainly be bad, since it was not through 'sedulous application' or 'zealous … performance' 'that office is retained and promotion won,'" but through party loyalty. Rosenblum, *supra*, at 591-92 (quoting 2 James Bryce, *The American Commonwealth* ch. 58 (1st ed. 1889)). This venal system was also expensive, with wages "swollen for political purposes." Werner Troesken, *Patronage and Public-Sector Wages in 1896*, 59 J. Econ. Hist. 424, 424 (1999).

A government of "party hacks looking to follow party orders" did nothing to advance a strong executive either. Rosenblum, *supra*, at 591. Since "the president's staff was largely incompetent," it was harder for the President to accomplish his policy objectives. *Id.* at 609. And the business of distributing that political patronage was a distraction from the President's policy role. Even in the midst of the Civil War, "Lincoln was 'swept along from room to room in the White House by a rising tide of office seekers,'" and preoccupied with appointing postmasters. *Id.* at 600 (quoting 1 James Bryce, *The American Commonwealth* 82 (1st ed. 1889)). In the end, this

system was so corrosive to executive power that it was the "executive, not Congress, [that] became the driving force behind the push to limit the president's removal authority." Kent Barnett, *Regulating Impartiality in Agency Adjudication*, 69 Duke L.J. 1695, 1726 (2020).

Article II does not leave Congress helpless against these evils. It "has never been the law" that every inferior officer—let alone the "broad swath of 'lesser functionaries' in the Government's workforce," *Lucia*, 585 U.S. at 245—must be removable by the President at will. *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

/s/Dana Kaersvang

Dana Kaersvang
Hyland Hunt
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 888-0404
dkaersvang@deutschhunt.com
Counsel for Amicus Curiae

July 28, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(g), this amicus curiae brief complies with the type-volume limitations set out in Federal Rule of Appellate Procedure 29(a)(5) and Federal Circuit Rules 29(b) and 32(b)(1) because it is in 14-point Times New Roman proportional font and contains 6,645 words as counted by Microsoft Word, excluding the items that may be excluded. The brief also complies with the typeface and style limitations set forth in Federal Rules of Appellate Procedure 32(a)(5)–(6).

/s/Dana Kaersvang
Dana Kaersvang

July 28, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on July 28, 2026, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system:

/s/ Dana Kaersvang
Dana Kaersvang