**No. 2026-1575**

**IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

MEGAN JACKLER AND BRANDON JAROCH,
*Petitioners*,

v.

MERIT SYSTEMS PROTECTION BOARD,
*Respondent*,

DEPARTMENT OF JUSTICE,

*Intervenor*

On Petition for Review
Merit Systems Protection Docket Nos. CF-0752-26-0069-I-1, DA-0752-25-0328-I-1, and DA-0752-25-0330-I-1

# BRIEF OF FORMER DIRECTOR AND ACTING DIRECTOR OF THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT AS *AMICI CURIAE* IN SUPPORT OF PETITIONERS AND REVERSAL

Michael C. Martinez
Webb Lyons
Joshua M. Salzman
Elena Goldstein
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
mmartinez@democracyforward.org

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** No. 26-1575

**Short Case Caption** Jackler v. MSPB

**Filing Party/Entity** Amicus Curiae Former Director and Acting Director of the United States Office of Personnel Management

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: July 28, 2026

Signature: /s/ Michael C. Martinez

Name: Michael C. Martinez

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Janice R. Lachance, Robert H. Shriver III | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ ii

INTEREST OF *AMICI CURIAE* ........ 1

SUMMARY OF ARGUMENT ........ 2

ARGUMENT ........ 7

I. Statutory Due Process Protection Are Critical to Effective Recruitment ........ 7

A. Fair and stable employment is a critical part of the government's compensation bargain. ........ 8

B. Civil service protections allow the government to retain a qualified workforce ........ 12

C. Statutory protections preserve accountability while improving the government's ability to compete for talent ........ 16

II. Statutory Due Process Protection Facilitate Candor and Expertise ........ 18

A. Candid career advice gives officials the information needed to exercise control ........ 18

B. Statutory protections protect candor without displacing lawful supervision. ........ 20

III. Statutory Due Process Protections Preserve Continuity of Service Delivery Across Administrations ........ 22

CONCLUSION ........ 25

CERTIFICATE OF COMPLIANCE ........ 27

CERTIFICATE OF SERVICE ........ 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Lane v. Franks*,
573 U.S. 228 (2014) .......... 19

*Seila L. LLC v. CFPC*,
591 U.S. 197 (2020) .......... 3

*Trump v. Slaughter*,
No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026). .......... 3

*United States v. Nixon*,
418 U.S. 683 (1974) .......... 19

*Waters v. Churchill*,
511 U.S. 661 (1994) .......... 19

## Statutes

3 U.S.C. § 102 .......... 23

5 U.S.C. § 1103 .......... 1

5 U.S.C. § 2301 .......... 16, 20

5 U.S.C. § 2302 .......... 21

5 U.S.C. § 4303 .......... 16

5 U.S.C. § 7513 .......... 8, 9, 16, 22

## Constitutional Provisions

U.S. Const. art. II, § 3 .......... 2, 25

## Rules

*Improving Performance, Accountability and Responsiveness in the Civil Service*, 91 Fed. Reg. 5580 (Feb. 6, 2026) .......... 11

*Upholding Civil Service Protections and Merit System Principles*,
89 Fed. Reg. 24982 (Apr. 9, 2024) .......... 10, 13, 17, 19

## Other Authorities

30 Writings of George Washington (J. Fitazpatrick ed. 1939)................. 3

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are a former Senate-confirmed Director and Acting Director of the United States Office of Personnel Management (OPM), the chief human resources agency and personnel policy manager for the federal government. Congress established OPM in the Civil Service Reform Act of 1978 (CSRA) and tasked it with "executing, administering, and enforcing…the laws governing the civil service." 5 U.S.C. § 1103(5). Pursuant to this responsibility, OPM administers programs for the federal workforce, issues regulations related to federal workforce policy, and aids and "advis[es] the President on actions which may be taken to promote an efficient civil service and a systematic application of the merit system principles." 5 U.S.C. § 1103(7).

