**2026-1575**

# United States Court of Appeals for the Federal Circuit

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners,*

– v. –

MERIT SYSTEMS PROTECTION BOARD,

*Respondent,*

DEPARTMENT OF JUSTICE,

*Intervenor.*

*On Petition for Review from the Merit Systems Protection Board Docket No. CF-0752-26-0069-I-1*

**BRIEF OF *AMICI CURIAE* LEGAL SCHOLARS CATHERINE L. FISK, NOAH A. ROSENBLUM, KATHERINE SHAW IN SUPPORT OF PETITIONERS URGING REVERSAL**

ARON FISCHER
GREGORY L. DISKANT
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Counsel for Amici Curiae*

JULY 28, 2026

COUNSEL PRESS
A Proceed Service
The Appellate Experts®
(800) 4-APPEAL • (394983)

# CERTIFICATE OF INTEREST

Counsel for amici curiae certifies that:

1. The full names of every entity represented by undersigned counsel are

   Catherine L. Fisk
   Noah A. Rosenblum
   Katherine Shaw

2. The names of any real party in interest for the represented entities are

   N/A

3. The parent corporations and every publicly held corporation that own 10 percent or more of the stock of the entities are

   N/A

4. The names of all law firms, partners, and associates that have not entered an appearance in the appeal, and (A) appeared for the entity in the lower tribunal; or (B) are expected to appear for the entity in this court, are

   N/A

5. The related or prior cases, other than the originating case number(s), that meet the criteria under Federal Circuit Rule 47.5 are

   N/A

6. The organizational victims in criminal cases and debtors and trustees in bankruptcy cases are

   N/A

Dated: July 28, 2026

/s/ *Aron Fischer*
Aron Fischer

# TABLE OF CONTENTS


INTEREST AND IDENTITY OF AMICI CURIAE .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

ARGUMENT .......... 2

I. Civil Service Protections Have Deep Roots in U.S. History and Tradition .......... 2

A. Protections for Executive Branch Officials and Employees Have Existed Since the Early Days of the Republic .......... 2

B. In the Mid-Nineteenth Century, the Spoils System Took Root in the Absence of Congress Asserting its Prerogative to Impose Civil Service Protections .......... 7

C. Late-Nineteenth Century Civil Service Reform Built on the Founding Era and Early-Nineteenth Century Precedents to Strengthen Civil Service Protections and Uproot the Spoils System .......... 8

II. The Civil Service Embodies a Constitutional Settlement to Address Corruption and Enhance State Capacity .......... 10

A. All Three Branches of Government Concurred in the Constitutional Principles Undergirding Civil Service Reform .......... 10

B. The Constitutionality of Civil Service Protections Is Settled History .......... 16

III. Civil Service Promotes the Energetic, Accountable Presidency of Article II .......... 19

A. The Presidents That Established Civil Service Protections Recognized That a Professional Civil Service Enhances Executive Energy .......... 21

B. Civil Service Reform Led to Measurably More Administrative Capacity That the President Could Wield .......... 24

C. Civil Service Protections Remain Consistent with the Supreme Court's Recent Article II Precedents ....27

CONCLUSION ....30

CERTIFICATE OF COMPLIANCE ....31

APPENDIX ....1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Collins v. Yellen*,
594 U.S. 220 (2021) .......... 31

*Ex parte Curtis*,
106 U.S. 371 (1882) .......... 12, 13, 14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .......... 30

*Kendall v. United States*,
37 U.S. (12 Pet.) 524 (1838) .......... 13

*Oklahoma v. U.S. Civ. Serv. Comm'n*,
330 U.S. 127 (1947) .......... 19

*Seila Law LLC v. Consumer Fin. Protection Bureau*,
591 U.S. 197 (2020) .......... 20

*Trump v. Cook*,
No. 25A312, 2026 WL 1855613 (U.S. June 29, 2026) .......... 20

*Trump v. Slaughter*,
609 U.S. __, No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026) .......... 20, 21, 29

*Trump v. United States*,
603 U.S. 593 (2024) .......... 28

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
413 U.S. 548 (1973) .......... 19

*United Pub. Workers v. Mitchell*,
330 U.S. 75 (1947) .......... 19

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) .......... 30, 31

*United States v. Perkins*,
116 U.S. 483 (1886) .......... 17, 18

**Statutes**

Act of August 12, 1790, ch. 47, § 2, 1 Stat. 186, 186 ........ 2

An Act Concerning the District of Columbia, ch. 15, 2 Stat. 103, § 11 (1801) ........ 3

An Act Establishing a Mint, and Regulating the Coins of the United States, ch. 16, 1 Stat. 246, § 18 (1792) ........ 7

An Act to Incorporate the Inhabitants of the City of Washington, in the District of Columbia, ch. 53, 2 Stat. 196, § 5 (1802) ........ 3

An Act to Lay and Collect a Direct Tax, ch. 75, 1 Stat. 597, § 11 (1798) ........ 4

An Act to Provide a National Currency, ch. 58, 12 Stat. 665 (1863) ........ 9

Lloyd-La Follette Act 37 Stat. 555 (1912) ........ 15

Pendleton Act, ch. 27, 22 Stat. 403, (1883) ........ 10, 14

**Regulations**

8 C.F.R. § 1003.1 ........ 31

**Legislative Materials**

1 Annals of Cong. 408 (1789) (Joseph Gales ed., 1834) (statement of Rep. Baldwin) ........ 5

14 Cong. Rec. 273 (Dec. 14, 1882) ........ 14, 15

**Other Authorities**

Abhay Aneja & Guo Xu, *Strengthening State Capacity: Civil Service Reform and Public Sector Performance during the Gilded Age*, 114 Am. Econ. Rev. 2352 (2024) ........ 25, 26

Aditya Bamzai & Peter M. Shane, *The Removal Question: A Timeline and Summary of the Legal Argument*, 78 Stan. L. Rev. Online 64 (2025), https://www.stanfordlawreview.org/online/the-removal-question-a-timeline-and-summary-of-the-legal-arguments/ ........ 7

