**No. 26-1575**

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners*

v.

MERIT SYSTEMS PROTECTION BOARD,

*Respondent*

DEPARTMENT OF JUSTICE,

*Intervenor*

**Petition for Review of the Merit Systems Protection Board**
**Docket No. CF-0752-26-0069-I-1**

# BRIEF OF THE FEDERAL CIRCUIT BAR ASSOCIATION AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY

Sandra Kuzmich
PRESIDENT, FEDERAL CIRCUIT BAR ASSOCIATION

HAUG PARTNERS LLP
745 Fifth Avenue
10th Floor
New York, NY 10151-2503
(212) 588-0800

Jason L. Romrell
Alexander E. Harding
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Daniel C. Cooley
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Numbers:** No. 26-1575

**Short Case Caption:** Jackler v. MSPB

**Filing Party/Entity:** Federal Circuit Bar Association

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 7/28/2026

Signature: /s/ Jason L. Romrell

Name: Jason L. Romrell

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☒ None/Not Applicable |
| Federal Circuit Bar Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this **court** for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☒ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

## TABLE OF CONTENTS

STATEMENT OF INTEREST ........................................................................ 1

INTRODUCTION ........................................................................................ 3

ARGUMENT ................................................................................................ 5

I. The Board's Jurisdictional Ruling Depends on Whether Article II Was the Basis for the Removals ........................................................................ 5

A. The Attorney General's Ordinary Authority Is Statutory ............................ 6

B. This Record Leaves an Open Question as to Whether the Attorney General Exercised Her Statutory Authority or the President's Article II Authority ........................................................................................ 11

C. Grounding Jurisdiction in the Contemporaneous Removal Record Provides an Administrable Rule ................................................................ 12

II. The Court's Review Depends on Independent and Predictable Adjudication ........................................................................................ 15

A. Reliable Adjudication Requires Neutral and Independent Adjudicators ........................................................................................ 15

B. The MSPB's Factors Recur Across Adjudicative Systems Reviewed by This Court ........................................................................................ 18

III. Other Circuits Have Developed Useful Guideposts for Adjudicator-Removal Questions ........................................................................ 20

A. The MSPB Relied on Three Factors in Concluding that Petitioners' Removal Protections Were Unconstitutional ............................................ 21

B. Other Courts Have Applied Similar Factors to Those Considered by the MSPB When Evaluating Removal Protections for Administrative Adjudicators ........................................................................ 22

C. Courts Distinguish Adjudicatory Functions from Policymaking Authority ........................................................................................ 23

D. Principal-Officer Review Can Preserve Accountability and Maintain Executive Oversight ........................................................................ 27

E. Courts Also Consider the Practical Restrictiveness of the Removal Standard ....... 30

CONCLUSION ....... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
567 U.S. 387 (2012)....................22

*Bowden v. Dep't of Veterans Affs.*,
13 F. App'x 924 (Fed. Cir. 2001).................... 31-32

*Burlington Truck Lines, Inc. v. United States*,
371 U.S. 156 (1962)....................9

*Butz v. Economou*,
438 U.S. 478 (1978)....................16

*Calcutt v. FDIC*,
37 F.4th 293 (6th Cir. 2022), *rev'd on other grounds*,
598 U.S. 623 (2023)....................23, 24, 28

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)....................13

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021)....................22, 23, 24, 26, 27-28, 30, 31

*Duenas v. Garland*,
78 F.4th 1069 (9th Cir. 2023)....................28, 29

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010).................... 8, 20, 23, 24, 25, 26, 30, 31, 32

*Hamblet v. Dep't of Just.*,
No. SF-0752-26-0020-I-2, 2026 WL 1684262
(MSPB June 2, 2026)....................20

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025), *cert. denied*, No. 25-1110
(U.S. June 30, 2026)....................26

*Jackler & Jaroch Consolidation v. Dep't of Just.*,
No. CF-0752-26-0069-I-1, 2026 WL 789485 (MSPB Mar. 20, 2026).................... 5, 8, 11, 12, 13, 15, 18, 21, 22, 23, 24, 25, 28, 29, 30

*Jarkesy v. SEC*,
34 F.4th 446 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024)..................................................................22, 23, 25, 27, 29

*Kennedy v. Braidwood Management, Inc.*,
606 U.S. 748 (2025)..........................................................................16, 17, 27

*Kochanny v. Bureau of Alcohol, Tobacco & Firearms*,
694 F.2d 698 (Fed. Cir. 1982) ..........................................................................32

*Leachco, Inc. v. CPSC*,
103 F.4th 748 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025)..........................................................................................23, 24

*Morrison v. Olson*,
487 U.S. 654 (1988)..........................................................................................31

*In re Murchison*,
349 U.S. 133 (1955)....................................................................................15, 16

*Myers v. United States*,
272 U.S. 52 (1926)..............................................................................................9

*Offutt v. United States*,
348 U.S. 11 (1954)............................................................................................16

*Rabadi v. U.S. DEA*,
122 F.4th 371 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025)..............................................................22, 24, 28, 29

*Space Expl. Techs. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) ......................................................................25, 29

*Swift & Co. v. Hocking Valley Ry. Co.*,
243 U.S. 281 (1917)............................................................................................9

*Trump v. Slaughter*,
No. 25-332, 2026 WL 1855612 (U.S. June 29, 2026).....................................7, 8

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ........ 17, 18, 27, 30

*United States v. Perkins*,
116 U.S. 483 (1886) ........ 7, 8

*Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*,
144 F.4th 1315 (11th Cir. 2025) ........ 22, 23, 24, 26, 28, 31

*Withrow v. Larkin*,
421 U.S. 35 (1975) ........ 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ........ 6-7, 9

