**26-1575**

# United States Court of Appeals for the Federal Circuit

MEGAN JACKLER and BRANDON JAROCH,

*Petitioners*

– v. –

MERIT SYSTEMS PROTECTION BOARD,

*Respondent*

DEPARTMENT OF JUSTICE,

*Intervenor.*

*Petition for Review from the Merit Systems Protection Board in No. CF-0752-26-0069-I-1*

**CORRECTED BRIEF OF AMICI CURIAE SEVEN SENATORS AND THIRTY-NINE REPRESENTATIVES IN SUPPORT OF PETITIONERS AND REVERSAL**

KEVIN L. OWEN
CHRISTOPHER H. BONK
ANDREW J. PERLMUTTER
WILLIAM CARTER SCHUBERT
GILBERT EMPLOYMENT LAW, P.C.
8403 Colesville Rd, Ste I000
Silver Spring, MD 209I0
(301) 608-0880
kowen-efile@gelawyer.com
cbonk-efile@gelawyer.com
aperlmutter-efile@gelawyer.com
wschubert-efile@gelawyer.com

*Counsel for Amici*

JULY 30, 2026

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1575

**Short Case Caption** Jackler v. DOJ

**Filing Party/Entity** Amici Curiae, 7 Members of the United States Senate and 39 Members of the United States House of Representatives

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/30/2026

Signature: Kevin L. Owen

Name: Kevin L. Owen

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| See attached list. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Gilbert Employment Law, P.C. | Andrew J. Perlmutter | |
| Kevin L. Owen | William Carter Schubert | |
| Christopher H. Bonk | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## LIST OF REPRESENTED ENTITIES

*Amici Curae*

*United States Senators*

Chris Van Hollen (MD)

Angela Alsobrooks (MD)

Mazie Hirono (HI)

Tim Kaine (VA)

Andy Kim (NJ)

Gary Peters (MI)

Mark Warner (VA)

*United States Representatives*

James Walkinshaw (VA-11)

Steny Hoyer (MD-05)

Don Beyer (VA-08)

Ed Case (HI-01)

Sean Casten (IL-06)

Judy Chu (CA-28)

Lloyd Doggett (TX-37)

Sarah Elfreth (MD-03)

Adriano Espaillat (NY-13)

Veronica Escobar (TX-16)

Robert Garcia (CA-42)

Mary Gay Scanlon (PA-05)

Jahana Hayes (CT-05)

Del. Eleanor Holmes Norton (DC)

Steven Horsford (NV-04)

Glenn Ivey (MD-04)

Hank Johnson (GA-04)

Stephen Lynch (MA-08)

April McClain Delaney (MD-06)

Jennifer McClellan (VA-04)

Kweisi Mfume (MD-07)

Dave Min (CA-47)

Gwen Moore (WI-04)

Seth Moulton (MA-06)

Johnny Olszewski (MD-02)

Nancy Pelosi (CA-11)

Mike Quigley (IL-05)

Emily Randall (WA-06)

Jamie Raskin (MD-08)

Janice Schakowsky (IL-09)

Bobby Scott (VA-03)

Lateefah Simon (CA-12)

Suhas Subramanyam (VA-10)

Rashida Tlaib (MI-12)

Paul Tonko (NY-20)

Norma Torres (CA-35)

Maxine Waters (CA-43)

Bonnie Watson Coleman (NJ-12)

Frederica Wilson (FL-24)

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... ii

**STATEMENT OF AUTHORSHIP AND FUNDING** .......... 1

**STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE** .......... 2

**INTRODUCTION** .......... 3

**ARGUMENT** .......... 11

I. The Removals of Jackler and Jaroch Are Against the Will of Congress and Not Justifiable Under Article II .......... 11

a. The Creation and Regulation of the Position of Immigration Judge Is Well Within the Constitutional Authority of Congress. .......... 11

b. Congress Protects Immigration Judges Via the Civil Service Reform Act. .......... 15

c. The Exercise of Article II Power in Removing Jackler and Jaroch Cannot Displace the Will of Congress. .......... 16

d. The Constitutional Basis for Congress Setting Removal Restrictions Is Even Stronger Here Than Other Cases Where Restrictions Have Been Upheld. .......... 20

II. Congress Has Consistently Legislated Protections for the Federal Workforce .......... 25

III. The Position of Immigration Judge Does Not Hold Unique Authority Such That Removal Is Obligated by Article II. .......... 27

**CONCLUSION** .......... 31

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bolling v. Sharpe*,
347 U.S. 497 (1954) .......... 25
*Bowsher v. Synar,*
478 U.S. 714 (1986) .......... 18, 19
*Brown v. GSA,*
425 U.S. 820 (1976) .......... 25, 26
*Bush v. Lucas*,
462 U.S. 367 (1983) .......... 8
*Chirac v. Lessee of Chirac*,
15 U.S. 259 (1817) .......... passim
*Elrod v. Burns*,
427 U.S. 347 (1976) .......... 3
*Ex parte Curtis*,
106 U.S. 371 (1882) .......... passim
*Fiallo v. Bell*,
430 U.S. 787 (1977) .......... 12, 21, 24
*Gonzales v. Raich*,
545 U.S. 1 (2005) .......... 23
*Margolin v. Nat'l Ass'n of Immigr. Judges*,
146 S. Ct. 1285 (2026) .......... 31
*McCulloch v. Maryland*,
17 U.S. 316 (1819) .......... passim
*Morrison v. Olson*,
487 U.S. 654 (1988) .......... passim
*Myers v. United States*,
272 U.S. 52 (1926) .......... 7
*Oceanic Steam Navigation Co. v. Stranahan*,
214 U.S. 320 (1909) .......... 12, 21, 24
*Raines v. Byrd,*
521 U.S. 811 (1997) .......... 5, 7

