No. 26-1575

IN THE
**United States Court of Appeals**
**for the Federal Circuit**

MEGAN JACKLER, BRANDON JAROCH,
*Petitioners*,
v.

MERIT SYSTEMS PROTECTION BOARD,
*Respondent,*

DEPARTMENT OF JUSTICE,
*Intervenor*.

On Petition for Review from the
Merit Systems Protection Board

# CORRECTED BRIEF OF *AMICUS CURIAE* METROPOLITAN WASHINGTON EMPLOYMENT LAWYERS ASSOCIATION AND NATIONAL EMPLOYMENT LAWYERS ASSOCIATION IN SUPPORT OF PETITIONERS

Debra D'Agostino
Federal Practice Group, LLP
801 17th Street, N.W., Suite 250
Washington, DC 20006
(202) 862-4360
ddagostino@fedpractice.com

*Counsel for Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 26-1575

**Short Case Caption** Jackler v. DOJ

**Filing Party/Entity** Debra D'Agostino

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/30/2026

Signature: /s/ Debra D'Agostino

Name: Debra D'Agostino

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Metropolitan Washington Employment Lawyers Association (MWELA) | | |
| National Employment Lawyers Association (NELA) | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Table of Contents .......... i

Table of Authorities .......... ii

I. CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... 1

II. STATEMENT OF THE ISSUES .......... 3

III. SUMMARY OF FACTS RELEVANT TO AMICI BRIEF .......... 3

IV. SUMMARY OF ARGUMENT .......... 4

V. ARGUMENT .......... 5

VI. CONCLUSION .......... 15

Certificate of Compliance .......... 17

## TABLE OF AUTHORITIES

### Cases

*Board of Regents v. Roth*, 408 U.S. 564, 572-73 (1972)........................................14

*Bush v. Lucas*, 462 U.S. 367, 385-90 (1983) ....................................................11, 15

*Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 564-67 (1973) ............................................................................................ 12, 15

*Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-46 (1985) ... 13, 15

*Codd v. Velger*, 429 U.S. 624, 627-28 (1977) ........................................................14

*Edmond v. United States*, 520 U.S. 651, 663 (1997) ......................................... 9, 15

*Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492-98 (2010) ............................................................................................. 9, 15

*Morrison v. Olson*, 487 U.S. 654, 685-93 (1988) ............................................... 8, 15

*Myers v. United States*, 272 U.S. 52, 161-64 (1926) ................................................7

*Sciolino v. City of Newport News*, 480 F.3d 642, 645-49 (4th Cir. 2007) ..............14

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213-18 (2020)................................................................................................... 9, 15

*Trump v. Slaughter*, 609 U.S. ___ (2026) ..............................................................10

*United Public Workers v. Mitchell*, 330 U.S. 75, 95-103 (1947)...................... 12, 15

*United States v. Fausto*, 484 U.S. 439, 443-49 (1988) .....................................11, 15

*United States v. Perkins*, 116 U.S. 483, 485 (1886)........................................... 7, 15

### Statutes

Civil Service Reform Act of 1978 ..........................................................................11

Pendleton Civil Service Reform Act of 1883 (Pendelton Act), 22 Stat. 403............6

### Rules

Fed. R. App. P. 29(a)(4)(E) ............................................................................1
RULE 29(a)(4)(A)...........................................................................................1
RULE 29(a)(4)(D)...........................................................................................1

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A) Parties and Amici. All parties appearing before the U.S. Merit Systems Protection Board and in this Court are listed in the Petitioner's Brief.

(B) Rulings Under Review. References to the rulings at issue appear in the Petitioner's Brief.

(C) Related Cases. There are no related cases.

