**CORRECTED**

No. 26-1575

-----------------------

IN THE

United States Court of Appeals for the Federal Circuit

--------------

MEGAN JACKLER, BRANDON JAROCH,

Petitioners

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent

DEPARTMENT OF JUSTICE,

Intervenor

------------------

On Petition for Review from the Merit Systems Protection Board

-----------------------

BRIEF OF NATIONAL ASSOCIATION OF IMMIGRATION JUDGES AS *AMICUS CURIAE* IN SUPPORT OF PETITIONERS AND URGING REVERSAL

-------------------------------------------

RICHARD R. RENNER
The Noble Law
700 Spring Forest Rd.
Suite 205
Raleigh, N.C. 27609
(919) 251-6008
rrenner@igc.org

ERIC SCHNAPPER
University of Washington
School of Law
Box 353020
Seattle, WA 98195
(206) 660-8845
schnapp@uw.edu

*Counsel for Amicus Curiae*

## CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae*, National Association of Immigration Judges, certifies the following in accordance with Federal Circuit Rule 47.4.

1. Represented Entities (Fed. Cir. R. 47.4(a)(1))

   **National Association of Immigration Judges**

2. Real Party in Interest (Fed. Cir. R. 47.4(a)(2))

   **Not Applicable.**

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3))

   **Not Applicable.**

4. Legal Representatives (Fed. Cir. R. 47.4(a)(4))

   **Not Applicable.**

5. Related Cases (Fed. Cir. R. 47.4(a)(5))

   **Not Applicable.**

6. Organizational Victims and Bankruptcy Cases (Fed. R. App. P. 36.1)(b) and 26.1(c); Fed. Cir. R. 47.4(a)(6))

   **Not Applicable.**

Dated: August 4, 2026

/s/Richard R. Renner
Richard R. Renner

# CONTENTS

CERTIFICATE OF INTEREST ........ i

CONTENTS ........ ii

TABLE OF AUTHORITIES ........ iii

RULE 29(a)(4)(E) STATEMENT ........ v

STATEMENT OF INTEREST OF AMICUS ........ 1

SUMMARY OF ARGUMENT ........ 2

I. INTRODUCTION ........ 4

II. THE DEPARTMENT OF JUSTICE HAS BEEN DISMISING NON-PROBATIONARY IMMIGRATION JUDGES AS A MEANS OF PRESSURING IMMIGRATION JUDGES TO DENY ASYLUM CLAIMS ........ 8

III. THE EXISTENCE OF A FINANCIAL INCENTIVE FOR IMMIGRATION JUDGES TO REJECT ASYLUM CLAIMS VIOLATES THE DUE PROCESS CLAUSE ........ 16

IV. ARTICLE II DOES NOT PRECLUDE CONGRESS FROM EXTENDING ORDINARY CIVIL SERVICE PROTECTIONS TO IMMIGRATION JUDGES. ........ 24

CONCLUSION ........ 28

## TABLE OF AUTHORITIES

### Cases

*A.A.R.P. v. Trump,* 605 U.S. 91 (2025).......................................................................18
*Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787 (2015) ........................................................................................................28
*Bradley v. Fisher*, 80 U.S. 335 (1871) .......................................................................22
*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976) .................................................................26
*Gibson v. Berryhill*, 411 U.S. 564 (1973) .................................................. 19, 20, 21
*Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748 (2025) ...........................27
*Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980)................................................. 21, 22
*Morrision v. Olson*, 487 U.S. 654 (1988) ..................................................................27
*Oria-Orellana v. Bondi*, 607 U.S. 537 (2026) .............................................................4
*Pierson v. Ray*, 386 U.S. 547 (1967)..........................................................................23
*Scott v. Stansfield*, L.R., 3 Ex. 220 (1868) .................................................................23
*Seila Law, L.L.C. v. Consumer Financial Protection Bureau,* 591 U.S. 197 (2020)7, 26, 27
*Trump v. J.G.G.*, 604 U. S. 670 (2025) ......................................................................18
*Tumey v. Ohio,* 273 U.S. 510 (1926)................................................................ 18, 19

### Statutes

5 U.S.C. § 7513 ..........................................................................................................17
5 U.S.C. §7513(a) ........................................................................................................28
8 U.S.C. §1158(b)(1)(B)(ii) ...........................................................................................5
8 U.S.C. §1158(b)(1)(B)(iii) ..........................................................................................5

### Regulations

8 C.F.R. § 1003.1(d)(3)(i) .............................................................................................5
8 C.F.R. § 1003.1(g)(2) ..................................................................................................5
8 C.F.R.§ 1003.10(b).......................................................................................................5

### Other Authorities

"The Entire System Will Collapse,'" Inside the Purge of US Immigration Courts," Mother Jones, March 6, 2025 .............................................................................9

