NO. 26-1575

# BRIEF FOR RESPONDENT MERIT SYSTEMS PROTECTION BOARD

---

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

MEGAN JACKLER, BRANDON JAROCH,
Petitioners,

v.

MERIT SYSTEMS PROTECTION BOARD,
Respondent,

and

DEPARTMENT OF JUSTICE,
Intervenor.

---

PETITION FOR REVIEW OF A DECISION OF THE
MERIT SYSTEMS PROTECTION BOARD IN NO. CF-0752-26-0069-I-1

---

Respectfully submitted,

KATHERINE M. SMITH
Acting General Counsel

Stephen Fung
Attorney
Office of the General Counsel
Merit Systems Protection Board
1615 M Street, NW
Washington, DC 20419-0002
(771) 210-1577

DATE: August 28, 2026

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ........ iii

**STATEMENT OF RELATED CASES** ........ vii

**JURISDICTIONAL STATEMENT** ........ vii

**STATEMENT OF THE ISSUE** ........ 1

**STATEMENT OF THE CASE** ........ 2

- **A. Factual Background** ........ 2
- **B. Immigration Judge Positions** ........ 3
- **C. MSPB Proceedings** ........ 5
  - **1. Initial Appeals** ........ 5
  - **2. Initial Decisions** ........ 6
  - **3. Administrative Petitions for Review** ........ 7
  - **4. The Board's Final Order** ........ 8

**SUMMARY OF ARGUMENT** ........ 10

**ARGUMENT** ........ 13

- **I. Standard of Review** ........ 13
- **II. The Board Correctly Found the CSRA's Removal Protections Cannot Constitutionally Apply to Petitioners** ........ 14
  - **A. The Supreme Court Has Consistently Forbidden Congress from Imposing Removal Restrictions for Executive Branch Officers Wielding Significant Authority** ........ 14

1. **The Historical Support for Robust Removal Power .17**

a. **The Decision of 1789 ..........................................17**

b. **The Supreme Court's *Myers* Decision .............19**

c. **Subsequent Decisions Supporting the Removal Power ..................................................................21**

2. **Exceptions to the General Removal Power ................23**

3. **The Supreme Court's Current Jurisprudence ..........27**

B. **The Board's Decision Adhered to the Supreme Court's Precedent.....................................................................29**

1. **The Board's Decision Stayed Within the Boundaries Established in *Seila Law* ..............................................30**

2. **The Board's Decision Does Not Contradict Prior Supreme Court Precedent............................................34**

a. **Seila Law Mandated the Board's Result..........34**

b. ***Morrison* Does Not Support Removal Restrictions for Petitioners................................37**

c. ***Arthrex* Does Not Compel Removal Restrictions for Petitioners .....................................................38**

III. **Petitioner's Policy Concerns Do Not Warrant Reversal ..........................41**

A. **The Scope of the Board's Decision is Limited......................41**

B. **The Board's Decision Was Its Own.......................................44**

C. **The Board's Jurisdiction Cannot Depend Solely on the Agency's Invocation of Article II ..........................................45**

**CONCLUSION.....................................................................................47**

# TABLE OF AUTHORITIES

## Cases

*Antolin v. Department of Justice*, 895 F.2d 1395, 1396 (Fed. Cir. 1989)............46
*Arizona v. United States*, 567 U.S. 387, 395 (2012) ..........................................32
*Bayly v. Office of Pers. Mgmt.*, 42 M.S.P.R. 524, 525-26 (1990) ........................42
*Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998) ................14
*Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3188 (1986) ....... 16, 21, 22
*Collins v. Yellen*, 594 U.S. 220, 141 S.Ct. 1761, 210 L.Ed.2d 432 (2021)...........27
*Edmond v. United States,* 520 U.S. 651, 660, 117 S.Ct. 1573, 1579, 520 U.S. 651, 660 (1997) ..........................................................................................15
*Elgin v. Department of Treasury*, 567 U.S. 1, 15-21 (2012)...............................42
*Forest v. Merit Sys. Prot. Bd.*, 47 F.3d 409, 410 (Fed. Cir. 1995) .......................13
*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 513-14, 130 S.Ct. 3138, 3164 (2010) ........................................ 16, 22, 34
*Garcia v. Department of Homeland Security*, 432 F.3d 1322, 1327 (Fed. Cir. 2006) ..........................................................................................46, 47
*Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611) (1935)..........................................................................................passim
*Jackler and Jaroch Consolidation v. Department of Justice and Director of the Office of Personnel Management*, MSPB Docket No. CF-0752-26-0069-I-1 .....2
*Malone v. Dep't of Justice*, 14 M.S.P.R. 403, 406 (1983)..................................42
*May v. Office of Personnel Management*, 38 M.S.P.R. 534, 538 (1988).............42
*Morrison v. Olson*, 487 U.S. 654, 685-93, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) ..........................................................................................passim
*Myers v. United States*, 272 U.S. 52, 111-132, 47 S.Ct. 21, 23-30 (1926) .... passim
*Parsons v. United States*, 167 U.S. 324, 343, 17 S.Ct. 880, 887 42 L.Ed. 185 (1897) ..........................................................................................19

*PHH Corporation v. Consumer Financial Protection Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) .......... 28

*Plyler v. Doe*, 457 U.S. 202, 242, 102 S.Ct. 2382, 2408 (1982) (Burger, J., dissenting) .......... 44

*Seila Law, LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213, 140 S.Ct. 2183, 2197 (2020) .......... passim

*Shurtleff v. United States*, 189 U.S. 311, 314-15, 23 S.Ct. 535, 536, 47 L.Ed. 828 (1903) .......... 20

*Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) .......... 42

*Synan v. Merit Sys. Prot. Bd.*, 765 F.2d 1099, 1100 (Fed. Cir. 1985) .......... 45

*Trump v. Hawaii*, 585 U.S. 667, 702-10 (2018) .......... 32, 37

*Trump v. Slaughter*, 146 S.Ct. 2283 (2026) .......... 24, 29, 33, 43

*TVA v. Hill*, 437 U.S. 153, 194–195, 98 S.Ct. 2278, 2301–2302, 57 L.Ed.2d 312 (1978) .......... 44

*U.S. v. Perkins*, 116 U.S. 483, 483-85, 6 S.Ct. 449 (1886) .......... passim

*United States v. Arthrex, Inc.*, 594 U.S. 1, 141 S.Ct. 1970, 210 L.Ed.2d 268 (2021) .......... 38, 39, 40, 41

*Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958) .......... 25

**Statutes**

28 U.S.C. § 1295(a)(9) .......... vii

5 U.S.C. § 7511 .......... 5, 6

5 U.S.C. § 7513 .......... 6

5 U.S.C. § 7513(b) .......... 5

5 U.S.C. § 7701 .......... 13

5 U.S.C. § 7701(a) .......... 46

5 U.S.C. § 7701(d)(1) .......... 6

5 U.S.C. § 7703 .......... 13

5 U.S.C. § 7703(b)(1)(A) .......... vii
8 U.S.C. § 1229a(a)(1) .......... 3, 31
8 U.S.C. § 1229a(a)(3) .......... 3, 31
8 U.S.C. § 1229a(b)(1) .......... 4
8 U.S.C. § 1229a(c)(1)(A) .......... 4

**Other Authorities**

1 Annals of Congress, at 387-399, 473-599 .......... 17
1 Annals of Congress, at 481 .......... 18
1 Annals of Congress, at 518 .......... 18
1 Annals of Congress, at 599 .......... 18
30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939) .......... 15
John Adams, "Notes of a Debate in the Senate" (July 15, 1789), in The Works of John Adams, vol. 3, pp. 407–412 (Charles Francis Adams ed., 1851) .......... 19
Pacificus No. 1, June 29, 1793, in 15 Papers of Alexander Hamilton 39–40 (H. Syrett ed. 1969) .......... 19
Postal laws and regulations of the United States of America, Edition of 1924, §§ 292-306, in effect July 1, 1924, available at https://catalog.hathitrust.org/Record/102675623/Home (last viewed August 24, 2026) .......... 36
*The Federalist No. 77*, at 459 .......... 19
U.S. Const. art. II, § 1, cl. 1 .......... 14
U.S. Const. art. II, § 2, cl. 2 .......... 15
U.S. Const. art. II, § 3 .......... 15