As former officials who have served at the highest levels of OPM, amici are intimately familiar with the civil service laws that shape the federal workforce, including the statutory due process protections at issue in this appeal. But amici's expertise extends beyond mere

---

[1] This brief is filed under the Court's June 17, 2026 *en banc* order permitting amicus briefs without consent or leave of court. *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel made a monetary contribution intended to fund the brief's preparation or submission.

knowledge: amici also have deep experience with *how* those civil service laws affect the federal workforce and their efficacy in serving the American people. And that experience has convinced them that statutory due process protections are fundamental to enabling a federal workforce that best serves the American people and that best enables the President to carry out his constitutional duties.

*Amici* respectfully urge reversal.

## SUMMARY OF ARGUMENT

Congress established statutory due process protections for career civil servants, like Petitioners here, not simply because it wanted to provide them with job security, but because it viewed those protections as a core part of a professional, merit-based civil service that could best serve the American people. In this litigation, Respondent and Intervenor (the "Government") have argued that these protections—which provide assurance to employees that they will not be fired for arbitrary or political reasons or no reason at all—improperly interfere with the President's constitutional responsibility to "take Care that the Laws be faithfully executed." Art. II, § 3. In amici's experience, however, the opposite is true: civil service protections in fact enable the President

to more faithfully and effectively discharge his Article II duties on behalf of the American people.

"To vest 'the whole executive power' in just one person was not to suggest that he could execute the laws alone and unaided." *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *7 (U.S. June 29, 2026). "[T]he framers did not opt for the President to work alone. They knew (as our first President would write) that it would be 'impossib[le]' for just 'one man . . . to perform all the great business of the State.'" *Id.* (citing 30 Writings of George Washington 334 ((J. Fitzpatrick ed. 1939)). Today, that "great business of the State" is enormously more expansive and complex than it was at the country's founding, and the President is aided in his work not only by the officers whom he appoints, but also by the government's roughly 2 million career civil servants. These public servants, nearly a third of whom are veterans, reside in every State and provide the American people services ranging from nursing care for veterans to research on the space program, from rooting out healthcare fraud to helping family farmers.

Given that the President must "rely on subordinate officers for assistance," *Seila L. LLC v. CFPC*, 591 U.S. 197, 204 (2020), the

availability of qualified subordinates is a concern of constitutional magnitude. Unless the executive branch can attract and retain a highly qualified corps of officials to provide the expertise and dedication essential to the faithful execution of the laws, the President's ability to exercise Article II prerogatives would be substantially impaired.

To be clear, these civil servants are and must be accountable to the President and to their agencies' political leadership. But the basic due process protections afforded by the CSRA do not undermine that accountability. Instead, through many years of leading OPM, amici can confidently say that these protections in fact enable the federal government to better serve the American people—and they therefore advance, rather than hinder, the President's ability to carry out his Article II authority. They do so in at least three ways.

*First*, statutory due process protections enhance the federal government's ability to recruit and retain highly talented and committed civil servants who bring their expertise to bear in service to the American people. The federal government has long recognized that it has struggled to fill critical positions across agencies, especially those, like technology positions, that require significant technical expertise.

The government simply cannot compete with the private sector with respect to salary, so statutory due process protections are a critical recruitment tool for federal agencies. But under the Government's conception of Article II, not only would this recruitment incentive disappear, but federal workers would in fact have *far fewer* protections than their private sector counterparts. According to the Government's theory, Article II trumps all else: the President has unbridled authority to discriminate against federal workers because of their race, sex, political affiliation, disability, or any other reason. Needless to say, any aspiring public servant, no matter their commitment to serve their country, would think twice before signing up for such a workplace.

*Second*, statutory due process protections encourage civil servants to offer their candor and full expertise, without fear of reprisal. The work of the government is complex, and agency political leadership must make consequential decisions every day that affect virtually all aspects of American life. How should public health agencies combat an emerging infectious disease? Do recent international regional conflicts change the approach to an upcoming diplomatic mission? What strategies can best contain a major wildfire spreading across the

country? The best decisions on these and countless other consequential issues—the decisions that most advance the public interest *and* the President's priorities—are made when career civil servants offer their expertise, experience, and honest input. Civil servants more readily offer that input when they are unafraid that doing so will lead to their removal.