Ari Hoogenboom, *Outlawing the Spoils: A History of the Civil Service Reform Movement 1865-1883* (1968) .......... 8

Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 Am. Hist. Rev. 301 (1959) .......... 24, 25, 26

Catherine A. Fisk, *Democracy and a Nonpartisan Civil Service*, 67 Ariz. Law Rev. 629 (2025) .......... 4, 8, 15, 16, 24

Christine Kexel Chabot*, Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022) .......... 5

Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1 (2020) .......... 3

Civ. Serv. Comm'n, 13 Op. Att'ys Gen. 516, 524 (1871) .......... 11

*The Civil Service, Opinion of Attorney-General Akerman*, N.Y. Times (Sept. 8, 1871) .......... 12

The Federalist No. 68 .......... 21

The Federalist No. 70 .......... 21

Harold H. Bruff, *Balance of Forces: Separation of Powers Law in the Administrative State* (2006) .......... 5

Jane Manners & Lev Menand, *The Power to Remove For Cause*, 136 Y.L.J. (*forthcoming*) (last rev. Mar. 18, 2026), https://ssrn.com/abstract=6303960 .......... 9, 12

Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1 (2021) .......... 3

Katherine Shaw, *Partisan Creep*, 118 Nw. U. L. Rev. 1563 (2024) .......... 8

Leonard D. White, *The Federalists: A Study in Administrative History* (1959) .......... 3, 4, 5, 6, 8

Letter from Rutherford Hayes, Accepting the Republican Party Nomination for Presidency of the United States (July 8, 1876) .......... 23

Merit Systems Protection Board, *What is Due Process in Federal Civil Service Employment?* (May 2015), http://mspb.gov/studies/studies/What_is_Due_Process_in_Federal_Civil_Service_Employment_1166935.pdf ....................16

Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 Stanford Law Rev. 823 (2025) ....................26, 27, 28

Paul P. Van Riper, *History of The United States Civil Service* (1958)............*passim*

*Report of the U.S. Civil Service Commission*, S. Ex. Doc. 42-10 (Dec. 19, 1871) ....................9

Robert Post, *Tension in the Unitary Executive: How Taft Constructed the Epochal Opinion of* Myers v. U.S., 45 J. Sup. Ct. Hist. 163, 183 (2020) ....................29

Ronald N. Johnson & Gary D. Libecap, "Replacing Political Patronage with Merit: The Roles of the President and the Congress in the Origins of the Federal Civil Service System" in *The Federal Civil Service System and The Problem of Bureaucracy* (1994) ....................23

Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877-1920* (1982)....................22, 23, 24

Theodore Roosevelt, *The Present Status of Civil Service Reform,* The Atlantic (Feb. 1895) ....................24

## INTEREST AND IDENTITY OF AMICI CURIAE[1]

Professors Catherine L. Fisk, Noah A. Rosenblum, and Katherine Shaw are legal scholars who have studied and published scholarship on the history and constitutional status of civil service protections. They have an interest in drawing the Court's attention to historical information germane to this appeal. Additional information about amici is included as an appendix to this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The modern civil service is the bedrock of the executive branch. Characterized by a professional, nonpartisan workforce with statutory employment protections, it provides the President with the experienced and skilled personnel necessary to effectuate government policy. The civil service as we know it was created nearly one hundred and fifty years ago on the basis of precedents dating back to the Founding. It helped address corruption in the workforce and expand government capacity—goals that were widely shared by officeholders and members of the public alike. The reform was successful and accepted as an appropriate exercise of legislative power. Presidents not only accepted but actively embraced the civil service, which was blessed by the courts, cementing its place as a longstanding

[1] No counsel for a party authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund its preparation or submission. No person, other than the amici curiae, their members, or their counsel, contributed money that was intended to fund preparing or submitting the brief.

constitutional settlement. Elaborated long before the New Deal, it remains on all fours with the Court's recent Article II jurisprudence, including in particular its embrace of the "chain of dependence" theory of executive branch organization.

## ARGUMENT

### I. CIVIL SERVICE PROTECTIONS HAVE DEEP ROOTS IN U.S. HISTORY AND TRADITION

#### A. Protections for Executive Branch Officials and Employees Have Existed Since the Early Days of the Republic

The modern civil service's removal regime includes three components: (1) insulation from removal at will, (2) removal for cause, and (3) a process for evaluating and determining cause beyond the President. All three components trace back to the infancy of the American republic.

Insulation from at will removal existed by law as well as norm. Several statutes in the early republic created commissions or officers that did not serve at the pleasure of the President. Most famously, in August 1790, the First Congress established the Sinking Fund Commission, a five-member board vested with the power to purchase up to $400 billion of debt in today's dollars. Two of its five members—then-Vice President John Adams and Chief Justice John Jay—*could not* be fired by the President. Act of August 12, 1790, ch. 47, § 2, 1 Stat. 186, 186. Hamilton, a member of the commission and a staunch proponent of a strong Executive, proposed the commission and expressed no skepticism regarding the

constitutionality of the non-removable members. *See* Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 3-4 (2020).

Other statutes set terms for office without including removal provisions. Justices of the Peace in Washington D.C., for example, served a five-year term that did not include any removal permissions. *See* An Act Concerning the District of Columbia, ch. 15, 2 Stat. 103, § 11 (1801). Likewise, the Mayor of Washington, D.C., was appointed for a one-year term without any statutory provision for removal. *See* An Act to Incorporate the Inhabitants of the City of Washington, in the District of Columbia, ch. 53, 2 Stat. 196, § 5 (1802). Such term-of-years tenures were understood to restrict removal before the end of the term. *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and the Statutory Limits of Agency Independence*, 121 Colum. L. Rev. 1, 18 (2021).