**Constitutional Provisions**

U.S. Const. art. II, § 1, cl. 1 ........ 7

U.S. Const. art. II, § 2, cl. 2, Appointments Clause ........ 16, 27

**Legislative Materials**

157 Cong. Rec. 12984 (Sep. 6, 2011) ........ 17

**Statutes**

5 U.S.C. § 7513 ........ 12, 13

5 U.S.C. § 7513(a) ........ 31, 32

5 U.S.C. § 7513(b) ........ 31

5 U.S.C. § 7513(d) ........ 31

5 U.S.C. § 7521(a) ........ 31, 32

5 U.S.C. § 7701 ........ 19

5 U.S.C. § 7703 ........ 19

8 U.S.C. § 1101(b)(4) ........ 28

8 U.S.C. § 1229a(b)(1) ........ 21

19 U.S.C. § 1337(c) ........................................ 18

28 U.S.C. § 503 ........................................ 6

28 U.S.C. § 509 ........................................ 6

28 U.S.C. § 519 ........................................ 6

35 U.S.C. § 6 ........................................ 18

35 U.S.C. § 319 ........................................ 18

38 U.S.C. § 7104 ........................................ 19

38 U.S.C. § 7292 ........................................ 19

41 U.S.C. § 7105(e) ........................................ 19

41 U.S.C. § 7107(a)(1) ........................................ 19

Civil Service Reform Act ........................................ 1, 4, 6, 11, 29

Leahy-Smith America Invents Act ........................................ 17

Sarbanes-Oxley Act ........................................ 30

**Rules**

Federal Rule of Appellate Procedure 29(a)(4)(E) ........................................ 1

**Regulations**

8 C.F.R. § 1003.10(b) ........................................ 21

8 C.F.R. § 1241.1 ........................................ 30

19 C.F.R. § 210.42 ........................................ 18

**Other Authorities**

*Effect of the Patriot Act on Disclosure to the President & Other Fed. Offs. of Grand Jury & Title III Info. Relating to Nat'l Sec. & Foreign Affs.*, 2002 WL 35651318 (OLC July 22, 2002) ........................................ 10

## STATEMENT OF INTEREST

The Federal Circuit Bar Association (FCBA) is a national organization for the bar of the United States Court of Appeals for the Federal Circuit.[1] One of the FCBA's primary purposes is to serve as a forum for dialogue between members of the Federal Circuit bar and this Court. Members within the FCBA practice before the administrative adjudicators whose records and decisions form the foundation of this Court's appellate review. As the principal bar association of this Court, the FCBA has a direct interest in the independence and predictability of those administrative proceedings. The FCBA also has a direct interest in improving the administration of justice, including ensuring that the jurisdictional authority of administrative tribunals under this Court's review is clearly defined.

The FCBA submits this brief in support of neither party. It takes no position on the merits of Petitioners' removal, on the scope of the President's Article II authority, or on the constitutionality of for-cause protections provided by the Civil Service Reform Act (CSRA) as applied to immigration judges. The FCBA writes instead to offer a perspective uniquely its own on three critical points: (1) a

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae certifies that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no person—other than amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

threshold jurisdictional issue at the core of this case; (2) the practical importance of independent and predictable adjudication in the administrative proceedings that this Court reviews; and (3) the helpful guideposts provided by sister circuits navigating similar removal protections for administrative adjudicators.

Because the federal government is a party, FCBA members and leaders who are federal government employees have not participated in the FCBA's decision whether to participate as an amicus, or in preparation of this brief.

## INTRODUCTION

Every agency decision that this Court reviews begins somewhere else—typically in a hearing room before an administrative adjudicator who takes evidence, weighs credibility, and decides, in the first instance, what the record shows and what the law requires. The reliability of that first decision is what makes meaningful review possible. Although this case is framed as a dispute about the President's removal power, it also implicates the conditions under which those first decisions are made.

The Merit Systems Protection Board (MSPB) held that immigration judges may be removed at will under Article II because they exercise significant adjudicatory, administrative, and policymaking authority, and that the MSPB therefore lacked jurisdiction over Petitioners' appeals. Although the MSPB's holding concerns immigration judges, several features it treated as constitutionally significant—hearing authority, evidentiary control, potential finality, and consequential subject matter—also appear in other federal adjudicative systems, including systems under this Court's jurisdiction. That overlap underscores the importance of distinguishing among these features that may bear on the Article II analysis and the extent to which each informs whether specific statutory removal protections are constitutional.

The FCBA files in support of neither party to make three connected points.

***First***, before reaching the merits of the MSPB's constitutional analysis, this Court has an independent obligation to determine that the MSPB had the jurisdiction to consider whether Article II affords an absolute right to fire Petitioners here. Jurisdiction must be confirmed regardless of whether the parties raised it; jurisdiction cannot be waived or conceded. If the record does not support that these removals were in fact exercises of Article II authority, then the MSPB did not resolve the *as-applied* challenge it claimed to have decided but instead decided a *facial* one—precisely the challenge the MSPB acknowledged that it had no jurisdiction to entertain.

***Second***, to the extent this Court reaches the constitutionality of for-cause removal protections provided by the CSRA, courts have noted the importance of neutral and independent adjudicators who can decide cases on the law and the record, rather than with an eye toward the potential employment consequences of a particular outcome.

***Third***, the Court does not write on a blank slate, and its decision here may impact thousands of administrative adjudicators spread across multiple agencies. Over the past five years, the courts of appeals have repeatedly confronted removal protections for administrative law judges (ALJs). And their competing approaches to the very functional factors the MSPB invoked here supply useful guideposts for other administrative adjudicators, including the recognition that accountability and

supervision can be preserved through principal-officer review rather than at-will removal.

Each of these points reflects the FCBA's institutional stake in the soundness of the adjudicatory systems that feed this Court's docket. The Court can resolve this case in a way that balances independence and accountability in administrative adjudication without announcing a broad Article II rule that might have consequences for administrative adjudicators beyond the immigration bench.