*Sabri v. United States*,
541 U.S. 600 (2004) .......... 13
*Trump v. Slaughter*,
Docket No. 25-332, 609 U.S. ____ (2026) .......... 29, 30, 31
*United States Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*,
413 U.S. 548 (1973) .......... 4, 7, 27
*United States v. Arthrex*,
594 U.S. 1 (2021) .......... passim
*United States v. Comstock*,
560 U.S. 126 (2010) .......... passim
*United States v. Darby*,
312 U.S. 100 (1941) .......... 25
*United States v. Lopez*,
514 U.S. 549 (1995) .......... 21, 24
*United States v. Perkins*,
116 U.S. 483 (1886) .......... 31
*United States v. Vazquez-Ramirez*,
163 F.4th 706 (9th Cir. 2026) .......... 12
*Waters v. Churchill*,
511 U.S. 661 (1994) .......... 26
*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1953) .......... 10, 11, 16, 17
*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .......... 12

**Statutes**

29 U.S.C. § 201 .......... 25
29 U.S.C. § 203(d) .......... 25
42 U.S.C. § 2000e-16 .......... 25
5 U.S.C. § 2301(8)(A) .......... 17
5 U.S.C. § 2302 .......... 26
5 U.S.C. § 7151 .......... 25
5 U.S.C. § 7511 .......... 11, 15, 16, 17

5 U.S.C. § 7513 ........................................................................ passim
5 U.S.C. § 7513(a) ........................................................................ 16
5 U.S.C. § 7513(b) ........................................................................ 15
5 U.S.C. § 7513(d) ........................................................................ 15
5 U.S.C. §§ 7323-7326 ........................................................................ 26
8 U.S.C. § 1101(b)(4) ........................................................................ 14
8 U.S.C. § 1229a(a)(1) ........................................................................ 11, 14
8 U.S.C. § 1229a(a)(3) ........................................................................ 14

**Other Authorities**

2 S. Johnson, A Dictionary of the English Language 1293 (4th ed. 1773) ........................................................................ 12
Carl Russel Fish, THE CIVIL SERVICE AND PATRONAGE (1905) .............. 4, 6
HOUSE COMMITTEE ON THE POST OFFICE AND CIVIL SERVICE, History of the Civil Service Merit Systems of the United States and Selected Foreign Countries, 94th Cong., 2d Sess. (1976) .................................... 8
Pub. L. No. 95-454, 92 Stat. 1111 (1978) ............................................ 9, 15
S. Rep. No. 95-969 (1978) ........................................................................ 9, 19
SEN. SEL. COMM. ON PRESIDENTIAL CAMPAIGN ACTIVITIES, 93D CONG., 1ST SESS., FINAL REPORT (1974) .............................................................. 8, 9
THE FEDERALIST No. 42 (James Madison) .............................................. 12
Whistleblower Protection Act of 1989 .................................................... 26
William B. Wedgwood, CIVIL SERVICE REFORM (1883) ..................... 4, 5, 7

**Rules**

Fed. R. App. P. 29(a)(4)(E) ........................................................................ 1

**Constitutional Provisions**

U.S. CONST. ART. I, § 8 ............................................................ 11, 22, 24
U.S. CONST. ART. II, § 3 ........................................................................ 20

## STATEMENT OF AUTHORSHIP AND FUNDING

No counsel for a party authored this brief in whole or part, no party or counsel for a party contributed money to fund preparing or submitting this brief, and no person contributed money intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE

*Amici* are seven members of the United States Senate representing five different states and thirty-nine members of the United States House of Representatives hailing from districts across seventeen different states and the District of Columbia. This Court permitted briefs of *amici curae* without consent and without leave of the court in its June 17, 2026, order granting initial hearing *en banc*.

*Amici* have an interest in this matter because the Board's decision below raises serious consequences for the separation of powers between Congress and the executive branch. Furthermore, *amici* collectively represent approximately 500,000 federal workers, many of whom may be impacted by the Board's decision. *Amici* respectfully request that this Court reverse the decision of the Board and cancel the removals of Petitioners.

## INTRODUCTION

The Merit Systems Protection Board's decision was incorrect. Article II does not permit the President to override Congress's constitutional power to pass laws governing the federal civil service. Upholding the final administrative decision would fundamentally alter the balance of power between the Executive and Legislative branches. Millions of federal workers would become removable at will—the civil service merit system would functionally cease to exist.