## RULE 29(a)(4)(A) STATEMENT OF *AMICUS*

The National Employment Lawyers Association (NELA) and Metropolitan Washington Employment Lawyers Association (MWELA) are associations. They do not have any corporate parents. They do not have any stock, and therefore no publicly held company owns 10% or more of the stock of this Amicus Curiae.[1]

## RULE 29(a)(4)(D) STATEMENT OF INTEREST OF AMICUS

Founded in 1985, NELA is the largest bar association in the country focused on empowering workers' rights attorneys. NELA and its sixty-nine circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to protecting the rights of workers in employment, wage and hour, labor, and civil rights disputes. NELA members represent federal employees across the country

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), Amicus states that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than Amicus or its members—contributed money that was intended to fund preparing or submitting the brief.

and therefore have an interest in ensuring the courts are correctly interpreting and applying laws designed to protect those employees.

MWELA is a local affiliate of the NELA with over 350 members who represent and protect the interests of employees under state and federal law. The purpose of MWELA is to bring into close association employee advocates and attorneys to promote the efficiency of the legal system and fair and equal treatment under the law. MWELA has frequently participated as Amicus Curiae in cases of interest to its members, including cases concerning the rights of federal employees.

## **STATEMENT OF THE ISSUE**

Whether the Civil Service Reform Act's (CSRA's) procedural and substantive protections for federal workers conflict with the President's Article II removal powers?

## **SUMMARY OF FACTS RELEVANT TO AMICI BRIEF**

Petitioners Megan Jackler and Brandon Jaroch were career civil servants, working for the Department of Justice as immigration judges. On February 14, 2025, both Jackler and Jaroch received letters informing them that they had been terminated effective immediately. Appx094; Appx101. Neither received the minimal advance notice of the removal as required by the CSRA, an opportunity to respond, or a reason for the termination. *Id.*; Appx344; Appx409.

Following their removal, Jackler and Jaroch filed appeals with the U.S. Merit Systems Protection Board (MSPB). Appx088-094; Appx095-101. Before the MSPB, the parties agreed that Jackler and Jaroch were inferior officers and that they fell within the CSRA's definition of an employee. *See* Appx433.

An Administrative Judge at the MSPB ordered the Department of Justice to reinstate Jackler and Jaroch, finding the Department of Justice failed to provide them with the minimal required due process. Appx037-039; Appx058-061. The Department then filed a Petition for Review with the MSPB, which issued a final decision in favor of the Department of Justice holding that Article II abrogates

Petitioners' protections under the CSRA, and thus the Board lacked jurisdiction to hear their appeals. Appx001-032.

## SUMMARY OF ARGUMENT

Amici respectfully submit that the Board erred in holding that Article II displaces the Civil Service Reform Act's protections for Petitioners. Congress has long possessed authority to structure the civil service and to impose removal protections for supervised federal personnel, provided those protections do not prevent the President from performing his constitutional duties.

Nothing in Article II requires that inferior officers or career federal employees serve at will. The Supreme Court's cases recognize that presidential accountability is preserved through supervision and direction, not through a rule of universal removability. And although the government will invoke modern removal precedent, those decisions do not authorize the Executive to disregard statutory protections, bypass due process, or dismantle the merit-based civil service Congress created.

The CSRA is a comprehensive statutory framework designed to protect merit principles, prevent arbitrary action, and provide orderly review of federal employment disputes. Allowing the Executive to nullify that framework by invoking Article II would render its protections meaningless.

The government's position also conflicts with due process. Where federal law confers continued employment absent cause for removal, the Constitution requires notice and an opportunity to respond before termination. Article II does not eliminate those protections.

Because the Constitution permits Congress to protect supervised federal personnel from arbitrary removal while preserving effective presidential supervision, the Board's contrary decision should be reversed.

## ARGUMENT

### I. The Federal Civil Service is a Constitutional Safeguard Against Patronage, Arbitrary Power, and Democratic Erosion.

The federal civil service is a constitutional safeguard, not a bureaucratic convenience. It preserves continuity when administrations change, protects the public from rule by favoritism and fear, and helps ensure that the laws of the United States are executed by professionals bound to law rather than to faction. Every day, career federal employees carry out functions that make ordered government possible: they respond to disasters, safeguard public health, administer benefits, enforce labor and civil-rights protections, and support the Nation's security. A system so central to the functioning of democratic government cannot be reduced to one in which continued employment turns on political grace. That is the premise of the civil-service laws, and it is the premise the government asks this Court to discard.