"Era of Amnesty is Over: President Trump Restores Rule of Law to Immigration Courts." The White House, April 9, 2026 ....................................................11, 12

"How Trump Purged Immigration Judges to Speed Up Deportations." New York Times, April 9, 2026, updated April 13, 2026 ....................................................9

"Immigration Courts Thrown into Chaos as Trump Administration Purges Dozens of Judges," Politico, Dec. 6, 2025 ....................................................13

"Judges Are Getting Fired as Trump Pursues Immigration 'Purge,'" Bloomberg Law, Dec. 16, 2025....................................................13

"Justice Department targets slow judges as Trump pushes faster deportations." Washington Post, May 6, 2026....................................................15

"Key Trump Deportation Strategies: Remove, Replace, and Pressure the Immigration Judges," Just Security, July 17, 2026 ....................................................13

EOIR Policy Memorandum 25-42....................................................8, 12

## RULE 29(a)(4)(E) STATEMENT

No party's counsel authored this brief in whole or in part.

No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.

No person, other than the amicus curiae, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF INTEREST OF AMICUS

The National Association of Immigration Judges (NAIJ) is a voluntary organization of both current and former United States immigration judges. The NAIJ works to improve our court system through educating the public, legal community and media, testimony at congressional oversight hearings, and advocating and lobbying for immigration court reform and the improvement of the working conditions for immigration judges.

In this case NAIJ acts to protect the independence and integrity of the nation's immigration courts and judges. This is not a simple employment dispute. The Department of Justice is invoking its Article II argument to purge immigration judges with whose opinions it disagrees, and to pressure the immigration judges who remain to rule in favor of the government. An adjudicatory system tainted by such pressures is inconsistent with due process.

This brief places the dispute regarding the two petitioners in the context of the larger, multifaceted series of events that has transpired since January 2025 regarding immigration judges and courts, and reflects NAIJ's understanding of those developments.

## SUMMARY OF ARGUMENT

This case involves far more than the employment rights of the two petitioners. It concerns the legality of an ongoing practice that is being used to undermine the integrity, and ultimately the constitutionality, of the immigration court system.

Over the course of the last year, the Department of Justice, invoking its claimed Article II power to disregard the terms of the Civil Service Reform Act and fire any immigration judge, has systematically purged almost 40 non-probationary immigration judges. Those judges have been singled out for dismissal because government officials object to the manner in which they have been deciding cases, and to the frequency with which those judges have ruled against the Department of Homeland Security.

The government has candidly acknowledged why it is firing these judges. The White House announced that it was "replacing activist judges," and seeking to reduce the rate at which asylum claims were being granted. The acting Attorney General proclaimed that "[if] there's judges that are just not applying the law in the way that it needs to be applied, . . . they're the folks that we're going to try to find somebody different to fill that spot." Referring to immigration judges, the acting Attorney General promises that "we'll watch them." Immigration judges have been specifically warned by their supervisors that unidentified officials are

scrutinizing recordings of immigration court proceedings. Speaking on condition of anonymity, two federal government employees confirmed that "White House and Justice Department officials have carefully monitored judges' rulings, examining statistics showing how often they have granted asylum."

As a result of that monitoring and pattern of dismissals, immigration judges today are under constant pressure to either deport aliens or risk losing their jobs.

This practice clearly violates the due process rights of aliens whose claims are being adjudicated in immigration courts. *Tumey v. Ohio* entitles litigants to a judge who does not have at potential financial interest in the manner in which the judge decides the case. In *Tumey* due process was violated by a scheme under which the adjudicator received a mere $12 if he convicted a defendant. In immigration courts today, immigration judges know that if they rule too often in favor of aliens they risk being fired from a job paying 10,000 times more than the modest sum at issue in *Tumey* itself.

Article II need not and should not be construed to confer on the President and his subordinates a right to systematically violate the Due Process Clause of the Fifth Amendment.

## I. INTRODUCTION

A. Immigration judges are the trial-level administrative judges responsible for fact-finding and the initial application of immigration laws in immigration removal proceedings initiated by the Department of Homeland Security. They conduct large numbers of bench trials applying the statutes which control whether an alien can remain in the United States. The largest portion of those bench trials concern asylum claims. As the Solicitor General advised the Supreme Court earlier this year, "[t]he vast majority of [asylum] decisions turn on factual assessments, not on making new law about the legal standard."[1] Immigration judges also resolve cases regarding withholding of removal, cancellation of removal, adjustment of status, and application of the Convention Against Torture. These issues, like asylum claims, generally turn on factual assessments and the application of settled law. When an alien is taken into custody by federal officials, an immigration judge will determine whether he or she should be released on bond, except in limited circumstances.

The volume of cases which an immigration judge hears in a year is extraordinary. There are more than 800,000 new asylum applications filed each year, more than a thousand each for the 600-700 immigration judges.