**Treatises**

3 K. Davis, Administrative Law Treatise § 20.04, at 74 (1958) .......... 42

**Regulations**

8 C.F.R. § 1003.1(d)(3)(i) .......... 4, 31
8 C.F.R. § 1003.10(a) .......... 4

8 C.F.R. § 1003.10(b) ........................................................................ 4
8 C.F.R. § 1240.1(a)(1)(i)-(iii) ........................................................... 4, 32
8 C.F.R. § 1241.1(a)-(f) ................................................................. 5, 31

## STATEMENT OF RELATED CASES

Counsel for respondent is aware of two cases pending in this Court that will be affected by the Court's decision in this case:

1) *Morwood, et al v. Merit Systems Protection Board*, Case No. 26-2023;

2) *Morwood v. Merit Systems Protection Board*, Case No. 26-2031.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this appeal pursuant to 5 U.S.C. § 7703(b)(1)(A) and 28 U.S.C. § 1295(a)(9).

NO. 26-1575

BRIEF FOR RESPONDENT MERIT SYSTEMS PROTECTION BOARD

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

MEGAN JACKLER, BRANDON JAROCH,
Petitioners,

v.

MERIT SYSTEMS PROTECTION BOARD,
Respondent,

and

DEPARTMENT OF JUSTICE,
Intervenor.

PETITION FOR REVIEW OF A DECISION OF THE
MERIT SYSTEMS PROTECTION BOARD IN NO. CF-0752-26-0069-I-1

## STATEMENT OF THE ISSUE

Whether the Merit Systems Protection Board correctly dismissed petitioners' appeals for lack of jurisdiction because the Supreme Court's precedents forbid the application of the removal protections contained at 5 U.S.C. § 7513 to petitioners, due to the significant administrative authority and policymaking ability vested in their positions.

# STATEMENT OF THE CASE

## I. Nature of the Case

Petitioners, Megan Jackler and Brandon Jaroch, seek review of an MSPB consolidated decision dismissing their appeals of their removals for lack of jurisdiction. *Jackler and Jaroch Consolidation v. Department of Justice and Director of the Office of Personnel Management*, MSPB Docket No. CF-0752-26-0069-I-1 (Initial Decisions, August 22, 2025; Final Order, March 20, 2026). Appx001-022; Appx033-066. The Board consolidated petitioners' appeals, vacated the initial decisions of the administrative judge, and dismissed the consolidated appeals for lack of jurisdiction, based on the Board's finding that the United States Constitution prohibited application of the Civil Service Reform Act to petitioners based on the nature of their positions. Appx008-016.

## II. Statement of Facts and Disposition Below

### A. Factual Background

On June 20, 2021, the Department of Justice ("DOJ" or "agency") appointed petitioner Jackler to the position of Assistant Chief Immigration Judge in the agency's Executive Office for Immigration Review ("EOIR")

in its New Orleans Office.[1] Appx217. On September 26, 2021, the agency appointed petitioner Jaroch to the position of Assistant Chief Immigration Judge in EOIR's Buffalo office.[2] Appx264. Petitioner Jaroch subsequently relocated to the agency's Houston office. Appx408. On February 14, 2025, the Acting Director of EOIR informed petitioners that their employment was being terminated effective that day. Appx094; Appx101. On February 20, 2025, petitioner Jaroch appealed his termination to the Board. Appx095-101. On February 21, 2025, petitioner Jackler appealed her termination to the Board. Appx088-094.

### B. Immigration Judge Positions

As immigration judges, petitioners had conducted "proceedings for deciding the inadmissibility or deportability of an alien," 8 U.S.C. § 1229a(a)(1), which proceedings are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or . . . removed from the United States," 8 U.S.C. § 1229a(a)(3). When conducting

[1] Petitioner Jackler was initially appointed to the position on June 21, 2021, for a period not to exceed 24 months. Appx217. On May 31, 2023, the Attorney General appointed petitioner Jackler to the same position effective June 19, 2023, on a permanent basis. Appx211-212.

[2] Petitioner Jaroch was initially appointed to the position on September 26, 2021, for a period not to exceed 24 months. Appx264. On September 25, 2023, the Attorney General appointed petitioner Jaroch to the same position on a permanent basis. Appx257-258.

these proceedings, petitioners were empowered to "administer oaths; receive evidence; interrogate, examine, and cross-examine . . . witnesses"; "issue subpoenas"; and "sanction . . . any action or inaction in contempt of the judge's proper exercise of Authority." 8 U.S.C. § 1229a(b)(1). At the close of proceedings, petitioners issued decisions determining "whether an alien is removable from the United States." 8 U.S.C. § 1229a(c)(1)(A).

As immigration judges, petitioners acted as delegates of the Attorney General in cases before them. 8 C.F.R. § 1003.10(a). In doing so, they exercised their independent judgment and discretion in conducting hearings and issuing decisions. 8 C.F.R. § 1003.10(b). Petitioners had authority to grant aliens a wide range of immigration benefits, including adjusting immigration status, granting waivers for inadmissibility, determining removability, granting asylum, allowing voluntary departure, and ordering withholding of removal. 8 C.F.R. § 1240.1(a)(1)(i)-(iii). Their decisions as immigration judges were subject to only limited appellate review; their factfinding was reviewed by the Board of Immigration Appeals ("BIA") only to determine if the factual findings were "clearly erroneous." 8 C.F.R. § 1003.1(d)(3)(i). Petitioners' decisions became the final orders of the United States if not appealed, and automatically became the final orders

of the United States in all decisions in which they ordered an alien removed in the alien's absence. 8 C.F.R. § 1241.1(a)-(f).

### C. MSPB Proceedings

#### 1. Initial Appeals

Before the administrative judge, petitioners' litigation proceeded on parallel and largely identical tracks. Petitioners argued that they met the requirements to qualify as employees under 5 U.S.C. § 7511, and thus were entitled to—but did not receive—the pretermination procedures set forth in 5 U.S.C. § 7513(b). Appx105-113; Appx150-158. The agency argued that Article II of the U.S. Constitution authorized the Attorney General to remove individuals qualifying as inferior officers without restriction; that the exercise of this authority abrogated otherwise applicable statutory removal protections; and that petitioners were inferior officers subject to this constitutional removal authority. Appx193-203; Appx239-249. The agency argued that the Board had statutory jurisdiction to hear the petitioners' removal appeals, but that section 7513 could not restrict the President of the United States' Article II authority to remove petitioners, and that petitioners were therefore at-will employees notwithstanding the statutory protections. *Id.*

The Office of Personnel Management ("OPM") notified the Board of its intent to exercise its statutory right to intervene in these appeals. Appx454-455; *see* 5 U.S.C. § 7701(d)(1). OPM filed a separate brief in both appeals supporting the agency's position, arguing in pertinent part that Article II of the Constitution vests the full executive power in the President, and that the Civil Service Reform Act (CSRA) cannot be read to preclude an Article II removal by the head of a Department. Appx004-005. Petitioners contested the agency's and OPM's arguments regarding the effect of the Article II removals. Appx304-336; Appx371-403.

**2. Initial Decisions**

On August 22, 2025, the administrative judge issued initial decisions finding jurisdiction and reversing petitioners' removals. Appx033-042; Appx055-064. The administrative judge found that petitioners' tenures at the agency qualified them as employees under 5 U.S.C. § 7511, and thus they were entitled to the procedures set forth in 5 U.S.C. § 7513 prior to their terminations. Appx033-042; Appx055-064. Because the agency concededly did not provide those procedures to petitioners, the administrative judge reversed their terminations and ordered them restored to employment. Appx039; Appx061. Regarding the agency's and OPM's arguments that termination of inferior officers pursuant to Article II invalidates section

7513's removal protections, the administrative judge held that, as an administrative agency, the Board "has long recognized" that it lacks the authority to invalidate statutory provisions, and the administrative judge therefore declined to address the agency's and OPM's arguments. Appx037-039; Appx060-061.