*Third*, statutory due process protections help ensure that the business of government, and therefore the business of serving the American people, can continue from one administration to the next. Historically, the federal government is staffed by a very small number of political appointees—federal officials who serve as agency leaders or confidential advisers to those leaders, who lack due process protections, and who change from one administration to the next. Because political appointee positions constitute such a small percentage of the federal workforce, government operations continue, largely uninterrupted, from one administration to the next. But the Government's view of Article II risks upending this continuity. If the President can fire the entire federal workforce for any reason and with no process, it takes little imagination to envision a President who would do so to cripple an

incoming administration's ability to carry out its own priorities—thereby undermining the incoming President's own Article II obligations.

Civil service protections are a key part of a merit-based civil service. Amici are proud to support them, because they help create a federal workforce that can best serve the American people and best enable the President to carry out his Article II responsibilities. The Board's decision should therefore be reversed.

## ARGUMENT

Statutory due process protections preserve accountability while strengthening three capabilities every administration needs: a skilled workforce, candid professional advice, and continuity across presidential transitions. The Board's decision weakens each.

### I. Statutory Due Process Protection Are Critical to Effective Recruitment and Retention

The federal government competes with private employers for lawyers, adjudicators, engineers, economists, physicians, nurses, scientists, cybersecurity specialists, procurement officers, program managers, and many other professionals. It has long struggled to fill positions requiring scarce technical expertise, and for many such

positions it cannot match private-sector compensation. Federal agencies therefore compete on other terms, including public mission, responsibility, benefits, and the assurance that employees who perform well and follow the law will not be dismissed arbitrarily or for political reasons. Statutory due process protections, including those at 5 U.S.C. § 7513, supply that assurance without preventing removals based on misconduct, poor performance, or insubordination. It is an important part of the employment bargain through which agencies recruit talented public servants.

### A. Fair and stable employment is a critical part of the government's compensation bargain.

The Board's own research confirms a strong link between federal recruitment and the promise of job stability. The Board conducted a recruitment study of a random sample of permanent, full-time employees newly hired from outside government into higher level (GS-12 through GS-15) government positions. Among sixteen possible reasons for applying, "more job security" ranked first, identified by 47 percent of respondents. Agency mission ranked second at 39 percent; opportunity to use one's talents, 36 percent; public service or career opportunity, 35 percent; benefits, 34 percent; and pay, 20 percent. U.S.

Merit Sys. Prot. Bd., *In Search of Highly Skilled Workers: A Study on the Hiring of Upper Level Employees from Outside the Federal Government* 3, 29–31 (Feb. 2008), https://perma.cc/575S-3Y6E. The Board concluded that a stable and secure job is a strong recruitment incentive and should be emphasized to attract high-quality applicants.

In reaching this conclusion, the Board emphasized that job security does not mean permanent tenure. It explained that federal employees remain subject to discipline and removal. What the government can offer, though, is employment that is "relatively stable" and governed by "employment practices that are fair." *Id.* at 30. For instance, Section 7513—the CSRA provision at issue in this case—permits removal for cause, promoting the efficiency of the service while also providing basic due process protections and the opportunity for Board review. *See* 5 U.S.C. § 7513.

Longstanding government data connects those procedural protections to a recruitment advantage. In a survey of agency personnel officials, 84.8 percent identified job security as a reason applicants accept federal employment and 78.7 percent identified it as a reason employees remain. Job security led every other favorable factor by more

than thirty percentage points. Officials attributed it to standard procedures and appeal rights that protect federal employees from summary dismissal. U.S. Gen. Accounting Off., GAO/GGD-90-117, *Recruitment and Retention: Inadequate Federal Pay Cited as Primary Problem by Agency Officials* 46–49, 72 (1990), https://perma.cc/SYP3-Y3ZN. Federal recruiters described protections against "being fired on the whim of a supervisor" as an important selling point to Department of Veterans Affairs nurse candidates, for instance. *Id.* at 49.