The norms of the federal workforce reinforced these statutory insulations. The early political parties—"Federalists and Republicans"—"agreed that removals [of civil servants] should be made only for cause." Leonard D. White, *The Federalists: A Study in Administrative History* 285 (1959). Reflecting this common understanding, James Sullivan, a lawyer and Democratic-Republican politician from Massachusetts who was involved in that state's convention to ratify the U.S. Constitution, observed that "[t]o remove men from office, for their having their own

opinions, is a species of tyranny of which we have loudly complained." *Id.* at 285 n.79 (quoting 2 Thomas C. Amory, *Life of James Sullivan* 94 (1859)).

Early presidential administrations observed this "for cause" principle. Between 1789 and 1829, even absent congressional action, the "tenure in most of the civil service was de facto during good behavior" rather than at will. Catherine A. Fisk, *Democracy and a Nonpartisan Civil Service*, 67 Ariz. Law Rev. 629, 631 (2025) (quoting David H. Rosenbloom, *Federal Service and the Constitution: The Development of the Public Employment Relationship* 36 (1971)). Removals of inferior officers and employees were infrequent during President Washington's tenure, and "[r]emoval for political reasons was unknown during" his "eight years of … service as President." White, *supra*, at 285-87. During the Washington administration, removal was only for reasons of "character or efficiency." Paul P. Van Riper, *History of The United States Civil Service*, 19 (1958).

Statutes also reflect this for cause standard. The 1798 Act to Lay and Collect a Direct Tax, for example, vested the power to remove collectors in those collectors' supervisors, and only for "good and sufficient cause." *See* ch. 75, 1 Stat. 597, § 11. More generally, Congress structured the Treasury as a whole to guard against corruption, increase efficiency, and limit direct presidential control. *See* Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129, 155-56 (2022); Harold H. Bruff, *Balance of Forces: Separation of Powers Law in the*

*Administrative State* 36 (2006). It limited removal of the Comptroller of the Treasury, and also established separate offices of "Comptroller, Auditors, Register and Treasurer" with the intention of limiting the Treasury Secretary's authority and making the Treasury "safe." Chabot*, supra, Interring the Unitary Executive*, at 155; Bruff, *supra*, at 36. These checks against corruption were also intended to allow "great improvements ... in the business of revenue." 1 Annals of Cong. 408 (1789) (Joseph Gales ed., 1834) (statement of Rep. Baldwin).

Congress and the President both developed and accepted ways of implementing these removal structures outside of direct presidential control. With respect to inferior officers and employees, President Washington generally respected the "full responsibility" of the heads of departments to superintend the affairs of their respective organizations, and did not seek to remove their subordinates: "[I]t is not agreeable to me to go into detail of business with any except the head of the Department to which it belongs, or thro' him with the immediate Agent." White, *supra*, at 30 (quoting John C. Fitzpatrick, *The Writings of George Washington* XXXII, 417-18 (1931-1944)).

Beyond these informal restrictions on at will removal, Congress passed and Presidents signed numerous laws to guard against corruption in the executive branch and promote effective government. A number of these laws limited presidential removal power in some manner, and none of these schemes were controversial.

The Judiciary Act of 1789, enacted by the First Congress, created the office of the marshal in each judicial district and permitted the marshal to appoint one or more deputies. White, *supra*, at 411. The marshal was an officer appointed by the President with advice and consent of the Senate. *Id.* The Judiciary Act imposed a four-year term on the marshal and expressly provided for removal at the pleasure of the President. *Id.* By contrast, the deputies were inferior officers—appointed by the marshal—with their removal not vested in the President, but with the district and circuit court judges. *Id.* No issue was raised with this arrangement, even though the marshals and their deputies undoubtedly wielded executive power and "quickly became the handy men of the federal administration." *Id.* They took "the first and second censuses," "hire[d] jails for federal prisoners," and "collect[ed] fines and enforce[d] jail sentences" in addition to other duties. *Id.*

In the same vein, the Coinage Act of 1792, which created the Mint, specified that the tenure of the Mint's officers turned on the integrity and quality of the coinage they produced. The sufficiency of the coinage was to be judged by the Chief Justice, the Secretary for the Department of State, the Secretary and the Comptroller of the Treasury, and the Attorney General, who would certify any negative findings to the President. The employee, upon such certification, would be deemed to have been fired. This effectively vested the removal power in an independent commission, which would make its decision on the basis of merit pursuant to a technical

examination. *See* An Act Establishing a Mint, and Regulating the Coins of the United States, ch. 16, 1 Stat. 246, § 18 (1792); *see also* Aditya Bamzai & Peter M. Shane, *The Removal Question: A Timeline and Summary of the Legal Argument*, 78 Stan. L. Rev. Online 64 (2025), https://www.stanfordlawreview.org/online/the-removal-question-a-timeline-and-summary-of-the-legal-arguments/.

All the key removal features of the modern civil service thus find strong precedents in the Founding Era. Early republic statutes, drafted by Congress and signed by the President, attempted to protect government functions and jobs from corruption, waste, and inefficiency through insulation from at will removal, the embrace of a for cause standard, and the use of processes that the President did not control. That ambition was not constitutionally controversial and was echoed in nineteenth century civil service reform efforts. These various structures—with no indication of attendant controversy—demonstrate that congressional limitations on removal of inferior officers and employees were seen as constitutionally permissible during the Founding Era.

### B. In the Mid-Nineteenth Century, the Spoils System Took Root in the Absence of Congress Asserting its Prerogative to Impose Civil Service Protections

Although Presidents in the early Nineteenth Century continued to observe various protections for federal employees, removals for political reasons began to grow over time. *See* White, *supra,* at 287-88; Van Riper, *supra*, at 21-26. Under

President Andrew Jackson's administration, firing government employees for purely partisan reasons became commonplace. Fisk, *supra*, at 651; Ari Hoogenboom, *Outlawing the Spoils: A History of the Civil Service Reform Movement 1865-1883*, at 6 (1968)). Although some degree of partisan hiring or firing had been a feature in other administrations, the Jackson administration allowed the "spoils system" to take hold. *See* Katherine Shaw, *Partisan Creep*, 118 Nw. U. L. Rev. 1563, 1573 (2024).