## ARGUMENT

### I. The Board's Jurisdictional Ruling Depends on Whether Article II Was the Basis for the Removals

The MSPB determined that because "Article II abrogates the removal protections of 5 U.S.C. § 7513," it lacked the subject-matter jurisdiction to review Petitioners' removals. *Jackler & Jaroch Consolidation v. Dep't of Just.*, No. CF-0752-26-0069-I-1, 2026 WL 789485, at *6-10 (MSPB Mar. 20, 2026). That is, in determining that it ultimately lacked jurisdiction, the MSPB *first* determined that it had the jurisdiction to "resolve as-applied constitutional challenges" brought by the agency—here, whether Petitioners are subject to at-will Article II removal. *Id.* at *4-6. Yet the MSPB appears to have assumed the Article II premise rather than establishing it—the Board never determined whether these removals were, in fact, an exercise of Article II authority. Because the MSPB's Article II assumption was the linchpin of its jurisdictional holding, this Court may consider requiring the

MSPB to determine, in the first instance, whether Article II was actually invoked here.

### A. The Attorney General's Ordinary Authority Is Statutory

While the Attorney General is a principal officer, the office and its ordinary powers are statutory. Congress created the office, 28 U.S.C. § 503; outlined the appointment process, *id.*; vested the entire Department of Justice's (DOJ) power in the Attorney General, *id.* § 509; and assigned the Attorney General the responsibility to supervise any litigation involving the United States and the attorneys who represent the United States, *id.* § 519. Thus, not only does the Attorney General's authority rest in statute, but so does the authority of all DOJ personnel. The statute vests the entire DOJ's authority in the Attorney General, meaning that every subordinate officer's power flows from the Attorney General, whose power in turn flows from Congress. *Id.* § 509. While DOJ staff may be employees of the executive branch, their mandate and the terms under which they serve flow from Congress. Therefore, a removal undertaken through DOJ's ordinary personnel authority is typically governed by the statutes Congress supplied, including the CSRA where it applies.

The distinction between Article II removal power and statutory removal power is supported by a long line of separation-of-powers precedents. As the Supreme Court articulated in *Youngstown Sheet & Tube Co. v. Sawyer*, "[t]he President's

power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." 343 U.S. 579, 585 (1952). But federal employees or officers—however senior—cannot independently invoke Article II authority. Only *the President* can draw upon the constitutional source because the Constitution vests the executive power in him alone. *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, at *5 (U.S. June 29, 2026) ("[T]he Framers decided to vest '[t]he executive Power' in one person . . . ." (second alteration in original) (quoting U.S. Const. art. II, § 1, cl. 1)). As Justice R. Jackson explained, if the President wants to act against Congress, "he can only rely upon *his own* independent powers." *Youngstown*, 343 U.S. at 637 (R. Jackson, J., concurring) (emphasis added).

The Attorney General is not the President and thus has no independent constitutional authority. If she acts without some form of presidential directive, she can only exercise whatever powers Congress has assigned to her subject to Congress's limitations on those powers. Regarding removal power specifically, the Attorney General has "no constitutional prerogative . . . *independent*[] of the legislation of congress." *United States v. Perkins*, 116 U.S. 483, 485 (1886) (emphasis added). In other words, the Attorney General's removal authority generally comes from Congress. Department heads must listen to Congress "not only in making appointments, but in all that is incident thereto"—including removal. *Id.*

In *Perkins*, the Supreme Court recognized that Congress may restrict principal officers from removing inferior officers at will, even if it cannot restrict the President from firing his more proximate subordinates. *Id.*; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) ("This Court has determined, however, that [the President's] authority [to remove officers] is not without limit. . . . [I]n *United States v. Perkins* . . . , the Court sustained similar restrictions on the power of principal executive officers . . . to remove their own inferiors."); *cf. Slaughter*, 2026 WL 1855612, at *7 (explaining that those officers who "derive their offices from [the President's] appointment" "must be removable by the President" (citation omitted)). Despite recent decisions acknowledging the Executive's removal powers for principal officers, the Court has not abandoned the distinction between the President's *constitutional* authority and a department head's *statutory* authority. Even in *Slaughter*, the Court avoided "determin[ing] the fate of officials not before us," including "non-Article III courts." 2026 WL 1855612, at *18 (citation omitted). The distinction remains intact.

This distinction is important because the MSPB appears to have presumed that the DOJ's removal of Petitioners was, in fact, an exercise of Article II removal authority on behalf of the President. The Board held that "for any removal *taken pursuant to Article II authority* . . . , the Constitution prohibits the [MSPB] from reviewing any aspect of the removal." *Jackler*, 2026 WL 789485, at *7 (emphasis

added). That conclusion, however, cannot be assumed in the absence of evidence of a presidential directive on record.

To be sure, Article II power *may* be exercised through subordinates: the President "must execute [the laws] by the assistance of subordinates." *Myers v. United States*, 272 U.S. 52, 117 (1926). But the asserted power must "stem either from an act of Congress or from the Constitution itself." *Youngstown*, 343 U.S. at 585. Here, the removal letters did not invoke a presidential directive, and the record suggests DOJ mistakenly viewed Petitioners as probationary. *See* Appx94; Appx101; Appx208-210; Appx254-256; Appx362.

*Burlington*'s rule against "appellate counsel's *post hoc* rationalizations" counsels against treating DOJ's Article II characterization as self-proving. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) (noting that agency action must be upheld, "if at all, on the same basis articulated in the order by the agency itself"). Nor does Petitioners' apparent agreement on that issue settle that premise. *See Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289 (1917). Before allowing that characterization to eliminate MSPB jurisdiction, the Court may consider requiring evidence that Article II authority *actually was* exercised when the removals occurred.

The MSPB's assumption of Article II implies that any removal action taken by an executive officer automatically falls under Article II. However, on any given

day, many removal actions are carried out by officials several layers removed from the President, often without his knowledge. An employee may be removed by a supervisor, a division chief, or a human-resources official. It is hard to imagine that such actions automatically count as exercises of the President's personal Article II removal power just because these are employees within the executive branch.[2] Even if this Court assumes that removals made by principal officers may in some circumstances derive from Article II direction, the question remains whether the challenged removals were taken on that basis, or instead under ordinary statutory personnel authority. An administrable approach would focus on the contemporaneous removal record: before Article II is treated as displacing statutory removal protections, the record should objectively identify Article II authority as the basis for the action.