"Patronage practice is not new to American politics. It has existed at the federal level at least since the Presidency of Thomas Jefferson, although its popularization and legitimation primarily occurred later, in the Presidency of Andrew Jackson." *Elrod v. Burns*, 427 U.S. 347, 353 (1976). The levels of corruption occurring during the apex of the spoils system in the late 1800s compelled Congress to enact legislative reforms laying the foundation of the civil service for over 140 years. During post-reconstruction America, appointments in the federal executive government were not given based on merit: "....federal employees came and went, depending upon party service and changing administrations,

rather than meritorious performance[.]" *United States Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 557 (1973).

The pitfalls of the spoils system were countless. Corruption and fraud at the expense of the taxpayer were the norm. Officials would regularly take home more than two or three times their government salary in bribes and exactions. *See* William B. Wedgwood, CIVIL SERVICE REFORM 9-11 (1883). Indeed, "[t]he avenues to bribery were open wide by these practices, and the lapse from a gratuity to a bribe was easy. Many shifted their fealty from the government they professed to serve to the merchants or brokers who paid them a larger compensation." *Id.* at 58 (abridged statement of Silas W. Burt, Naval Officer of the Port of New York before the Committee on Civil Service and Retrenchment, Feb. 11, 1882).

Instances of this corruption resulted in significant financial losses to the federal government. *See* Carl Russel Fish, THE CIVIL SERVICE AND PATRONAGE 137-140 (1905) (discussing the various schemes and frauds resulting in significant losses of public funds). "These vast losses of revenue, this demoralization of the service, these great scandals, were rendered possible and easy by the methods of appointment. Each one

attended sedulously to his partisan work, paid large political assessments cheerfully, and re-imbursed himself from plunder from the merchant or the government." Wedgwood, supra at 59.

The government simply did not function efficiently, and the federal employee was less qualified: "[a] spoils system does not drive ability from the civil service. […] The really deleterious change that the spoils system does make is to throw open the doors of office to a very inferior class of men, and to lower the minimum of capacity required." Fish, supra at 135. Employees worked in "fear of arbitrary changes…[t]he same thing occurs every time there is a change of administration or Secretary…[i]t is a continued system of terrorism and demoralization." Wedgwood, supra at 75 (abridged statement of Edward O. Graves, Senior Official at the Treasury Department before the Committee on Civil Service and Retrenchment).

An early legislative effort to curtail the spoils system was the Tenure of Office Act in 1867. The Act required Senate concurrence before the President could remove certain executive officials. *See Raines v. Byrd,* 521 U.S. 811, 826 (1997). In the floor debate on the bill, Senator Charles

Sumner articulated that the actions of President Andrew Johnson and his administration were the primary motivation for this legislation:

> Andrew Johnson, who came to supreme power by a bloody accident, has become the successor of Jefferson Davis in the spirit by which he is governed and in the mischief he is inflicting on his country…. He is a usurper, who promising to be a Moses, has become a Pharoah.
>
> Do you ask for evidence? It is found in public acts which are beyond question. It is already written in the history of our country. And now in the maintenance of his usurpation he has employed the power of removal from office. Some, who would not become the partisans of his tyranny, he has, according to his own language, 'kicked out.'
>
> Others are left, but silenced by this menace…. Wherever any vacancy occurs, whether in the loyal or the rebel States, it is filled by the partisans of his usurpation. Other vacancies are created to provide for these partisans. I need not add that just in proportion as we sanction such nominations or fail to arrest them, according to the measure of our power, we become parties to his usurpation.

Fish, supra at 194-95 (quoting Senator Charles Sumner in Congressional Globe, 39 Cong. 2 sess. 542) (ellipses in original). "The Tenure-of-Office Bill of 1867 marked the first definite success that the Senate had obtained in its contest with the president for the control of the patronage[.]" *Id.* at 197. The Act was not without its faults, *see e.g., Myers*

*v. United States*, 272 U.S. 52, 177 (1926), and it was ultimately repealed in 1887. *Raines*, 521 U.S. at 826. But Congress continued to combat the patronage system.

In 1883, Congress passed the Pendleton Act, the precursor to the modern Civil Service Reform Act (CSRA). During consideration of the bill, Edward Graves, an official at the Treasury Department, testified before the Committee on "Civil Service and Retrenchment" and articulated: "clerks suspected of being Democrats were *ruthlessly slaughtered*. One of my best book-keepers was discharged on that ground, although he was appointed under the civil service rules. I have no doubt, from general information, that the same system prevails with like results in all departments of the Government." Wedgwood, supra at 7, 13 (emphasis in original). The Act created the Civil Service Commission which could investigate and adjudicate violations of civil service rules promulgated by the President. *See Letter Carriers*, 413 U.S. at 558.

Congress once again made strides in the battle against patronage via the Lloyd-LaFollette Act of 1911. The Act "provided that 'no person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said

service and for reasons given in writing….'" *Bush v. Lucas*, 462 U.S. 367, 383 (1983) (quoting HOUSE COMMITTEE ON THE POST OFFICE AND CIVIL SERVICE, History of the Civil Service Merit Systems of the United States and Selected Foreign Countries, 94th Cong., 2d Sess., 202-203 (1976)) (ellipses in original). The Act also codified the right of employees to disclose information to members of Congress. *Id.* at 383-84.