That request should be rejected for what it is. The government's theory is not a modest refinement of presidential supervision. It is an invitation to reintroduce into federal employment the very evil Congress spent generations uprooting: a system in which public servants keep their jobs not by competence, fidelity to law, and faithful performance, but by satisfying the shifting demands of political power. The Constitution does not compel that regression. It does not tolerate it. And the Supreme Court's precedents do not come close to authorizing it.

Congress enacted the Pendleton Civil Service Reform Act of 1883 (Pendleton Act), 22 Stat. 403, because the spoils system had corroded public administration and public trust. The Pendleton Act established the merit-based federal civil service, replacing patronage with competitive hiring and laying the institutional foundation for a politically neutral bureaucracy that continues to serve successive presidential administrations. Congress understood that a government staffed through political loyalty, rather than merit, is dangerous. It rewards obedience over judgment, pliability over integrity, and partisan usefulness over public service. The modern civil service exists precisely to prevent that degradation of democratic governance.

## II. Congress Has Long Possessed Constitutional Authority to Structure the Civil Service and To Limit Removal of Supervised Federal Personnel.

The government's position fails at the threshold because it ignores more than a century of settled law. The Supreme Court has long recognized that Congress possesses substantial authority to regulate federal offices, structure the civil service, and impose limits on employee removal where doing so does not disable the President from carrying out his constitutional responsibilities.

In *United States v. Perkins*, 116 U.S. 483, 485 (1886), the Court held that when Congress vests appointment of inferior officers in department heads, it may also "limit and restrict" their removal. That holding alone refutes the sweeping proposition advanced here. Article II has never meant that every person exercising executive functions must serve at the unreviewable pleasure of the President. If it did, *Perkins* could not have come out the way it did. But it did, and it has never ceased to be good law.

Nor does *Myers v. United States*, 272 U.S. 52, 161-64 (1926), rescue the government's position. *Myers* addressed removal of a postmaster and articulated a broad conception of presidential removal authority in that setting. But *Myers* did not impose a constitutional command of universal at-will service throughout the Executive Branch. It did not erase the distinction between principal and inferior officers. It did not invalidate Congress's ability to structure federal employment.

And it certainly did not hold that every statutory protection for career civil servants must yield whenever the Executive invokes Article II.

The Supreme Court made that unmistakably clear in *Morrison v. Olson*, 487 U.S. 654, 685-93 (1988), where the Court rejected the very kind of absolutism the government advances here. The question, the Court explained, is not whether the President prefers unrestricted removal. The question is whether the restriction is "of such a nature that it impedes the President's ability to perform his constitutional duty." *Id*. at 691. That is the governing inquiry, and under that inquiry the government's argument collapses. Requiring cause and procedural and even substantive due process before terminating supervised career personnel does not disable the President from supervising the Executive Branch. It does not strip principal officers of control over policy. It does not prevent the correction, review, or direction of subordinate action. It simply requires the Executive to obey the law Congress enacted.

### III. Article II Does Not Require a Federal Workforce Governed by Fear, Favor, and Political Obedience.

The theory pressed by the government is radical not because it is aggressive, but because of what it would do to the structure of federal administration. It would convert presidential supervision into a claimed power to disregard duly enacted protections for vast swaths of the federal workforce. It would make statutory tenure contingent, procedural rights precarious, and merit principles optional. And it

would do so not because the President cannot supervise the Executive Branch without such power, but because the government insists that supervision is meaningful only if every subordinate may be discarded at will.

That is not the law. The Supreme Court has repeatedly explained that constitutional accountability is preserved through supervision, direction, and review by principal officers. In *Edmond v. United States*, 520 U.S. 651, 663 (1997), the Court emphasized that inferior officers are those whose work is "directed and supervised" by principal officers. That principle matters here. The Constitution does not require that every subordinate be personally vulnerable to immediate removal by the President for the President to remain accountable for the execution of federal law. The chain of command, not a regime of universal job insecurity, is what preserves presidential control.