---

[1] Brief for Respondent, *Oria-Orellana v. Bondi*, 607 U.S. 537 (2026), 4.

Unsurprisingly, there is a current backlog of over 3 million cases awaiting hearing and resolution.

Federal law recognizes the fact-bound nature of an immigration judge's responsibilities. The asylum statute attaches controlling importance to the assessment by "the trier of fact" of the credibility and weight of the evidence. 8 U.S.C. §1158(b)(1)(B)(ii). The statute spells out the considerations which "a trier of fact" may consider in determining credibility, which can be of critical importance in these cases. 8 U.S.C. §1158(b)(1)(B)(iii). Although immigration judge decisions are subject to review by the Board of Immigration Appeals, the Department of Justice has chosen to respect the preeminent role of immigration judges in making factual determinations. Under the Department's regulations, factual findings by an immigration judge may be overturned by the Board only if they are they are clearly erroneous (8 C.F.R. § 1003.1(d)(3)(i)), and immigration judges are directed to "exercise their independent judgment and discretion" in resolving cases. 8 C.F.R.§ 1003.10(b). Only the Board can issue precedential decisions. 8 C.F.R. § 1003.1(g)(2).

B. In January 2025 the Department dismissed appellant Jackler, who then held the position of Assistant Chief Immigration Judge (ACIJ). In its termination notice to Ms. Jackler, the Department explained only that she had been appointed as an Assistant Chief Immigration Judge (ACIJ) in June 2023. Because that was

less than two years earlier, Ms. Jackler was still a probationary ACIJ, and as a probationary employee could be removed from that position without cause. At that point in 2025, under the impetus of the so-called Department of Government Efficiency, federal agencies were dismissing large numbers of probationary employees. In connection with that then ongoing practice, the Department of Justice was firing significant numbers of probationary immigration judges and ACIJs.

However, before being promoted to the position of ACIJ, Jackler had been an immigration judge. Because she had been an immigration judge for more than two years, she was no longer a probationary employee in that capacity. Under the terms of the Civil Service Reform Act (CSRA), an ACIJ who was promoted from a non-probationary position is entitled to return to his or her prior position or some comparable job if terminated as an ACIJ. Therefore, although the Department could remove Jackler from her position as an ACIJ, under the terms of the CSRA it could not fire her. In all probability the decision to fire Jackler, rather than demote her back to her previous position as an immigration judge, was a mistake.

But rather than rectify that mistake, the Department took the position that under Article II it could fire non-probationary immigration judges without cause, and that the substantive and procedural guarantees of the CSRA were

unconstitutional as applied to an immigration judge. In its March 13, 2025, Narrative Response to Jackler's appeal to the MSPB, the Department asserted that

> clear case law authorizes the Attorney General to remove Immigration Judges without restriction. *See, e.g., Duenas* [*v. Garland*], 78 F.4th [1069], 1072 [(9th Cir. 2023)] (noting that "*nothing* restricts the Attorney General's ability to remove [immigration judges]"). Appellant has not explained how the Board has a basis to overturn an exercise of authority pursuant to Article II of the Constitution, and no such basis is apparent from any applicable source of law.

Agency Narrative Response, p. 9 (emphasis in narrative statement). The Department reiterated that position in May 30, 2025. Agency Closing Statement, p. 14 ("any restriction on the removal of an immigration judge from office would impermissibly encroach on the President's otherwise 'unrestricted removal power' with respect to "inferior officers." *Seila Law LLC*, [*v. Consumer Financial Protection Bureau*]. 591 U.S. [197,] 204 [(2020)]."

That legal position became the basis for an ongoing practice in July 2025. At that point in time, expressly invoking Article II, the Department began to deliberately dismiss a series of non-probationary immigration judges. In August 2025, the Executive Office for Immigration Review (EOIR) issued a Policy Memorandum expressly announcing to immigration judges its position that under

Article II the Attorney General could fire any immigration judge, and that the contrary provisions of the CSRA were unconstitutional.[2]

As of July 2026, the Department has terminated almost 40 non-probationary immigration judges under Article II, the most recent in late July of 2026.

## II. THE DEPARTMENT OF JUSTICE HAS BEEN DISMISING NON-PROBATIONARY IMMIGRATION JUDGES AS A MEANS OF PRESSURING IMMIGRATION JUDGES TO DENY ASYLUM CLAIMS

Dismissals of immigration judges began in February 2025, and continue to this day. But the nature of those terminations, and their consequence to the immigration courts, have changed fundamentally. In early 2025, immigration judges were understandably concerned about losing their jobs, but did not yet perceive in those dismissals any threat to the integrity of the immigration courts themselves. In March of 2025, a union president commented, "[t]hese [still employed immigration] judges are looking at it and thinking, if they're going to do this to my colleagues, who's next?"[3] A year later, the New York Times correctly

---

[2] EOIR PM 25-42 (August 22, 2025) ("nothing in . . . applicable law, limits the Attorney General's supervisory authority over EOIR adjudicators, all of whom are inferior officers subject to both appointment and removal by the Attorney General exercising executive authority enshrined in Article II of the Constitution on behalf of the President").