### 3. Administrative Petitions for Review

The agency filed administrative petitions for review of both initial decisions. Appx002. The agency argued in both administrative petitions for review that the administrative judge erred in declining to consider its constitutional defense as an "as-applied challenge," which does not require that the Board overturn a statutory provision, but that it merely find application of the provision invalid in particular circumstances. Appx005-006. The agency further reiterated its agreement with petitioners that the Board has jurisdiction over their appeals. Appx005-006. OPM again exercised its statutory authority to intervene in the petitions for review and attached and incorporated its briefs before the administrative judge for consideration by the Board. Appx006.

On September 26, 2025, shortly after the agency filed the administrative petitions for review, the Department of Justice's Office of Legal Counsel ("OLC") issued an opinion titled "The Merit Systems

Protection Board's Authority to Adjudicate Constitutional Questions Within an Administrative Proceeding." Appx483-494. In its opinion, OLC opined that MSPB administrative judges are obligated to adjudicate agencies' constitutional challenges to the application of the removal restrictions in the Civil Service Reform Act ("CSRA") to certain employees in the executive branch. Appx483-494. OLC did not, however, take any position on the merits of the agencies' challenges in its opinion. Appx494. On September 27, 2026, the agency submitted OLC's September 26, 2025 opinion as supplemental authority in its pending administrative petition for review. Appx477-481.

#### 4. The Board's Final Order

On March 20, 2026, the Board issued an opinion and order, in which it consolidated petitioners' appeals, granted the agency's administrative petitions for review, vacated the initial decisions, and dismissed the appeals for lack of jurisdiction. Appx001-022. The Board first discussed its authority to address constitutional challenges to its jurisdiction, and clarified that, while the Board generally does not have jurisdiction to evaluate constitutional arguments in the absence of jurisdiction over an appealable action, the Board must be able to decide constitutional challenges bearing on its jurisdiction. Appx006.

The Board next addressed the initial decisions' holding that the Board lacked the authority to address the agency's constitutional arguments, which the initial decisions construed as facial challenges. Appx006-011. The Board reversed the initial decisions on this point, finding that the agency's challenge was an "as-applied" constitution challenge – not a facial challenge – which the Board has long recognized it has authority to adjudicate. Appx006-011. The Board noted that it was not addressing the parties' arguments regarding whether the Board was obligated to follow the September 26, 2025 OLC opinion, because its ruling was based on application of the Board's existing case law and because the agency had waived any argument that the Board could adjudicate facial constitutional challenges. Appx008. The Board further noted that even if it were to consider the OLC opinion, it would be superfluous in the case at hand, because the OLC opinion merely relied on existing Board case law to reach its conclusions. Appx008.

The Board then addressed the substance of the agency's challenge regarding the constitutionality of the application of the removal restrictions from the Civil Service Reform Act ("CSRA") to petitioners. Appx011-016. The Board reviewed the history of the Supreme Court's jurisprudence on removal restrictions for executive branch officers, and determined that

Supreme Court precedent allowed removal restrictions for inferior officers only if they had limited duties or tenure, and had no policymaking or administrative authority. Appx011-016. The Board reviewed petitioners' positions of record and found that their immigration judge duties rendered them inferior officers under the Constitution. Appx014. The Board further found that petitioners, as immigration judges, exercised significant duties, and had significant administrative and policymaking authority. Appx014-016. The Board thus found that the CSRA's removal restrictions could not constitutionally apply to petitioners, and as such, the Board lacked jurisdiction to hear their appeals. Appx016.

The Board finally addressed the agency's challenge to the initial decisions' provision of interim relief to petitioners. Appx016-018. The Board found that the interim relief was allowed under its governing statute and regulation, and therefore declined the agency's request to vacate the interim relief order. Appx016-018.

This appeal timely followed. The Court granted en banc consideration in the first instance on June 17, 2026.

## SUMMARY OF ARGUMENT

This is a case about petitioners' interpretation of Supreme Court precedent versus the Supreme Court's interpretation of its precedent. The Board properly followed the Supreme Court's interpretation, which has made clear that Congress may not create removal restrictions for executive branch inferior officers who are vested with significant administrative and policymaking authority. The Board correctly determined that immigration judges wield significant discretion to enforce the immigration laws of the United States, thereby vesting them with authority to make decisions on behalf of, and influence policy for, the United States in an area of high importance. Because petitioners possessed such authority as immigration judges, and the Supreme Court has stated that officers with such authority must be removable at will by the President, the Board correctly determined that the removal restrictions contained in the Civil Service Reform Act could not constitutionally be applied to them. Additionally, because the Board's jurisdiction to hear removal appeals is paired with the statutory provision establishing removal restrictions, the Board correctly determined that the constitutional abrogation of petitioners' statutory removal restrictions simultaneously abrogated the Board's statutory jurisdiction to hear their removal appeals.

Petitioners argue that the Board misinterpreted Supreme Court precedent. They are mistaken. The Board's decision carefully examined and followed Supreme Court jurisprudence, which prohibits removal restrictions for inferior officers wielding as much authority as petitioners.

Petitioners' argument incorrectly expands the scope of Supreme Court decisions and disregards the primary factors consistent in every Supreme Court decision addressing removal restrictions: accountability and control of officers who wield significant authority when executing the laws on behalf of the President. The Supreme Court has consistently held that the President must have full control over executive branch officers who wield significant administrative or policymaking authority, and that such control must come in the form of an unrestricted removal power. Indeed, the decisions on which petitioners rely *agree* that the Constitution requires such control to ensure the President and his subordinates remain accountable to the people. Any apparent contradictions between petitioners' cited cases and the Board's decision are mere surface level differences in situation or language; the cases they cite, consistent with all Supreme Court precedent in this area, reinforce that the Constitution requires accountability and control of powerful inferior officers via removability.

Finally, petitioners and amici charge that the Board's decision may be utilized to politicize the entire civil service. This argument has no basis in the Board's decision, which expressly states it is analyzing only the constitutionality of the CSRA as it applies to petitioners. The terms of the decision do not apply to any other individual or position; indeed, the Board specifically noted that the fact-intensive test it formulated to determine if an appellant is an inferior officer wielding significant authority would have to be applied position by position, and appellant by appellant.

## ARGUMENT

### I. Standard Of Review

The MSPB's jurisdiction is limited to those matters over which jurisdiction has been specifically granted by law, rule, or regulation. 5 U.S.C. § 7701; *see also Forest v. Merit Sys. Prot. Bd.*, 47 F.3d 409, 410 (Fed. Cir. 1995). The Court must affirm the decision of the MSPB unless it is: (1) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (2) obtained without following the procedures required by law; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *see also Forest*, 47 F.3d at 410. The Court reviews the MSPB's decisions regarding jurisdiction *de novo*. *Palmer v. Merit Sys. Prot. Bd.,* 550 F.3d

1380, 1382 (Fed. Cir. 2008). The Court, however, is bound by the MSPB's factual findings on which its jurisdictional determination is based unless those findings are not supported by substantial evidence. *Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998).

## II. The Board Correctly Found the CSRA's Removal Protections Cannot Constitutionally Apply to Petitioners

### A. The Supreme Court Has Consistently Forbidden Congress from Imposing Removal Restrictions for Executive Branch Officers Wielding Significant Authority

The extent of the President's ability to remove officers within the executive branch has long been the subject of significant debate, amongst the judiciary, Congress, and scholars alike. These debates have centered around three clauses in Article II of the Constitution – the Vesting Clause, the Appointments Clause, and the Take Care Clause.