OPM's successive rulemakings on civil service protections and merit system principles also recognize the importance of stability and fairness to recruitment and retention. In 2024, after notice and comment, OPM found that eliminating protections for a category of career employees would sacrifice a federal competitive advantage in recruiting talent, namely "stable, fair, merit-based employment," and risk the loss of experienced personnel. *Upholding Civil Service Protections and Merit System Principles*, 89 Fed. Reg. 24982, 25040 (Apr. 9, 2024). When OPM rescinded the rule in 2026, it still acknowledged that due process procedures and appeal rights provide greater job security and that "[t]o the extent that employees value this

job security," eliminating them "would reduce the relative value of Federal employment." *Improving Performance, Accountability and Responsiveness in the Civil Service*, 91 Fed. Reg. 5580, 5641 (Feb. 6, 2026). The rules assign vastly different weight to competing concerns, but both recognize that the statutory due process protections have labor-market value. The Board's reasoning eliminates that value.

Even more concerning, the Government's Article II theory in fact may result in federal employees having *fewer* job protections than private employees. Private employers remain subject to federal antidiscrimination statutes and other laws that protect them from illegal employment practices. Under the Government's Article II theory, however, the President can fire federal employees at will, for any reason or for no reason, and there is nothing that Congress can do about it. Indeed, in other civil service litigation, the Government has argued this exact thing, invoking its Article II theory to contend that Title VII and the First Amendment cannot constrain removal of covered federal officers. *See* Pet'rs' Br. 13 (discussing the Government's arguments in *Nemer v. Blanche*, No. 1:25-cv-04170 (D.D.C.)). It is hard to imagine anyone wanting to enter a workplace where they have no protection

from discrimination and other patently illegal conduct. And it would be perverse if Article II were construed to prevent the President from standing on at least equal footing with private employers when trying to attract talented employees.

### B. Civil service protections allow the government to retain a qualified workforce

Recruitment begins the government's investment in the civil service and retention determines whether the public receives a return. Career employees learn statutory schemes, agency precedents, data systems, contracting rules, recurring factual problems, regulated industries, security protocols, and operational risks. Much of that knowledge is specific to an agency or program and accumulates over years. Non-merit pressures on the civil service hurt retention and federal expertise.

Political science research explains the stability required to invest in one's own career. Because much agency expertise is costly to acquire and has limited value outside a particular government program, uncertainty about future service reduces an employee's incentive to make that investment. *See* Sean Gailmard & John W. Patty, *Slackers and Zealots: Civil Service, Policy Discretion, and Bureaucratic*

*Expertise*, 51 Am. J. Pol. Sci. 873, 873–89 (2007). OPM drew the same conclusion from the research record in 2024. Stable career service encourages investment in expertise, while instability and politicization increase turnover and weaken incentives to develop it. 89 Fed. Reg. at 25041, 25044.

Government surveys show that perceived arbitrary or politicized action puts this stability and the government's investment in the civil service at risk. According to Board's 2021 Merit Principles Survey, among employees who reported no prohibited personnel practices and believed leaders would not tolerate unethical supervisors, only 12 percent intended to leave for another agency. By contrast, among employees who reported experiencing a prohibited personnel practice and believed leaders tolerated unethical supervisors, the figure more than tripled to 44 percent. U.S. Merit Sys. Prot. Bd., *Perceptions of Prohibited Personnel Practices: An Update* 38–40 (Feb. 2023), https://perma.cc/FJ6T-G6DZ. Nearly every agency representative the Board consulted regarded protection from prohibited personnel practices as important to recruitment and retention. *Id.* at 39–40.