During this period, the ideal of efficiency in administration gave way to an epidemic of patronage. "[P]arty service was recognized as a reason for appointment to office, and party dissent as a cause for removal." Van Riper, *supra*, at 23. Political parties rewarded their supporters based on loyalty, not skill. These office holders were typically either beholden to their political, rather than public, obligations or were entirely unqualified for the positions to which they had been appointed. *Id.*; Hoogenboom, *supra*, at 8. Widespread patronage resulted in massive government waste, corruption, and inefficiency. *See Report of the U.S. Civil Service Commission*, S. Ex. Doc. 42-10 (Dec. 19, 1871), at 4-5, 8; Van Riper, *supra*, at 19.

### C. Late-Nineteenth Century Civil Service Reform Built on the Founding Era and Early-Nineteenth Century Precedents to Strengthen Civil Service Protections and Uproot the Spoils System

During and after the Civil War, Congress began to reassert its authority to regulate executive branch officials by taking steps to limit removals for purely political reasons. It created a new bureau within the Treasury department whose

head, the Comptroller of the Currency, was insulated from direct presidential control: the statute initially required the concurrence of the Senate for removal, *see* An Act to Provide a National Currency, ch. 58, 12 Stat. 665-66 (1863), but it was quickly changed to a different scheme, in which the President was required to inform the Senate of the reasons for removal. *See* Jane Manners & Lev Menand, *The Power to Remove For Cause*, 136 Y.L.J. (*forthcoming*), 16 (last rev. Mar. 18, 2026), https://ssrn.com/abstract=6303960.

By the 1870s, public sentiment was beginning to turn against the "spoils system" that had characterized appointments since the Jackson Administration. *See* Van Riper*, supra*, at 537. The 1881 assassination of President James Garfield by a disappointed office seeker proved the necessary catalyst for comprehensive reform.

The Pendleton Act, passed in 1883, established competitive civil service examinations for federal workers (at first, only a small subset of workers) and protected these workers from political retribution. The Act provided that "no person in the public service is … under any obligations to contribute to any political fund, or to render any political service," and guaranteed that federal workers "will not be removed or otherwise prejudiced for refusing to do so." Pendleton Act, ch. 27, 22 Stat. 403, § 2. Federal employers were also prohibited from "coerc[ing] the political activity of any person or body." *Id.*

## II. THE CIVIL SERVICE EMBODIES A CONSTITUTIONAL SETTLEMENT TO ADDRESS CORRUPTION AND ENHANCE STATE CAPACITY

### A. All Three Branches of Government Concurred in the Constitutional Principles Undergirding Civil Service Reform

In the years before the Pendleton Act became law, legislators, executive branch officials, and the courts each considered the constitutionality of a civil service with some measure of independence and insulation from partisan political influence. When civil service reform ultimately became the law of the land, it embodied a constitutional settlement through which the spoils system and its attendant corruption could be uprooted, and state capacity and government efficiency increased, without encroaching on the constitutional authority of the Presidency. Contemporaneous analyses from all three branches of government reflect a shared understanding that civil service reform, as ultimately embodied in the Pendleton Act and later reforms, was consistent with the Executive's constitutional prerogatives.

In 1871, a little more than ten years before the Pendleton Act became law, Congress passed its first attempt at civil service reform legislation, under which President Ulysses S. Grant formed the first Civil Service Commission (the "Commission"). The 1871 law and the Commission laid the groundwork for "much that is today considered fundamental to modern governmental personnel administration." Van Riper, *supra*, at 69. Amid questions about the constitutionality of the then-novel agency, the Commission asked President Grant's Attorney

General, Amos T. Akerman, to opine on the constitutional limits of the Commission's authority. Akerman's analysis concluded that Congress could constitutionally require that civil servants meet certain qualifications without impinging on the President's appointment powers:

> Though the appointing power alone can designate an individual for an office, … Congress can prescribe the qualifications and require that the designation be made out of a class of persons ascertained by proper tests to have those qualifications ….

Civ. Serv. Comm'n, 13 Op. Att'ys Gen. 516, 524 (1871).

Akerman noted that even for officers of the United States, "Congress could require that officers shall be of American citizenship of a certain age, that judges should be of the legal profession and of a certain standing in the profession, and still leave room to the appointing power for the exercise of its own judgment and will." *Id.* at 524-25. Akerman's opinion was so important that it was printed in full in the New York Times on September 8, 1871.[2]

The gravamen of Akerman's view—that the legislature has a constitutional role in delineating who may serve in the civil service—was echoed by the Supreme Court eleven years later in *Ex parte Curtis*, 106 U.S. 371 (1882). In *Ex parte Curtis*, General Newton M. Curtis, a treasury department employee, challenged his

[2] *The Civil Service, Opinion of Attorney-General Akerman*, N.Y. Times at 5 (Sept. 8, 1871), https://timesmachine.nytimes.com/timesmachine/1871/09/08/78773216.html?pageNumber=5.

conviction under an 1876 law that prohibited certain federal officers or employees from levying political assessments (*i.e.*, "requesting, giving to, or receiving from, any other officer or employe of the government any money or property or other thing of value for political purposes"). *Id.* at 371; *see* Van Riper, *supra*, at 90. Violation of the law was punishable by a fine and, importantly, removal from office. *Ex parte Curtis*, 106 U.S. at 371.

Addressing the constitutionality of this enactment, the Court listed a series of comparable laws, dating back to the founding, by which Congress had permissibly regulated "in some particulars the conduct of certain officers and employes of the United States." *Id.* at 372-73. The Court noted that prior enactments of this type had never been thought unconstitutional and stated that it was "clearly … within the scope of just legislative power" for Congress to pass laws to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Id.* at 373. The Court thus concluded that the law in question, and General Curtis's removal from government service for its violation, were constitutional. *Id.* at 375.