This Court need not decide the outer limits of presidential removal authority unless the contemporaneous record shows that Article II authority was actually invoked. The source of authority determines the applicable legal regime. *See infra*

[2] *Cf. Effect of the Patriot Act on Disclosure to the President & Other Fed. Offs. of Grand Jury & Title III Info. Relating to Nat'l Sec. & Foreign Affs.*, 2002 WL 35651318, at *2 (OLC July 22, 2002) ("[The President] may delegate that authority to others—including by an oral direction—but officials such as the Attorney General may not exercise an inherent constitutional power of the President to disclose such information to others without some direction from the President.").

Section I.C. Without the directive, Article II may be inapposite, and this Court only needs to ask whether the agency acted in accordance with the statute.

### B. This Record Leaves an Open Question as to Whether the Attorney General Exercised Her Statutory Authority or the President's Article II Authority

The MSPB did not identify anything in the contemporaneous removal record showing that DOJ invoked Article II authority when removing Petitioners. It did not find that the removal notices cited Article II, identify a presidential directive, or otherwise distinguish these removals from ordinary personnel actions taken under DOJ's statutory authority. *Jackler*, 2026 WL 789485, at *2-3; *see also* Appx94; Appx101; Appx208-210; Appx254-256; Appx362.

While possible that the DOJ acted on instruction from the President instead of its own statutory authority, the record leaves that question open. Documents disclosed by the government indicate that DOJ officials mistakenly treated Petitioners as probationary employees not covered by CSRA, which would have, if correct, left them terminable at will even absent Article II. Appx208-210; Appx254-256; Appx362; Pet. Br. 13. Whether this case actually involves a deliberate exercise of Article II authority is therefore not immediately apparent from the current record.

### C. Grounding Jurisdiction in the Contemporaneous Removal Record Provides an Administrable Rule

Determining whether Article II is implicated bears directly on the MSPB's ability to reach the constitutional question here. If Petitioners were subjected "to at-will Article II removal," then the MSPB "must dismiss their appeal for lack of jurisdiction because 5 U.S.C. § 7513 . . . cannot constitutionally apply to that employee." *Jackler*, 2026 WL 789485, at *9. The key word is "apply." Throughout the opinion, the MSPB insisted that it was only considering § 7513 *as applied* to Petitioners. And the MSPB framed its holding that way, emphasizing that § 7513 could not constitutionally apply to *these* employees because of Article II. *Id.* at *5. Indeed, the MSPB itself recognized that it could not hear facial challenges to statutes. *Id.* at *3, *4 n.5.

The MSPB's characterization of the agency's defense as "as applied" leaves unresolved the separate question of whether applying § 7513 in these cases would, in fact, constrain an actual exercise of Article II removal authority. The MSPB framed its jurisdictional rule in terms of removals "taken pursuant to Article II authority." *Id.* at *7. But it made no finding that Petitioners' removals *were* undertaken pursuant to such authority, rather than DOJ's ordinary statutory personnel authority. Without that finding, the MSPB had not established the predicate necessary to conclude that applying § 7513 here *would* interfere with Article II. If Petitioners' removals were not in fact exercises of Article II authority,

the MSPB's ruling would not be tied to the particular application that it said it had authority to adjudicate; the ruling would instead appear to rest on the broader proposition that § 7513 cannot constitutionally govern the removal of immigration judges—a proposition more characteristic of the facial challenge the MSPB said was not before it.

It is not enough that the government classified its own challenge as "as applied." As the MSPB itself said, an agency cannot "deprive the Board of jurisdiction over an adverse action *merely* by invoking Article II authority." *Id.* at *9 (emphasis added). Determining whether a challenge is as applied or facial "goes to the breadth of the *remedy* employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (emphasis added).

A narrow and administrable rule is available. Before Article II can be invoked to displace § 7513 or any other statutory removal restrictions as applied, the MSPB should determine whether the agency's contemporaneous removal record identifies Article II authority as the basis for the challenged action. That inquiry remains faithful to constitutional structure without inviting collateral litigation over subjective intent. It is also entirely consistent with the MSPB's recognition that agency invocation of Article II authority alone is insufficient to defeat jurisdiction. *Jackler*, 2026 WL 789485, at *9.

Determining as a threshold matter whether Article II authority was in fact invoked would allow this Court to avoid unnecessary constitutional determinations. The MSPB's decision here may have broader implications for the separation-of-powers doctrine, immigration judges, and potentially other administrative adjudicators. *See infra* Section II. Yet this Court need not reach those questions if the record does not clearly establish that Article II removal authority was used in the first place. If it remains an open question whether the Attorney General was acting according to presidential directive or some other statutory power, then this Court may wish to resolve that issue before considering the broader constitutional questions presented in this case.

The FCBA has a direct interest in the administrability of this Court's decisions. As the practitioners before this Court and the agencies under its review, FCBA members depend on predictable and clear rules grounded in sound jurisdictional authority. This Court may not need to decide the broad question of removal protections for administrative adjudicators and Article II authority now. It only needs to decide what the MSPB did not: whether the contemporaneous record supplies an objective basis for treating the removals as Article II removals before deciding questions of broader constitutional consequence.

## II. The Court's Review Depends on Independent and Predictable Adjudication

To the extent this Court reaches the MSPB's constitutional analysis, this case also implicates a more basic feature of the adjudicative process. The Federal Circuit reviews decisions by adjudicators, who should be able to decide cases according to law and the record without fear of removal for a legally correct, but unwelcome, decision. That is the FCBA's core institutional concern—not job protection per se, but the integrity of adjudication by tribunals that this Court reviews and before which FCBA members regularly practice.

The MSPB's decision here treated immigration judges' adjudicatory powers, the practical significance of their decisions, and the possibility that those decisions may become final if unreviewed as reasons for why ordinary civil-service protections cannot constitutionally apply. *See Jackler*, 2026 WL 789485, at *8-9. Those features are not unique to immigration judges; they are common features of administrative adjudication generally.