But patronage practice re-emerged in the early 1970s. The Senate Select Committee on Presidential Campaign Activities found the Nixon Administration imposed an elaborate, multi-layered scheme to maximally corrupt the federal government for partisan political purposes. *See* SEN. SEL. COMM. ON PRESIDENTIAL CAMPAIGN ACTIVITIES, 93D CONG., 1ST SESS., FINAL REPORT (1974). One aspect of the Nixon Administration's scheme was to hire individuals into competitive service positions that were politically aligned with the President. *Id.* at 416. Another finding of the Committee was that evidence suggested the Administration diverted taxpayer-funded grants and contracts to groups and areas that were most politically helpful to the President—and done so in a manner that could constitute a criminal conspiracy. *Id.* at 439-440. The Nixon Administration even went so far as to meddle with a

proceeding before the Equal Employment Opportunity Commission (EEOC); evidence presented to the Committee suggested administration officials convinced the Chair of the EEOC to not pursue an action against the University of Texas because it could harm Nixon politically. *Id.* at 410. The Committee recommended criminal prosecution where appropriate and identified a number of statutory reforms aimed at curtailing the ability of the executive branch to weaponize the government for political ends. *Id.* at 442-44.

As part of reversing this Nixon Administration corruption and implementing the Committee's reforms, the Civil Service Reform Act of 1978 transformed the "outdated patchwork of statutes and rules built up over almost a century" with respect to executive branch employees. S. Rep. No. 95-969 at 3 (1978); Pub. L. No. 95-454, 92 Stat. 1111 (1978). The CSRA stands today as the chief line of defense between an independent civil service and a return to the spoils system.

Congress acted squarely within its constitutional authority when creating the position of Immigration Judge and placing it under the protection of the Civil Service Reform Act. This is the will of Congress—that Immigration Judges are entitled to the protections of 5 U.S.C.

§ 7513. By removing Megan Jackler and Brandon Jaroch without those protections, the President acted against the will of Congress. That action is sustainable "only by disabling the Congress from acting upon the subject." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1953) (Jackson, J., concurring). Article II does not allow the President such power.

These removals run counter to centuries of historical Congressional practice affirmed by the courts. For almost 50 years, the Board has judiciously and even-handedly applied the CSRA while leaving constitutional review to this Court. Until now.

The Board's decision must be reversed. Given the nature and consequences of this matter, *amici* request that this Court issue a decision on an expedited basis.

# ARGUMENT

## I. The Removals of Jackler and Jaroch Are Against the Will of Congress and Not Justifiable Under Article II.

The position of Immigration Judge was created by Congress pursuant to its power to "establish a uniform rule of naturalization[.]" U.S. CONST. ART. I, § 8., cl. 4; 8 U.S.C. § 1229a(a)(1). As employees defined under 5 U.S.C. § 7511, Immigration Judges are entitled to the procedural protections set forth in 5 U.S.C. § 7513. Appx012. The removals of Jackler and Jaroch without the protections of 5 U.S.C. § 7513 is therefore contrary to the will of Congress. The President's removal power under Article II cannot "disabl[e]" Congress from enacting a reasonable restriction on the removal of employees whose duties mirror tremendous swaths of the civil service. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1953) (Jackson, J., concurring).

### a. The Creation and Regulation of the Position of Immigration Judge Is Well Within the Constitutional Authority of Congress.

The Constitution vests Congress with the power to "establish a uniform rule of naturalization" and to enact all laws that are "necessary and proper for carrying into execution" that power. U.S. CONST. ART. I, § 8., cl. 4, 18. The naturalization power is understood as a power

"exclusively in congress[.]" *Chirac v. Lessee of Chirac*, 15 U.S. 259, 269 (1817). "[The Supreme Court] has repeatedly emphasized that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). In Federalist No. 42, James Madison stated that "[t]he dissimilarity in the rules of naturalization has long been remarked as a fault in our system." THE FEDERALIST No. 42 (James Madison). "By granting Congress the exclusive power to fashion rules of naturalization, the Constitution removes these dissimilarities." *United States v. Vazquez-Ramirez*, 163 F.4th 706, 715 (9th Cir. 2026). Additionally, "[a]t the founding, the word 'naturalization' meant '[t]he act of investing aliens with the privileges of native subjects.'" *Zivotofsky v. Kerry*, 576 U.S. 1, 46 (2015) (Thomas, J., concurring in part, dissenting in part) (quoting 2 S. Johnson, A Dictionary of the English Language 1293 (4th ed. 1773)).

"[T]he Necessary and Proper Clause makes clear that the Constitution's grants of specific federal legislative authority are accompanied by broad power to enact laws that are 'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" *United States v.*

*Comstock*, 560 U.S. 126, 133-134 (2010) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)). Indeed, "Congress is permitted to determine for itself what is necessary and what is proper." *Ex parte Curtis*, 106 U.S. 371, 372 (1882). This is not a demanding standard: "[i]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock,* 560 U.S. at 134 (citing *Sabri v. United States*, 541 U.S. 600, 605 (2004)).