The same is true of *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492-98 (2010), and *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213-18 (2020). Those cases concerned insulation of principal officers exercising substantial executive power. They do not stand for the proposition that Article II forbids Congress from protecting career employees lower in the hierarchy from arbitrary dismissal. To stretch those decisions into a mandate for universal at-will federal employment would be to wrench them from their reasoning and their facts.

Further, while *Trump v. Slaughter*, 609 U.S. ___ (2026), held that officials subject to the President's "general administrative control" must be removable by the President at will, *Slaughter* did not license the Executive to disregard every statutory and constitutional protection applicable to the federal workforce, nor did it erase the distinction between principal officers, inferior officers, and ordinary employees, or to nullify procedural and due-process constraints on removal. On the contrary, the Court emphasized that it was deciding only the question before it and expressly declined to resolve the status of other categories of officials not presented in that case. Nothing in *Slaughter* suggests that Article II silently displaces the CSRA's comprehensive framework, rather, *Slaughter* narrows one line of removal-protection doctrine.

The consequences of constitutionalizing a return to patronage or authorizing the dismantling of the merit-based civil service would be severe. A federal workforce governed by fear of summary dismissal would be more vulnerable to coercion, retaliation, and politicization. It is less likely to provide candid advice, less able to resist unlawful pressure, and less capable of maintaining continuity and expertise across administrations. The Constitution does not require courts to mistake vulnerability for accountability.

## IV. The Civil Service Reform Act Is a Foundational Statutory Settlement, Not a Disposable Obstacle to Executive Preference.

Congress did not enact the Civil Service Reform Act of 1978 ("CSRA") as a gesture. It enacted the CSRA as a structural settlement: a comprehensive system designed to protect merit, constrain arbitrariness, and provide an orderly mechanism for resolving federal employment disputes. The statute created and coordinated institutions, procedures, and remedies precisely because Congress understood that a professional civil service cannot survive if protections against unlawful removal exist only at executive sufferance.

The Supreme Court has treated the CSRA accordingly. In *Bush v. Lucas*, 462 U.S. 367, 385-90 (1983), the Court recognized Congress's "elaborate, comprehensive scheme" for dealing with federal employment disputes and declined to supplement it with a new judicial remedy. In *United States v. Fausto*, 484 U.S. 439, 443-49 (1988), the Court described the CSRA as an "integrated scheme of administrative and judicial review." Those decisions reflect the Court's repeated recognition that the CSRA is not peripheral. It is the backbone of modern federal personnel law.

The government's theory would gut that statutory settlement from within. If Article II permits the Executive to cast aside congressionally enacted removal protections whenever it invokes a generalized interest in presidential control, then the CSRA's promises become hollow. Cause protections become optional.

Procedures become dispensable. The distinction between lawful administration and political expedience begins to disappear. That would not preserve the Executive Branch. It would destabilize it.

And it would do so in the very area where Congress has been most deliberate: preserving a civil service in which continued federal employment depends on merit, legality, and faithful performance rather than on partisan usefulness. The Court should not endorse a constitutional theory that would unravel that judgment and return the federal government toward a patronage system in all but name.

## V. The Supreme Court Has Also Recognized the Government's Compelling Interest in a Politically Neutral Civil Service.

The government's position is also in profound tension with the Supreme Court's recognition that the United States has a weighty interest in maintaining an impartial and nonpartisan civil service. In *United Public Workers v. Mitchell*, 330 U.S. 75, 95-103 (1947), the Court sustained restrictions on partisan political activity by federal employees because the government has a legitimate and substantial interest in protecting the civil service from partisan abuse. The Court reaffirmed that principle in *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 564-67 (1973), emphasizing that the government may act to guard against political justice, political favoritism, and political coercion in public service.