[3] Mother Jones, "'The Entire System Will Collapse,'" Inside the Purge of US Immigration Courts," (March 6, 2025).

described a very different, widespread concern on the part of immigration judges, one of constitutional magnitude, reporting that “in interviews, more than two dozen immigration judges who have served under the second Trump administration described feeling a consistent sense of pressure to deport immigrants or risk losing their jobs.”[4] That difference is a result of the complex series of events that occurred at the Department of Justice during the intervening year.

In March of 2025 the dismissals of immigration judges was limited to judges who had served for less than two years, and were thus probationary employees. Under the CSRA probationary employees have very limited rights, and can be dismissed without cause. For the agents of the so-called Department of Government Efficiency, probationary employees werethus easy to fire, and tens of thousands of probationary federal workers were being dismissed across a wide range of federal agencies. Those dismissals were often criticized as hasty and ill-considered; the DOGE operatives typically had very little understanding of the agencies they were undermining, or of the work of the federal employees they were firing. “Who’s next” reflected the common objection that there was little rhyme or reason to each succeeding wave of dismissals. In the case of the

---

[4] New York Times, April 9, 2026, updated April 13, “How Trump Purged Immigration Judges to Speed Up Deportations.”

immigration court dismissals, most of the probationary judges fired in February 2025, in the first wave of dismissals, were seemingly selected simply because they were the most recently hired, having been appointed in the last week of December 2024 or the first week of January 2025. The probationary judges who remained were likely worried that they might fall victim to the seemingly random layoffs (as many did) and that the agency was becoming even more understaffed. But whatever standard was being used to select the probationary judges to be fired was more likely to be criticized as irrational, rather than as in some sense nefarious.

The dismissal of probationary judges virtually ended in September 2025. Today DOGE has little if any role in federal affairs, and the Department of Justice is enthusiastically hiring additional immigration judges. But the Department is simultaneously systemically firing *non*-probationary judges, invoking Article II to do so without any explanation and without any of the procedures required by the CSRA. That ongoing purge is gravely undermining the integrity and independence of the immigration courts, and not by chance.

Once the Department began firing non-probationary judges in July 2025, and it became clear that the Department would continue doing so, it became a matter of urgent concern to the remaining judges to understand how the Department was choosing the particular judges to be dismissed. It quickly became apparent that

judges were being singled out for termination because higher officials did not approve of the way in which the selected judges had decided cases.

The ongoing Justice Department practice can be traced to a White House press release of April 9, 2025.[5] The announcement candidly explained why the administration wanted to fire certain immigration judges.

> President Trump took decisive action, replacing activist judges—who slow-walked deportations and granted asylum at sky-high rate—with professionals committed to understanding the law, not undermining it.

The announcement insisted that there would be "no more activist judges shielding criminal illegals." *Id*. "Activist judge" is a phrase of art in the current administration for a judge who has decided a case in a manner with which the government disapproves.

There were two additional references in the press release to the rate at which applications for asylum were granted. One passage recounted "Asylum grant rates have collapsed: Under President Trump, asylum is now granted in just 7% of cases—a historic low: plummeting from over 50% rubber-stamped under Biden." *Id.* (emphases in original). A graph depicted asylum as being granted in only 7%

---

[5] The White House, "Era of Amnesty is Over: President Trump Restores Rule of Law to Immigration Courts." https://www.whitehouse.gov/releases/2026/04/era-of-amnesty-is-over-president-trump-restores-rule-of-law-to-immigration-courts/

of cases as of February 2025, compared to approximately 30% in the last month of the Biden administration.

This focus on the rate at which a judge ruled in favor of immigrants continued in later actions. In an August 2025 Policy Memorandum regarding "the appropriateness of corrective action or discipline for an adjudicator," the Director of EOIR indicated her office would regard such statistics as possible evidence of bias or lawlessness warranting disciplinary measures.

> Adjudicatory outliers or statistically improbable outcome metrics, particularly relative to EOIR's overall adjudicator corps and after controlling for sample size and relevant docket characteristics, may be indicative of a systematic bias or failure to adhere to applicable law that warrants close examination and potential action.

EOIR PM 25-42, 4.