The Vesting Clause states: "The executive Power shall be vested in a President of the United States of America." U.S. Const. art. II, § 1, cl. 1.

The Appointments Clause states:

> "He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper,

> in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.

Finally, the Take Care Clause states: "he shall take Care that the Laws be faithfully executed. . . [.]" U.S. Const. art. II, § 3.

These clauses vest full authority and responsibility for execution of the laws in the President and charge him with the duty of ensuring the laws are faithfully executed. They further give the President the responsibility to appoint subordinate officers to assist him in his execution of the laws, "because it would be impossib[le] for one man to perform all the great business of the State. . . [.]" *Seila Law, LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 213, 140 S.Ct. 2183, 2197 (2020) (quoting 30 Writings of George Washington 334 (J. Fitzpatrick ed. 1939)) (internal quotation marks omitted). But the Appointments Clause also ensures political accountability for both the President and Congress by giving each responsibility for appointments of executive branch principal officers. *Edmond v. United States,* 520 U.S. 651, 660, 117 S.Ct. 1573, 1579, 520 U.S. 651, 660 (1997) ("By requiring the joint participation of the President and the Senate, the Appointments Clause was designed to ensure public accountability for both the making of a bad appointment and the rejection of a good one.")

The intersection of these clauses, and how they work together to ensure the President has sufficient ability to execute the laws through his subordinate officials, has been the subject of extensive examination by the Supreme Court. The generally accepted principle has been that the Constitution must give the President "the authority to remove those who assist him in carrying out his duties," because "[w]ithout such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 513-14, 130 S.Ct. 3138, 3164 (2010). The Supreme Court has explained that the President's ability to ensure that his subordinate officers are executing the laws according to the will of the people is entirely dependent on his ability to control those officers. This control must include the ability to remove those officers, for it is "only the authority that can remove him…that he must fear, and, in the performance of his functions, obey." *Bowsher v. Synar*, 478 U.S. 714, 726, 106 S.Ct. 3181, 3188 (1986) (internal quotation marks omitted). In other words, the Court has consistently maintained that because the President must be accountable to the people, his subordinate officers must be accountable to him. If it were otherwise, the President

would not truly be accountable to the people, because he could not control the actions of his subordinates that are attributable to him.

Petitioners argue that the Board relied on an inaccurate interpretation of Supreme Court precedent regarding the removal power. Petitioners' Brief ("PB") at 25-43. Their argument fails, however, because the Board relied on the Supreme Court's own prescription of Executive accountability and control through removability as presented by the Court in *Seila Law, LLC*, 591 U.S. at 197, which, as explained below, is amply supported by the historical record.

**1. The Historical Support for Robust Removal Power**

**a. The Decision of 1789**

The First Congress debated the President's removal power at length when discussing the creation of the Department of Foreign Affairs. 1 Annals of Congress, at 387-399, 473-599.[3] There, Congress discussed whether to include a provision in the legislation that stated that the President would be able to remove the Secretary at will. *Id.* Significant objection was raised to this proposition. *Id.* Not because Congress opposed

[3] All citations to the Annals of Congress in this brief reference Gales and Seaton's History of Debates in Congress, available on the Library of Congress's website at https://www.congress.gov/annals-of-congress/page-headings/1st-congress (last date visited August 21, 2026).

the idea of giving the President the ability to remove the Secretary, but because many members of Congress felt that inclusion of such a provision implied that the removal power was not otherwise inherent within the President's authority under the Constitution. *Id.*; *see also Myers v. United States*, 272 U.S. 52, 111-132, 47 S.Ct. 21, 23-30 (1926) (detailing the 1789 Congressional debate over statutory removal restrictions). The primary proponent of the inherent removal power theory was James Madison, who stated during the debate, *inter alia*: "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." 1 Annals of Congress, at 481; *see also* 1 Annals of Congress, at 518 ("If the President should possess alone the power of removal from office, those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community."). In what has since become known as the "Decision of 1789," the First Congress ultimately resolved, by a vote of 34-20, not to include the removal provision in its legislation *based on its conclusion that the Constitution already provided the President the authority to remove his officers at will.* 1 Annals of Congress, at 599.

The theory of inherent Presidential at-will removal authority over executive officers quickly came to be accepted amongst our forefathers, with agreement coming from, among others, Oliver Ellsworth, also in 1789. John Adams, "Notes of a Debate in the Senate" (July 15, 1789), in *The Works of John Adams*, vol. 3, pp. 407–412 (Charles Francis Adams ed., 1851) ("There is an explicit grant of Power to the President, which contains the Powers of Removal."). Indeed, while some maintain that Alexander Hamilton initially argued against the President's ability to remove such officers without restriction, *see The Federalist No. 77*, at 459, by 1793, he too, had acquiesced to the view that the removal power must be solely vested in the President. Pacificus No. 1, June 29, 1793, in 15 Papers of Alexander Hamilton 39–40 (H. Syrett ed. 1969) ("With these exceptions the Executive Power of the Union is completely lodged in the President. This mode of construing the Constitution has indeed been recognized by Congress in formal acts, upon full consideration and debate. The power of removal from office is an important instance.").

**b. The Supreme Court's *Myers* Decision**

More than a century later, the Supreme Court expressed support for the President's inherent authority to remove executive officers in a pair of decisions – *Parsons v. United States*, 167 U.S. 324, 343, 17 S.Ct. 880, 887

42 L.Ed. 185 (1897) (holding the President had the inherent authority to remove a district attorney), and *Shurtleff v. United States*, 189 U.S. 311, 314-15, 23 S.Ct. 535, 536, 47 L.Ed. 828 (1903) ("the President can, by virtue of his general power of appointment, remove an officer, even though appointed by and with the advice and consent of the Senate.").

Then, in *Myers*, the Court engaged in a fulsome analysis of this removal power, and in doing so incorporated the rationale from the Decision of 1789 into its interpretation of the Constitution. *Myers*, 272 U.S. at 111-132. The *Myers* Court reviewed the legality of legislation that prevented the President from removing a first-class postmaster, a position requiring Presidential nomination and Senate confirmation, without first obtaining Senate approval. *Id.*, 272 U.S. at 107. The Court's analysis relied heavily on its review of the Congressional debates preceding the Decision of 1789. *Id.*, 272 U.S. at 111-132. The Court found particularly persuasive that a significant proportion of the First Congress participated in the Constitutional Convention and thus was more likely than subsequent generations to have an accurate understanding of the President's Constitutional authorities, including removal authority. *Id.* at 174-77. The Court concluded that, because the First Congress resolved that the President's authority to remove officers was inherent and critical to his

duties under Article II, Congress was prohibited from restricting the President's ability to remove executive constitutional officers by requiring Senate consent or review of such removals. *Id*. at 174-77.

The Court recognized the importance of the President's removal power and its centrality to his ability to carry out his Constitutional duties, explaining: "[t]he moment that he loses confidence in the intelligence, ability, judgment, or loyalty of any one of [his chief executive subordinates], he must have the power to remove him without delay. . . . The imperative reasons requiring an unrestricted power to remove the most important of his subordinates in their most important duties must therefore control the interpretation of the Constitution as to all appointed by him." *Id*.

**c. Subsequent Decisions Supporting the Removal Power**

In later decisions, the Supreme Court reiterated the original idea espoused by the First Congress and later repeated in *Myers* – the President must have the ability to control officers in the executive branch without Congressional interference, and the removal power is the primary tool to exercise that control. For example, in *Bowsher*, the Court reviewed a statute that gave the Comptroller General, an Article I officer, authority to execute the laws. *Bowsher*, 478 U.S. at 721-34. The Court held the statute

unconstitutional because only Congress could remove the Comptroller General, and thus only Congress could control the Comptroller General. *Bowsher*, 478 U.S. at 732-34. Because only the President may have removal authority over an individual performing executive branch duties, the Court held the statute giving Congress such control unconstitutional. *Id*.