A separate Board survey found similar retention pressure associated with perceived favoritism. U.S. Merit Sys. Prot. Bd., *Preserving the Integrity of the Federal Merit Systems: Understanding and Addressing Perceptions of Favoritism* iv, 3, 52–53 (Dec. 2013), https://perma.cc/CP7B-P8HA. Employees perceiving favoritism were more likely to plan to leave their work unit or agency. *Id.* at 52–53. They are also less likely to recommend their agency as a place to work. The Board observed that the recruiting harm from a negative employee recommendation is likely greatest among highly qualified applicants with other options. *Id.*

Peer-reviewed research explains why expertise is sensitive to politicization. A study of roughly 3,500 federal civil servants and executives found that perceived politicization was associated with greater intended exit and reduced investment in expertise, including less training, fewer professional seminars, and less consultation with outside experts. Mark D. Richardson, *Politicization and Expertise: Exit, Effort, and Investment*, 81 J. Pol. 878, 888 (2019), https://perma.cc/DNW9-HF7B. The study concludes that, "[i]n total, politicization reduces policy expertise in federal agencies by increasing

turnover and reducing investment in expertise among careerists who remain in the federal government."

Retaining experienced civil servants is vital for ensuring the effective operations of government. GAO has designated strategic human-capital management as a governmentwide high-risk area because skill gaps impede service delivery and results. In 2025, GAO found that human-capital problems contributed to 20 of the government's other 37 high-risk areas, including shortages associated with delayed disaster assistance, project failures, cost overruns, and accidents. U.S. Gov't Accountability Off., GAO-25-107743, *High-Risk Series: Heightened Attention Could Save Billions More and Improve Government Efficiency and Effectiveness* 272, 274–75 (2025), https://perma.cc/K6B5-SJ7U. The Board's decision, by further destabilizing recruitment and retention, would substantially exacerbate these human capital challenges, harming the American people and the President's ability to deliver for them.

### C. Statutory protections preserve accountability while improving the government's ability to compete for talent

Congress saw civil service protections as working hand in hand with employee accountability. Agencies must deploy employees efficiently and effectively, retain them based on performance, correct inadequate performance, separate those who cannot or will not improve, and protect employees from arbitrary action and partisan coercion. *See* 5 U.S.C. § 2301(b)(5), (6), (8). Chapters 43 and 75 provide the tools necessary to ensure that public servants remain accountable. Section 4303 authorizes reduction in grade or removal for unacceptable performance. Section 7513 authorizes adverse action "only for such cause as will promote the efficiency of the service." The Government has not shown that these tools are inadequate or that at-will employment is needed to improve workforce performance.

Section 7513 prescribes workable procedures. The agency gives written notice of the charges, allows a reasonable response, considers that response, issues a reasoned decision, and remains accountable on review for the ground it chose. 5 U.S.C. § 7513(b), (d). OPM explained in 2024 that a supervisor may use chapter 75 to remove an employee with

a history of unacceptable performance without first providing a performance-improvement period. 89 Fed. Reg. at 25039. Misconduct, insubordination, refusal to follow lawful direction, and deficient performance remain grounds for discipline. A difference in professional judgment, standing alone, need not be converted into misconduct.

The experience of States with at-will employment systems undermines any claim that easier removal necessarily produces better performance. A 2026 review of six States found that fewer than 20 percent of surveyed human-resources professionals thought at-will employees were more productive. Nearly one-third of respondents across the States reported occasions when the system had been used to dismiss a competent employee for reasons unrelated to performance. Chris Piper, *At-Will Employment: What the Federal Government Can Learn from States* 4, 14–18, Partnership for Pub. Serv. (Jan. 2026), https://perma.cc/2VMG-EPCD. This data counsels against equating fewer procedures with a stronger workforce.

Congress selected a personnel framework that balances managerial authority to remove employees for work-related reasons while giving applicants confidence that the authority will be exercised

through a merit-based process. The federal government is well positioned to offer that assurance. A precedent disrupting this balance may expand formal discretion in the short term but diminishes the talent and expertise available to carry presidential direction into effect.

## II. Statutory Due Process Protection Facilitate Candor and Expertise

Expertise has value only if it reaches the officials who make decisions. Whether the federal government is confronting an emerging infectious disease, a regional conflict, a major wildfire, or administration of a complex statutory program, political leaders need career specialists to identify relevant facts, legal constraints, operational limits, and risks that may complicate a preferred course. Political leadership remains entitled to choose among lawful options, but the quality of decisionmaking depends on access to accurate facts and candid professional judgments. Statutory due process protections facilitate the unvarnished sharing of these facts and judgments.