This was not a novel principle. In an earlier decision, the Supreme Court—upholding the jurisdiction of courts to issue writs of mandamus—observed that it "by no means follows, that every officer in every branch of [the executive] department is under the exclusive direction of the President." *Kendall v. United*

*States*, 37 U.S. (12 Pet.) 524, 610 (1838). While the Supreme Court acknowledged that "[t]here are certain political duties imposed upon many officers in the executive department, the discharge of which is under the direction of the President," the Court also noted that "it would be an alarming doctrine, that congress cannot impose upon any executive officer any duty they may think proper, which is not repugnant to any rights secured and protected by the constitution; and in such cases, the duty and responsibility grow out of and are subject to the control of the law, and not to the direction of the President." *Id.*

As the examples listed above illustrate, the Congress that passed the Pendleton Act was not writing on a blank slate. Rather, legislators were attuned to the potential constitutional pitfalls of civil service reform legislation. Accordingly, the debates that led to the adoption of the Pendleton Act—which were held over roughly two weeks and now fill "nearly 200 pages in the Congressional Record"—"thoroughly explored" "[t]he likely effects of the proposed legislation up on the constitutional position of the President and Congress" as well as other issues. Van Riper, *supra*, at 97 & n.3.

These constitutional considerations resulted in a law that struck a balance between the prerogatives of the Executive under Article II and the legislature's power to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service." *Ex parte Curtis*, 106 U.S. at 373.

Proponents of the Pendleton Act believed the drafters had struck this balance well and avoided any constitutional problems. For example, the Act included language that prohibited the removal of any member of the civil service for refusing to "contribute to any political fund" or "render any political service." Pendleton Act § 2. Even with this provision, Senator George F. Hoar commented during the debates over the Pendleton Act that the bill "does not assert any disputed legislative control over the tenure of office," rendering moot debates over "the President's power of removal." 14 Cong. Rec. 273, 274 (Dec. 14, 1882). Instead, Senator Hoar commented, the bill had been drafted to "take away every possible temptation to improper removals" by, for example, providing that even if a civil servant were removed, his or her replacement would have to come from a pool of applicants qualified by the nonpartisan exam system the bill provided for. *Id.* He believed that such measure in the law "substantially cure[d]" the "evil of unjust removal" of civil servants. *Id.* at 275.

Ultimately, the Pendleton Act passed with strong bipartisan support in both chambers: in the House of Representatives, 102 Republicans, 49 Democrats, and 4 Independents voted in its favor, and in the Senate, 23 Republicans, 14 Democrats, and 1 Independent voted in favor. Van Riper, *supra*, at 98 & n.4.

Following its enactment, Presidents readily implemented the directives of the Pendleton Act. By 1900, "less than twenty years after the law's passage, the civil

service covered nearly half of federal employees." Shaw, *supra*, at 1576. Presidents played a critical role in this process. Not only did Presidents reclassify numerous employees into the civil service, but they also pushed for further protections. In 1897, then-President William McKinley issued an executive order, which required "just cause" for the dismissal of any civil servant. *See* Fisk, *supra*, at 654. Subsequently, Congress codified removal protections in the 1912 Lloyd-La Follette Act, 37 Stat. 539, 555, which stated that "no person in the classified Civil Service of the United States shall be removed therefrom except for such cause as will promote the efficiency of the said service and for reasons given in writing." Shaw, *supra* at 1577; *see also* Merit Systems Protection Board, *What is Due Process in Federal Civil Service Employment?,* 5-6 (May 2015), http://mspb.gov/studies/studies/What_is_Due_Process_in_Federal_Civil_Service_Employment_1166935.pdf.

Congress enacted various other modifications to the protections for, and duties imposed upon, civil servants between 1912 and 1978, including the Hatch Act in 1939. Then, in 1978, President Jimmy Carter led a reform that resulted in the most sweeping changes to the Pendleton Act since its enactment. President Carter stated that his goals in advancing the reform effort were to "increase the government's efficiency by placing new emphasis on the quality of performance of Federal workers" and to "ensure that employees and the public are protected against political abuse of the system." Shaw, *supra* at 1577 (quoting Letter from Jimmy Carter to U.S

Cong. (Mar. 2, 1978), *reprinted by* The Am. Presidency Project, https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress)). Among other things, the Civil Service Reform Act of 1978 codified additional protections for civil servants and created the Merit Systems Protection Board to handle appeals of adverse employment actions against classified civil servants. Fisk, *supra*, at 659.

In short, in establishing, expanding, and modifying civil service protections over the last 150 years, each branch of government has made significant contributions to the constitutional settlement represented by the civil service today.

### B. The Constitutionality of Civil Service Protections Is Settled History

Shortly after enactment of the Pendleton Act, the Supreme Court considered for cause removal restrictions of inferior executive officers. In 1886, the Supreme Court adjudicated an appeal involving a claim by a Naval Academy graduate whom the Secretary of Navy discharged because upon graduation there was no vacancy in the naval service for the graduate to fill. *United States v. Perkins*, 116 U.S. 483, 483 (1886). The Naval Academy graduate challenged the discharge, asserting that his at will removal by the Secretary of Navy was contrary to a statute "provid[ing] that 'no officer in the military or naval service shall in time of peace be dismissed from service except upon and in pursuance of the sentence of a court-martial to that effect.'" *Id.* at 484. The Secretary of Navy asserted that "this restriction of the power

of removal is an infringement upon the constitutional prerogative of the executive." *Id.* Adopting the opinion of the court of claims, the Supreme Court rejected this view, holding that:

> [W]hen congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in congress to thus vest the appointment implies the authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed. The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress, and by such legislation he must be governed … in all that is incident thereto.

*Id.* at 485.

*Perkins* reflects the consensus view dating back to the Founding Era under which Congress has a constitutional prerogative to impose removal restrictions on inferior officers. *See supra* at 2-8. In the 150 years since *Perkins*, the Supreme Court has repeatedly reaffirmed this position. Even as the Supreme Court struck down certain statutory restrictions on the President's removal authority of a principal officer in *Myers v. United States*, the Court noted that the Constitution grants "Congress the power to limit and regulate removal of … inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them." 272 U.S. 52, 29 (1926) (citing *Perkins*, 116 U.S. at 485). In *Morrison v. Olson*, the Supreme Court affirmed the underlying principle in

*Perkins* by upholding the "for cause" removal restrictions for the inferior office at issue in that case. 487 U.S. 654 (1988). Justice Antonin Scalia's influential dissent went out of its way to acknowledge that "*Perkins* is in no way inconsistent with my views." *Id.* at 724 n.4 (Scalia, J. dissenting).