### A. Reliable Adjudication Requires Neutral and Independent Adjudicators

The Supreme Court has long recognized that adjudication requires neutrality, both in reality and appearance. "[A] 'fair trial in a fair tribunal is a basic requirement of due process.'" *Withrow v. Larkin*, 421 U.S. 35, 46 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). And because adjudication depends on

public confidence, "justice must satisfy the appearance of justice." *In re Murchison*, 349 U.S. at 136 (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).

Those principles apply with special force to administrative adjudicators. In *Butz v. Economou*, the Court explained that federal hearing examiners and administrative law judges perform acts "functionally comparable" to those of judges. 438 U.S. 478, 513 (1978). The Court emphasized that the "modern federal hearing examiner or administrative law judge" exercises "independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency." *Id.* That independence is not an affront to executive government. It is part of the adjudicatory design Congress has repeatedly chosen when assigning executive-branch officers to decide individual cases.

Recent Appointments Clause decisions reflect the same understanding. In *Kennedy v. Braidwood Management, Inc.*, the Supreme Court described Congress's longstanding practice of allowing inferior-officer adjudicators in the executive branch to make "initial, independent decisions" subject to later review by a superior officer. 606 U.S. 748, 774-75 (2025). Citing *Butz*, the Court again recognized that administrative adjudicators exercise independent judgment free from agency pressure. *Id.* at 774 (citing *Butz*, 438 U.S. at 513). The Court then described principal-officer review as the "almost-universal model of adjudication

in the Executive Branch" and the "standard way to maintain political accountability and effective oversight." *Id.* at 775 (quoting *United States v. Arthrex, Inc.*, 594 U.S. 1, 20, 25 (2021)).

That distinction matters. An adjudicator need not be beyond supervision, discipline, or review. At the same time, fair adjudication depends on confidence that case-specific outcomes will be addressed through ordinary review rather than employment consequences. *See, e.g.*, *Arthrex*, 594 U.S. at 38 (Gorsuch, J., concurring in part) (recognizing that patent holders are entitled to "a proceeding before a neutral and independent judge"); *id.* at 41 (Breyer, J., concurring in part) ("Given the technical nature of patents, the need for expertise, and the importance of avoiding political interference, Congress chose to grant the [administrative patent judges] a degree of independence.").[3] If important or policy-adjacent adjudication is enough to require at-will removal, then decisional independence may become vulnerable in precisely the cases where neutral adjudication matters most.

[3] *See also* 157 Cong. Rec. 12984 (Sep. 6, 2011) (statement of Sen. Jon Kyl) (noting that Congress's "overarching purpose" of the Leahy-Smith America Invents Act (AIA) was "to create a patent system that is clearer, *fairer*, *more transparent*, and *more objective*" (emphases added)).

### B. The MSPB's Factors Recur Across Adjudicative Systems Reviewed by This Court

The MSPB relied on features of immigration judging that are familiar across administrative adjudication. It emphasized that immigration judges conduct hearings, administer oaths, receive evidence, examine witnesses, issue subpoenas, and impose sanctions. *Jackler*, 2026 WL 789485, at *8. It also emphasized that their decisions may become final if not appealed, and that immigration adjudication can have important policy consequences. *Id.*

Those factors are not limited to immigration judges. They also appear in adjudicatory systems that are central to the Federal Circuit's work.

Start with administrative patent judges (APJs). They conduct adversarial proceedings, resolve evidentiary and procedural issues, and issue decisions in technically complex and high-stakes patent disputes that are reviewed by the Director and then by this Court. *See* 35 U.S.C. §§ 6, 319; *Arthrex*, 594 U.S. at 6-9 ("Billions of dollars can turn on a Board decision."), 25-26. And their decisions may become final if not appealed. Similarly, International Trade Commission (ITC) ALJs conduct evidentiary hearings and issue initial determinations in Section 337 proceedings, subject to ITC and eventual Federal Circuit review. *See* 19 U.S.C. § 1337(c); 19 C.F.R. § 210.42. If the ITC declines review, and the result is not appealed to this Court, their decisions may become final. MSPB administrative judges (AJs) develop records and issue initial decisions that may be

reviewed by the Board and then by this Court. *See* 5 U.S.C. §§ 7701, 7703. Judges of the Boards of Contract Appeals decide government-contract disputes that are reviewable in this Court. *See* 41 U.S.C. §§ 7105(e), 7107(a)(1). Veterans Law Judges (VLJs) decide veterans-benefits matters that may reach this Court on legal questions after review by the Court of Appeals for Veterans Claims. *See* 38 U.S.C. §§ 7104, 7292.

These examples do not mean that the outcome of *Jackler* will necessarily decide the removal status of all such adjudicators. After all, the governing statutes differ, the review structures differ, and the precise constitutional questions may differ. But these examples *do* show why precision matters before this en banc Court. If hearing authority, evidentiary control, independent judgment, potential default finality, or practical policy significance are treated as sufficient to transform neutral adjudication into policymaking authority requiring at-will removal, the same reasoning may be invoked for administrative adjudicators well beyond immigration judges.

This Court's review function depends on those adjudicators producing reliable records and reasoned decisions in proceedings that are both fair and perceived as fair. A rule that categorically equates consequential adjudication with executive policymaking may undermine that structure. A rule that distinguishes adjudication from policymaking—and maintains supervision by a principal officer—would

preserve both Article II accountability and the adjudicatory independence on which this Court's review depends.

## III. Other Circuits Have Developed Useful Guideposts for Adjudicator-Removal Questions

Within the last five years, several circuit courts have confronted the constitutionality of removal protections for administrative adjudicators.[4] In resolving this issue, circuit courts have repeatedly examined the functions and responsibilities exercised by those administrative adjudicators. And their conclusions provide useful benchmarks for this Court in reviewing the MSPB's constitutional analysis of removal protections for immigration judges.