In *Ex Parte Curtis*, the Supreme Court upheld a law prohibiting government employees from contributing or soliciting money for political purposes. 106 U.S. at 372-74. The Court analogized to several other laws where Congress set restrictions on government employees, such as a law "which makes it unlawful for certain officers of the Treasury Department to engage in the business of trade or commerce" and a law "which makes it an offence for a clerk in the same department to carry on trade or business in the funds or debts of the States or of the United States, or in any kind of public property[.]" *Id.* at 372. Justifying the law at issue, the Court stated: "[t]he evident purpose of Congress in all this class of

enactments has been to promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service. Clearly such a purpose is within the just scope of legislative power[.]" *Curtis*, 106 U.S. at 373.

Congress explicitly set forth the position and duties of Immigration Judges by statute. As defined, "[t]he term 'immigration judge' means an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 1229a of this title." 8 U.S.C. § 1101(b)(4). Further, "[a]n immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe[.]" *Id.* The central function of an Immigration Judge is to "conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). These proceedings are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3). This statutory scheme and Congress's decision to apply civil service adverse action procedures to Immigration Judges, is more

than fairly "rationally related" as a necessary and proper exercise of Congress's "exclusive" power to establish a uniform rule of naturalization. *Comstock*, 560 U.S. at 134; *Chirac*, 15 U.S. at 269. It is further consistent with Congress's Constitutional legislative authority to promote efficiency and integrity in the discharge of immigration judges' official duties and "to maintain proper discipline" in the immigration court system. *See Curtis,* 106 U.S. at 373.

**b. Congress Protects Immigration Judges Via the Civil Service Reform Act.**

The Civil Service Reform Act provides certain procedural protections for employees in the executive branch. *See* Pub. L. 95-454, 92 Stat. 1111 (1978); 5 U.S.C. § 7513. Specifically, an employee subjected to an adverse action is entitled to "at least 30 days' advance written notice" and "a reasonable time, but not less than 7 days, to answer orally and in writing" as well as "a written decision and the specific reasons therefor[e] at the earliest practicable date." 5 U.S.C. § 7513(b). If the action is sustained, the employee may appeal to the Merit Systems Protection Board. 5 U.S.C. § 7513(d).

Jackler and Jaroch are employees within the meaning of the CSRA. *See* 5 U.S.C. § 7511; Appx012 ("the agency asserts that the appellants

met the definition of 'employee' under 5 U.S.C. § 7511 and thus were entitled to appeal certain adverse actions to the Board"). Accordingly, Congress has provided that adverse action may be taken against them "only for such cause as will promote the efficiency of the service" and in accordance with the procedures providing for notice and an opportunity to be heard. 5 U.S.C. § 7513(a).

**c. The Exercise of Article II Power in Removing Jackler and Jaroch Cannot Displace the Will of Congress.**

"When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1953) (Jackson, J., concurring). "Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject." *Id.* at 637-38. The President is in "the least favorable of possible constitutional postures" under these circumstances. *Id.* at 640.

The Board's decision styles this case as one controlled by Article II of the Constitution, holding that "Article II abrogates the removal protections 5 U.S.C. § 7513 otherwise provide[d] to employees covered

under 5 U.S.C. § 7511[.]" Appx011. That ignores the work and power of Congress.

Indeed, Congress "determine[d] for itself" that Immigration Judges, along with the rest of the positions falling under § 7511, are entitled to the procedural protections of the CSRA. *Curtis*, 106 U.S. at 372. Doing so is necessary and proper to ensure a uniform rule of naturalization untainted by political pressure or fear of reprisal, as well as a civil service built on "efficiency and integrity[.]" *Id.* at 373; 5 U.S.C. § 2301(b)(8)(A) ("Employees should be—protected against arbitrary action, personal favoritism, or coercion for partisan political purposes").

This is the will of Congress. Removing Jackler and Jaroch is contrary to the will of Congress because they were not afforded the procedural guarantees of 5 U.S.C. § 7513. The only way to sustain this action is to hold that the "exclusive presidential control" over the position of Immigration Judge "disabl[es]" Congress from acting. *Youngstown*, 343 U.S. at 637-38. In other words, the removal power would disable Congress from enacting laws necessary and proper to establish a uniform rule of naturalization, an area of "exclusive[]" Congressional control. *Chirac*, 15 U.S. at 269. Under such an interpretation, Congress becomes

subordinate to the President's whims if it wishes to exercise its constitutional power. This result contradicts the text of the constitution and unduly cedes Congressional power to the President.

Moreover, this is not a case where Congress seeks to reserve the removal power for itself, a fact pattern the Supreme Court has viewed with intense skepticism. In *Bowsher v. Synar*, the Court struck down a removal scheme providing that the Comptroller General was removable only by impeachment or joint resolution of Congress. 478 U.S. 714, 728-32 (1986). In short, "Congress cannot reserve for itself the power of removal of an officer charged with the execution of the laws except by impeachment." *Id.* at 726. Two years later, in *Morrison v. Olson*, the Court distinguished the scheme in *Bowsher* to a Special Counsel removable only for "good cause" by the Attorney General. 487 U.S. 654, 695-697 (1988). The Court upheld this removal provision because "this case simply does not pose a 'dange[r] of congressional usurpation of Executive Branch functions.'" *Id.* at 694 (quoting *Bowsher*, 478 U.S. at 727) (bracket in original).