Those decisions do not directly decide the Article II issue. But they expose the flaw in the government's theory. The Constitution cannot be read to permit, much less require, a federal employment regime in which job security for nonpolitical positions turns on political acceptability. The Court has long understood that the Nation's interest lies in a civil service capable of serving the law rather than the party in power. The government's argument would push in exactly the opposite direction.

## VI. Due Process Forbids the Government from Stripping Protected Career Employees of Their Positions Without Even Minimal Fairness.

Even apart from the Article II issue, the government's position runs headlong into bedrock due-process principles. When the government confers a statutory entitlement to continued employment absent cause for removal, it creates a protected property interest. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538-46 (1985). The Constitution therefore requires, at a minimum, notice of the charges and an opportunity to respond before termination. *Id*. at 546.

That requirement is not ornamental; it is a Constitutional floor. It reflects the elementary premise that the government may not deprive individuals of important legal rights by fiat. In the civil-service context, those protections are especially important because Congress deliberately created them to protect lawful administration from arbitrary and retaliatory action. To say that Article II allows

the Executive to bypass those procedures is to say that the Constitution silently authorizes the Executive to ignore constitutional safeguards in the name of preserving executive power. That cannot be right.

The same is true where termination inflicts reputational as well as economic injury. When the government couples termination with charges that seriously stigmatize an employee and jeopardize future employment prospects, due process requires a meaningful opportunity to clear one's name. *See Board of Regents v. Roth*, 408 U.S. 564, 572-73 (1972); *Codd v. Velger*, 429 U.S. 624, 627-28 (1977); *Sciolino v. City of Newport News*, 480 F.3d 642, 645-49 (4th Cir. 2007). Nothing in Article II suspends those constitutional guarantees. Presidential authority to supervise the Executive Branch is not a license to dispense with fairness, process, or law.

## VII. This Court Should Reject an Interpretation of Article II That Would Turn the Federal Service Back Toward the Spoils System.

At bottom, the government asks this Court to constitutionalize a theory of federal employment that Congress repudiated long ago and that the Supreme Court has never endorsed. The Court should decline the invitation. This case does not require any dramatic pronouncement about the outer boundaries of presidential power. It requires only fidelity to settled precedent and recognition of what is at stake.

Under *Perkins, Morrison, Edmond, Free Enterprise Fund, Seila Law, Bush, Fausto, Loudermill, Mitchell*, and *Letter Carriers*, Congress may create a professional civil service, protect supervised career personnel against arbitrary dismissal, and require the Executive to follow lawful procedures before depriving employees of rights Congress has conferred. That arrangement does not weaken the Presidency. It preserves the constitutional balance between energetic executive supervision and the rule of law.

The government's theory would shatter that balance. It would make federal service less professional, less independent, and less lawful. It would invite political pressure where the law demands impartiality. It would replace a merit-based civil service with a system shadowed by fear of reprisal and reward for personal loyalty. And it would do so under the banner of Article II, even though Article II does not require it and longstanding precedent rejects it.

The Constitution does not demand a civil service built on insecurity and obedience. It permits, and history confirms the necessity of, one built on law, merit, and faithful service to the public. The judgment should be reversed.

## CONCLUSION

For the foregoing reasons, Amici respectfully submit that this Court should reverse the decision of the Merit Systems Protection Board.

Respectfully submitted,

/s/Debra D'Agostino______
Debra D'Agostino
Federal Practice Group, LLP
801 17th St. NW, Suite 250
Washington, DC 20006
Tel: (202) 862-4360
ddagostino@fedpractice.com

*Counsel for Petitioner*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:
   [ X ] this brief contains 3,044 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), *or*
   [ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).
2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:
   [ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14pt Times New Roman*; *or*
   [ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

/s/Debra D'Agostino______
Debra D'Agostino
Federal Practice Group, LLP
801 17th St. NW, Suite 250
Washington, DC 20006
Tel: (202) 862-4360
ddagostino@fedpractice.com

*Counsel for Petitioner*