The pattern of dismissals that emerged in 2025 confirmed that the priorities in the April 9 press release animated the Department's decisions. The judges being dismissed almost all had been upholding asylum claims more often than the average immigration judge; virtually no judges who ruled against a majority of asylum claims were being fired. A number of news organizations published analyses identifying that pattern.[6] Sitting immigration judges did not need a

---

[6] *E.g.,* "How Trump Purged Immigration Judges to Speed Up Deportations," New York Times, April 9, 2026, updated April 13; "Key Trump Deportation Strategies: Remove, Replace, and Pressure the Immigration Judges," Just Security, July 17, 2026; "Judges Are Getting Fired as Trump Pursues Immigration 'Purge,'"

statistical analysis to understand what was happening; they knew personally many of the judges being fired, and retained, and understood the differences in their records. Well publicized mass firings drew national attention to the pattern. The Department fired five San Francisco immigration judges on November 21, 2025, and six New York City immigration judges on December 1. Press accounts pointed out what most immigration judges knew, that asylum applications had been more successful in those courts (and before those judges) than in other parts of the country. As a practical matter, the success rate of asylum claims varies for reasons having nothing to do with a judge's views; for example, asylum claims are successful 62% of the time from applicants from China, and 59% of the time from Russians, compared to only 5% of claims from individuals from Mexico. The types of cases assigned to a judge could affect his or her overall statistics, as could differences in the applicable circuit precedent. But the pattern of dismissals did not appear to take such factors into account.

Earlier this year the New York Times reported that "[d]uring Mr. Trump's second term, White House and Justice Department officials have carefully monitored judges' rulings, examining statistics showing how often they have granted asylum, according to two federal government employees with knowledge

---

Bloomberg Law, Dec. 16, 2025; "Immigration Courts Thrown into Chaos as Trump Administration Purges Dozens of Judges," Politico, Dec. 6, 2025.

of the activity who spoke on condition of anonymity for fear of retaliation."[7] That confirmed what many immigration judges have long believed was occurring. Obviously some type of systemic collection of information would have to be occurring to enable the Department to decide who among the hundreds of immigration judges to dismiss.

In May of 2026 the acting Attorney General announced that it was Department policy to monitor the opinions and actions of immigration judges, and to remove those of whom it disapproved. "If there's judges that are just not applying the law in the way that it needs to be applied, delaying inappropriately, have backlogs that are just unacceptable, they're the folks that we're going to try to find somebody different to fill that spot."[8] "We have a very rigorous process to get people interviewed, approved and then trained up. And then we'll watch them."[9] A recently hired (now former) immigration judge advised Congress that trainees were instructed that the Department would be "watching" them.[10] That is

---

[7]New York Times, April 9, 2026, updated April 13, "How Trump Purged Immigration Judges to Speed Up Deportations."

[8] Washington Post, May 6, 2026, "Justice Department targets slow judges as Trump pushes faster deportations."

[9] *Id*.

[10] "[The director of EOIR] stated that while immigration judges (IJs) had 'judicial autonomy,' they had fired almost 100 judges to date and were watching new judges very carefully," New York Times, April 9, 2026, updated April 13, "How Trump Purged Immigration Judges to Speed Up Deportations."

consistent with the official warnings given to existing immigration judges, who beginning in May of 2025 were admonished by Assistant Chief Immigration Judges that their hearings are being monitored. Such warnings did not merely inform immigration judges; they alerted judges to the risk of doing things at their hearings that might draw official attention and disapproval.

The understanding among immigration judges regarding what they must do to avoid being dismissed has been shaped in part by the manner in which the Department has been recruiting new judges. In a widely publicized online job announcement, first posted in November 2025, the Department describes the position as "deportation judge."[11] That label is generally understood to reflect the Department's desire that immigration judges decide cases in a manner that maximizes the number of immigrants who are deported. It would obviously be imprudent to be known, instead, as an "activist judge.""

In sum, non-probationary immigrations judges have for over a year been selectively dismissed under Article II, without an explanation in any individual case of why that action was taken. The information available to the remaining judges indicates that dismissal decisions are likely to be based, at least in part, on the rate at which a judge grants asylum petitions, and on whether a judge has

[11] https://join.justice.gov/ (last viewed July 28, 2026).

issued opinions with which the Department of Justice disagrees. The risk of dismissal would also likely be greater if an immigration judge decided adversely to the Department of Homeland Security a case involving a high profile alien. That has been a widespread and reasonable concern among immigration judges since the spring of 2025, when the February 21, 2025, Policy Memorandum 25-23, questioning the validity of the CSRA ,was followed by the April 9, 2025, White House press release criticizing “activist [immigration] judges” and “sky-high” asylum grant rates.

For Justice Department and White House policymakers, this may all seem like an ingenious way to increase the rate of deportations without being seen to expressly threaten immigration judges with dismissal if they grant too many asylum claims too frequently or grant bond too often. How well that pressure is working could be difficult to assess. But the resulting due process violation is clear.

## III. THE EXISTENCE OF A FINANCIAL INCENTIVE FOR IMMIGRATION JUDGES TO REJECT ASYLUM CLAIMS VIOLATES THE DUE PROCESS CLAUSE

This case concerns the constitutionality of section 7513, which provides certain procedural and substantive protections to civil servants such as Jackler and

Jaroch. 5 U.S.C. § 7513. The MSPB, considering only Article II of the U.S. Constitution, held that section 7513 is unconstitutional. But the proper constitutional analysis in this case necessarily turns, to at least an equal degree, on the Due Process Clause.