In a more recent decision, *Free Enterprise Fund*, the Court reviewed the then-novel concept of layers of removal restrictions for officers in the executive branch. 561 U.S. at 483-84. There, the Court considered the statutory removal protections provided to members of the Public Company Accounting Oversight Board ("PCAOB"). *Id*. The legislation creating the PCAOB stated that members of the Board could only be removed by the Securities and Exchange Commission ("SEC") for "good cause," and the members of the SEC could not be removed by the President except under the standard of "inefficiency, neglect of duty, or malfeasance in office... [.]" *Id*. at 484-87. (internal citation omitted). The Court was therefore faced with the question of whether the combination of those removal protections was an unconstitutional limitation on the President's control of the executive branch. *Id*. at 483-84. The Court called this structure "dual for-cause limitations," and held that such limitations left the President without meaningful control over the PCAOB due to the removal protection afforded

to the individuals actually charged with removing members of the PCAOB, the SEC. *Id*. at 488, 496. The Court believed that the statutory structure led to a scenario where, due to the restrictions on the PCAOB's removal protections, the SEC was not able to fully control the PCAOB's actions, and the President, in turn, could not hold the SEC fully accountable for the PCAOB's conduct. *Id.* at 492, 496. Such a structure ran afoul of the Constitution's vested authority in the President "to remove those who assist him in carrying out his duties," meaning that "the President could not be held fully accountable for discharging his own responsibilities. . . [.]" *Id*. at 513-514. Accordingly, again returning to the central concern of Presidential accountability through his officers' removability, the Court found the PCAOB's removal protections to be unconstitutional. *Id*. at 492.

**2. Exceptions to the General Removal Power**

While the Supreme Court has consistently emphasized the need for the President to be able to control executive branch officers – particularly principal officers – it has permitted some restrictions on that control for certain inferior officers. But, as discussed below and emphasized by the Court in *Seila Law, LLC*, 591 U.S. at 197, in each instance in which the Court approved a statutory removal restriction, the exception was narrow

and qualified, and did not run afoul of the President's general need to control officers wielding significant executive power.

In *U.S. v. Perkins*, the Court addressed the legality of removal restrictions for an officer in the Navy. 116 U.S. 483, 483-85, 6 S.Ct. 449 (1886). The Court approved the restriction, holding that Congress was within its authority under the Constitution to create removal restrictions for inferior officers such as Mr. Perkins. *Id*. at 483-85. Importantly, however, the officer in question was a cadet engineer, just two years removed from graduation from the Naval Academy. *Perkins*, 116 U.S at 483. His status as an officer derived not from the importance of his duties, but simply because Congress designated his Officer status by statute. *Id*. at 484-85 ("Congress has by express enactment vested the appointment of cadet engineers in the secretary of the navy, and when thus appointed they become officers and not employes."). As such, while the Court allowed removal restrictions for Mr. Perkins, it did not do so for an official that could be said to be exercising significant executive power.

Nearly a decade after *Myers*, the Court provided its most expansive allowance of removal restrictions in *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611) (1935) (overturned by *Trump v. Slaughter*, 146 S.Ct. 2283 (2026)). There, the Court conducted its first

review of statutory removal restrictions for the Presidentially-appointed and Senate confirmed members of the Federal Trade Commission. *Id*. at 619. The Court found that Congress could impose such a restriction for FTC members, reasoning that its prior analysis supporting its finding of unlimited removal authority for the President in *Myers* was based on the position in *Myers* being a "purely executive" position, while the FTC members did not fit that criteria. *Id*. at 631-32. The FTC instead had a quasi-legislative and quasi-judicial character that meant, to the Court at that time, that the agency did not truly wield executive power as the Postal Service did. *Id*. at 624-25. The Court noted that its holding was dependent on the character of the office in question. *Id*. at 631-32. Offices that were viewed as purely executive and not independent were still subject to removal at will by the President. *Id*.

Approximately twenty years after *Humphrey's Executor*, the Court relied on the same criteria to approve statutory removal restrictions for members of the War Crimes Commission in *Wiener v. United States*, 357 U.S. 349, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). The War Crimes Commission members were, like the FTC members, Presidentially-appointed and Senate confirmed Principal Officers, and they acted as a tribunal to adjudicate charges of war crimes. *Id*. at 354-55. The Court found, applying

the *Humphrey's Executor* criteria, that the duties of the War Crimes Commission members were primarily judicial. *Id*. at 351-52. Thus, because (in the Court's view at that time) the Commission members were not performing executive functions, the Court found their removal restrictions allowable under the Constitution. *Id*. at 355-56

The Court revisited the subject of removal restrictions for executive Branch officers in *Morrison v. Olson*, considering the constitutionality of a removal restriction for an independent counsel within the Department of Justice, who was an inferior officer under the Constitution. 487 U.S. 654, 685-93, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Here, the Court departed from the "purely executive" versus "quasi-legislative" and "quasi-judicial" line drawn in *Humphrey's Executor*, and instead explained the standard for whether removal restrictions would be allowed was whether the limitation sufficiently deprived the President of control over the official to interfere impermissibly with the President's constitutional obligation to ensure faithful execution of the laws. *Id*. For the independent counsel, the Court found that, because the position had limited jurisdiction and tenure, and lacked significant policymaking or administrative authority, a removal restriction did not sufficiently interfere with the President's ability to execute the laws. *Id*. at 691. Accordingly, because of the limited nature of

the independent counsel, the Court upheld the statutory removal restriction. *Id*. at 685-93.

In sum, while the Court has on occasion approved removal restrictions for certain executive branch officers, it has never wavered from its original doctrine that the President must have sufficient control over officers in the executive branch who wield significant authority or make policy on behalf of the President. It has only ever allowed removal restrictions for officers who lack significant policymaking or administrative authority, or those who had limited jurisdiction and tenure.

### 3. The Supreme Court's Current Jurisprudence

Recently, the Supreme Court reexamined the constitutionality of executive branch officer removal restrictions in its decisions in *Seila Law, LLC*, 591 U.S. at 197, and *Collins v. Yellen*, 594 U.S. 220, 141 S.Ct. 1761, 210 L.Ed.2d 432 (2021). In those matters, the Court reviewed the constitutionality of removal restrictions for the heads of executive branch agencies led by a single Director, rather than a multi-member commission or board. *Seila Law*, 591 U.S. at 202-205; *Collins*, 594 U.S. at 226-28. In each decision, the Court reemphasized the general understanding from *Myers* that removal at will should be considered the default position for officers in the executive branch. *Id*. The Court further repeated the idea of the President's

need to control officers within the executive branch in order to preserve accountability. *Seila Law*, 591 U.S. at 213-14; *Collins*, 594 U.S. at 251-22. The Court in *Selia Law* took the additional step of presenting a unified theory of its removal power jurisprudence to that point, explaining the various exceptions to the general rule from *Myers* recognized by the Court over its history. *Seila Law*, 591 U.S. at 215-18. The Court categorized the exceptions as "one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority," and described those exceptions as "the outermost constitutional limits" on the President's removal power. *Id.* at 215-18. ("These two exceptions…represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power.") (quoting *PHH Corporation v. Consumer Financial Protection Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting)) (internal quotation marks omitted). Based on its assessment of its prior jurisprudence, the Court found that the removal restrictions provided to the directors deprived the President of sufficient control, and thus were unconstitutional. *Seila Law*, 591 U.S. at 238; *Collins*, 594 U.S. at 250-57.