### A. Candid career advice gives officials the information needed to exercise control.

The Supreme Court has recognized that public employees are often "the members of a community who are likely to have informed and

definite opinions" as to the operations of government and "are often in the best position to know what ails the agencies for which they work." *Lane v. Franks*, 573 U.S. 228, 240 (2014) (quoting *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (plurality opinion)). An accountable official can revise a subordinate's analysis, reverse an adjudicative decision where law permits, or choose a different policy. But the official cannot make an informed choice if material facts and professional objections never travel upward.

As the Supreme Court recognized in *United States v. Nixon*, which concerned confidentiality of presidential communications, executive decisionmaking depends on an environment in which advisers can offer "candid, objective, and even blunt or harsh opinions" before a decision is made. 418 U.S. 683, 708 (1974). Decisionmaking improves when subordinates can state the facts, identify risks, and test assumptions before leadership chooses a course.

As OPM explained in the last administration, career personnel give political appointees objective analyses of existing programs and educated views in carrying out their duties, without fear of reprisal or loss of employment. 89 Fed. Reg. at 24983, 25037. That contribution

helps incoming administrations understand the programs they have been elected to direct. OPM further found that a more politicized environment would chill objective analysis and frank views across the service, impairing the advice available to leadership. *Id.* at 25037.

Organizational research identifies the same lesson outside the civil-service context. Employees often withhold relevant concerns when they believe speaking up may damage their careers or relationships with supervisors, while perceived safety promotes upward communication and organizational learning. *See* Elizabeth W. Morrison, *Employee Voice and Silence*, 1 Ann. Rev. Org. Psych. & Org. Behav. 173, 193 (2014). A personnel system impacts not only the legal processes surrounding a removal but the everyday incentives that shape what employees feel comfortable disclosing in the performance of their duties.

### B. Statutory protections protect candor without displacing lawful supervision.

Merit system principles promote candor by protecting employees against arbitrary action, personal favoritism, partisan coercion, and reprisal for lawful disclosures. 5 U.S.C. § 2301(b)(8)(A)–(B). The prohibited personnel practice provisions protect employees who disclose information they reasonably believe shows illegality, gross

mismanagement, gross waste, abuse of authority, or a substantial danger to health or safety, and those who exercise specified appeal and grievance rights. *Id.* § 2302(b)(8)–(9).

The Board has explained the government interest served by those protections. Whistleblowers facilitate efficient and effective administration by surfacing violations, waste, abuse, and dangers that leadership needs to correct. Fear of reprisal chills those reports. U.S. Merit Sys. Prot. Bd., *The Merit System Principles: Guiding the Fair and Effective Management of the Federal Workforce* 63–66 (Sept. 2016).

State experience again illustrates this. In the 2026 surveys described above, nearly 30 percent of Mississippi HR directors said at-will employment discouraged reports of wrongdoing, and nearly 40 percent said it discouraged employees from freely voicing objections or differing opinions. Partnership for Pub. Serv., *supra*, at 20–22.

The chill extends beyond whistleblowing. A government lawyer who identifies litigation risk, a scientist who describes uncertainty, or an adjudicator who applies precedent evenhandedly may not be reporting gross waste or illegality. Each may simply provide professional advice leadership would prefer not to hear. When

continued employment can turn on whether that advice pleases the current decisionmaker, self-censorship becomes rational. Section 7513 and other statutory protections reduce that pressure by requiring a work-related ground for an adverse action and a regular merit-based process.

A personnel system that invites subordinates to conceal error and suppress unwelcome expertise leaves accountable officials with broader nominal discretion and less reliable command of their agencies.

## III. Statutory Due Process Protections Preserve Continuity of Service Delivery Across Administrations

A foundational feature of American government is that its core functions continue from one administration to the next. A career civil service, one that does not change wholesale from one administration to the next, is the reason why.