Other regulations of the civil service, such as the Hatch Act, have also withstood constitutional challenges. *See, e.g.*, *United Pub. Workers v. Mitchell*, 330 U.S. 75, 99 (1947) ("Congress and the President are responsible for an efficient public service. If, in their judgment, efficiency may be best obtained by prohibiting active participation by classified employees in politics as party officers or workers, we see no constitutional objection."); *Oklahoma v. U.S. Civ. Serv. Comm'n*, 330 U.S. 127, 129 n.1, 142-43 (1947). Since the inception of the modern civil service nearly 150 years ago, no constitutional challenge to removal restrictions or the limitations on political activities has proven successful.

From this lengthy development, it is clear that "the judgment of history, a judgment made by this country over the last century" is that "it is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service." *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557 (1973). As detailed above, the civil service, as it exists today, developed over a long period in a manner respecting each branch's view of the Constitution. Its development was informed by practices and

ideas dating to the Founding that were adapted to the realities of an executive branch that had expanded rapidly since that era. *See supra* at 2-8; *infra* at 22. The "longstanding historical practice and understanding" of a civil service that is insulated from partisan caprice, yet consistent with the President's Article II powers, is the bedrock on which the modern Presidency is built. *See Trump v. Cook*, No. 25A312, 2026 WL 1855613, at *17 (U.S. June 29, 2026) (Kavanaugh, J., concurring). At this point, the independent civil service represents a "special arrangement sanctioned by history" and no challenge to it can succeed without upsetting long-settled constitutional understanding. *Id.* at *14.

## III. CIVIL SERVICE PROMOTES THE ENERGETIC, ACCOUNTABLE PRESIDENCY OF ARTICLE II

At core, the Supreme Court's present jurisprudence on the President's removal power under Article II of the U.S. Constitution reflects the view that "an energetic executive" is "essential to the 'protection of the community against foreign attacks,' 'the steady administration of the laws,' 'the protection of property,' and 'the security of liberty,'" but that in wielding the awesome authority of the office the President must be "politically accountable"—"'a single object for the jealousy and watchfulness of the people.'" *Seila Law LLC v. Consumer Fin. Protection Bureau*, 591 U.S. 197, 223-24 (2020) (quoting The Federalist No. 70). According to the Supreme Court, this accountability requires that the President have the power to remove principal officers at will. *Trump v. Slaughter*, 609 U.S. __, No. 25-332, 2026

WL 1855612, at *9 (U.S. June 29, 2026) ("Only if the President's deputies were removable at will would … the President … be personally responsible for everything.") (internal quotation marks, citations, and emphasis omitted).

But although this view holds that the President "ha[s] plenary power to remove principal officers," it "does not require that [the President] have plenary power to remove inferior officers." *Morrison*, 487 U.S. at 724 n.4 (1988) (Scalia, J. dissenting). The position has never been that "every officer of the United States exercising any part of [the executive] power must serve at the pleasure of the President and be removable by him at will." *Id.* That "has never been the law." *Id*.

To the contrary, ensuring an energetic Presidency requires a workforce with civil service protections that ensure continuity, expertise, institutional knowledge, integrity, and efficiency. As Alexander Hamilton wrote in The Federalist No. 70, the "ingredients which constitute energy in the Executive are, first unity; secondly, duration; thirdly, an adequate provision for its support; fourthly, competent powers." Without a professional civil service insulated from capricious removal and patronage, it simply is not possible to ensure that the Presidency has "an adequate provision for its support" or that it has "competent powers." As Hamilton also observed, "the true test of a good government is its aptitude and tendency to produce a good administration." The Federalist No. 68.

### A. The Presidents That Established Civil Service Protections Recognized That a Professional Civil Service Enhances Executive Energy

Since the time of the Pendleton Act, Presidents have consistently recognized that civil service protections enhanced, rather than detracted from, the power of the Executive. At the end of the Nineteenth Century, executive branch employment was expanding rapidly. In 1871, the federal government employed 53,000 individuals in civilian services with expenditures under $300 million. *See* Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877-1920*, at 49 (1982). By 1901, the number of employees had increased fivefold and federal expenditures exceeded $1 billion. *Id.*

Under the earlier spoils system, the President did not control this burgeoning bureaucracy. It was the political parties and party leaders that exercised control. As Rutherford B. Hayes explained when accepting the Republican Party's nomination for President in 1876, under the spoils system:

> [T]he appointing power, in many cases, passed into the control of the members of Congress. The offices in these cases have become not merely rewards for party services, but rewards for services to party leaders. This system destroys the independence of the separate Departments of the Government; it tends directly to extravagance and official incapacity; it is a temptation to dishonesty; it hinders and impairs that careful supervision and strict accountability, by which alone faithful and efficient public service can be secured; it obstructs the prompt removal and sure punishment of the unworthy.

Letter from Rutherford Hayes, Accepting the Republican Party Nomination for Presidency of the United States (July 8, 1876).

Further, with the expanding bureaucracy, the spoils system threatened to sap the vitality from the Presidency. "[I]ncreases in the number of patronage positions raised the costs of negotiating and administering the distribution of the spoils and of monitoring the performance of patronage employees," forcing the President "to devote more and more time to the allocation and monitoring of patronage appointments, diverting attention from other executive duties." Ronald N. Johnson & Gary D. Libecap, "Replacing Political Patronage with Merit: The Roles of the President and the Congress in the Origins of the Federal Civil Service System" in *The Federal Civil Service System and The Problem of Bureaucracy* 13-14 (1994).