The stakes are substantial.[5] As Justice Breyer recognized in *Free Enterprise Fund*, "the Federal Government relies on 1,584 ALJs to adjudicate administrative matters in over 25 agencies." 561 U.S. at 542-43 (Breyer, J., dissenting). And there are thousands of non-ALJ administrative adjudicators across the government, including APJs, MSPB AJs, and VLJs. While these sister circuits have not spoken with one voice, their decisions collectively support a more nuanced inquiry than

[4] Most of these cases arose from parties challenging the authority of an ALJ to hear or resolve a particular issue rather than removal challenges like those in *Jackler*, which typically run through the MSPB.

[5] The MSPB has dismissed numerous cases without prejudice pending resolution of Petitioners' case here. *See, e.g.*, *Hamblet v. Dep't of Just.*, No. SF-0752-26-0020-I-2, 2026 WL 1684262 (MSPB June 2, 2026) (Initial Decision).

the MSPB employed—especially on whether Petitioners' particular adjudicatory functions should be treated as policymaking authority for Article II purposes.

### A. The MSPB Relied on Three Factors in Concluding that Petitioners' Removal Protections Were Unconstitutional

In concluding that Petitioners' removal protections were unconstitutional, the MSPB cited the "significant . . . authority" exercised by immigration judges, focusing on three main factors: (1) administrative (or adjudicatory) authority; (2) the degree of review and finality associated with their decisions; and (3) their policymaking authority. *Jackler*, 2026 WL 789485, at *8-9.

In determining that immigration judges exercise "significant . . . administrative authority," the MSPB pointed to the adjudicatory powers granted to them under 8 U.S.C. § 1229a(b)(1) and 8 C.F.R. § 1003.10(b). *Id.* at *8. The MSPB specifically cited immigration judges' authority to conduct hearings and proceedings, administer oaths, receive evidence, examine and cross-examine witnesses, and issue subpoenas and sanctions. *Id.*

The MSPB next emphasized the potential finality of immigration judges' decisions. *Id.* at *2, *8. The Board explained that although Petitioners' decisions were reviewable by the Board of Immigration Appeals (BIA) and the Attorney General, their "decisions were not subject to unlimited appellate review and *could* potentially become the final order of the United States if not appealed." *Id*. at *8 (emphasis added).

As for policymaking authority, the MSPB concluded that, “as immigration judges,” Petitioners “wielded vast administrative authority in an area of significant consequence.” *Id.* In the MSPB’s view, Petitioners’ decisions “can have a major impact on a significant area of our nation’s domestic and foreign policy” by affecting matters such as “trade, investment, tourism, and diplomatic relations.” *Id*. (quoting *Arizona v. United States*, 567 U.S. 387, 395 (2012)).

### B. Other Courts Have Applied Similar Factors to Those Considered by the MSPB When Evaluating Removal Protections for Administrative Adjudicators

This Court’s sister circuits have addressed the constitutionality of civil-service removal protections for inferior-officer ALJs. And many of the factors that they have considered are similar to the factors considered by the MSPB here, including: (1) the ALJ’s adjudicative functions; (2) the extent of the ALJ’s enforcement or policymaking authority; (3) the degree of review and finality associated with the ALJ’s decisions; and (4) the restrictiveness of removal protections at issue. *See, e.g.*, *Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*, 144 F.4th 1315, 1343-48 (11th Cir. 2025); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1129-36 (9th Cir. 2021); *Rabadi v. U.S. DEA*, 122 F.4th 371, 374-75 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 2846 (2025); *Jarkesy v. SEC*, 34 F.4th 446, 463-66 (5th Cir. 2022), *aff’d on other grounds*, 603 U.S. 109 (2024).

Although other circuits have examined many of the same considerations, they have differed in how they weigh each factor. The Ninth, Tenth, and Eleventh Circuits have generally emphasized the adjudicative nature of ALJs' duties and the availability of agency review. *See, e.g.*, *Decker Coal*, 8 F.4th at 1133; *Walmart*, 144 F.4th at 1343; *Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025). In contrast, the Fifth Circuit has placed greater emphasis on the finality of ALJs' decisions and their control over proceedings. *Jarkesy*, 34 F.4th at 464.

### C. Courts Distinguish Adjudicatory Functions from Policymaking Authority

The scope of adjudicatory function has been a core consideration across tribunals. The MSPB emphasized the policymaking authority of immigration judges to determine that their removal protections were unconstitutional. *Jackler*, 2026 WL 789485, at *8-9. But circuit courts upholding removal protections have noted that the fundamental role of various ALJs is to decide cases; they do not initiate enforcement actions or set policy. These circuit courts cited *Free Enterprise Fund* for the proposition that "ALJs 'perform adjudicative rather than enforcement or policymaking functions.'" *Calcutt v. FDIC*, 37 F.4th 293, 319 (6th Cir. 2022) (quoting *Free Enter. Fund*, 561 U.S. at 507 n.10), *rev'd on other grounds*, 598 U.S. 623 (2023). Consistent with that distinction, the Ninth, Tenth, and Eleventh Circuits contrasted ALJs who "cannot sua sponte initiate

investigations or commence a . . . case" with the Public Company Accounting Oversight Board (PCAOB) members at issue in *Free Enterprise Fund* who exercised policymaking and enforcement functions. *Decker Coal*, 8 F.4th at 1133; *Free Enter. Fund*, 561 U.S. at 504, 507 n.10; *Leachco*, 103 F.4th at 764; *see also Walmart*, 144 F.4th at 1322, 1343 (noting that Office of the Chief Administrative Hearing Officer (OCAHO) ALJs within the Executive Office for Immigration Review (EOIR) "cannot initiate investigations or bring an enforcement action").

Indeed, courts upholding removal protections have repeatedly characterized ALJs as performing a "purely adjudicatory function." *Decker Coal*, 8 F.4th at 1133; *Walmart*, 144 F.4th at 1343; *Leachco*, 103 F.4th at 764; *Rabadi*, 122 F.4th at 375. These decisions have focused on the ALJs' specific adjudicatory responsibilities, many of which are similar to the functions the MSPB identified for immigration judges in *Jackler*, 2026 WL 789485, at *2, *8. For example, the Eleventh Circuit observed that OCAHO ALJs issue subpoenas, rule on evidentiary matters, conduct settlement conferences, and resolve procedural motions—core adjudicative responsibilities. *Walmart*, 144 F.4th at 1343. Similarly, the Sixth Circuit observed that Office of Financial Institution Adjudication (OFIA) ALJs conduct adversarial hearings, receive and rule on the admissibility of evidence, certify the record of proceedings, and rule on motions. *Calcutt*, 37 F.4th at 302-03.