Congress, in the CSRA or Immigration and Nationality Act, does not "reserve for itself" the power to remove employees of the Executive

Branch. *Bowsher*, 478 U.S. at 726. The opposite is true. The CSRA created the Merit Systems Protection Board, an "independent body" designed to "adjudicate cases of alleged violation of the merit system, enforce compliance with its decisions and orders, order stays of personnel actions in cases where it determines that such relief is justified, and conduct studies of the civil service and other merit systems." S. Rep. No. 95-969, at 6 (1978). Congress has no role in the functions of the Board other than Senate confirmation of members of the Board. *Id*.

Congress was acutely aware of the perception that it was too difficult to fire employees under the prior Civil Service System: "Many managers and personnel officers complain that the existing procedures intended to assure merit and protect employees from arbitrary management actions have too often become the refuge of the incompetent employee." S. Rep. No. 95-969, at 3. And "[o]ne of the central tasks of the civil service reform bill is simple to express but difficult to achieve: Allow civil servants to be able to be hired and fired more easily, but for the right reasons." S. Rep. No. 95-969, at 4. Indeed, the structure and requirements of the CSRA are so engrained across OPM and federal

agencies that upsetting that framework would have a cascading effect across the entire government.

Congress had no designs to hinder the Executive Branch in the performance of its duties. If the performance of Jackler and Jaroch was unsatisfactory or if they had engaged in misconduct, there is no outright prohibition on their removal. Congress only requires that the employee be given a chance to defend themselves before action is taken. *See* 5 U.S.C. § 7513. Delaying the ultimate removal of an employee for a short time to ensure they have received due process is a more than tolerable guardrail on the President's obligation to "take care that the laws be faithfully executed." U.S. CONST. ART. II, § 3.

**d. The Constitutional Basis for Congress Setting Removal Restrictions Is Even Stronger Here Than Other Cases Where Restrictions Have Been Upheld.**

The Supreme Court has upheld removal restrictions in cases where Congress acts upon far weaker footing than it does here. *See Morrison,* 487 U.S. at 660; *United States v. Arthrex*, 594 U.S. 1, 23-26 (2021). If those restrictions are permissible, then Congress can certainly employ the CSRA's restrictions to a position created pursuant to a power that is

"exclusive[]" and "complete[.]" *Chirac*, 15 U.S. at 269; *Fiallo*, 430 U.S. at 792 (quoting *Oceanic Steam*, 214 U.S. at 339).

The necessary and proper clause allows Congress to enact laws that are "essential to the beneficial exercise of the [enumerated] power, but not indispensably necessary to its existence." *McCulloch*, 17 U.S. at 417; *see also Comstock*, 560 U.S. at 146. For instance, Congress executes "the power "to establish post offices and post roads'…by the single act of making the establishment," but this also gives Congress "the power and duty of carrying the mail along the post road, from one post office to another. And, from this implied power, has again been inferred the right to punish those who steal letters from the post office, or rob the mail." *McCulloch*, 17 U.S. at 417. But the more degrees of separation a particular law is from the enumerated power, the more it becomes attenuated and subject to being struck down as an unconstitutional exercise of Congressional power. *See Comstock*, 560 U.S. at 146 (quoting *United States v. Lopez*, 514 U.S. 549, 567 (1995)) ("Invoking the cautionary instruction that we may not 'pile inference upon inference' in order to sustain congressional action under Article I").

There is an exceptionally close connection between creating the position of Immigration Judge and Congress's power under the Naturalization Clause. The text reads that Congress has the power to "establish a uniform rule of naturalization[.]" U.S. CONST. ART. I, § 8., cl. 4. Creating the position of a Judge obligated to make rulings and decisions concerning naturalization is "indispensably necessary" to "establish a uniform rule of naturalization[.]" *McCulloch*, 17 U.S. at 417; U.S. CONST. ART. I, § 8., cl. 4. And setting the removal conditions for that position is undoubtedly "essential to the beneficial exercise" if not "indispensably necessary" to effectuating that power. *McCulloch*, 17 U.S. at 417. This connection is far less attenuated than other removal cases with Congressional action based in more general grants of authority, such as the Commerce Clause, yet where the Supreme Court has still upheld removal protections. *See* U.S. CONST. ART. I, § 8., cl. 7; *e.g.*, *Comstock*, 560 U.S. at 147-148 ("Congress relies on different enumerated powers (often, but not exclusively, its Commerce Clause power) to enact its various federal criminal statutes").

For example, *Morrison v. Olson* involved an Independent Counsel appointed under the Ethics in Government Act of 1978 and given the

power "to investigate and, if appropriate, prosecute certain high ranking Government officials for violations of federal criminal laws." 487 U.S. at 660. The Court held that removal of the Counsel for only "good cause" by the Attorney General was constitutional. *Id*. at 695-697. The *McCulloch*-style inferences required to justify this scheme are numerous: the substantive criminal laws at issue would first likely have to pass muster under a Commerce Clause analysis, that the conduct at issue "substantially affect[s]" interstate commerce. *See e.g., Gonzales v. Raich*, 545 U.S. 1, 17 (2005). Then, from this, Congress has the power to employ people to prosecute these crimes, then the power create a position to specifically prosecute high ranking government officials, and finally, to determine how the Counsel can be removed as a way to further the Counsel's independence and efficiency. In short, the logic to justify the special prosecutor under the constitutional authority of Congress requires several inferences of the implied power of Congress. *McCulloch*, 17 U.S. at 417.