Immigration judges such as petitioners are responsible for determining the rights, claims and liberty of aliens; the underlying issues are of enormous practical important to those litigants, determining among other things whether they can remain in the United States (e.g., based on a claim for asylum), and whether they can remain out on bond during the pendency of the litigation. The Fifth Amendment entitles aliens to procedural due process in the context of these administrative adjudications. *A.A.R.P. v. Trump,* 605 U.S. 91, 94 (2025); *Trump v. J.G.G.*, 604 U. S. 670, 673 (2025) (per curiam). Although the requirements of due process vary with the circumstances in which a question arises, in the context of a formal adjudication due process requires a fair tribunal that meets constitutional standards.

The leading case regarding that due process requirement is *Tumey v. Ohio,* 273 U.S. 510 (1926). Tumey had been convicted following a bench trial. Under the applicable statute, the official who convicted Tumey received $12 for his costs. Had Tumey been acquitted, the adjudicator would not have received that payment. The Supreme Court held that arrangement violated due process.

> [I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case. The [adjudicator] has a direct personal pecuniary interest in convicting the defendant who came before him for trial, in the $12 of costs imposed in his behalf, which he would not have received if the defendant had been acquitted.

273 U.S. at 523. Due process is not satisfied by a showing that the adjudicator in question, or even that most judges, would not be prejudiced by the personal consequence of a conviction or acquittal

> There are doubtless mayors who would not allow such a consideration as $12 costs in each case to affect their judgment in it, but the requirement of due process of law in judicial procedure is not satisfied by the argument that men of the highest honor and the greatest self-sacrifice could carry it on without danger of injustice. Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

273 U.S. at 532. Due process is violated by any arrangement that creates a "possible temptation" to tip the scales of justice even a little in favor of the result beneficial to the judge.

The Supreme Court elaborated the requirement of *Tumey* in *Gibson v. Berryhill*, 411 U.S. 564 (1973). *Gibson* was an administrative proceeding before the Alabama Board of Optometry, which had been asked to suspend or revoke the licenses of certain optometrists because they worked for a corporation (Lee

Optical), rather than being in private practice. A decision by the Board would not have resulted in any payment of costs or penalties to the Board members. But the Board members were themselves optometrists in private practice; if Lee Optical were shut down, there was a possibility that the Board members might get some additional clients. The Court upheld the district court decision that the adjudication of that issue by such a Board violated due process.

> For the District Court, the inquiry was not whether the Board members were 'actually biased but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.' 331 F. Supp., [122,] 125 [(M.D. Ala. 1971)] . Such a possibility of bias was found to arise in the present case from a number of factors. . . [T]he court found as a fact that Lee Optical Co. did a large business in Alabama, and that if it were forced to suspend operations the individual members of the Board, along with other private practitioners of optometry, would fall heir to this business. Thus, a serious question of a personal financial stake in the matter in controversy was raised.

411 U.S. at 571.

> Because the Board of Optometry was composed solely of optometrists in private practice for their own account, the District Court concluded that success in the Board's efforts would *possibly* redound to the personal benefit of members of the Board, sufficiently so that in the opinion of the District Court the Board was constitutionally disqualified from hearing the charges filed against the appellees.

411 U.S. at 578 (emphasis added). In upholding the conclusion that adjudication by the Board would violate due process, that Court explained that "the financial stake need not be as direct or positive as it appeared to be in *Tumey*." 411 U.S. at 579.

The Court also held that the due process standard in *Tumey* applies to administrative adjudications. *Id.*

*Marshall v. Jerrico, Inc.,* 446 U.S. 238 (1980), further clarified the scope of *Tumey*. In *Marshall* an Assistant Regional Administrator of the Department of Labor had assessed a substantial amount in penalties against an employer for violations of the child labor provisions of the Fair Labor Standards Act. The district court concluded that the assessment violated *Tumey*, because it was possible that such funds (although initially paid to the Department) could be turned over to the regional office. *Tumey* had held that sometimes an adjudicator's interest in obtaining funds for official use (e.g., a major's interest in fines payable to the city) could violate due process. But the Supreme Court concluded in *Marhsall* that no due process violation had occurred there, because there was little chance that the regional office would ever benefit by assessing an award of greater size (or at all). In practice, on those occasions in which the Department had disbursed collected penalties to regional offices, the disbursements had been proportional to what each office had spent on such cases, not to the amount the office had won. The Court explained that a series of unlikely occurrences, including a change in that practice, would have to occur for any benefit to accrue to a regional office based on the amount of penalties it had won. Although it might have been legally permissible under the statute for the Department to return awards

to the office which won them, the Department had never done so. Thus, the Court concluded that the statute "as presently administered" did not violate due process. 446 U.S. at 252.