The Supreme Court's most recent foray into executive branch removal restrictions occurred in its last term, in *Slaughter*, 146 S.Ct. 2283 (2026). As in *Humphrey's Executor*, the Court in *Slaughter* reviewed the constitutionality of removal protections afforded to FTC members. *Slaughter*, 146 S.Ct. at 2291. The Court's review of the removal protections again centered on the President's ability to control officers within the executive branch. *Id*. Much like in *Seila Law*, the Court reviewed the history of the Constitution, focusing heavily on the Decision of 1789, and reasserted the President's need to have unfettered removal authority over officers exercising any part of the executive power in order to ensure he is able to faithfully execute the laws. *Id*. at 2291-2311. The Court therefore held that the removal protections afforded to members of the FTC stood in opposition to the President's ability to control those members, and could not be constitutional. *Id*. In reaching its decision, the Court found that the rationale from *Humphrey's Executor* could not apply to any modern executive branch agency, and therefore overruled *Humphrey's Executor.*[4] *Id*. at 2302.

### B. The Board's Decision Adhered to the Supreme Court's Precedent

---

[4] In discussing the President's need to control the officers of the executive branch, the Court did not distinguish between principal and inferior officers, but focused on the President's need to control officers, without qualification. *Id*. at 2306 ("She agrees, for instance, that officers with purely executive functions, like the postmaster in *Myers*, must be removable at will by the President.") (internal quotation marks omitted).

### 1. The Board's Decision Stayed Within the Boundaries Established in *Seila Law*

This Court should affirm the Board's decision because it adhered to the Supreme Court's pronouncements regarding the President's removal authority, which the Board correctly applied to the petitioners. As discussed above, *Seila Law* established the "outermost constitutional limits of permissible congressional restrictions on the President's removal power": specifically, that Congress may not restrict the President's ability to remove, at will, any officer who wields significant executive authority. *Seila Law*, 591 U.S. at 218. Removal restrictions constitutionally apply only to inferior officers who do *not* wield such authority. As explained below, the Board correctly applied this principle to abrogate the CSRA's statutory for-cause removal restriction as applied to petitioners, whom the Board correctly found were inferior officers wielding significant executive authority. As the Board held, the statutory removal restriction – providing that employees may only be removed for "such cause as will promote the efficiency of the service," 5 U.S.C. § 7513(a) – is inconsistent with the bounds set forth in *Seila Law*, and therefore inapplicable to petitioners. *Id*. at 215-18.

First, there is no dispute that the Board correctly held that petitioners were inferior officers: petitioners concede this point in their brief. PB at 25.

Second, the Board did not err in holding that petitioners wielded significant authority to act on behalf of the Executive branch in matters of serious consequence.[5] As immigration judges, petitioners were charged with conducting proceedings for "deciding the inadmissibility or deportability of an alien," 8 U.S.C. § 1229a(a)(1), and those proceedings were "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or…removed from the United States. . . [.]" 8 U.S.C. § 1229a(a)(3). They exercised their independent judgment and discretion when conducting these hearings and issuing decisions, and their decisions were subject to only limited review of their factfinding, with potential for their decisions to become the final order of the United States. 8 C.F.R. §§ 1003.1(d)(3)(i), 1241.1(a)-(f). They were empowered to make decisions on behalf of the United States on a tremendous range of potential benefits for aliens, including, but not limited to, asylum, adjustment of immigration status, granting of waivers for inadmissibility, determinations on removability, allowance of voluntary departure, and ordering the withholding of removal. 8 C.F.R. § 1240.1(a)(1)(i)-(iii). Essentially,

---

[5] The Board also correctly held that, unlike the independent counsel in *Morrison*, petitioners encumbered permanent positions. Appx014. Petitioners do not contest the Board's finding in this regard.

petitioners had broad discretion in their positions to wield executive power on behalf of the United States in the highly significant arena of immigration.

Moreover, petitioners had authority to impact United States policy on immigration, which can in turn "affect trade, investment, tourism, and diplomatic relations for the entire Nation. . .[.]" *Arizona v. United States*, 567 U.S. 387, 395 (2012). The consequences of immigration decisions can have an extended reach – "[p]erceived mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad." *Id*. And decisions made in immigration can even have a significant impact on national security. *Trump v. Hawaii*, 585 U.S. 667, 702-10 (2018) (discussing the foreign policy and national security implications of executive branch immigration decisions).

Consequently, contrary to petitioners' suggestion that their positions vested them with only "modest responsibilities," PB at 53-55, petitioners' permanent positions as immigration judges gave them sufficient authority and policymaking ability such that their otherwise applicable statutory removal restrictions could not exist within the confines of *Seila Law*. Petitioners were not merely cadet engineers recently graduated from a military academy lacking any real authority or policymaking ability, as in *Perkins*. *See Seila Law*, 591 U.S. at 215-18. Nor did they encumber time-

limited positions with jurisdiction constrained to one specific case occurring solely within the executive branch, akin to the independent counsel from *Morrison*. *Id*. Petitioners wielded vast administrative authority to make decisions for our nation in an area of significant consequence. They were permanent employees, and their jurisdiction extended far beyond a few individual cases. The Supreme Court made clear in *Seila Law* and *Slaughter* that the President must be able to control any officer exercising significant executive authority on a permanent basis, and that control must come from an unfettered removal power. *Seila Law*, 591 U.S. at 213-14; *Slaughter*, 146 S.Ct. at 2291-2311. As repeatedly stated by the Court, the removal power is necessary to ensure that the President and his subordinates remain accountable in executing the immigration laws through his officers. *Id.* Indeed, as the Court stated in *Seila Law*, an official with the ability to dictate and enforce policy for a vital segment of the economy affecting millions of Americans must be controllable by an unrestricted removal authority. *Seila Law*, 591 U.S. at 225. Thus, even before the Supreme Court reiterated this principle in *Slaughter*, the Board correctly applied *Seila Law* to find that the CSRA's removal protections at 5 U.S.C. § 7513(a) could not constitutionally apply to petitioners. Appx011-013. And because the Board's jurisdiction to hear removal appeals arises out of § 7513(a), *see* 5

U.S.C. § 7513(d), the Board correctly determined that the constitutional abrogation of petitioners' statutory removal restrictions simultaneously abrogated the Board's statutory jurisdiction to adjudicate petitioners' removal appeals. Consequently, the Board properly dismissed petitioners' appeal for lack of jurisdiction.

### 2. The Board's Decision Does Not Contradict Prior Supreme Court Precedent

#### a. Seila Law Mandated the Board's Result

Petitioners contend that the Board's decision is counter to Supreme Court decisions authorizing removal restrictions for all inferior officers and improperly rests on brief dicta from *Seila Law*. PB at 5, 17 (arguing that the Board relied on "a half sentence of dictum."), 27-30 (arguing that the Court authorized removal restrictions for all inferior officers in *Perkins*, and reiterated support for this proposition in *Myers*). These arguments ignore *Seila Law*'s thorough canvassing and reconciling of precedent – including *Perkins* and *Myers* – and its authoritative interpretation of that precedent. The *Seila Law* court's distinction between inferior officers who exercise significant authority and those who do not is not dictum, but binding authority, and the Board faithfully and correctly applied it.

In *Seila Law*, the Court summarized the entirety of its prior jurisprudence, from the Decision of 1789 through *Free Enterprise Fund*, and

explained that *Perkins*, *Morrison*, and *Humphrey's Executor* represented the outermost limits for what executive officer removal restrictions may be countenanced under the Constitution. *Id*. at 218. Specifically, the Court explained "that the President has unrestrictable power…to remove purely executive officers[,]" and that it has only recognized exceptions to this power for "multimember expert agencies that do not wield substantial executive power and…inferior officers with limited duties and no policymaking or administrative authority. . . [.]" *Id*. at 217-18 (quoting *Myers*, 295 U.S. at 632) (internal quotation marks omitted). As discussed below, the Court has since eliminated the exception for multimember expert agencies, in *Slaughter*, but its discussion of the exception for inferior officers with limited duties and no policymaking or administrative authority remains viable. Thus, it is now the sole exception to the President's otherwise unfettered removal authority with regard to Constitutional officers.