Each time an administration changes hands, a President appoints up to 4,000 political appointees, individuals who help carry out a President's policy priorities and change from one administration to the next. Many of the highest-level political appointees require Senate confirmation, which means that it often takes weeks or months before they are confirmed to their appointed position. But even for those

positions which are not subject to advice and consent, filling them is a daunting task for any President, and it is well documented that vacancies have negative effects on agency performance and national security.[2]

The good news for incoming administrations—and the good news for the American people—is that the federal government is primarily staffed by career civil servants who ensure that the work of government continues during Presidential transitions. This is exactly the system that Congress designed. In the Presidential Transition Act, Congress recognized that "[t]he national interest requires that such transitions in the office of President be accomplished so as to assure continuity in the faithful execution of the laws and in the conduct of the affairs of the Federal Government, both domestic and foreign." 3 U.S.C. § 102, Notes Sec. 2. Moreover, "[a]ny disruption occasioned by the transfer of the executive power could produce results detrimental to the safety and well-being of the United States and its people." *Id.* Career civil servants

[2] *See, e.g.*, Chris Piper, *Taking stock of the vacancy crisis across cabinet departments*, Partnership for Pub. Serv., Blog (April 25, 2024), https://perma.cc/KGH9-CAF9; Partnership for Pub. Serv., *Unconfirmed: why reducing the number of senate-confirmed positions can make government more effective* (Aug. 9, 2021), https://perma.cc/8BJN-AAEX.

carry out the will of Congress; they continue to execute and implement government programs, perform their duties without interruption, serve as acting office heads, and prepare incoming administrations with the information they need to lead.

Consider, then, how damaging it would be if there was not reliable continuity in the civil service during the transition from one administration to the next. The government would effectively grind to a halt. The Department of Justice could stop prosecutions of dangerous criminals. The Department of Agriculture could cease meat inspections. Iraq war veterans could no longer be able to access their benefits. National parks could close to the public. The Treasury Department might default on the nation's debts. Commercial air travel would become riskier. The examples of harm to the American people are near limitless.

These consequences may sound extreme, but nothing about them is especially far-fetched. This is the result of the Government's radical Article II theory: if the President has unbridled authority to fire career civil servants, it requires no leap at all to imagine a (vindictive) President doing just that. A President who disagrees with his successor

on immigration might terminate ICE agents en masse; a president who disagreed with his successor on matters of environmental regulation might similarly act to preemptively cripple EPA.

That is not a system that best serves the American people. Nor is it a system that would ensure the incoming President would be positioned to discharge his own duty to "take Care that the Laws be faithfully executed." Art. II, § 3. Because Presidents can only carry out their constitutional responsibility if the work of the American government continues from one administration to the next, civil service protections promote, rather than inhibit, core Article II values. This Court should uphold them and reverse the Board's decision.

## CONCLUSION

Statutory due process protections give the Executive Branch a workforce recruited on merit, retained on performance, able to offer candid expertise, and prepared to carry lawful presidential direction across administrations. They also allow for discipline and removal for deficient performance, misconduct, insubordination, and other cause promoting the efficiency of the service. That design advances the President's duty to take care that the laws are faithfully executed.

The Court should reverse the decision of the Merit Systems Protection Board.

Dated: July 28, 2026

Respectfully submitted,

*/s/ Michael C. Martinez*
Michael C. Martinez
Webb Lyons
Elena Goldstein
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
mmartinez@democracyforward.org

**CERTIFICATE OF COMPLIANCE**

This brief complies with Federal Rule of Appellate Procedure 29(a)(5), Federal Circuit Rule 29(b), and the Court's June 17, 2026 order because it contains 4554 words excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This certificate complies with Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3). This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: July 28, 2026

/s/ *Michael C. Martinez*
MICHAEL C. MARTINEZ

## CERTIFICATE OF SERVICE

I certify that on July 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court using the Court's CM/ECF system, which will send notice of filing to all registered CM/ECF users.

Dated: July 28, 2026

*/s/ Michael C. Martinez*
MICHAEL C. MARTINEZ