Civil service reform was, therefore, a way to "replace" those party controls with "independent executive controls." *Skowronek*, *supra*, at 179. Although his presidency predated the Pendleton Act, and his reform efforts were largely unsuccessful, President Hayes commented that in advancing civil service reform he "chiefly aimed … to break down Congressional patronage." Skowronek, *supra*, at 56. Hayes understood that party control of patronage threatened "executive independence" and "burdened" Presidents with "the never-ending task of reviewing the appointment recommendations of partisan supporters." *Id.* It is not surprising,

then, that once the Pendleton Act became law Presidents began reclassifying large swaths of the bureaucracy into merit-based, or "classified," civil service.

In the first decades after the Pendleton Act, the classification of executive branch officials as civil servants and the general expansion of the civil service was accomplished "by the action of successive Presidents under" the Pendleton Act "without the necessity of action by Congress." Theodore Roosevelt, *The Present Status of Civil Service Reform,* The Atlantic (Feb. 1895) at 240. These Presidents understood that "the civil service law is the most trenchant of weapons with which to fight political corruption, and the best device by which to secure good administration." *Id.* at 245. By the end of the Nineteenth Century, nearly half of all executive branch officials were placed in the civil service. Ari Hoogenboom, *The Pendleton Act and the Civil Service*, 64 Am. Hist. Rev. 301, 303 (1959).

Beyond wresting authority back from the party system and preventing corruption, Presidents benefited from the salutary effect that the civil service reforms had on the federal workforce. With short tenures in office under the spoils system, "there was no opportunity for advancement, and people were chosen for their loyalty to the elected official rather than for knowledge or skill relevant to their job." Fisk, *supra*, at 654. With the requirements and protections of the Pendleton Act in force, positions in the executive branch began to attract more qualified individuals. For example, between 1885 and 1896, "roughly one-quarter of those who passed clerk

and copyist examinations for appointment at Washington had some college training" at a time when college attendance was rare. Hoogenboom, *supra*, *The Pendleton Act*, at 312.

### B. Civil Service Reform Led to Measurably More Administrative Capacity That the President Could Wield

The early years of the expanding, newly professionalized bureaucracy were characterized by an increase in the efficiency and quality of government services. Scholars have examined, for example, the impact of civil service reform on the performance of the United States Postal Service, historically the "largest civilian agency within the federal government." Abhay Aneja & Guo Xu, *Strengthening State Capacity: Civil Service Reform and Public Sector Performance during the Gilded Age*, 114 Am. Econ. Rev. 2352, 2353 (2024). Using historical performance and personnel records of the Postal Service, the authors of that study found that civil service protections improved the quality of the Postal Service via a significant reduction in delivery errors and increased productivity from 1883 to 1901. *Id.* at 2383-84. The study demonstrated that the enactment of the Pendleton Act in 1883 and the expansion of Pendleton to cover the post offices in smaller cities in 1893 led to a reduction of reported delivery errors of between 19 and 22 percent. *Id.* at 2354, 2367-69. The addition of more qualified postal employees, rather than patronage hires, not only improved the quality of service: it also led to a more efficient and productive Postal Service. *Id.* at 2369-70. Measured either by volume per carrier

(that is, the number of letters delivered by each mail carrier) or the cost incurred by the Postal Service per unit delivered, civil service reform gave many cities throughout the nation a vastly improved and more cost-effective government service. *Id.*

Further, for the Postal Service employees themselves, "civil service reform led to a significant reduction in turnover and more stable careers." *Id.* at 2384. This empirical study confirms contemporaneous accounts of the same period, in which supervisory officials noted an increase in morale among employees covered by civil service protections. Hoogenboom, *supra*, *The Pendleton Act*, at 310-11.

A study looking at more recent measures of government efficiency has also observed benefits associated with civil service protections. *See* Nicholas R. Bednar, *Presidential Control and Administrative Capacity*, 77 Stanford Law Rev. 823 (2025). Considering data from a survey of federal executives involved in rulemaking, federal personnel records, and more than 5,000 rulemakings across the Presidencies of George W. Bush, Barack Obama, and Donald J. Trump, the study explored what effect "administrative capacity" has on the ability of Presidents to pursue their agendas through agency rulemaking. *Id.* at 824.

The study defines "administrative capacity" as "an agency's prospective ability—not its willingness—to complete tasks delegated to it by the President and Congress," which is influenced by factors such as "expertise and experience of the

workforce, the material resources available to the agency, and the processes that promote efficiency and teamwork within the agency." *Id.* at 848. In other words, administrative capacity encompasses many of the elements that civil service protections are intended to foster in the executive branch workforce, including expertise, experience, and efficiency.

The study noted a correlation between administrative capacity and the ability of Presidents to initiate and complete agency rulemaking. *Id.* at 881-902. Further, the study observed a positive relationship between administrative capacity and independence, which in turn suggests a "*negative* correlation between presidential control and capacity." *Id.* at 908. Accordingly, increasing presidential control "may erode capacity by eliminating structures that preserve [agency] autonomy" and in turn may "*weaken* the President's ability to implement their agenda in agencies that suffer from capacity constraints." *Id.* Although some level of presidential control is necessary lest the President find "themselves incapable of directing the agency's policy making activities," too much control undermines administrative capacity leaving Presidents "incapable of promulgating policy through rulemaking." *Id.* at 912-13.

At bottom, the empirical research bears out the intuition of early presidential proponents of civil service reform: on the whole, the civil service—inclusive of its protections—tends to increase Executive energy and provide Presidents with support

and power to pursue their chosen policies. In fact, permitting a President to hollow out the civil service would undermine the Framers' desire for an energetic Executive as it would do a grave disservice to the President's successors, who will need to rely on the administrative capacity of the civil service. When considering the constitutional dimensions of the separation of powers, the aim is "to protect not the President himself, but the institution of the Presidency." *Trump v. United States*, 603 U.S. 593, 632 (2024).