The Fifth Circuit has taken a different approach—it has framed similar adjudicatory duties as evidence of control over proceedings. For example, in *Jarkesy*, the Fifth Circuit observed that Securities and Exchange Commission (SEC) ALJs exercise "considerable power over administrative case records by controlling the presentation and admission of evidence" and "they may punish contemptuous conduct." 34 F.4th at 464; *see also Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 775 (5th Cir. 2025) (citing similar functions performed by National Labor Relations Board (NLRB) ALJs). While the Fifth Circuit ultimately concluded that the SEC ALJs' removal protections were unconstitutional, it did not characterize these functions as policymaking authority. *Jarkesy*, 34 F.4th at 464. Instead, the court emphasized that "even if ALJs' functions are more adjudicative than [the] PCAOB members" in *Free Enterprise Fund*, two layers of removal protections interfere with the President's Article II power. *Id.* at 464-65 (citing *Free Enter. Fund*, 561 U.S. at 507 n.10). And unlike the MSPB, none of the circuits treated an ALJ's authority to administer oaths as a factor in the analysis. *Jackler*, 2026 WL 789485, at *8.

The distinction between adjudication and policymaking makes a difference in cases like this. Adjudication involves resolving case-specific disputes between identified parties through routine adjudicatory functions. Policymaking generally involves setting enforcement priorities or establishing standards, functions

commonly associated with administrative board members. *Free Enter. Fund*, 561 U.S. at 484-85. Consistent with this distinction, the Eleventh Circuit observed that "to the extent that the outcomes of individual adjudications may ultimately shape policy, this is *incidental* to ALJs' function as adjudicators." *Walmart*, 144 F.4th at 1343 (emphasis added).

Notably, each of these sister-circuit decisions evaluated ALJs operating within a dual-layer removal scheme: ALJs could only be removed for cause, and MSPB members could only be removed by the President for cause. *Decker Coal*, 8 F.4th at 1129-31. But in *Harris v. Bessent*, the D.C. Circuit recently held that the for-cause removal protections applicable to principal-officer MSPB members are unconstitutional. 160 F.4th 1235, 1242, 1254-57 (D.C. Cir. 2025), *cert. denied*, No. 25-1110 (U.S. June 30, 2026). That is, the D.C. Circuit has now held that a second layer of removal protections at the MSPB level no longer exists.[6]

Because they predate *Harris*, the dual-layer removal structures considered by other circuits were more insulated from Article II than a potential single-layer structure post-*Harris*. To the extent the Ninth, Tenth, and Eleventh Circuits upheld ALJ removal protections despite the existence of dual-layer protections, their reasoning may provide stronger support for the constitutionality of a single-layer

[6] Although the D.C. Circuit's decision in *Harris* is not binding on this Court, it is the only circuit to have addressed removal protections for MSPB members.

regime. The same consideration may be relevant to the Fifth Circuit's analysis, which emphasized the constitutional significance of dual-layer removal protections. *Jarkesy*, 34 F.4th at 464.

### D. Principal-Officer Review Can Preserve Accountability and Maintain Executive Oversight

In *Arthrex*, the Supreme Court considered an Appointments Clause defect involving APJs. Instead of affirming this Court's elimination of statutory removal protections for APJs, the Supreme Court cured the violation by making APJs' decisions reviewable by the United States Patent and Trademark Office's (USPTO) Director, a principal officer. *Arthrex*, 594 U.S. at 10, 25. The Supreme Court recently reaffirmed the significance of principal-officer review in *Braidwood Management*, explaining that "[i]f an adjudicative officer's decisions are reviewable by a superior, then the officer may be considered inferior even if not removable at will." 606 U.S. at 765. Thus, both *Arthrex* and *Braidwood Management* recognize reviewability by a principal officer as an important mechanism for ensuring executive accountability. 594 U.S. at 15; 606 U.S. at 765.

Sister circuits have likewise treated supervision by the Attorney General or agency heads as constitutionally significant. Take *Decker Coal*, where the Ninth Circuit held that review of Department of Labor (DOL) ALJ decisions by Benefits Review Board (BRB) members who can "readily overturn an ALJ's decision" represents "meaningful control" over ALJs by the executive branch. 8 F.4th at

1134-35. Other circuits upholding removal protections have also relied, at least in part, on the fact that those ALJ decisions remained subject to review by principal officers or multimember boards. For example, OCAHO ALJ decisions are reviewable by the Attorney General, Office of Financial Institution Adjudication (OFIA) ALJ decisions are reviewable by the Federal Deposit Insurance Corporation (FDIC) Board, and Drug Enforcement Administration (DEA) ALJ decisions are subject to review by the DEA administrator. *Walmart*, 144 F.4th at 1343; *Calcutt*, 37 F.4th at 319; *Rabadi*, 122 F.4th at 375.

Here, immigration judges are inferior officers, and their decisions are "subject to review by both the Board of Immigration Appeals and the Attorney General." *Jackler*, 2026 WL 789485, at *8 (holding that immigration judges are inferior officers); *see also* Pet. Br. 14-15 (noting that "[b]efore the MSPB, the parties agreed that Jackler and Jaroch were inferior officers"); *Duenas v. Garland*, 78 F.4th 1069, 1073 (9th Cir. 2023) (holding that immigration judges are inferior officers). Moreover, immigration judges themselves "shall be subject to such supervision and shall perform such duties as the Attorney General"—a principal officer—"shall prescribe." 8 U.S.C. § 1101(b)(4).[7]

---

[7] The government's internal memoranda cite the Ninth Circuit's decision in *Duenas* for the proposition that a restriction on the Attorney General's removal of an inferior officer would be unconstitutional. Appx209 (citing 78 F.4th at 1069); Appx255 (citing same). *Duenas* held that the removal process for immigration

In holding removal protections unconstitutional, the Fifth Circuit acknowledged the reviewability of SEC ALJ and NLRB ALJ decisions by principal officers or multimember boards. That court, however, focused on the *potential* for the decision to become final if no review is sought. *Jarkesy*, 34 F.4th at 464 ("[O]ften[, SEC ALJ] decisions are final and binding."); *Space Expl. Techs.*, 151 F.4th at 775. In particular, the Fifth Circuit emphasized that NLRB ALJ decisions "become final . . . in not-uncommon circumstances." *Space Expl. Techs.*, 151 F.4th at 775.