Similarly, in *United States v. Arthrex*, the Court allowed CSRA removal protections to stand for Administrative Patent Judges provided that their decisions would be reviewed by the Director of the Patent and

Trademark Office. 594 U.S. at 17, 23-26. Similar to *Morrison*, this scheme requires several analytical leaps to get to the Congressional root: the sale of goods and products affects commerce; patents are necessary to protect people that make those goods and products; some office must issue patents; someone in that office must determine the merits of a patent; and for-cause removal ensures the officials that review patents can do their jobs independently.

In stark contrast, an Immigration Judge, as a neutral, unbiased arbiter of Immigration Laws, is "indispensably necessary" to "establishing a uniform rule of naturalization[.]" *McCulloch*, 17 U.S. at 417; U.S. CONST. ART. I, § 8., cl. 4. Congress would not get far in effecting a uniform law without judges who apply that law. Where the Court has upheld removal protections when Congress has legislated by "inference upon inference" limits of its constitutional power, then removal protections are certainly permissible when Congress legislates directly pursuant to a "complete" and "exclusive[]" power. *Comstock*, 560 U.S. at 146 (quoting *Lopez*, 514 U.S. at 549); *Fiallo*, 430 U.S. at 792 (quoting *Oceanic Steam*, 214 U.S. at 339); *Chirac*, 15 U.S. at 269.

## II. Congress Has Consistently Legislated Protections for the Federal Workforce.

Outside of the Article II removal context, Congress has set, and the Supreme Court has affirmed, a variety of safeguards for federal employees. The Fair Labor Standards Act sets forth a minimum wage that certain employees must be paid. *See generally* 29 U.S.C. §§ 201, et. seq. In *United States v. Darby*, the Supreme Court upheld the Fair Labor and Standards Act as a proper exercise of Congressional power under the Commerce Clause. 312 U.S. 100, 122-126 (1941). The act applies to the United States government as an employer and is a congressional restriction upon how the executive branch may pay certain employees. 29 U.S.C. § 203(d), (x).

The Civil Rights Act of 1964 regulates the ways in which the federal government may treat its employees; specifically, the government may not take personnel actions against its employees or applicants on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16. In *Brown v. GSA*, the Court stated: "[a]lthough federal employment discrimination clearly violated both the Constitution, *Bolling v. Sharpe*, 347 U.S. 497 (1954), and statutory law, 5 U.S.C. § 7151, before passage of the 1972 Act, the effective availability of either administrative or

judicial relief was far from sure." 425 U.S. 820, 825 (1976) (citations in original) (discussing the Equal Employment Opportunity Act of 1972). The Court's holding dealt with the exclusivity of the remedies under the Civil Rights Act, but the point remains: Congress may, and has, provided protection for the federal workforce against discrimination.

Similarly, the Whistleblower Protection Act makes it unlawful for the government to take certain personnel actions against employees that have disclosed violations of law. *See generally* 5 U.S.C. § 2302. The Court has acknowledged these protections for public servants, enacted by Congress, stating: "the government may certainly choose to give additional protections to its employees beyond what is mandated by the First Amendment, out of respect for the values underlying the First Amendment, values central to our social order as well as our legal system. *See, e. g.*, Whistleblower Protection Act of 1989." *Waters v. Churchill*, 511 U.S. 661, 674 (1994) (citation in original).

The Hatch Act broadly prohibits certain federal employees from engaging in partisan political activity both on and off duty. *See* 5 U.S.C. §§ 7323-7326. The Supreme Court upheld these restrictions on federal employees against a constitutional challenge in *United States Civ. Serv.*

*Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548 (1973). The Court succinctly stated: "Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees." *Id.* at 556.

Though these cases have not squarely encountered the intersection between Article II removal authority and the CSRA, or its predecessor, the message is clear: Congress setting protections and guardrails for the federal workforce at-large has been a consistent practice since the founding, the very same principle undergirding the decision in *Ex Parte Curtis*. 106 U.S. at 373 (noting the Congressional purpose to "promote efficiency and integrity in the discharge of official duties, and to maintain proper discipline in the public service"). Upholding the Board's decision opens the door for a return to the spoils system and the catastrophic consequences of inefficiency, patronage, and corruption.

## III. The Position of Immigration Judge Does Not Hold Unique Authority Such That Removal Is Obligated by Article II.

In permitting the removals, the Board reasons that Immigration Judges exercise "significant policymaking and administrative authority." Appx015. These duties include receiving evidence, issuing subpoenas, conducting hearings, exercising adjudicative authorities, issuing

sanctions, and potentially—if the Attorney General does not disagree—making a final decision of the United States. Appx015-16. These are simply not unique functions.