The basic principle of *Tumey* applies to every federal or state court, including to immigration courts. The $12 awarded in 1925 to the adjudicator in *Tumey* is the equivalent of $229 today. If the Attorney General were to give immigration judges a $229 bonus every time they denied an asylum claim, those adjudications would obviously violate due process.

The issue in the instant case is not that immigration judges may benefit from ruling against an immigrant, but that judges may be worse off (fired) if they fail to do so. The distinction between financial benefit and financial harm is irrelevant. "[I]t is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 80 U.S. 335, 347 (1871). "[It is] for the benefit of the public [,in] whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequences." *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (quoting *Scott v. Stansfield*, L.R., 3 Ex. 220, 223 (1868)). If the Department were to dock a judge's pay $229 every time he or she granted an

asylum petition, that would be economically indistinguishable from a bonus in the same amount for denying a petition.

Much more is at stake here than a bonus, or pay cut, of a mere $229. The Department of Justice, invoking its claim that the CSRA violates Article II, has for a year treated immigration judges as at-will employees, and has fired almost 40. The prospect of such a dismissal—without prior hearing or possibility redress--would be far more likely than the award of $12 in *Tumey* to "offer a possible temptation to the average man as judge . . . not to hold the balance nice, clear, and true between [the Department of Homeland Security] and [an immigrant] . . . ." If an immigration judge were instructed, on pain of dismissal, to deny a particular asylum claim, any resulting denial of that claim would clearly be overturned under *Tumey* as a violation of due process.

*Gibson* makes clear that the rule in *Tumey* is not limited to situations in which the benefit (or harm) to an adjudicator is certain. Just as in *Gibson* the members of the Optometry Board might have influenced by the possibility that closing Lee Optical might lead to more clients for the board members, so in this case the risk of dismissal could influence the decision of any judge. As a practical matter, even a slight possibility of dismissal from a well-paid and prestigious position is more likely to taint a decision than the certainty of a $229 bonus.

Under the terms of the CSRA, there would be little chance that an immigration judge could be dismissed because of a decision that was unpopular at the Justice Department or even the White House. The statute limits the grounds on which an immigration judge can be fired, requires a pre-termination process, and permits a dismissed judge to seek review by the MSPB (the remedy which Jackler and Jaroch sought in vain). Prior to 2025, the protections accorded to federal employees by the CSRA would doubtless have precluded a *Tumey* challenge to the decision of an immigration judge.

Now, however, the MSPB, at the urging of the Department of Justice, has held that those CSRA protections, as applied to immigration judges, are unconstitutional, fundamentally altering the *Tumey* assessment. The issue is not whether the mere absence of those CSRA protections, without more, would result in a *Tumey* violation. For more than a year, the Department of Justice has been acting on its view that immigration judges are at will-employees, and has dismissed dozens of those judges. The controlling question is thus a practical one, whether the scheme under which immigration judges are employed and dismissed, "as presently administered," is consistent with *Tumey*. That turns on whether current practice would create for "an average man [or woman] as [immigration] judge" "a possible temptation" to treat a case differently in the fear that a decision

in favor of an immigrant, or a series of such decisions, could increase the risk of dismissal. Clearly it would.

## IV. ARTICLE II DOES NOT PRECLUDE CONGRESS FROM EXTENDING ORDINARY CIVIL SERVICE PROTECTIONS TO IMMIGRATION JUDGES.

The MSPB analyzed the Department's as-applied challenge to the CSRA solely in light of its interpretation of Article II. But treating judges as at-will employees under present circumstances gives rise to a clear violation of the Due Process Clause. However Article II might be construed in isolation, and whatever it might mean in other contexts, here a court must interpret the Constitution as a whole.

The MSPB's interpretation of Article II has collided to an intolerable degree with the requirements of the Due Process Clause. The combination of targeted dismissals, veiled and overt threats, public policy announcements and private pressure has created an adjudicatory system that is the very model of what *Tumey v. Ohio* was intended to prevent. If Article II as originally enacted compelled treating administrative judges as at-will employees, the subsequent adoption of the Due Process Clause in the Fifth Amendment removed any constitutional obstacle

to a statute such as the CSRA that protects the integrity of administrative adjudication. *See Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976).

There is, however, no need to interpret Article II in that manner. The MSPB's analysis of Article II is clearly wrong. The MSPB described *Seila Law, L.L.C. v. Consumer Financial Protection Bureau,* 591 U.S. 197 (2020), as "observing that at-will removal should be considered the default position for officers in the Executive Branch, except for 'inferior officers with limited duties and no policymaking or administrative authority . . . .'"). 2026 MSPB 3, 6 (2025). *Seila Law* contains no such holding. The passage quoted from *Seila Law* does not limit the exceptions to application that could exist to Article II; rather it simply described what "up to now" had been the only recognized exceptions.