The Board's decision faithfully applied the limits the Court explained in *Seila Law*, including the now sole exception to unrestricted Presidential removal authority for officers. Mindful of the Court's prohibition on removal restrictions for inferior officers wielding significant authority, the Board carefully analyzed petitioners' duties and determined that as

immigration judges, they exercised significant administrative and policymaking authority (the latter de facto, if not de jure). Appx014-016. The Board thus found that the statutory removal protections at § 7513, prevented the President from being able to hold the immigration judges accountable in their execution of the laws, as the Constitution required due to petitioners' exercise of significant executive authority, and were therefore unconstitutional as applied to petitioners. Appx014-016. This analysis and outcome were fully consistent with the Court's removal authority jurisprudence, as set forth in *Seila Law*.

As for petitioners' argument that *Seila Law* cannot be reconciled with *Perkins and Myers*, had the Supreme Court applied the "significant executive authority" test in *Perkins* and *Myers*, the outcomes of those cases would have been the same. The position examined by the Court in *Perkins* was a cadet engineer, recently graduated from the Naval Academy, who lacked any policymaking or significant authority under the law. *Seila Law*, 591 U.S. at 217; *Perkins,* 116 U.S. at 483-85. *Myers* dealt with only a postmaster, charged with the day-to-day operation of a local post office branch. *Myers*, 272 U.S. at 107-08; *see also* Postal laws and regulations of the United States of America, Edition of 1924, §§ 292-306, in effect July 1, 1924, available at https://catalog.hathitrust.org/Record/102675623/Home

(last viewed August 24, 2026). These positions stand in complete contrast to petitioners, who had the ability to wield significant administrative authority and affect policy in their hearings and decisions, as well as considerable discretion to affect immigration policy, foreign relations, and national security in their positions, *Supra*, at 29; Appx003; Appx014-016. Therefore, factually as well as legally, *Perkins* and *Myers* cannot bear the weight petitioners attempt to place on them.

#### b. ***Morrison*** **Does Not Support Removal Restrictions for Petitioners**

Petitioners cite to *Morrison* as another purported example of support for *all* inferior officer removal restrictions, but this argument equally fails. As explained in *Seila Law*, the officer in *Morrison* had limited tenure and limited jurisdiction. *Seila Law*, 591 U.S. at 217-218. She was appointed under the governing act solely to investigate potential misconduct by a government official, and her appointment would end once her designated investigation reached completion. *Morrison*, 487 U.S. at 672. Her gaze was "trained inward to high-ranking Governmental actors identified by others. . . [.]" *Seila Law*, 591 U.S. at 219. In contrast, petitioners occupied outward facing positions with vast jurisdiction, with the ability /to dictate policy of significant consequence for the nation. Appx003; Appx014-016; *see also Hawaii*, 585 U.S. at 702-10. The level of consequence of petitioners'

position compared to the independent counsel from *Morrison* is not comparable, and the level of control needed for the positions are therefore not equivalent. Under the *Seila Law* test, then, the office in *Morrison* would pass (and thus permissibly have removal restrictions), but as the Board correctly held, petitioners themselves must fail.

#### c. *Arthrex* Does Not Compel Removal Restrictions for Petitioners

Finally, petitioners argue that the Board erred because the Supreme Court's recent decision in *United States v. Arthrex, Inc.*, 594 U.S. 1, 141 S.Ct. 1970, 210 L.Ed.2d 268 (2021), signifies that inferior officers may still have statutory removal protections under the Constitution. PB at 33-35. As explained below, this argument is beside the point. The Board did not hold that inferior officers could *never* have such restrictions; it held, applying *Seila Law*, that these particular inferior officers, vested with significant Executive authority, could not have such removal restrictions. The Court in *Arthrex* focused only on reducing the administrative patent judge petitioners from principal to inferior officers. The Court did not further address what type of inferior officers they were, because that issue was not before it; and the Court certainly did not overrule *Seila Law* on this point, as would be required for Petitioners' argument to prevail.

In *Arthrex*, the Supreme Court reviewed a challenge to the appointment status of administrative patent judges ("APJs") at the United States Patent and Trademark Office ("USPTO"). *Arthrex*, 594 U.S. at 11. The challenge arose because pursuant to statute, the USPTO Director lacked authority to review APJs' decisions. *Id*. at 10-11. The lack of reviewability meant that APJs had the ability to make unreviewable final decisions on behalf of USPTO, and therefore had the authority of principal officers under the Constitution, despite not being nominated by the President and confirmed by the Senate as required by the Constitution. *Id*. at 14-17. Upon review, this Court initially agreed that the APJs' ability to issue final decisions not subject to review by a principal officer improperly converted them to principal officers. *Id.* at 10-11. This Court attempted to remedy this defect by deeming the APJs' statutory removal protections unconstitutional as applied to the APJs, reasoning that they would be sufficiently controllable in their decisions if they had no removal protections. *Id*. Upon review, the Supreme Court agreed that the APJs' decision-making ability impermissibly gave them the authority of principal officers, but disagreed with this Court's chosen remedy for the violation. *Id*. at 23-27. The Supreme Court found that, even if the APJs had no removal protections, they would still have the ability to issue final decisions

on behalf of USPTO that no USPTO higher authority could review. This meant that the APJs still wielded the authority of a principal officer – but continued to lack the control through removability that the Court had long required for principal officers. *Id*. The Court rectified this constitutional defect by eliminating the statutory provisions depriving the Director of USPTO of the ability to review APJ decisions. *Id.* Having thereby converted the APJs back to inferior officers, and without having granted certiorari to consider whether removal restrictions for inferior officers were permissible, the Court had no occasion to reach the latter issue and therefore vacated this Court's severing of the APJs' statutory removal protections.

Petitioners argue that the Supreme Court's remedy for the Constitutional violation in *Arthrex* represents an implicit approval of removal restrictions for inferior officers such as APJs. PB at 33-35. This conclusion does not follow from the Court's decision. The question of removal authority for inferior officers was not before the Court, and therefore the Court did not address it. The Court addressed only the constitutional violation that made the APJs principal officers, and tailored the remedy to that issue; it did not reach beyond that remedy to address a question not presented, such as whether their removal restrictions were constitutional outside of their principal officer status. *Arthrex*, 594 U.S. at

27. ("Because the source of the constitutional violation is the restraint on the review authority of the Director, rather than the appointment of APJs by the Secretary. . . [.]"). The answer to the questions presented – whether and why the APJs were principal officers -- was the APJs' decision-making ability, and so the Court fixed that, and only that, problem. *Id*. Indeed, when presented with the question of how to remedy the violation, the Court expressed no opinion regarding the effect of any potential lack of removal restrictions, because it had no bearing on the reviewability of the APJ decisions. *Id*. at 26. The Court elected to use a "tailored approach" that focused solely on the cause of the violation, and left the remainder of the statute alone because it was not at issue. *Arthrex*, 594 U.S. at 25. Accordingly, contrary to petitioners' argument, *Arthrex* does not hold, suggest, or implicitly approve removal restrictions for all inferior officers. Rather, *Seila Law* continues to control; and under that test, as the Board held, officers wielding significant administrative and policymaking authority may not enjoy removal restrictions.