### C. Civil Service Protections Remain Consistent with the Supreme Court's Recent Article II Precedents

Because civil service protections are longstanding features of the executive branch that tend to increase Executive energy, there is little difficulty in reconciling such protections with the Supreme Court's current precedents regarding the Article II powers of the Presidency. Indeed, *Myers*, the fountainhead of the current jurisprudence regarding the removal of executive branch officers, drew an analytical distinction between the removal restriction of a post-master, an officer of the United States appointed by the president and confirmed by the Senate and the "Civil Service Act of 1883," 272 U.S. at 173, which protected, *inter alia*, postal workers. Even while invalidating the removal restriction that required Senate consent before removing a post-master, Chief Justice Taft spoke approvingly of the removal restrictions in the Pendleton Act to address "[t]he evil of the spoils system" because those restrictions are "in respect to inferior offices." *Id.* Taft noted that "when

appointments were vested in the heads of departments to which they belong," as opposed to the President with the advice and consent of the Senate, "they could be entirely removed from politics" and from at will removal by the President. *Id.* at 174; *see also* Robert Post, *Tension in the Unitary Executive: How Taft Constructed the Epochal Opinion of* Myers v. U.S., 45 J. Sup. Ct. Hist. 163, 183 (2020).

More recently, the Supreme Court has repeatedly indicated that removal restrictions for inferior officers (not to mention employees) are permissible so long as the officers ultimately report to—and their decisions are reviewable by—someone who is removable by the president. *See Slaughter*, 2026 WL 1855612, at *9 (noting that "the chain of dependence [can] be preserved" if the President has the power of removal) (quoting 1 Annals of Cong. 499 (Rep. Madison)).

In *United States v. Arthrex, Inc.*, the Supreme Court considered an appeal of a decision by the administrative patent judges ("APJs") on the Patent Trial and Appeal Board. 594 U.S. 1, 6 (2021). The patentholder challenged a decision invalidating one its patents on the grounds that the APJs were unconstitutionally appointed because their decisions were unreviewable and because they possessed "for cause" removal protections. *Id.* at 10. The court below had agreed with the patentholder and struck down the tenure protections for APJs. *Id.* But the Supreme Court fashioned a different remedy. Noting that the Executive derives "its power through 'a clear and effective chain of command' down from the President," *id.* at

11 (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010)), the Supreme Court vacated the lower court's decision invalidating the tenure restrictions and instead required that decisions of the APJs be reviewable by the Director of the Patent and Trademark Office. *Id.* at 27.

In *Kennedy v. Braidwood Management, Inc.*, the Supreme Court again explicated the principle that appointments (and removal restrictions) are permissible so long as they "preserve the chain of political accountability that was central to the Framers' design of the Appointments Clause." 606 U.S. 748, 794 (2025). The Court explained that "[a]t-will removal is one means of ensuring supervision and direction" but another is whether the officer has the "power to render a final decision … without review by" another officer. *Id.* at 765. "If an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will." *Id.*

Civil service protections, including those afforded to Appellants, are entirely consistent with these principles. Although civil servants may not be removed at will, their decisions are subject to review by a superior who reports to the President. Immigration judges are a case in point. Although cloaked in the protection of the civil service laws, their decisions are reviewable by the Board of Immigration Appeals and the Attorney General, who serves at the pleasure of the President. *See* 8 C.F.R. § 1003.1. Because "disobeying an order is generally regarded as 'cause' for

removal," *Collins v. Yellen*, 594 U.S. 220, 256 (2021), through the chain of accountability, the President's policies can still be implemented consistent with the Constitution's design.

## CONCLUSION

For the forgoing reasons, amici urge the Court to reverse the decision of the Merit Systems Protection Board.

July 28, 2026

Respectfully submitted,

*/s/ Aron Fischer*
Aron Fischer
Gregory L. Diskant
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
Phone: (212) 336-2000
afischer@pbwt.com
gldiskant@pbwt.com

*Counsel for amici curiae Catherine L. Fisk, Noah A. Rosenblum, and Katherine Shaw*

[3] Messrs. Fischer and Diskant wish to acknowledge the assistance of their colleagues Andrew Kirschenbaum, Stephanie Sofer, and Isaac Weingram in preparing the brief.

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because, excluding those items listed as exempted under the Federal Rules of Appellate Procedure and Federal Circuit Rules, the filing has been prepared using a proportionally-spaced typeface and includes 6,964 words.

July 28, 2026

*/s/ Aron Fischer*
Aron Fischer

## APPENDIX

Catherine L. Fisk is the Barbara Nachtrieb Armstrong Distinguished Professor of Law at the University of California, Berkeley where she teaches courses on labor and employment law, the legal profession, and civil procedure. Professor Fisk has six books in print and two in press and has won book prizes from the American Society of Legal History and the American Historical Association. Her articles have been published in the *California Law Review*, *Stanford Law Review*, *University of Chicago Law Review*, *Law and History Review*, and many other law reviews and scholarly journals. Among her recent scholarship is an article on the history and functions of the nonpartisan civil service.

Noah A. Rosenblum is an Associate Professor of Law at New York University School of Law and a Senior Fellow at the Moynihan Center. He is also a faculty affiliate of NYU's Department of History. Professor Rosenblum works primarily in administrative law, constitutional law, and legal history. His research takes a historical approach to the study of state institutions, seeking to understand how law can be used to promote democratic accountability. His academic writing has appeared in the *Harvard Law Review*, *Columbia Law Review*, and *Yale Law Journal*, among other venues, and has received several awards, including the ABA's Award for Scholarship in Administrative Law and the AALS's Fred C. Zacharias Award in Legal Ethics.

Katherine Shaw is a Professor of Law at the University of Pennsylvania Carey Law School. Professor Shaw primarily teaches courses on constitutional law, administrative law, and legislation. Her academic work focuses on executive power, the law of democracy, the Supreme Court, and reproductive rights and justice. Professor Shaw's scholarship has appeared in the *Harvard Law Review*, *Columbia Law Review*, *Georgetown Law Journal*, *Cornell Law Review*, *Michigan Law Review*, and *Texas Law Review*, among other places. From 2025-2026 she was a Crane Fellow in Law and Public Policy at Princeton's School of Public and International Affairs. She is currently a Senior Fellow of the Administrative Conference of the United States and a member of the American Law Institute.