The MSPB also recognized that immigration judges' decisions are subject to review by the BIA and the Attorney General, and that only those entities "are empowered to issue binding, precedential decisions." *Jackler*, 2026 WL 789485, at *8. Yet, similar to the Fifth Circuit approach, the MSPB concluded that those decisions "could still become the final decisions of the United States if not

---

judges "complies with Article II" because the petitioner had "identified no . . . limit on the Attorney General's ability to dismiss" them. 78 F.4th at 1074. The court did not address any statutory removal restriction, and it evaluated a constitutional challenge to the immigration-judge appointment and removal framework rather than the CSRA. *Duenas* also did not cite or address *Perkins*. In *Rabadi*, the same court later upheld removal restrictions for DEA ALJs. 122 F.4th at 375-76.

appealed." *Id*. (citing 8 C.F.R. § 1241.1). Moreover, the MSPB concluded that review of immigration judges' decisions is "limited and conditional." *Id.* at *8 n.6.[8]

### E. Courts Also Consider the Practical Restrictiveness of the Removal Standard

Sister circuits have considered the degree to which the removal restrictions limit executive control. Where circuit courts upheld civil-service protections for ALJs, they have compared the removal restrictions at issue to the protections invalidated by the Supreme Court in *Free Enterprise Fund*. In doing so, circuit courts noted both that *Free Enterprise Fund* concerned PCAOB members rather than ALJs and that the removal restrictions there were comparatively demanding. *See, e.g.*, *Decker Coal*, 8 F.4th at 1132-33 (citing *Free Enter. Fund*, 561 U.S. at 505). Indeed, the Supreme Court characterized the Sarbanes-Oxley Act's removal protections as "unusually high," providing a more "serious threat to executive control than an 'ordinary' dual for-cause standard." *Free Enter. Fund*, 561 U.S. at 502-03.

The Ninth Circuit has similarly noted that the provisions in the Sarbanes-Oxley Act permitted removal only for "willful violations of the [Sarbanes-Oxley]

---

[8] If this Court determines that the Attorney General's review of immigration judges' decisions is restrained in a manner that conflicts with Article II, then this Court may consider invoking the same remedy used in *Arthrex*—removing "the restraint on the review authority." 594 U.S. at 26-27.

Act, Board rules, or the securities laws; willful abuse of authority; or unreasonable failure to enforce compliance." *Decker Coal*, 8 F.4th at 1132 (alteration in original) (quoting *Free Enter. Fund*, 561 U.S. at 503). In fact, the protections did not allow PCAOB members to be removed "for violations of *other* laws" unrelated to the Act. *Id*.

The removal protections at issue in the circuit-court decisions above are different from the protections at issue in *Free Enterprise Fund*; they generally provide that an ALJ may be removed "only for good cause" established by the MSPB after an "opportunity for [a] hearing." 5 U.S.C. § 7521(a). As the Eleventh Circuit explained in *Walmart*, the "'good cause' standard, properly construed," is "a low bar." 144 F.4th at 1324. The Eleventh Circuit further explained that "good cause" encompasses misconduct and may include a failure to adequately perform assigned duties. *Id*. (citing *Morrison v. Olson*, 487 U.S. 654, 692 (1988)).

In Petitioners' case, the MSPB did not address the text of the removal statute applicable to immigration judges, 5 U.S.C. § 7513(a). That provision authorizes removal of an employee "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). The statute provides notice, response, and a written decision, with entitlement for MSPB review after the agency's action. *Id.* § 7513(b), (d). This Court has likewise found this standard to include misconduct and failure to adequately perform assigned duties. *See Bowden v. Dep't of Veterans*

*Affs*., 13 F. App'x 924, 924 (Fed. Cir. 2001) (sustaining removal for "disrespectful conduct, using obscene language[,] and threatening an agency employee"); *Kochanny v. Bureau of Alcohol, Tobacco & Firearms*, 694 F.2d 698, 699 (Fed. Cir. 1982) (sustaining removal for agency's dissatisfaction with job performance, including quality of work). Thus, the "willful" standard at issue in *Free Enterprise Fund* appears more demanding than both the "good cause" removal protections upheld by other circuits and § 7513(a)'s "efficiency of the service" protections at issue in Petitioners' case. 561 U.S. at 503; 5 U.S.C. § 7521(a); 5 U.S.C. § 7513(a).

## CONCLUSION

For the foregoing reasons, the FCBA respectfully submits that the Court may resolve this case narrowly—addressing the threshold jurisdiction inquiry before it and, to the extent necessary, drawing on its sister circuits' guideposts—while preserving both adjudicative independence and accountability to Article II.

Date: July 28, 2026

Respectfully submitted,

/s/ Jason L. Romrell
Jason L. Romrell
Alexander E. Harding
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

Daniel C. Cooley
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street
Suite 800
Reston, VA 20190-6023
(571) 203-2700

Sandra Kuzmich
PRESIDENT, FEDERAL CIRCUIT BAR
ASSOCIATION

HAUG PARTNERS LLP
745 Fifth Avenue
10th Floor
New York, NY 10151-2503
(212) 588-0800

*Counsel for Amicus Curiae Federal Circuit Bar Association*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 26-1575

**Short Case Caption:** Jackler v. MSPB

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,933 words.
- [ ] the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- [ ] the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 07/28/2026

Signature: /s/ Jason L. Romrell

Name: Jason L. Romrell