Throughout the federal workforce, countless other positions share the same or similar duties as Immigration Judges. The 1895 – Customs and Border Protection job series includes duties such as "mak[ing] informed decisions regarding the admissibility of aliens into the United States and admitting, holding, or releasing merchandise" and "exercis[ing] sound judgment necessary to apprehend, detain, or arrest persons at the point of entry who are violating Federal immigration, customs, agriculture, or other laws."[1] Positions in the 0967 – Passport and Visa Examining Series are responsible for "managing, supervising, or performing administrative work concerned with adjudicating applications for United States passports or visas, including related work involving determining citizenship or fitness of non-citizens for admission to the United States."[2] The 1980 – Agricultural Commodity Grading

---

[1] *Handbook of Occupational Group and Families*, OFFICE OF PERSONNEL MANAGEMENT, at 113 (Dec. 2018) https://www.opm.gov/policy-data-oversight/classification-qualifications/classifying-general-schedule-positions/occupationalhandbook.pdf (last visited June 5, 2026).

[2] *Id*. at 77.

Series is responsible for "examining and evaluating agricultural products to determine their official U.S. grade and/or their acceptability in terms of quality or condition in accordance with official standards and related regulations."[3]

These are only a few of the many job series that would be swept into the realm of at-will removal and outside of the CSRA if the Board's decision stands. The danger of a broad impact on swathes of the federal workforce is real—the dividing line on what constitutes an inferior officer is increasingly blurred. *See, e.g., Arthrex,* 594 US at 55-57 (Thomas, J., dissent). The potential consequence here is that the CSRA is functionally eliminated and federal employees will no longer have protections against arbitrary removal, reprisal, or the assurance of due process.

## IV. *Trump v. Slaughter* Is Not Controlling Because This Case Does Not Concern Principal Officers.

On June 29, 2026, the Supreme Court decided *Trump v. Slaughter*, overturning *Humphrey's Executor* and holding the for-cause removal restrictions for members of the Federal Trade Commission (FTC) are unconstitutional. No. 25-332, 2026 U.S. LEXIS 2877, 609 U.S. ___ (2026).

[3] *Id*. at 115.

The decision concerns only principal officers under Article II of the Constitution and therefore is not controlling in this matter because—as Petitioners relay in their opening brief—Immigration Judges are, at most, inferior officers. In the majority opinion, while discussing Justice Story's analysis of the Decision of 1789, the Chief Justice writes: "He [Justice Story] identified the very 'question' at issue in this case: "[W]hether congress can give any duration of office in such cases [of principal officers], not subject to the exercise of this [Presidential] power of removal?" 2026 U.S. LEXIS 2877, at 47 n. 6 (quoting 3 Story §1531, at 389) (brackets in original). In fact, the majority opinion never uses the term inferior officers. Justice Sotomayor notes in dissent (without rebuttal in the majority opinion) that "the majority studiously ignores" the issue of "inferior officers and civil-service employees." *Id.* at *125 (Sotomayor, J., dissenting).[4]

---

[4] Justice Sotomayor likewise points out that *Morrison* held the ability to remove the subordinate of the Attorney General only "for-cause" still provided the President with ample means to ensure control over lesser civil service employees and inferior officers. *See Slaughter,* 2026 U.S. LEXIS 2877, at *79-80 (Sotomayor, J., dissenting) (*citing Morrison,* 487 U.S. at 691-92). Which is exactly the case here with Immigration Judges.

Justice Gorsuch in his concurrence also notes this distinction, observing that "the civil service laws […] ordinarily afford rank-and-file agency employees considerable protection against removal." *Id.* at *65 (Gorsuch, J., concurring). Accordingly, as *Slaughter's* holding did not extend to inferior officers or civil service employees, it does not control the instant matter—especially in the face of clear contrary authority such as *United States v. Perkins,* 116 U.S. 483 (1886)*, Morrison* and *Arthrex.*

**CONCLUSION**

That the President now asserts this authority under Article II does not change the fact that the removals of Jackler and Jaroch are in violation of the CSRA, and accordingly against the will of Congress. "Neither the President's view that he can remove federal executive officials, *see* [*Myers* v. *United States*, 272 U.S. 52 (1926)], nor his having done so, change the meaning of the statute or the binding nature of this Court's interpretation of it." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1289 (May 26, 2026) (Thomas, J., concurring).

Accordingly, *amici* respectfully ask this Court to reverse the Board's decision and to issue that decision on an expedited basis.

Respectfully Submitted,

Kevin L. Owen, Esq.
Christopher H. Bonk, Esq.
Andrew J. Perlmutter, Esq.
William C. Schubert, Esq.
Gilbert Employment Law, P.C.
8403 Colesville Rd., Suite 1000
Silver Spring, MD 20910
(301) 608-0880
kowen-efile@gelawyer.com
cbonk-efile@gelawyer.com
aperlmutter-efile@gelawyer.com
wschubert-efile@gelawyer.com

*Counsel for Amici*

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 26-1575

**Short Case Caption:** Jackler v. DOJ

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 6012 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- ☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/30/2026

Signature: Kevin L. Owen

Name: Kevin L. Owen