> These two exceptions—one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority—"represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *PHH* [*Corporation v. Consumer Financial Protection Bureau*], 881 F.3d [75,] 196 [(D.C. Cir. 2018)] (Kavanaugh, J., dissenting) (internal quotation marks omitted).

591 U.S. at 218. The phrase "default position" does not appear in *Seila Law* at all.

After noting that the independent counsel in *Morrision v. Olson*, 487 U.S. 654 (1988) lacked policymaking or significant administrative authority, the MSPB asserted that

> [t]he Court recently reaffirmed this holding in . . . *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 762-64 (2025) (discussing removability at will as "the default presumption" for inferior officers in the Executive Branch).

2026 MSPB at 6. But *Braidwood Management* had nothing to do with Article II. Rather, the question there was whether the superior officer who had appointed certain inferior officers could remove those inferior officers without some express statutory authorization. The Supreme Court merely held that a superior officer is presumptively empowered to do so even in the absence of any such specific statutory sanction. It explained that superior officer could do so in that case because "no statute restricts removal of [the inferior officers]." 606 U.S. at 764. To make clear that the "default" rule in favor of removability concerned only an official's power in the absence of specific statutory authorization (not any constitutional rule) the Court added:

> [w]hen Congress wants to depart from the default of at-will removability and instead furnish for-cause protection, it knows how to do so. In many statutes, Congress has specified that officers shall be removed only for good cause, often using a formulation like . . . "for such cause as will promote the efficiency of the service" (. . . 5 U.S.C. §7513(a)).

Section 7513(a), of course, is the very statute at issue in this case.

If the framers indeed intended that Article II require treating some inferior officers as at-will employees, it is inconceivable that they wanted Article II to mandate that precarious status for judges. One of the specific grievances recounted by the Declaration of Independence was that King George "has made Judges

dependent on his Will alone, for the tenure of their offices . . . ." The government contends that Article II makes immigration judges "dependent on [the Attorney General's] will alone." But Article II cannot plausibly be read to embody in the Constitution itself what the framers regarded as one of the great abuses of the English monarch. The Supreme Court has repeatedly relied on the terms of the Declaration of Independence in construing the essentially contemporaneous provisions of the Constitution. *E.g., Arizona State Legislature v. Arizona Independent Redistricting Commission*, 576 U.S. 787, 820 (2015)

If that Article II limits the ability of Congress to establish standards and procedures for removing inferior officers, it does so at most only where those standards and procedures would interfere impermissibly with the President's constitutional obligations to ensure faithful execution of the laws. The role of immigration judges in making individual factual assessments falls far short of that standard.

Were this court to hold, as the Department urges, that immigration judges are at-will employees, that would be likely to cripple—not advance—the ability of the President to ensure the faithful execution of the laws. In light of the experience of the last 18 months, there is a substantial probability that any immigration judge decision made since the spring of 2025 would be held invalid under *Tumey*. And decisions by an immigration judge is usually the sole method authorized by

Congress for resolving immigration disputes, such as asylum claims. Without a constitutional method of deciding immigration cases, much of the immigration system would grind to a halt. Nothing in the Supreme Court's Article II jurisprudence requires that this court provide the government with such a pyrrhic victory.

## CONCLUSION

Immigration statutes are complex and exacting. The standard for asylum can be a demanding one. Not all the individuals who appear in immigration court will or should prevail. But every person whose claim is heard in that court is entitled—in the same full measure as the Department of Homeland Security—to a decision based on the law and the facts, handed down by an immigration judge who need not worry about whether he or she will be fired because of his or her action in that case. That is the promise of *Tumey v. Ohio*, that is the promise of the Due Process Clause of the Bill of Rights, and that is the promise which this court must keep.

For the above reasons, the decision of the Merit Systems Protection Board should be reversed.

Respectfully submitted,

/s/Richard R. Renner
RICHARD R. RENNER
The Noble Law
700 Spring Forest Rd.
Suite 205
Raleigh, N.C. 27609
(919) 251-6008
rrenner@igc.org

ERIC SCHNAPPER
University of Washington
School of Law
Box 353020
Seattle, WA 98195
(206) 660-8845

*Counsel for Amicus*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the type-volume limitation set forth in Fed. R. app. P. 32(b)(1). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), this *amicus* brief contains 6,285 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionately spaced font.

/s/Richard R. Renner
Richard R. Renner

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing with the United States Court of Appeals for the Federal Circuit through the CM/ECF system on August 4, 2026. I further certify that copies of the foregoing will be served by email on the Merit Systems Protection Board, which consented to email service, at the addresses below:

katherine.smith@mspb.gov

stephen.fung@mspb.gov

/s/Richard R. Renner
Richard R. Renner