## III. Petitioner's Policy Concerns Do Not Warrant Reversal

### A. The Scope of the Board's Decision is Limited

Petitioner, along with multiple amici, raise concerns about the scope of the Board's decision, arguing it could potentially imperil the entire civil

service. PB at 58-61. These concerns are unfounded. The Board's decision did not purport to invalidate 5 U.S.C. § 7513 on its face, nor could it, as controlling Board precedent holds that the Board lacks such authority.[6] *Malone v. Dep't of Justice*, 14 M.S.P.R. 403, 406 (1983); *Bayly v. Office of Pers. Mgmt.*, 42 M.S.P.R. 524, 525-26 (1990); *see Elgin v. Department of Treasury*, 567 U.S. 1, 15-21 (2012) (discussing administrative agencies' general inability to adjudicate facial constitutional challenges to statutes). The Board instead found that § 7513 was unconstitutional *as applied* to petitioners based on the specific nature of petitioners' positions and duties. Appx016. Such a ruling was well within the Board's authority, *see May v. Office of Personnel Management*, 38 M.S.P.R. 534, 538 (1988) (finding the Board has the authority to address as applied constitutional challenges to statutes); 3 K. Davis, Administrative Law Treatise § 20.04, at 74 (1958) ("We commit to administrative agencies the power to determine constitutional applicability, but we do not commit to administrative agencies

[6] Based on the agency's pleadings at the administrative level, the Board found that, to the extent the agency initially intended to raise a facial challenge to 5 U.S.C. § 7513, it later abandoned such challenge and therefore waived the challenge. Appx007-008.

the power to determine the constitutionality of legislation."), and underscores the limited nature of the Board's decision.[7]

Regarding challenges to removal restrictions for other inferior officers, while the Board is obligated to continue to follow Supreme Court precedent regarding the constitutionality of removal restrictions – as well as the test the Board set forth in *Jackler*, unless reversed or modified by this Court – appeals of Article II-based removals from other Executive branch positions will still require individualized assessment from the Board. Appx013-014. Under the Board's decision, as under *Seila Law*, a statutory removal restriction for inferior officers who do not exercise significant administrative or policymaking authority faces no constitutional infirmity. The Court in *Seila Law* established that removal protections can still apply in limited situations for officers who meet certain criteria. *Seila Law*, 591 U.S. at 215-18. The Supreme Court in *Slaughter* did not overrule *Seila Law*, *Perkins*, or *Morrison*, only *Humphrey's Executor*; therefore, the framework set forth in *Jackler* remains valid. *Slaughter*, 146 S.Ct. at 2302.

Moreover, nothing in *Jackler*, in *Seila Law*, or in prior Supreme Court precedent preclude removal restrictions for non-officers. It logically

[7] Petitioners have not challenged the Board's ability to adjudicate as-applied challenges, and therefore should be found to have waived such a challenge. *Smithkline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

follows that if officers exercising limited authority can have removal restrictions, employees who exercise even less authority can enjoy the same.[8] Indeed, as the Supreme Court itself has observed, a nonpartisan, merit-based civil service is not incompatible with the President's oversight via authority to remove. *See Myers*, 272 U.S. at 173-74.

In short, the Board's decision applies solely to petitioners. Its logic does not eliminate removal restrictions for anyone other than individuals who occupy the same position as petitioners – immigration judges and chief immigration judges – and its application to future cases or positions will rise or fall on a case-by-case basis, not civil service-wide.

### B. The Board's Decision Was Its Own

Petitioners reference a September 26, 2025 opinion from the Department of Justice's Office of Legal Counsel ("OLC"), insinuating that the decision was not the Board's own and was directed by OLC. As the Board's decision states, however, the Board acknowledged, but did not rely

[8] But even if removal restrictions were not allowed for lesser inferior officers or for non-officers, policy concerns could not make allowable what the Constitution forbade. *See Plyler v. Doe*, 457 U.S. 202, 242, 102 S.Ct. 2382, 2408 (1982) (Burger, J., dissenting) (citing *TVA v. Hill*, 437 U.S. 153, 194–195, 98 S.Ct. 2278, 2301–2302, 57 L.Ed.2d 312 (1978)) ("the Constitution does not constitute us as Platonic Guardians nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, wisdom, or common sense.") (internal quotation marks omitted).

on, the OLC opinion. Appx008. The Board reached its decision based on application of existing case law. Appx008. The Board further noted that the OLC opinion itself relied on Board precedent. Appx008. Additionally, petitioners themselves consented to the Board considering the OLC opinion as "supplemental authority." Appx008.

Moreover, the OLC opinion did not address the sole issue before this Court: whether the Board correctly determined that section 7513 is unconstitutional as applied to petitioners. The OLC opinion addressed only two issues: whether the Board may adjudicate facial constitutional challenges, and whether the Board must adjudicate all constitutional challenges presented, whether formulating them as facial or as-applied. Appx505-515. Petitioners have not disputed either issue before this Court. Any claim that the Board improperly relied on the OLC opinion therefore is not only inaccurate, but irrelevant to the issue at hand.

### C. The Board's Jurisdiction Cannot Depend Solely on the Agency's Invocation of Article II

Finally, another amicus suggests that the Board's jurisdiction should depend on whether an agency actually invokes Article II as the basis for removal – a bright-line rule. *See Brief of Federal Circuit Bar Association*, at 5-14. This argument fails because it misconstrues the nature of the Board's jurisdiction. The Board's jurisdiction is not plenary; it is limited to those

actions which are made appealable to it by law, rule, or regulation. 5 U.S.C. § 7701(a); *Synan v. Merit Sys. Prot. Bd.*, 765 F.2d 1099, 1100 (Fed. Cir. 1985). If there is no law, rule, or regulation giving the Board jurisdiction, or, as here, the law giving the Board jurisdiction is unconstitutional as applied to an appellant, then the Board simply lacks jurisdiction over an appeal. *Garcia v. Department of Homeland Security*, 432 F.3d 1322, 1327 (Fed. Cir. 2006) ("jurisdiction for the board to hear a particular type of action must be granted by some law, rule or regulation.") (quoting *Antolin v. Department of Justice*, 895 F.2d 1395, 1396 (Fed. Cir. 1989)).

The amicus's unworkable attempt to impose a bright-line rule in fact highlights why the Board's as-applied formulation in *Jackler* is correct. As the Board explained, if an agency argues that the basis of a removal was Article II (as the agency did in this matter, *see* Appx194; Appx240), the Board must examine whether an individual's position qualifies as the type of inferior officer for which Article II prohibits removal restrictions. Appx014-016. This is far from a foregone conclusion; it is a careful factual and legal inquiry, of the type the Board undertook here. If the agency attempts to invoke Article II for a position the Board holds either is not an inferior officer, or is an inferior officer who does not wield significant Executive authority, then the

as-applied challenge will fail and the Board will exercise jurisdiction over the appeal.

A comparable and more familiar scenario may be constructive removal appeals. In such appeals, an individual files an appeal with the Board stating that their facially voluntary departure was actually involuntary, and thus equivalent to an appealable removal under 5 U.S.C. § 7512(1). *See Garcia*, 437 F.3d at 1335-44. But the mere allegation of a constructive removal is insufficient to establish Board jurisdiction. *Id*. at 1344. The appellant must prove by preponderant evidence that his removal was actually coerced and therefore a constructive removal within the Board's jurisdiction. *Id*. at 1344.

Similarly, an agency's invocation of Article II by itself cannot eliminate Board jurisdiction. The invocation does, however, prompt an inquiry into whether the appellant is an inferior officer who exercises such authority and responsibility that the CSRA's removal restrictions cannot be applied to him under the Constitution.

## **CONCLUSION**

For the reasons set forth above, the Court should affirm the decision of the Merit Systems Protection Board dismissing petitioners' appeals for lack of jurisdiction.

Respectfully submitted,

KATHERINE M. SMITH
Acting General Counsel

/s/ Stephen W. Fung
Stephen W. Fung
Attorney
Office of the General Counsel
Merit Systems Protection Board
1615 M Street, NW
Washington, DC 20419-0002
(771) 210-1577

CERTIFICATE OF SERVICE

I hereby certify that on this date, service of the RESPONDENT'S FORMAL BRIEF was made upon all parties via CM/ECF.

DATE: August 28, 2026

/s/ Stephen W. Fung
Stephen W. Fung
Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g)(1) of the Federal Rules of Appellate Procedure, I hereby certify that the text of the electronic version of the foregoing brief is identical to the paper copies, has been scanned by Microsoft Intune and found to be virus-free, and that the textual portion of the brief, exclusive of the certificates of service and compliance, but including headings, footnotes, and quotations, contains 9,875 words as determined by the word counting feature of Microsoft Word, and therefore complies with Rule 32(a)(7)(B).

/s/ Stephen W. Fung
Stephen W. Fung
Attorney