**No. 2026-1575**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

MEGAN JACKLER, BRANDON JAROCH,

Petitioners,

v.

MERIT SYSTEMS PROTECTION BOARD,

Respondent,

DEPARTMENT OF JUSTICE,

Intervenor.

On Petition for Review from the
Merit Systems Protection Board in No. CF-0752-26-0069-I-1.

# BRIEF FOR INTERVENOR THE DEPARTMENT OF JUSTICE

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5432*

## TABLE OF CONTENTS

Page

STATEMENT OF RELATED CASES ........ xi

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 6

STATEMENT OF THE ISSUE ........ 7

STATEMENT OF THE CASE ........ 7

A. Legal Framework ........ 7

1. Immigration Judges and the Immigration System ........ 7

2. Civil Service Reform Act ........ 14

B. Factual Background ........ 15

C. Prior Proceedings ........ 18

SUMMARY OF ARGUMENT ........ 20

ARGUMENT ........ 24

I. The Board Correctly Upheld Petitioners' Removal By The Attorney General ........ 24

A. At-Will Removal of Executive Officers Is Necessary to Maintain the Executive Branch's Accountability to the Electorate ........ 24

B. As Inferior Officers with Broad Duties and Policymaking and Administrative Powers, Petitioners Were Removable At Will ........ 34

C. Petitioners Do Not Fall Within Any Exception to At-Will Removal Based on *Perkins* and *Morrison* ........ 41

D. Petitioners' Remaining Counterarguments Lack Merit............51

1. The Attorney General's authority to review adjudications does not displace the removal power ....... 52

2. No settled historical practice supports petitioners' insulation from removal................................................ 57

3. Politically accountable adjudications are consistent with due process............................................................ 60

II. The Board Erred In Concluding That It Lacked Jurisdiction ............ 62

CONCLUSION........................................................................................ 67

CERTIFICATES OF COMPLIANCE AND SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page**

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
941 F.3d 1320 (Fed. Cir. 2019) .............................................. 38, 44, 51, 54

*Biden v. Texas*,
597 U.S. 785 (2022) .......................................................................... 39

*Bowsher v. Synar*,
478 U.S. 714 (1986) ..................................................................... 25, 30

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................ 3, 5, 34, 46

*City of Arlington v. FCC*,
569 U.S. 290 (2013) .......................................................................... 46

*Clinton v. Jones*,
520 U.S. 681 (1997) .......................................................................... 27

*Collins v. Yellen*,
594 U.S. 220 (2021) .......................................................................... 24

*Dada v. Mukasey*,
554 U.S. 1 (2008) ............................................................................... 12

*Delgadillo v. Carmichael*,
332 U.S. 388 (1947) .......................................................................... 45

*Denig v. United States*,
37 Ct. Cl. 383 (1902) ......................................................................... 43

*Department of State v. Muñoz*,
602 U.S. 899 (2024) ............................................................................ 7

*Duenas v. Garland*,
78 F.4th 1069 (9th Cir. 2023) ..................................................... 2, 38, 61

*Edmond v. United States*,
520 U.S. 651 (1997) .......... 32

*Elgin v. Department of Treasury*,
641 F.3d 6 (1st Cir. 2011) .......... 63
567 U.S. 1 (2012) .......... 65

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010) .......... *passim*

*Freytag v. Commissioner*,
501 U.S. 868 (1991) .......... 38

*Garland v. Ming Dai*,
593 U.S. 357 (2021) .......... 36

*Helman v. Department of Veterans Affairs*,
856 F.3d 920 (Fed. Cir. 2017) .......... 34

*Herrera-Alcala v. Garland*,
39 F.4th 233 (4th Cir. 2022) .......... 11

*Houston Community College System v. Wilson*,
595 U.S. 468 (2022) .......... 59

*In re Hennen*,
38 U.S. 230 (1839).......... 33

*Jay v. Boyd*,
351 U.S. 345 (1956) .......... 54

*Johnson v. Guzman Chavez*,
594 U.S. 523 (2021) .......... 11-12, 12

*Kennedy v. Braidwood Management, Inc.*,
606 U.S. 748 (2025) .......... 31, 33, 48, 62

*Ling Huang v. Holder*,
744 F.3d 1149 (9th Cir. 2014) .......... 11

*Lucia v. SEC*,
585 U.S. 237 (2018) .......... 2, 38, 52

*Marcello v. Bonds*,
349 U.S. 302 (1955) .......... 9

*McGinty v. Brownell*,
249 F.2d 124 (D.C. Cir. 1957) .......... 58

*Myers v. United Sates*,
272 U.S. 52 (1926) .......... 29, 39, 48, 50, 51, 61

*Morrison v. National Australia Bank Ltd.*,
561 U.S. 247 (2010) .......... 66, 67

*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 4, 5, 21, 41, 43, 48, 49

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) .......... 7, 37

*NLRB v. Bell Aerospace Co.*,
416 U.S. 267 (1974) .......... 5, 46

*Orellana v. Bondi*,
141 F.4th 560 (4th Cir. 2025) .......... 16

*Perez v. Department of Justice*,
480 F.3d 1309 (Fed. Cir. 2007) .......... 15

*Personal Audio LLC v. CBS Corp.*,
946 F.3d 1348 (Fed. Cir. 2020) .......... 63

*Reno v. American-Arab Anti-Discrimination Committee*,
525 U.S. 471 (1999) .......... 21, 45

*Roy v. MSPB*,
672 F.3d 1378 (Fed. Cir. 2012) .......... 64

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) .......... *passim*

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... *passim*

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954) .......................... 61

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) .......................... 32, 51, 54, 59

*United States v. Fausto*,
484 U.S. 439 (1988) .......................... 14, 58

*United States v. Germaine*,
99 U.S. 508 (1879) .......................... 31, 32

*United States v. Perkins*,
116 U.S. 483 (1886) .......................... 4, 21, 41, 43, 49

*United States v. Redgrave*,
116 U.S. 474 (1886) .......................... 42

*Urias-Orellana v. Bondi*,
607 U.S. 537 (2026) .......................... 11

*Webster v. Fall*,
266 U.S. 507 (1925) .......................... 52

*Wilkinson v. Garland*,
601 U.S. 209 (2024) .......................... 5, 11, 36

*Wong Yang Sung v. McGrath*,
339 U.S. 33 (1950) .......................... 8, 22, 45

**Constitution and Statutes:**

U.S. Const. art. II, § 1, cl. 1 .......................... 1, 20, 25, 32

U.S. Const. art. II, § 2, cl. 2 .......................... 31, 48, 52

U.S. Const. art. II, § 3 .......................... 20, 25

U.S. Const. art. III, § 1 .......................... 40

Act of July 27, 1789, ch. 4,
1 Stat. 28 .......... 33

Act of Aug. 3, 1882, ch. 376,
22 Stat. 214 .......... 7

Act of August 24, 1912, ch. 389,
37 Stat. 539 .......... 57, 58

Alien Registration Act of 1940,
Pub. L. No. 76-670, 54 Stat. 670 .......... 7

Civil Service Due Process Amendments,
Pub. L. No. 101-376, 104 Stat. 461 (1990) .......... 14, 15, 58

Immigration and Nationality Act of 1952,
Pub. L. No. 82-414, 66 Stat. 163 .......... 8, 9

Veterans' Preference Act of 1944,
Pub. L. No. 78-359, 58 Stat. 387 .......... 58

5 U.S.C. § 863 (1946) .......... 58

§ 7511(a)(1) .......... 6, 23, 64, 65

§ 7511(a)(1)(B)-(C) .......... 63

§ 7512 .......... 15

§ 7512(1) .......... 63

§ 7513 .......... 6, 18, 19, 38, 54, 59

§ 7513(a) .......... 3, 14, 40, 62, 64

§§ 7513(a), 7703(b)(1)(A) .......... 41

§ 7513(b) .......... 15

§ 7513(d) .......... 6, 15, 19, 23, 62, 63, 64

§ 7701(a) .......... 64

§ 7703(a)(2) .......... 19

§ 7703(b)(1) .......... 15

§ 7703(b)(1)(A) .......... 6, 23

6 U.S.C. § 521(a) .... 9

8 U.S.C. § 155(a) (1946) .... 8
§ 1101(a)(47)(B)(ii) .... 13
§ 1101(b)(4) .... 9, 20, 35, 40
§ 1103(g)(1)-(2) .... 13, 51
§ 1158(b)(1)(A) .... 35
§§ 1158(b)(1)(A), 1225(b)(1)(B)(iii)(III) .... 11
§ 1159(a)(2) .... 11, 35
§ 1225(b)(4) .... 11, 35
§ 1229a(a)(1) .... 9, 35
§ 1229a(a)(1)-(3) .... 40-41
§ 1229a(a)(3) .... 10, 22, 35, 37, 56
§ 1229a(b)(1) .... 10, 36, 37
§ 1229a(c)(1)(A) .... 10, 35
§ 1229a(c)(4) .... 36
§ 1229a(c)(4)(B) .... 10
§ 1229a(c)(4)(C) .... 10
§ 1229b(a)-(b) .... 35
§ 1229c(b) .... 35
§ 1229c(b)(1) .... 12
§ 1231 .... 35
§ 1231(a)(1)-(2) .... 12, 37
§ 1231(a)(5) .... 12
§§ 1231(a)(5), 1326(a) .... 37
§ 1231(b)(3)(A) .... 35
§ 1252(b)(4) .... 11
§ 1252(b)(4)(B) .... 36
§ 1326(a) .... 13

12 U.S.C. § 5563 .... 60

15 U.S.C. § 45(b) .... 60

15 U.S.C. § 7217(b)-(c) .... 53

21 U.S.C. § 824 .... 60

28 U.S.C. § 541(a) .... 57

28 U.S.C. § 596(b) .... 43

28 U.S.C. § 1295(a)(9) .... 6, 15, 63

42 U.S.C. § 405(b) .... 60

50 U.S.C. § 4819(c) .... 60


**Rules and Regulations:**

5 C.F.R. § 213.3102(d) (1988) .... 14

8 C.F.R. §§ 90.2-90.3, 150.6-150.9 (1949) .... 8

8 C.F.R. § 1003.1(a)-(b) .... 13

8 C.F.R. § 1003.1(d)(3)(i) .... 36

8 C.F.R. § 1003.1(h) .... 13

8 C.F.R. § 1003.39 .... 13

24 Fed. Reg. 9124 (Nov. 10, 1959) .... 57

38 Fed. Reg. 8590 (Apr. 4, 1973) .... 9

91 Fed. Reg. 47979 (July 30, 2026) .... 37


**Other:**

1 Annals of Cong. .... 2, 20, 28, 29, 62

Cong. Globe, 31st Cong., 1st Sess. (1850) ....................................................31

Andrew Manuel Crespo,
*In Memoriam: Judge Stephen Reinhardt*,
131 Harv. L. Rev. 2101 (2018) .................................................................. 56

Executive Office for Immigration Review,
Department of Justice,
*Adjudication Statistics:*
*New Cases and Total Completions—Historical* (2026)............... 13, 22, 53

The Federalist
(Jacob E. Cooke ed., 1961) ........................................................ 20, 26, 30

Harold J. Krent,
*Presidential Control of Adjudication Within the Executive Branch*,
65 Case W. Res. L. Rev. 1083 (2015) ...................................................... 60

James Madison,
*Notes of Debates in the Federal Convention of 1787*
(Gaillard Hunt & James Brown Scott, eds., 1920) .................................. 32

*Secretary of Education Review of Administrative Law Judge Decisions*,
15 Op. O.L.C. 8 (1991) ............................................................................ 46

Writings of George Washington
(John C. Fitzpatrick ed. 1939) ................................................................ 27

## STATEMENT OF RELATED CASES

No other appeal from the same proceeding has previously been before this Court or any other appellate court. We are aware of the following cases pending in this Court concerning the removal of immigration judges that will be directly affected by the Court's decision in this case:

*Morwood v. MSPB*, No. 2026-2023 (Fed. Cir.);

*Morwood v. MSPB*, No. 2026-2031 (Fed. Cir.);

*Acosta v. Department of Justice*, No. 2026-2032 (Fed. Cir.).

# INTRODUCTION

"Nearly 250 years ago, the Framers decided to vest '[t]he executive Power' in one person—'a President of the United States of America.'" *Trump v. Slaughter*, 146 S. Ct. 2283, 2291 (2026) (quoting U.S. Const. art. II, § 1, cl. 1). The authority of the President of the United States to remove at will constitutional officers of the Executive Branch is the *sine qua non* of the President's political accountability to the people. The President is elected by the entire Nation, and he supervises an Executive Branch whose subordinate officers touch the lives of Americans in innumerable ways. No President could realistically supervise each of those officers in their discharge of their individual functions. But because the President can remove officers of the Executive Branch at will—either directly or through his principal officers that appointed them—he remains politically accountable for every significant exercise of executive power across the Nation. To an unpopular executive decision, the President cannot respond "that decision was made by someone else, don't blame me." Because of the removal power, "[t]he buck stops with the President." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 493 (2010).

That is why the Supreme Court has stressed that Congress may not interfere with the President's plenary power to remove his subordinate officers—in case after case, culminating in this year's landmark decision in *Slaughter*. The Court's removal-power decisions do not empower the President for the President's sake. Rather, they ensure that the President is responsible for all officers of the Executive Branch, "so that 'the chain of dependence [is] preserved,'" and "that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020) (quoting 1 Annals of Cong. 499 (J. Madison)). The Constitution demands that executive officers must "remain accountable to the President," and so "must be removable" without restriction. *Slaughter*, 146 S. Ct. at 2293. Executive officers "exercise the *President's* power, not their own, and thus must be *responsible* to him." *Id.* at 2310.

Petitioners here were immigration judges—executive officers appointed by the Attorney General who wield "significant authority pursuant to the laws of the United States." *Duenas v. Garland*, 78 F.4th 1069, 1072 (9th Cir. 2023); *see also Lucia v. SEC*, 585 U.S. 237, 246-49 (2018) (holding that administrative law judges who oversee adversarial administrative adjudications are executive officers, rather than employees).

As immigration judges, petitioners determined whether aliens should be lawfully admitted into the United States or whether they should be removed—a quintessential sovereign power long entrusted to the Executive Branch. As such, petitioners were subject to the usual rule that "lesser officers must remain accountable to the President," through removal, "for it is 'only the authority that can remove' such officials that they must fear and, in the performance of [their] functions, obey.'" *Seila Law*, 591 U.S. at 213-14.

The Attorney General appointed petitioners to their offices, and later removed petitioners from their offices. Petitioners now challenge that removal as unlawful, relying on the civil service protections generally applicable to federal employees, which provide that that certain adverse employment actions "against an employee only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a). But petitioners are not among the "millions of federal workers," Br. 1, who simply serve as "employees of the United States rather than officers," *i.e.*, those "lesser functionaries subordinate to officers," *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). This case therefore does not touch upon § 7513's constitutionality for employees who do not wield significant authority under federal law. Instead, the question is whether petitioners can be

vested with an executive office to exert constitutional power—and then remain insulated from removal unless the Executive Branch makes a sufficient showing of "cause" for removal. Br. 5. Because "[t]he *entire* 'executive Power' belongs to the President alone," *Seila Law*, 591 U.S. at 213 (emphasis added), petitioners must be accountable to the President, through the Attorney General, for their exercise of that power.

After *Slaughter*, there only one relevant possible "exception[] to the President's unrestricted removal power" over executive officers. *Seila Law*, 591 U.S. at 204. The Supreme Court has held in two cases that Congress may "provide tenure protections to certain inferior officers with narrowly defined duties." *Seila Law*, 591 U.S. at 204 (citing *United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison v. Olson*, 487 U.S. 654 (1988)). Thus, a removal restriction for "inferior officers with limited duties and no policymaking or administrative authority" represents "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218.

Neither *Perkins* nor *Morrison* can support removal restrictions for petitioners. They are not like a cadet engineer fresh off of graduation from the academy, *Perkins*, 116 U.S. at 484, nor do they hold an office that "is limited in tenure," designed to "accomplish a single task" focused on other

specified "federal officials," and lacking in "any authority to formulate policy" or possessing "any administrative duties outside of those necessary to operate [their] office," *Morrison*, 487 U.S. at 671-72. Petitioners held an ongoing office and possessed "administrative powers" in administering the immigration laws and making "determinations of eligibility" for lawful presence in the United States, *Buckley*, 424 U.S. at 140, and made policy for the Executive Branch through case-by-case adjudications, *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292-94 (1974). They decided whether the people in front of them were removable and—even so—whether it was in the Nation's interests to nevertheless permit them to remain as a matter of discretion. *Wilkinson v. Garland*, 601 U.S. 209, 212-13 (2024).

Petitioners cite no comparable office so deeply entrusted with core executive power that has been held to be beyond the President's supervision. That is not surprising. The Framers "created a structure in which '[a] dependence on the people' would be the 'primary control on the government,'" and a "key 'constitutional means'" to that end—"perhaps *the* key means—was 'the power of appointing, overseeing, and controlling those who execute the laws.'" *Free Enterprise*, 561 U.S. at 501. Petitioners could thus be constitutionally removed at will by the Attorney General, as the Merit Systems Protection Board correctly concluded.

The Board erred, however, in holding that that it lacked jurisdiction over petitioners' claims. Petitioners fall within the statutory definition of employee under the Civil Service Reform Act, 5 U.S.C. § 7511(a)(1), and the statute grants the Board jurisdiction to administratively review petitioners' challenges to covered adverse actions, *id.* § 7513(d). The availability of administrative and judicial review is not, by itself, unconstitutional, and the Board possessed jurisdiction under the statute. Accordingly, the Board correctly concluded that the substantive limitations on petitioners' removal were unconstitutional as-applied, and that conclusion resolved the merits of the dispute. The Court should confirm that statutorily analysis to preserve the Civil Service Reform Act's generally exclusive scheme of review through the Board to this Court, rather than through a patchwork of district court actions.

## STATEMENT OF JURISDICTION

Petitioners are immigration judges who challenged their removals before the Merit Systems Protection Board. 5 U.S.C. § 7513. The Board issued a final decision dismissing their appeals on March 20, 2026, Appx018, and petitioners filed a petition for review in this Court on March 23, 2026. This Court has jurisdiction under 28 U.S.C. § 1295(a)(9) and 5 U.S.C. § 7703(b)(1)(A).

## STATEMENT OF THE ISSUE

Whether it violates Article II of the Constitution for Congress to restrict the Attorney General's authority to remove immigration judges from office.

## STATEMENT OF THE CASE

### A. Legal Framework

#### 1. Immigration Judges and the Immigration System

The United States "has the power, as inherent in sovereignty," to "forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). And from the "first federal immigration statutes," *Department of State v. Muñoz*, 602 U.S. 899, 912 (2024), Congress has directed the Executive Branch to "execute" the immigration laws, to "protect the United States and immigrants into the United States" consistent with the laws, and to "sen[d] back" those to whom Congress has not permitted entry, Act of Aug. 3, 1882, ch. 376, §§ 3-4, 22 Stat. 214, 214.

Adversarial deportation hearings have been a feature of our immigration system since federal law first required the Attorney General to arrest and deport removable aliens. Under the Alien Registration Act of 1940, Pub. L. No. 76-670 § 20, 54 Stat. 670, 671-73, Congress provided that

removable aliens "shall, upon warrant of the Attorney General, be taken into custody and deported." 8 U.S.C. § 155(a) (1946). The statute did not require a deportation hearing or any related procedures, but the Attorney General promulgated regulations to provide for an adversarial hearing and administrative appeal process. 8 C.F.R. §§ 90.2-90.3, 150.6-150.9 (1949).

Shortly after the enactment of the Administrative Procedure Act (APA), the Supreme Court held that the APA applies to removal proceedings, *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48-51 (1950), and that the existing procedures were inadequate because the inspectors who presided over such hearings did not qualify as a "[p]residing officer" under the APA, *id.* at 51-52. The Court noted, however, that Congress may "specifically provid[e]" for "other officers" to conduct such hearings. *Id.* at 51.

Congress did so in the Immigration and Nationality Act of 1952, Pub. L. No. 82-414 § 242(b), 66 Stat. 163, 209-10, by creating a special category of executive officers and assigning them the responsibility to conduct deportation hearings under federal law. The Act provided that deportation proceedings would be overseen by "[a] special inquiry officer," and that this would "be the sole and exclusive procedure for determining the

deportability of an alien under this section."[1] Special inquiry officers would be "selected by the Attorney General" and would be "subject to such supervision and [would] perform such duties, not inconsistent with this Act, as the Attorney General [may] prescribe." *Id.* § 101(b)(4), 66 Stat. at 171. Eventually, these special inquiry officers were renamed "immigration judges." David A. Martin, *Major Issues in Immigration Law* 7 (Federal Judicial Center 1987); 38 Fed. Reg. 8590, 8590 (Apr. 4, 1973) (providing that the titles "may be used interchangeably").

Today, an immigration judge is an "attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review," 8 U.S.C. § 1101(b)(4), within the Department of Justice, 6 U.S.C. § 521(a). Immigration judges are still the primary officers within the Executive Branch whom Congress has authorized to "conduct proceedings for deciding the inadmissibility or deportability of an alien" in the first instance. 8 U.S.C. § 1229a(a)(1). With few exceptions, proceedings before an immigration judge are "the sole and exclusive procedure for

---

[1] The Immigration and Nationality Act also established "a specialized administrative procedure applicable to deportation hearings" that borrowed some APA requirements but also expressly departed from others. *Marcello v. Bonds*, 349 U.S. 302, 308-09 (1955).

determining whether an alien may be admitted to the United States or * * * removed from the United States." *Id.* § 1229a(a)(3).

An immigration judge exercises multiple powers in presiding over hearings. The immigration judge may issue subpoenas, "administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses." 8 U.S.C. § 1229a(b)(1). The immigration judge determines whether an alien shall be removed from the United States, and that determination "shall be based only on the evidence produced at the hearing" overseen by the immigration judge. *Id.* § 1229a(c)(1)(A). Because removal decisions often involve competing evidence, the immigration judge is tasked with "determin[ing] whether or not the testimony is credible" and "persuasive" such that the alien has demonstrated an entitlement to relief or protection. *Id.* § 1229a(c)(4)(B). The immigration judge makes that credibility determination based on, among other things, the witnesses' demeanor, candor, and responsiveness during the hearing. *Id.* § 1229a(c)(4)(C). Even if the alien's testimony is credible, the immigration judge can require the alien to provide corroborating evidence, which the alien "must" provide unless they do not have and cannot reasonably obtain it. *Id.* § 1229a(c)(4)(B).

"Congress has required the courts of appeals to give significant deference to [immigration judge] factfinding throughout [8 U.S.C.] § 1252(b)(4)," the statutory provision for judicial review of removal orders. *Urias-Orellana v. Bondi*, 607 U.S. 537, 550 (2026). That is because the "immigration judge alone is in a position to observe an alien's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." *Ling Huang v. Holder*, 744 F.3d 1149, 1153 (9th Cir. 2014). "Even a 'single testimonial discrepancy * * * may be sufficient to find an applicant incredible in some circumstances.'" *Herrera-Alcala v. Garland*, 39 F.4th 233, 245 (4th Cir. 2022).

If the immigration judge determines that an alien is a refugee and admissible, the alien is "regarded as lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1159(a)(2). Immigration judges also have authority to review if other executive branch officials have properly granted asylum to an alien. *Id.* § 1225(b)(4). Even if an alien is otherwise subject to removal, the immigration judge may grant asylum, *id.* §§ 1158(b)(1)(A), 1225(b)(1)(B)(iii)(III); cancellation of removal, *Wilkinson v. Garland*, 601 U.S. 209, 212-13 (2024); withholding of removal, *see*

*Johnson v. Guzman Chavez*, 594 U.S. 523, 530-32 (2021); and relief under the Convention Against Torture, *id.*

As an alternative to removal, Congress has allowed aliens to voluntarily depart from the United States, "a discretionary form of relief" that allows the alien to "avoid[] extended detention" and "facilitates the possibility of readmission." *Dada v. Mukasey*, 554 U.S. 1, 8, 11 (2008). The Attorney General's authority to grant voluntary departure at the conclusion of removal proceedings, however, depends upon whether the immigration judge has made certain statutorily required findings. 8 U.S.C. § 1229c(b)(1).

Serious consequences flow from an immigration judge's removal decision. If it is not challenged—or if it is upheld on administrative and judicial review—the alien must be removed from the United States within 90 days and will be detained until that removal can be accomplished. 8 U.S.C. § 1231(a)(1)-(2). If the alien unlawfully re-enters the country, "the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under [the Immigration and Nationality Act], and the alien shall be removed under the prior order at any time." *Id.* § 1231(a)(5). The immigration judge's removal order also triggers potential criminal

penalties, with fines and up to two years' imprisonment if the alien attempts unlawfully to re-enter the country. 8 U.S.C. § 1326(a).

The Attorney General has statutory authority to review decisions in immigration proceedings. 8 U.S.C. § 1103(g)(1)-(2). Consistent with that authority, removal decisions can be appealed to the Board of Immigration Appeals, whose fifteen members—like immigration judges themselves—are appointed by the Attorney General. 8 C.F.R. § 1003.1(a)-(b). The Attorney General may also personally review the Board of Immigration Appeal's decisions. *Id.* § 1003.1(h). If not reviewed, an immigration judge's decision is the final and binding decision of the United States. 8 U.S.C. § 1101(a)(47)(B)(ii); 8 C.F.R. § 1003.39.

The number of cases heard and decided by immigration judges has increased dramatically. In 1983, immigration judges collectively completed a total of approximately 75 cases per month. Executive Office for Immigration Review, Department of Justice, *Adjudication Statistics: New Cases and Total Completions—Historical* at 2 (2026) (*Immigration Adjudication Statistics*), https://perma.cc/Q6GC-Y9LZ. The present number is 73,371 cases per month. *Id.*

### 2. Civil Service Reform Act

Congress enacted the Civil Service Reform Act of 1978 to "replace the haphazard arrangements for administrative and judicial review of personnel action" that had "built up over almost a century." *United States v. Fausto*, 484 U.S. 439, 444 (1988). Under the Act, federal agencies may take adverse action against their employees—including removal—"only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a); *see Fausto*, 484 U.S. at 446-47. Congress granted "only competitive service employees and preference eligible members of the excepted service the right to appeal" adverse employment actions to the Merit Systems Protection Board and to the Federal Circuit. *Fausto*, 484 U.S. at 446. By contrast, "nonpreference members of the excepted service"—*e.g.*, non-veteran government attorneys—were "denied [] the right to seek either administrative or judicial review of the agency's final action." *Id.* That included immigration judges, who are Department of Justice attorneys and members of the excepted service. 5 C.F.R. § 213.3102(d) (1988); *id.* (2025).

In 1990, Congress amended the Civil Service Reform Act to generally allow members of the excepted service to appeal adverse employment actions to Board and the Federal Circuit. Pub. L. No. 101-376, § 2, 104 Stat.

461, 461-62 (1990).[2] An agency must follow certain procedures before it takes adverse actions against a covered civil service employee (*i.e.,* before removal, suspension for more than 14 days, a reduction in grade or pay, or a furlough of 30 days or less). 5 U.S.C. § 7512. The agency must give 30 days written notice of the action stating its reasons; the employee has at least 7 days to respond; and the agency must make its final decision in writing with "specific reasons therefor." *Id.* § 7513(b); *accord Perez v. Department of Justice*, 480 F.3d 1309, 1310-11 (Fed. Cir. 2007). Adverse actions can be appealed to the Board, 5 U.S.C. § 7513(d), and to this Court, *id.* § 7703(b)(1); 28 U.S.C. § 1295(a)(9).

## B. Factual Background

Petitioners Megan Jackler and Brandon Jaroch were initially appointed as assistant chief immigration judges in 2021, Appx117, Appx164, and both received permanent appointments from the Attorney General in 2023, Appx122-123 (Jackler appointment order and memorandum); Appx258-259 (Jaroch appointment order and memorandum).

---

[2] Congress did not extend administrative and judicial review to presidential appointments; to employees "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character"; to members of the Foreign Service; to employees of the Central Intelligence Agency, the Federal Bureau of Investigation, the National Security Agency, or the Defense Intelligence Agency. 104 Stat. at 462.

Assistant chief immigration judges manage and coordinate "Immigration Judge activities throughout the United States" and "supervis[e] the administrative operations of the program." Appx272. Their responsibilities include "[a]ssisting in development of policy and procedure for the operations of the program, * * * evaluating and adjusting broad objectives as needed, [and] determining need for and effecting changes in organizational structure and delegation of authority." Appx272-273. They work with the Chief Immigration Judge to "formulat[e] * * * Executive Office for Immigration Review programs and policies," and they "recommend[] adoption or rejection of policy changes." Appx273. They may also assign to themselves reserved decisions concerning the "extraordinary remedy" of cancellation of removal. *Orellana v. Bondi*, 141 F.4th 560, 564-65 (4th Cir. 2025).

In her first two years in office, Jackler "completed 1,110 cases." Appx124. Those decisions were in addition to her "significant supervisory duties" that included "supervis[ing] 7 Immigration Judges," holding regular meetings to "discuss court performance, docket management, agency policies, procedures, goals, and mission accomplishment," and working to reduce the New Orleans office's caseload by 6,619 cases. Appx124, Appx130. Jackler also supervised three attorney advisors, an immigration

court administrator and staff assistant, and performed the duties of "absent [immigration] judges." Appx339-340.

In his first two years in office, Jaroch "completed 43 cases," which was "low for an" immigration judge. Appx260. But this limited caseload was offset by Jaroch's "significant supervisory duties" including "having responsibility for" multiple immigration courts—Batavia, Buffalo, Detroit, Hartford, Houston, and Ulster. Appx260, Appx417. In that capacity, Jaroch "supervise[d] 33 Immigration Judges and approximately 90 Court Staff members" and regularly discussed with them "agency policies, procedures, goals and [] mission." Appx417. Jaroch "worked closely" with the immigration judges he supervised to address both "performance concerns" and "transition to the bench after an extended absence." Appx420. He also "shifted dockets to accommodate new priorities" as immigration judges dealt "with a surge in CFR [credible fear review] cases." Appx423.

In February 2025, the Attorney General removed Jackler and Jaroch from their offices. Appx208-210, Appx254-256. The memorandum accompanying that decision explained that "immigration judges are inferior officers" and that the Attorney General may remove them "at will" because any statutory removal restrictions "would conflict with Article II of the

Constitution." Appx209, Appx255. Jackler and Jaroch were notified of their termination by separate letters. Appx114, Appx159.

### C. Prior Proceedings

Jackler and Jaroch appealed their removals to the Board, arguing that the Attorney General was statutorily prohibited from removing them "unless" she could demonstrate "cause or unacceptable performance" under 5 U.S.C. § 7513. Appx329 (Jackler's brief), Appx396 (Jaroch's brief). The Department of Justice and the Office of Personnel Management (as intervenor) argued that the removal restrictions in § 7513 were unconstitutional as applied to immigration judges. Appx004-005. The cases were initially assigned to an administrative judge, who held that petitioners had not received advance notification of their removal or an opportunity to respond, as required under § 7513, and so ordered the removals reversed. Appx036-039, Appx058-061.

The Department of Justice appealed to the Board, which held the removal restrictions unconstitutional as applied to petitioners. Appx011-016. The Board explained that, under Supreme Court precedent, "at-will removal should be considered the default position for officers in the Executive Branch, except for 'inferior officers with limited duties and no policymaking or administrative authority.'" Appx012 (quoting *Seila Law*

*LLC v. CFPB*, 591 U.S. 197, 218 (2020)). The Board concluded that immigration judges—like other Executive Branch adjudicators—are inferior officers, Appx014, and that they did not fall within the exception to at-will removal, Appx015-016. Immigration judges, the Board observed, "wield[] vast administrative authority in an area of significant consequence, and the decisions entrusted to their discretion can involve policy choices that bear on this Nation's international relations." Appx016 (quotation marks omitted). The Board thus held that "5 U.S.C. § 7513 cannot be applied" to petitioners, "as doing so would unconstitutionally infringe upon the President's ability to faithfully execute the laws." Appx016.

Despite rejecting petitioners' claims on the merits, the Board concluded that the proper disposition was to dismiss their appeals for lack of jurisdiction. Appx016. The Board reasoned that if the removal restrictions in 5 U.S.C. § 7513 cannot be constitutionally applied to petitioners, then "the grant of Board jurisdiction in section 7513(d) [also] cannot constitutionally apply." Appx016.

Petitioners appealed to this Court, which granted initial hearing en banc. Given the Board's jurisdictional disposition, the Court identified the Board as the proper respondent. *See* 5 U.S.C. § 7703(a)(2). The Department of Justice intervened.

## SUMMARY OF ARGUMENT

**I.** The Constitution vests "[t]he executive Power" in a single President, and instructs that he "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. To ensure the President's democratic legitimacy, the Constitution ensures "a due dependence on the people" by having the President elected by the entire Nation, and by charging him with "due responsibility" for all the Executive Branch's actions. The Federalist No. 70, at 472 (A. Hamilton) (Jacob E. Cooke ed., 1961). Through the President's oversight and power of removal, "'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020) (quoting 1 Annals of Cong. 499 (J. Madison)).

Thus, the Supreme Court has repeatedly struck down removal restrictions, applying the general rule that executive officers are subject to the usual rule that "the President may remove his subordinates at will." *See Trump v. Slaughter*, 146 S. Ct. 2283, 2297 (2026); *id.* 2298-302 (collecting cases). Petitioners were constitutional officers of the United States in the Executive Branch. They occupied enduring offices established by Congress, 8 U.S.C. § 1101(b)(4), and received appointments to those offices from the

Attorney General, Appx122, Appx258. As immigration judges, they exercised consequential powers conferred exclusively on them by federal law, interpreting and applying federal immigration law according to their judgment and discretion. And as assistant chief immigration judges, petitioners supervised *other* inferior officers, recommended and devised administrative policies, and managed the work of multiple immigration courts. They are thus subject to the general rule that executive officers are removable at will.

The only way petitioners could possibly fall outside that rule is if they were "inferior officers" who possessed only "limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 217-18 (citing *United States v. Perkins*, 116 U.S. 483 (1886) and *United States v. Morrison*, 487 U.S. 654 (1988)). But *Slaughter* makes clear that, if that exception still exists, it is narrow; regardless, petitioners do not come close to meeting that exception under any construction. In addition to their administrative and policymaking duties, immigration judges wield the sovereign power of the United States in determining who may be lawfully admitted to the country and who must be removed. Those responsibilities, which concern "violation[s] of United States law," *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 490 (1999), as well as

"issues basic to human liberty and happiness," *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950), demand the clearest lines of political accountability.

Petitioners, in short, exercised significant power in the Executive Branch. And under our Constitution, "[t]he entire 'executive Power' belongs to the President alone," *Seila Law*, 591 U.S. at 213. If the President is to be politically accountable to the electorate for the actions and decisions of his subordinate officers, he must have plenary authority—directly, or through his Department Heads—to remove those who exercise a portion of that power. Through this chain of command, "the President" will "be *personally responsible* for everything." *Slaughter*, 146 S. Ct. at 2295.

It is no answer to contend that the Attorney General could adequately supervise immigration judges by reviewing their decisions—even setting aside the absurdity of suggesting that he could somehow review the 2,400 decisions they issue every day. *Immigration Adjudication Statistics* at 2, https://perma.cc/Q6GC-Y9LZ. Congress has vested immigration judges with "exclusive" authority over those removal proceedings, 8 U.S.C. § 1229a(a)(3), and the Attorney General's "general 'oversight and enforcement authority over'" immigration judges cannot "'blun[t] the constitutional impact of for-cause removal,'" because "[b]road power over

[an officer's] functions is not equivalent to the power to remove," *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 504 (2010). Precisely because of the difficulties of reviewing subordinate officers' decisions after the fact, it is the threat of removal that offices "must fear and, in the performance of [their] functions, obey." *Seila Law*, 591 U.S. at 213-14.

**II.** The Board correctly held that the Attorney General properly removed petitioners at will, but erred in its assessment of its own jurisdiction. The fact that the Department of Justice asserted a valid constitutional defense to petitioners' appeals does not mean that the Board lacked jurisdiction to hear the appeals in the first place. Instead, petitioners meet Title 5's definition of "employee," 5 U.S.C. § 7511(a)(1), who can seek review of covered employment actions before the Board, *id.* § 7513(d), and this Court, *id.* § 7703(b)(1)(A). While the substantive limitations on the Attorney General's authority to remove petitioners are unconstitutional, the mere fact that petitioners can contest that position before the Board is not, and so the Board properly had jurisdiction. Congress generally vested exclusive review of removal decisions for statutorily defined employees with the Board and this Court—not with

district court across the country with appeals to the regional circuits, which would likely result in a patchwork of conflicting decisions.

## ARGUMENT

### I. The Board Correctly Upheld Petitioners' Removal By The Attorney General

#### A. At-Will Removal of Executive Officers Is Necessary to Maintain the Executive Branch's Accountability to the Electorate

In case after case in the modern era, the Supreme Court has held that the President possesses virtually unfettered authority under Article II to remove his subordinate executive officers at will. *See, e.g.*, *Trump v. Slaughter*, 146 S. Ct. 2283, 2310 (2026) ("Subordinates who exercise the President's power are subject to removal by him."); *Collins v. Yellen*, 594 U.S. 220, 250 (2021) (statute's "for-cause restriction on the President's removal authority violates the separation of powers"); *Seila Law LLC v. CFPB*, 591 U.S. 197, 224 (2020) (removal restriction for agency head "contravenes" the Constitution's "carefully calibrated system."); *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 498 (2010) ("By granting the Board executive power without the Executive's oversight, this Act subverts the President's ability to ensure that the laws are faithfully executed."). That "general rule," that the President may "remove those who assist him in carrying out his duties," does not exist

merely for the convenience of the President. *Seila Law*, 591 U.S. at 215. At-will removal for executive officers, the Supreme Court has emphasized, guarantees that the President remains politically accountable to the people for the actions of his subordinates.

**1.** "The Framers recognized that, in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). For the most part, "[t]heir solution to governmental power and its perils was simple: divide it." *Seila Law*, 591 U.S. at 223. "At the highest level, they 'split the atom of sovereignty' itself into one Federal Government and the States. They then divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Id.* (citation omitted). They further "bifurcated the federal legislative power into two Chambers * * * each composed of multiple Members and Senators." *Id.*

"The Executive Branch," however, "is a stark departure from all this division." *Seila Law*, 591 U.S. at 223. The Constitution vests "[t]he executive Power" in a single President, and instructs that he "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1; *id.* § 3. On the one hand, the Framers considered but rejected a multi-executive model, concluding that the vital interests of the Nation would be best served by

single Chief Executive capable of decisive action. They “deemed an energetic executive essential to ‘the protection of the community against foreign attacks,’ ‘the steady administration of the laws,’ ‘the protection of property,’ and ‘the security of liberty.’” *Seila Law*, 591 U.S. at 223-24 (quoting The Federalist No. 70, at 471 (A. Hamilton) (Jacob E. Cooke ed., 1961)). On the other hand, the Framers—having just won the Revolution—were not blind to the dangers “of a King who reigned as ‘a Tyrant.’” *Slaughter*, 146 S. Ct. at 2291 (quoting the Declaration of Independence ¶ 30).

The Framers’ solution was to make the President singularly accountable to the electorate. The Constitution ensured “safety in the republican sense” by tying the President to “a due dependence on the people” and charging him with “due responsibility” for all the Executive’s actions. The Federalist No. 70, at 472. In the Framer’s design, “[o]nly the President (along with the Vice President) is elected by the entire Nation,” making him “the most democratic and politically accountable official in Government.” *Seila Law*, 591 U.S. at 224. “The resulting constitutional strategy is straightforward: divide power everywhere except for the Presidency, and render the President directly accountable to the people through regular elections.” *Id.*

**2.** The President is accountable to the public, furthermore, not just for his personal actions, but for all "the actions of the Executive Branch," and he "never adjourns" in those duties. *Clinton v. Jones*, 520 U.S. 681, 712-13 (1997) (Breyer, J., concurring in the judgment). "The buck stops with" him. *Free Enterprise*, 561 U.S. at 493.

"In light of '[t]he impossibility that one man should be able to perform all the great business of the State,' the Constitution provides for executive officers to 'assist the supreme Magistrate in discharging the duties of his trust.'" *Free Enterprise*, 561 U.S. at 483 (quoting 30 Writings of George Washington 334 (John C. Fitzpatrick ed. 1939)). But "[t]hese officers were to serve as envoys of the President, not his equals. Their very purpose, after all, was to assist him 'to discharge *his* arduous employment,' not *theirs*." *Slaughter*, 146 S. Ct. at 2294. "As such, the Government's 'ministers' were required to 'exercise their functions in subordination to the Executive,' whether their tasks were big or small." *Id*.

This structure ensures that the President remains politically accountable for all exercises of executive power under his watch. Individual executive officers "still wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President. Through the President's oversight, 'the chain of dependence [is]

preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law*, 591 U.S. at 224 (quoting 1 Annals of Cong. 499 (J. Madison)).

**3**. The Article II removal power is what enforces that chain of dependence—and thus what guarantees the President's political accountability for all significant exercises of executive power. Without it, Congress could require a President to retain executive officers in whose judgment the President lacked confidence, and for whose decisions the President would be blamed. Likewise, without the removal power, a President could always tell a voter who was angry about a subordinate officer's actions: "Don't blame me, that was not my appointee, and even if he was, there was nothing I could do to stop him."

The centrality of the President's removal power to the constitutional design has been evident since the beginning. The First Congress debated at length whether the newly adopted Constitution assigned to the President the exclusive duty of determining when and whether executive officers should be removed, or if Congress could freely regulate such removals. "Madison led the charge," arguing that "removal was part of 'the Executive power' vested in the President, which 'the Legislature has no right to

diminish or modify.'" *Slaughter*, 146 S. Ct. at 2296 (quoting 1 Annals of Cong. 463 (J. Madison)). Madison persuaded his colleagues that "'if any power whatsoever is in its nature Executive * * * it is the power of appointing, overseeing, and controlling those who execute the laws,'" from which "the 'power of removal from office' must follow." *Id.* (quoting 1 Annals of Cong. 463, 499 (J. Madison)).

Madison's construction of the Constitution "emerged victorious" and "gained fame as 'the Decision of 1789." *Slaughter*, 146 S. Ct. at 2296. And all the Presidents of the Founding era and beyond, through Andrew Jackson, ascribed to the understanding that "the power to 'remov[e] executive officers [is] inherent in [the] Executive,'" and that "'the tenure of all subordinate executive Offices' is 'necessarily the pleasure of the chief by whom they were commissioned.'" *Id.* at 2297 (collecting examples). Indeed, "all branches of the government" "acquiesce[d]" in the "decision of 1789 as to executive officers, whether superior or inferior," and for "74 years, there was no act of Congress, no executive act, and no decision of this court at variance with the declaration of the First Congress." *Myers v. United Sates*, 272 U.S. 52, 163 (1926). All understood that for "lesser officers" to "remain accountable to the President, whose authority they wield," they must be removable at will, "for it is 'only the authority that can

remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Seila Law*, 591 U.S. at 213-14 (quoting *Bowsher*, 478 U.S. at 726).

The removal power also protects the independence and autonomy of the Executive Branch from Congress. Although the President requires subordinates to assist him in discharging his many varied responsibilities, the Constitution establishes no offices within the Executive Branch besides the President and Vice President. Instead, "Congress has plenary control over" the "existence of executive offices," along with their salaries and duties. *Free Enterprise*, 561 U.S. at 500. "Only Presidential oversight can counter" that legislative influence. *Id.* And to "remain accountable to the President, those officers must be removable by the President." *Slaughter*, 146 S. Ct. at 2293. Otherwise, Congress could authorize "the President's so-called assistants" to "exercise *his* power against *his* wishes," leaving no one politically accountable for the exercise of government power. *Id.* at 2295 (quoting The Federalist, No. 47, at 326 (J. Madison)). As Daniel Webster recognized, if Congress were to inject itself into the removal of executive officers, it would cause "the power of two or more departments [to be] mixed up irregularly and jumbled together," resulting in "no just

responsibility upon anybody." Cong. Globe, 31st Cong., 1st Sess. 1126 (1850).

**4.** These principles apply with full force to officers appointed by Department Heads. The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, "specifies how 'Officers of the United States,' as distinct from employees, must be appointed." *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 759 (2025). Constitutional officers are those who exercise "significant authority pursuant to the laws of the United States." *Id.* at 759-60. By contrast, the Supreme Court has long recognized that many federal workers lack such significant authority, and so serve as "an agent or employé * * * as nine-tenths of the persons rendering service to the government undoubtedly are, without thereby becoming its officers." *United States v. Germaine,* 99 U.S. 508, 509 (1879).[3]

Principal officers "who report directly to the President" must be appointed by the President with the advice and consent of the Senate. *Id.* at 759-61. Inferior officers—those "whose work is directed and supervised at some level by" those appointed as principal officers, *id.* at 760-61—are by default appointed in the same way, but can also be appointed by "the

[3] "The applicable proportion has of course increased dramatically since 1879." *Free Enterprise*, 561 U.S. at 506 n.9.

President alone," by the "Courts of Law," or by "the Heads of Departments," if Congress so provides, U.S. Const. art. II, § 2, cl. 2. That alternative method of appointment, known as the Excepting Clause, "was added to the proposed Constitution on the last day of the Grand Convention, with little discussion." *Edmond v. United States*, 520 U.S. 651, 660 (1997). It was adopted after "[i]t was urged that * * * some such provision" was "too necessary to be omitted," James Madison, *Notes of Debates in the Federal Convention of 1787*, at 572 (Gaillard Hunt & James Brown Scott, eds., 1920) (*Notes of Debates*).

As the Supreme Court has explained, the "obvious purpose" of the Clause "is administrative convenience." *Edmond*, 520 U.S. at 660. Inferior officers can, and by default are, still appointed by the President with confirmation by the Senate. U.S. Const. art. II, § 2, cl. 2. "But the Framers foresaw that 'when offices became numerous, and sudden removals necessary, this mode" of appointment "might be inconvenient.'" *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (quoting *Germaine*, 99 U.S. at 510). Rather than having "[b]lank commissions" be sent and approved for such inferior offices, *see Notes of Debates* 572, the Constitution permits inferior officers in the Executive Branch to be appointed by and removed by Department Heads—who themselves are removable at will by the President.

In that way, the Department Head may remove an inferior officer "at any time, and therefore [will] be fully responsible for what" the subordinate does. *Free Enterprise*, 561 U.S. at 495. And by extension, the President may hold the Department Heads "to account for [their] supervision of" inferior officers "to the same extent that he may hold [them] to account for everything else." *Id.* at 495-96.

That understanding of "at-will removability by Heads of Departments" is confirmed by "[h]istorical practice." *See Braidwood*, 606 U.S. at 762-63. "For example, in designating the 'chief Clerk in the Department of Foreign Affairs' as an 'inferior officer,' the First Congress made clear that the Clerk was 'to be employed' as the Secretary of Foreign Affairs 'shall deem proper.'" *Id.* at 763 (quoting Act of July 27, 1789, ch. 4, 1 Stat. 28, 29). "The same was true of the Chief Clerk of the Department of War," and indeed the First Congress granted all Heads of Departments "the authority to 'appoint all necessary clerks'; that those clerks were subject to at-will removal by the Secretaries; and that they fell 'under that class of inferior officers.'" *Id.* (quoting *In re Hennen*, 38 U.S. 230, 259-60 (1839)). Inferior officers thus historically "remain[ed] accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. Through this chain of command, "the President" will "be personally responsible for

everything," as the Constitution requires. *Slaughter*, 146 S. Ct. at 2295 (emphasis omitted).

### B. As Inferior Officers with Broad Duties and Policymaking and Administrative Powers, Petitioners Were Removable At Will

Petitioners were constitutional officers of the Executive Branch who served as immigration judges and exercised significant executive power. Because of their status as constitutional officers, petitioners required and received personal appointments to their offices from the Attorney General. Appx122, Appx258. And because the Attorney General, and thus the President, was ultimately accountable for petitioners' exercise of the powers of their offices, petitioners were removable at will by the Attorney General.

At the outset, petitioners do not seriously dispute that they were constitutional officers of the United States. That is for good reason. Most federal employees are exactly that—"employees of the United States rather than officers." *Buckley v. Valeo*, 424 U.S. 1, 126 n.162 (1976). By contrast, an "Officer of the United States" is one who "exercis[es] significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126; *accord Helman v. Department of Veterans Affairs*, 856 F.3d 920, 927-28 (Fed. Cir. 2017).

There is no serious question that petitioners were constitutional officers of the United States who exercised significant executive power. Petitioners served as immigration judges who occupied enduring offices established by statute, 8 U.S.C. § 1101(b)(4), and wielded tremendous authority under the immigration laws. Immigration judges are the primary officers within the Executive Branch whom Congress has authorized to "conduct proceedings for deciding the inadmissibility or deportability of an alien" in the first instance. *Id.* § 1229a(a)(1). Indeed, in most circumstances, proceedings before an immigration judge are "the sole and exclusive procedure for determining whether an alien may be admitted to the United States or * * * removed from the United States." *Id.* § 1229a(a)(3). Based on the evidence and their own discretion, immigration judges can admit aliens into the United States, *id.* § 1159(a)(2), reverse a grant of admission, *id.* § 1225(b)(4), grant asylum, *id.* § 1158(b)(1)(A), withhold removal, *id.* § 1231(b)(3)(A), cancel removal, *id.* § 1229b(a)-(b), grant relief under the Convention Against Torture, *id.* § 1231 note, grant voluntary departure, *id.* § 1229c(b), or order an alien's removal, *id.* § 1229a(c)(1)(A).

Immigration judges, in short, preside at the legal gates of our Nation and use their broad authority and discretion under the laws of the United

States to police its boundaries. And that authority is formidable. Immigration judges issue subpoenas, receive evidence, and question witnesses. 8 U.S.C. § 1229a(b)(1). They act with independence and discretion, make credibility determinations, *id.* § 1229a(c)(4), and render findings of fact. Those findings of fact are reviewable only for clear error, 8 C.F.R. § 1003.1(d)(3)(i) (Board of Immigration Appeals "will not engage in de novo review of" facts, and immigration judges' findings are conclusive unless "clearly erroneous"), and substantial evidence, 8 U.S.C. § 1252(b)(4)(B) ("[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). Likewise, immigration judges' credibility determinations command great deference from reviewing courts. As the Supreme Court has stressed, the immigration judge "who actually observes the witness" is "best positioned to assess the applicant's credibility in the first instance." *Garland v. Ming Dai*, 593 U.S. 357, 367 (2021). Accordingly, as a practical matter, an immigration judge's "factfinding on credibility, the seriousness of a family member's medical condition, or the level of financial support a noncitizen currently provides" will often be "unreviewable." *Wilkinson v. Garland*, 601 U.S. 209, 225 (2024).

Congress has also vested immigration judges with authority to "sanction by civil money penalty any action (or inaction) in contempt" with their proceedings, 8 U.S.C. § 1229a(b)(1), which can include the ability to impose penalties on attorneys, aliens, and witnesses who appear before the immigration judge, 91 Fed. Reg. 47979, 47980-81 (July 30, 2026) (notice of proposed rulemaking).

An immigration judge's final order of removal must be effectuated within 90 days, and detention of the alien is mandatory until removal is completed. 8 U.S.C. § 1231(a)(1)-(2). If the alien then unlawfully re-enters the United States after the removal is effectuated, the alien faces summary removal, is ineligible for discretionary relief from removal, and may face criminal penalties for unlawful reentry. *Id.* §§ 1231(a)(5), 1326(a). In all these ways, immigration judges wield the initial and "exclusive" power of the United States government, *id.* § 1229a(a)(3), "inherent in sovereignty," to "forbid the entrance of foreigners * * * or to admit them only in such cases and upon such conditions as" permitted, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).

These powers plainly constitute significant authority under federal law. Indeed, the Supreme Court and this Court have repeatedly held that that Executive Branch adjudicators with similar—and even far less

significant—duties qualify as constitutional officers. *See, e.g.*, *Freytag v. Commissioner*, 501 U.S. 868, 880-82 (1991) (holding that special trial judges of the Tax Court are officers because they "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance"); *Lucia v. SEC*, 585 U.S. 237, 247-50 (2018) (holding that administrative law judges are officers because "*Freytag* says everything necessary to decide this case"); *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1328 (Fed. Cir. 2019) (holding that administrative patent judges are offices because they perform materially the same duties as the adjudicators in *Freytag* and *Lucia*). Applying that straightforward analysis, the Ninth Circuit has recognized that immigration judges serve as "inferior officers of the United States" who may be appointed by the Attorney General. *Duenas v. Garland*, 78 F.4th 1069, 1073 (9th Cir. 2023).

Because petitioners are inferior officers, they were removable at will by the Attorney General, who appointed petitioners and who is in turn removable at will by the President. This Court has already recognized that the removal restrictions in 5 U.S.C. § 7513 deprive Department Heads of their usual "unfettered removal authority" over inferior officers. *Arthrex*, 941 F.3d at 1332. That removal restriction is unconstitutional as applied to petitioners.

As immigration judges, petitioners determined whether aliens should be lawfully admitted into the United States or whether they should be removed—a quintessential sovereign power long entrusted to the Executive Branch. The proper regulation of immigration has been the focus of Presidents across administrations, to the point where Presidents direct new immigration policy immediately upon taking office. *See, e.g.*, *Biden v. Texas*, 597 U.S. 785, 790-91 (2022). Immigration judges execute the immigration laws, and the President's removal authority extends to those officers "'for whom he can not continue to be responsible.'" *Slaughter*, 146 S. Ct. at 2291 (quoting *Myers*, 272 U.S. at 117). Any other rule would make it "impossible for the President * * * to take care that the laws be faithfully executed," *id.*, and would rend an unwarranted separation of the President and the Executive's actions taken in his name. But the Constitution ensures that the President, through his oversight and removal authority, "cannot * * * escape responsibility for his choices by pretending that they are not his own." *Free Enterprise*, 561 U.S. at 497.

As such, petitioners were subject to the usual rule that "lesser officers must remain accountable to the President," through removal, "for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of [their] functions, obey.'" *Seila Law*, 591 U.S. at 213-14.

Any other rule leads to exactly the "diffusion of power" and "diffusion of accountability" that the Constitution guards against. *Free Enterprise*, 561 U.S. at 497. If Congress could circumscribe the grounds for petitioners' removal, then no one would be clearly responsible for their exercise of executive power. Petitioners themselves would not be accountable, for they are only inferior officers and must be responsible to someone else. And the Attorney General would have tried to remove them but would be restricted from doing so unless a reviewing court determined the removal did not "promote the efficiency of the service." 5 U.S.C. § 7513(a). Neither would such a court be responsible, for Article III judges exercise no executive power and serve for good behavior. U.S. Const. art. III, § 1. And "where, in all this, is the role for oversight by an elected President," *Free Enterprise*, 561 U.S. at 499, who cannot review immigration decisions personally, and would have little reason to reprimand an Attorney General who attempted to—but was prohibited from—removing petitioners.

Immigration judges are "neither elected by the people nor meaningfully controlled (through the threat of removal) by someone who is." *Seila Law*, 591 U.S. at 224-25. Congress cannot create an executive office, 8 U.S.C. § 1101(b)(4), direct that these officers "conduct proceedings for deciding the inadmissibility or deportability of an alien," *id.*

§ 1229a(a)(1)-(3), and then insulate these officers from removal if the Executive cannot make a showing of "cause" sufficient to satisfy a co-ordinate branch of government, 5 U.S.C. §§ 7513(a), 7703(b)(1)(A).

### C. Petitioners Do Not Fall Within Any Exception to At-Will Removal Based on *Perkins* and *Morrison*

**1.** After *Slaughter* overruled *Humphrey's Executor*, 146 S. Ct. at 2302, the only possible remaining exception to the President's at-will removal authority over executive officers rests on *United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison v. Olson*, 487 U.S. 654 (1988), the only two cases in which the Court "held that Congress could provide tenure protections to certain inferior officers with narrowly defined duties," *Seila Law*, 591 U.S. at 204 (emphasis omitted). Notably, in describing the unfettered nature of the President's removal power in *Slaughter*, the majority conspicuously omitted any mention of the *Perkins*/*Morrison* exception. The dissenters accused the majority of "ignor[ing]," *Perkins*, 146 S. Ct. at 2335 (Sotomayor, J., dissenting), and predicted that the majority's "decision may also have major implications for inferior officers," as they too "wield some executive power" and removal restrictions cause "a break in the chain of dependence" to the President, *id.* at 2344 (quotation marks omitted). While the majority distinguished non-governmental bodies, non-executive officers, and non-Article III courts, *id.* at 2305-06 (majority

opinion), it did not distinguish inferior officers in light of the dissent's arguments. Instead, the majority was clear: "Subordinates who exercise the President's power are subject to removal by him." *Id.* at 2310.

Even assuming (as this Court must) that *Perkins* and *Morrison* remain good law, their exception defines "the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Seila Law*, 591 U.S. at 218. Petitioners now invite this Court "to extend these precedents to a new configuration," *id.* at 204—that is, to supervisory immigration judges with significant individual authority under federal law and significant administrative and supervisory responsibilities. The Court should decline that invitation, especially since *Slaughter* casts significant doubt upon whether this exception exists at all, and at a minimum compels narrowly confining it rather than expanding it.

*Perkins* concerned a Navy cadet engineer, a student who received "a scientific mechanical education" at the Naval Academy for four years and then served for two more years on "naval steamers." *United States v. Redgrave*, 116 U.S. 474, 478 (1886). After graduation, a cadet engineer could be promoted to an "assistant engineer * * * if found qualified." H.R. Rep. No. 46-62, at 1-2 (1881). Navy engineers around this time performed duties related to the ship's "stores, engines, boilers, machinery, etc., * * *

rather than duties of a peculiarly confidential and personal nature to the commander in chief." *Laws Relating to the Navy*, S. Doc. No. 67-238, at 501 (1921); *see also Denig v. United States*, 37 Ct. Cl. 383, 385-86 (1902) (describing similar duties). *Perkins* held that cadet engineers could not be removed simply because there was no vacancy for promotion to assistant engineer. 116 U.S. at 483-85.

*Morrison* concerned an "independent counsel appointed to investigate and prosecute particular alleged crimes by high-ranking Government officials." *Seila Law*, 591 U.S. at 217. That temporary assignment of a narrow slice of executive power "was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter in which the Department of Justice had a potential conflict of interest." *Id.* at 219. The independent counsel's office would terminate once her investigations and "any resulting prosecutions[] have been completed" or substantially completed. 28 U.S.C. § 596(b). *Morrison* upheld a "good cause" restriction on the Attorney General's authority to remove the independent counsel, premised on her "limited jurisdiction and tenure" and lack of "policymaking or significant administrative authority." 487 U.S. at 691.

The Supreme Court has accordingly construed *Perkins* and *Morrison* to hold at most that Congress may impose removal restrictions for "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. Petitioners repeatedly suggest that this statement was somehow dicta, but it served as the predicate for the Court's conclusion that it would not further extend the "outermost constitutional limits" of restrictions on the removal power. *Id.*

**2.** The *Perkins*/*Morrison* exception plainly does not encompass petitioners, who both exercised more than "limited" duties and possessed not only "policymaking" but also "administrative authority."

First, petitioners' duties were not "limited" in the sense of *Perkins* or *Morrison*. Petitioners occupied permanent offices created by statute, oversaw adversarial hearings, interpreted and applied federal law according to their own judgment, and issued binding decisions. *See Arthrex*, 941 F.3d at 1328 (describing similar powers for administrative patent judges). "Unlike the Independent Counsel," immigration judges "do not have limited tenure, limited duties, or limited jurisdiction." *Arthrex*, 941 F.3d at 1334 (similar).

While those general powers are sufficient to place them beyond *Perkins* and *Morrison*, the gravity of petitioner's particular duties only

underscore that conclusion. "A deportation hearing involves issues basic to human liberty and happiness." *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950). On the one hand, an immigration judge's order of removal "can be the equivalent of banishment or exile. The stakes are indeed high and momentous for the alien who has acquired his residence here." *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) (citation omitted). On the other hand, a decision that permits an alien to remain in the country when there is no basis to do so "is to permit and prolong a continuing violation of United States law." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 490 (1999). Those solemn duties, applied over millions of cases affecting the United States' sovereignty, border security, and foreign relations—not to mention the lives of untold ordinary people—require the clearest form of political accountability. "The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the people." *Free Enterprise*, 561 U.S. at 499.

Second, unlike the Naval cadet in *Perkins* or the independent counsel in *Morrison*, petitioners exercised "administrative powers" in administering the immigration laws and making "determinations of

eligibility" for lawful presence in the United States. *Buckley*, 424 U.S. at 140. And petitioners likewise exercise policymaking authority in interpreting and applying federal immigration policy to the cases that passed before them—especially in deciding whether to exercise myriad discretionary authorities, such as granting cancellation of removal, withholding of removal, or voluntary departure. Executive adjudicators "determine, on a case-by-case basis, the policy of an executive branch agency for the administration of a federal program." *Secretary of Education Review of Administrative Law Judge Decisions*, 15 Op. O.L.C. 8, 15 (1991). Through adjudications, executive officers necessarily "fill statutory and regulatory interstices comprehensively with [their] own policy judgments." *Id.* at 14; *accord City of Arlington v. FCC*, 569 U.S. 290, 304-05 (2013) (judges of all types decide "how best to construe an ambiguous term in light of competing policy interests"); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292-94 (1974) (executive adjudication "serve[s] as [a] vehicle[] for the formulation of agency policies").

And as assistant chief immigration judges, petitioners acted as supervisory inferior officers with yet more administrative and policymaking responsibilities. Petitioners managed and coordinated "Immigration Judge activities throughout the United States." Appx272. Their responsibilities

included “evaluating and adjusting broad objectives as needed,” including “effecting changes in organizational structure,” and “formulat[ing] * * * Executive Office for Immigration Review programs and policies.” Appx272-273.

Jackler supervised the work of seven other immigration judges, three attorney advisors, and immigration court staff. Appx124, Appx339-340. Jaroch likewise had “significant supervisory duties” in overseeing immigration courts in Batavia, Buffalo, Detroit, Hartford, Houston, and Ulster, “supervis[ing] 33 Immigration Judges and approximately 90 Court Staff members,” and furthering “agency policies, procedures, goals and [] mission.” Appx260, Appx417. The breadth of these responsibilities belies petitioners’ insistence that they are analogous to mere civil servants whose removal warranted no different treatment under federal law than the proposed removal of a GS-9 legal assistant or a GS-13 program analyst.

Petitioners, in short, were hardly “inferior officers with limited duties and no policymaking or administrative authority.” *Seila Law*, 591 U.S. at 218. They were executive officers with sweeping and significant power and discretion in executing the immigration laws in the name of the Attorney General, on behalf of the President. They were therefore removable at will by the Attorney General.

A broader reading of *Perkins* makes little sense. Because "[t]he power to remove inferior executive officers * * * is an incident of the power to appoint them," *Myers*, 272 U.S. at 161, and because the President generally has at-will removal authority over inferior officers whom he can only appoint with the Senate's approval, U.S. Const. art. II, § 2, cl. 2, the President too must have general authority to remove inferior officers appointed by his "*alter ego*" department heads, *Myers*, 272 U.S. at 133.

That reasoning is consistent with the purpose of permitting appointments by Department Heads. "'It is perfectly obvious' that the" Excepting Clause "'was intended merely to make clear * * * that those officers appointed by the President with Senate approval could on their own appoint their subordinates, who would, of course, by chain of command still be under the direct control of the President.'" *Braidwood*, 606 U.S. at 761 (quoting *Morrison*, 487 U.S. at 720-721 (Scalia, J., dissenting)). In other words, the ability of Executive Department Heads to appoint their own subordinates "helps protect the independence of the Executive Branch" by permitting appointments without reliance upon the Senate's approval. *Id.* at 760. The Excepting Clause thus permits "necessary" and "sudden removals" among the "numerous" executive offices that have expanded as the federal government has grown over the centuries. *Id.* The

Clause's purpose of ensuring Executive independence and alacrity would be frustrated if Congress may freely impose removal restrictions on these executive officers.

Petitioners seek to extend *Perkins* beyond its holding by asserting that it creates a general exception to removal whenever it is in "the public interest," Br. 9, 27, 42 (quoting *Perkins*, 116 U.S. at 485). But the Supreme Court's recent decisions make clear that removal restrictions are not assessed on a policy basis to determine whether they are sufficiently in "the public interest," *Perkins*, 116 U.S. at 484, or whether they "impermissibly burden[] the President's power," *Morrison*, 487 U.S. at 692. The Court has rejected attempts to read its precedents as endorsing a view "that Congress may impose 'modest' restrictions on the President's removal power," so long as Congress itself does not remove officers and does not prohibit removal altogether. *Seila Law*, 591 U.S. at 228. Instead, the precise holdings of *Perkins* and *Morrison* as applied to those officers with "narrowly defined duties," *id.* at 204, are the furthest incursions on the removal power that the Supreme Court will tolerate, *id.* at 204-05, 218.

**3.** Petitioners relatedly err in suggesting that *Myers* recognized a categorical exception for inferior officers to be insulated from removal, Br.

29-30, which would be plainly inconsistent with *Seila Law*'s explanation of the Court's removal precedents.

In all events, *Myers* emphasized that its prior decisions "conclusively establishe[d]" that the "decision of 1789 included inferior officers." 272 U.S. at 159. *Myers* also noted that Congress may vest the appointment of inferior officers in Department Heads and thereby "regulate removals" for such offices. *Id.* at 161. Petitioners misread that discussion and transform it into a free-standing invitation to encumber all inferior officers with whatever removal restrictions Congress thinks best. But the "President's removal power is the rule, not the exception" and the Supreme Court has declined to "elevate" any of its precedents "into a freestanding invitation for Congress to impose *additional* restrictions on the President's removal authority." *Seila Law*, 591 U.S. at 228 (emphasis added). Moreover, the discussion in *Myers* was fundamentally about *who* holds the removal power, because Congress may provide for an inferior officer's removal by someone *other* than the President. In the face of statutory silence, "the power of removal must remain where the Constitution places it, with the President," *Myers*, 272 U.S. at 161, but Congress can of course place the power to appoint and remove inferior officers in a Department Head if it so chooses. *Myers* cautioned that portions of Article II that "blend action by

the legislative branch" in authorizing the appointments of inferior officers in Department Heads "are limitations to be strictly construed, and not to be extended by implication." *Id.* at 164. Any other rule "would make it impossible for the President, in case of political or other difference with the Senate or Congress, to take care that the laws be faithfully executed." *Id.*

### D. Petitioners' Remaining Counterarguments Lack Merit

#### 1. The Attorney General's authority to review adjudications does not displace the removal power

The Attorney General has statutory authority to review decisions in immigration proceedings. 8 U.S.C. § 1103(g)(1)-(2). As this Court and the Supreme Court explained in *Arthrex*, that level of supervision is sufficient to render immigration judges inferior rather than principal officers. *See Arthrex*, 594 U.S. at 25-26 (severing statutory restriction on review of adjudications by a principal officer); *cf. Arthrex*, 941 F.3d at 1329 (explaining how the lack of direct review within the Executive contributes to an adjudicator's principal officer status). The possibility of Attorney General review thus resolves any Appointments Clause concerns, and immigration judges may be appropriately appointed by the Attorney General rather than by the President with requisite Senate confirmation. *See* U.S. art. II, § 2, cl. 2.

But that does not resolve concerns raised by the Take Care Clause, the Vesting Clause, or separation of powers principles that require the President to retain necessary supervision over the Executive Branch. *See supra* pp.25-34. Petitioners are thus incorrect in asserting that *Arthrex* decided those issues, Br. 20-21, 34-35, when the Court's analysis was confined to the Appointments Clause. Petitioners assert that it would be impossible for the Court to redress an Appointments Clause error while leaving a separate Article II violation in place. Br. 34. But the challenger in *Arthrex* did not raise a separate removal claim, and the Supreme Court has made clear that it can decide whether someone has been properly appointed as an inferior officer, *see Lucia*, 585 U.S. at 244, without conclusively addressing whether their removal restrictions are constitutional, *id.* at 244 n.1 (declining to assess the constitutionality of removal restrictions for administrative law judges); *accord Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record" and "no[t] ruled upon, are not to be considered as having been so decided."). Indeed, the Court in *Seila Law* suggested that Congress could permissibly re-structure the CFPB as "a multimember agency" to preserve its statutory removal restrictions, 591 U.S. at 237, even though it confirmed just a few

years later that such removal restrictions are unconstitutional under the core reasoning of *Seila Law*. *Slaughter*, 146 S. Ct. at 2301-02, 2305-06.

Proper appointment does not prove that removal restrictions are constitutional. Take the inferior officers in *Free Enterprise*—they were properly appointed as inferior officers but the court invalidated their removal restrictions as unconstitutional. 561 U.S. at 508-10. Moreover, those officers were subject to direct review by the Securities and Exchange Commission, which could review the inferior officer's proposed rules and sanctions. *Id.* at 486 (citing 15 U.S.C. § 7217(b)-(c)). But while they were subject to "some latent Commission control," these officers were also free to "start, stop, or alter" the use of executive power without immediate Executive oversight. *Id.* at 504. That is why the Court held that at-will removal was necessary.

The same is true for immigration judges—they oversee removal proceedings and wield executive authority, with Attorney General review only after they have rendered their decision.

Those decisions are many. In 2026, immigration judges were completing 73,371 removal cases per month, or approximately 2,445 cases per day. *Immigration Adjudication Statistics* at 2, https://perma.cc/Q6GC-Y9LZ. In *Arthrex*, it was at least conceivable that the Director of the

Patent and Trademark Office could review the 500 decisions issued by the inferior officers per year. 941 F.3d at 1330. But there are "only twenty-four hours in a day" and "the Attorney General is burdened with a vast range of duties." *Jay v. Boyd*, 351 U.S. 345, 371 (1956) (Frankfurter, J., dissenting). It is not within human endurance or prudence that the Attorney General should review each of the thousands of removal decisions issued by his inferior officers every day. Even Thomas Jefferson, when serving as Secretary of State and a member of the original Patent Board, lamented that "he had 'been obliged to give undue & uninformed opinions on rights often valuable' without the 'great deal of time' necessary to 'understand & do justice by' patent applicants." *Arthrex*, 594 U.S. at 6-7.

Still further would it be beyond the Attorney General's capacity to scrutinize each of the immigration judges' discretionary decisions, *e.g.*, whether to ask a particular question or credit certain testimony. And given the sheer volume of cases, it would be regrettable but understandable for an Attorney General to attempt to disclaim responsibility for these decisions—he would assert that individualized review is simply not practical and that immigration judges enjoy protection from removal under 5 U.S.C. § 7513, and so he cannot truly be responsible for their actions.

All this is why the Supreme Court has already rejected the notion that "at-will removal power over" an officer's "*functions*" is the equivalent of "at-will removal." *Free Enterprise*, 561 U.S. at 503. The Attorney General's "general 'oversight and enforcement authority over'" immigration judges cannot "'blun[t] the constitutional impact of for-cause removal,'" because "[b]road power over [an officer's] functions is not equivalent to the power to remove." *Id.* at 504. And constraining supervision to individualized review of hundreds of thousands of cases per year, or through generalized rules of procedure, is "obviously a poor means of micromanaging the" responsibilities of immigration judges. *Id.* The President "has been given the power to oversee executive officers; he is not limited, as in Harry Truman's lament, to 'persuad[ing]' his unelected subordinates 'to do what they ought to do without persuasion.'" *Id.* at 501-02. In "pursuit of a 'workable government,' Congress cannot reduce the Chief Magistrate to a cajoler-in-chief." *Id.* at 502. Because immigration judges are fully accountable to the President and the Attorney General through removal, they are subject to control at all times—there is no latent possibility that an immigration judge may try to capitalize on the logistical difficulties of reviewing all removal decisions to defy the Attorney General, on the theory

that he "simply couldn't 'catch 'em all.'" *Cf.* Andrew Manuel Crespo, *In Memoriam: Judge Stephen Reinhardt*, 131 Harv. L. Rev. 2101, 2102 (2018).

On a more fundamental level, the President and Attorney General are constrained by Congress' decision to vest "exclusive" authority over removal proceedings in immigration judges. 8 U.S.C. § 1229a(a)(3). Congress' "'plenary control over the salary, duties, and even existence of executive offices' makes 'Presidential oversight' *more* critical—not less—as the '[o]nly' tool to 'counter [Congress's] influence.'" *Seila Law*, 591 U.S. at 231 (quoting *Free Enterprise*, 561 U.S. at 500). The "various 'bureaucratic minutiae' a President might use to corral agency personnel is no substitute for at will removal"; and the desire to solve the problems of the day "must be tempered by constitutional restraints that are not known—and were not chosen—for their efficiency or flexibility." *Id.* (quoting *Free Enterprise*, 591 U.S. at 499-500). Congress can of course "create governmental offices and to structure those offices as it chooses * * * [b]ut Congress' power * * * is inevitably bounded by the express language of the Constitution." *Free Enterprise*, 561 U.S. at 500 n.5 (quotation marks omitted).

Any other rule would appear to allow Congress to re-create the CFPB Director from *Seila Law* with the *same* removal restrictions, so long as the Director was ostensibly housed within the Commerce Department and

subject to review by the Secretary. So too, Congress could re-design the appointment and oversight of United States Attorneys, who are inferior officers generally appointed by the President with Senate confirmation. 28 U.S.C. § 541(a). Under petitioner's rule, Br. 29, Congress could seemingly vest the appointment of U.S. Attorneys solely in the Attorney General, and then restrict their removal except for cause that would satisfy an Article III court. There is little doubt that such a restriction on the supervision of core executive power would be patently unconstitutional. That is because the legitimacy of executive officers rests on "a clear and effective chain of command" from the people, to the President, to the Attorney General, to petitioners. *Free Enterprise*, 561 U.S. at 498.

### 2. No settled historical practice supports petitioners' insulation from removal

Government attorneys have long fallen outside of the classified civil service, *see* 24 Fed. Reg. 9124, 9124 (Nov. 10, 1959) (placing all federal attorneys in the excepted service), and accordingly have historically fallen outside the provisions of the civil service laws that restrict removal from "the classified civil service * * * except for such cause as will promote the efficiency of said service," Act of August 24, 1912, ch. 389 § 6, 37 Stat. 539,

555.[4] Accordingly, "an attorney in the Department of Justice" historically could "[]not claim privileged status under the" civil service removal restrictions, even as an employee. *McGinty v. Brownell*, 249 F.2d 124, 125-26 & n.3 (D.C. Cir. 1957) (citing 37 Stat. at 555). After the Supreme Court confirmed that this statutory construction applied to the Civil Service Reform Act, *see United States v. Fausto*, 484 U.S. 439, 455 (1988), Congress amended the statute in 1990 and—for the first time—generally provided that excepted service positions would be governed by "the efficiency of the service" standard and could receive judicial review of adverse employment actions. Pub. L. No. 101-376, § 2, 104 Stat. 461, 461-62 (1990).

There is accordingly no settled historical precedent for the proposition that immigration judges or other executive officers who fall within the excepted service may be constitutionally and categorically insulated from removal.

"'Perhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it." *Seila Law*, 591 U.S. at 220 (quoting *Free Enterprise*, 561 U.S.

---

[4] Veterans and other preference eligibles had their own civil service protections for both the competitive and excepted service. *See* Pub. L. No. 78-359, § 14, 58 Stat. 387, 390-91 (1944) (codified at 5 U.S.C. § 863 (1946)).

at 505). Petitioners and amici identify no well-established or accepted practice of vesting executive officers with the broad, coercive, and sovereign authorities wielded by immigration judges, vesting them with a continuing and indefinite office, and then prohibiting their removal at will. Congress' 1990 amendments to include the excepted service within 5 U.S.C. § 7513 are "comparatively recent," *id.* at 221, and provide no "no 'foothold in history or tradition' across the Executive Branch," *Arthrex*, 594 U.S. at 21. By contrast, the "[l]ong settled and established practice," *Houston Community College System v. Wilson*, 595 U.S. 468, 474 (2022), from the Founding onwards has been that inferior officers are removable at will by their appointing power, *see supra* pp.32-34.

Petitioners assert that the line between employees and inferior officers "is blurry," Br. 26, and then intimate that inferior officers have naturally fallen within the civil service protections since their inception, Br. 38-41, and so these removal restrictions must necessarily be regarded as constitutional as applied to officers, even if no Court has endorsed that conclusion. But even if there may be close questions on the margins, immigration judges are quintessential constitutional officers, and there is no long-established history approving of their removal restrictions.

### 3. Politically accountable adjudications are consistent with due process

From the first Congresses, Congress has directed various matters to be adjudicated by Secretaries who are removable at will by the President. *See* Harold J. Krent, *Presidential Control of Adjudication Within the Executive Branch*, 65 Case W. Res. L. Rev. 1083, 1089-90 (2015). Numerous contemporary statutes vest officers removable at will with the authority to conduct consequential adjudications. *See, e.g.*, 12 U.S.C. § 5563 (CFPB Director); 15 U.S.C. § 45(b) (Federal Trade Commission); 21 U.S.C. § 824 (Attorney General); 42 U.S.C. § 405(b) (Commissioner of Social Security); 50 U.S.C. § 4819(c) (Secretary of Commerce). Petitioners err in suggesting that these adjudications by politically accountable officers, or that similar adjudications by removable immigration judges, are somehow inconsistent with due process. Br. 49-51. The fact that these officers are politically accountable does not mean that they cannot or will not provide a fair hearing with a reasoned explanation for their decision. Indeed, many state courts judges are *elected*, and thus are often removed from office by the people based on disagreement with their decisions—no one thinks that this violates due process or that due process compels Article III tenure protections for state-court judges.

Indeed, long before immigration judges were governed by the 1990 civil service amendments, they were required to provide a fair process while still being removable at will. As the Supreme Court explained in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954), immigration judges are "required * * * to exercise [their] own judgment" in a removal proceeding and "must exercise [their] authority according to [their] own understanding and conscience." Yet in exercising that impartial judgment, immigration judges are still properly overseen by the Attorney General, on whom "they 'remain dependent'" as the Constitution requires. *Duenas*, 78 F.4th at 1074.

As the Supreme Court has explained, there "may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control." *Myers*, 272 U.S. at 135. And for removal proceedings, the "the Attorney General" has long disclaimed the authority to "dictate [their] decision[s] in any manner." *Accardi*, 347 U.S. at 267. But the Attorney General may, of course, "consider the decision after its rendition as a reason for removing" the immigration judge "on the ground that the discretion regularly entrusted to [them] has not been on the whole

intelligently or wisely exercised." *Braidwood*, 606 U.S. at 764 (explaining that inferior officers who were removable at will could still provide independent decisions). That structure "preserves both expertise and accountability." *Id.* at 775.[5]

## II. The Board Erred In Concluding That It Lacked Jurisdiction

The Board correctly held that the removal restrictions in 5 U.S.C. § 7513(a) are unconstitutional in that they prevent the at-will removal of petitioners as executive officers. Appx011-016. So too, the Board rightly noted that the Attorney General need not provide immigration judges with advance notice or reasons for their removal under § 7513(b), as they are removable at will. *See* Appx004, Appx007.

The Board erred, however in concluding that it "must dismiss [petitioners'] appeal for lack of jurisdiction because * * * the grant of Board jurisdiction in section 7513(d), cannot constitutionally apply to" petitioners. Appx016. All that is necessary for the Board to have jurisdiction over an

[5] As James Madison noted when discussing the Comptroller of the Treasury, there may be officers who "partake of a Judiciary quality as well as Executive." 1 Annals of Cong. 611-12. As a policy preference, "there may be strong reasons why an officer of this kind should not hold his office at the pleasure of the Executive Branch," but the Constitution demands that even these executive officers must "be dependent upon the President because [they] can be removed by him." *Id.* at 612; *accord Seila Law*, 591 U.S. at 227 n.10 (explaining that the Comptroller was removable at will).

administrative appeal is for a covered employee to seek review of a covered employment action. Here, petitioners were defined as covered employees under 5 U.S.C. § 7511(a)(1)(B)-(C) because they were in the excepted service and had served in their positions for more than two years. The Attorney General removed petitioners from their positions, *id.* § 7512(1), and so they could "appeal" that removal "to the Merit Systems Protection Board," *id.* § 7513(d).

That statutory review scheme "provides a mechanism for administrative and judicial review and relief" and is "exclusive of ordinary district court actions to challenge a removal." *Elgin v. Department of Treasury*, 641 F.3d 6, 8-9 (1st Cir. 2011) (collecting cases). This Court likewise has "exclusive jurisdiction" over appeals from the Board. *Personal Audio LLC v. CBS Corp.*, 946 F.3d 1348, 1352 (Fed. Cir. 2020) (quoting 28 U.S.C. § 1295(a)(9)). In such proceedings before the Board and this Court, the parties may bring "facial and as-applied constitutional claims," which are "common in administrative proceedings." *Elgin*, 641 F.3d at 11. The fact that the Department raised and the Board accepted a constitutional defense to petitioners' claims does not deprive the Board of jurisdiction.

This is therefore not a case where the petitioners fall outside the statutory definition of "employee," and therefore cannot appeal to the

Board at all under 5 U.S.C. § 7701(a). *See Roy v. MSPB*, 672 F.3d 1378, 1380 (Fed. Cir. 2012). Instead, petitioners fall within the statutory definition of "employee," 5 U.S.C. § 7511(a)(1), and can challenge their removal before the Board. As explained, however, that challenge fails on the merits because the Constitution provides that petitioners are removable at will. Thus, the substantive removal restrictions in 5 U.S.C. § 7513(a)-(b) are unconstitutional and as-applied to petitioners.

But the Board's statutory jurisdiction under § 7513(d) to review petitioners' removal after-the-fact poses no constitutional difficulties, as it imposes no limitation on the Attorney General's authority, occurs only after the officers have been removed, and simply channels such challenges through a specific administrative and judicial review scheme rather than allowing for general district court jurisdiction. Indeed, review can serve to *confirm* the constitutionality of the removal decision. *See, e.g.*, *Slaughter*, 146 S. Ct. at 2291. There is thus no constitutional basis to invalidate the Board's statutory jurisdiction in § 7513(d).[6]

---

[6] Additionally, there may be questions about whether a person's duties and position rise to the level of "significant authority" to make them a constitutional officer or related issues. Those questions would be appropriately subject to Board review under 5 U.S.C. § 7513(d) and judicial review under § 7703(b)(1)(A).

The Board's jurisdictional error is significant and warrants the Court's correction entirely apart from the merits of the constitutional discussion above. The Civil Service Reform Act generally vests the Board and this Court with "the exclusive avenue to judicial review" for adjudicating the lawfulness of removals of statutorily defined federal employees. *Elgin v. Department of Treasury*, 567 U.S. 1, 5 (2012). The statutory scheme thus generally "precludes district court jurisdiction" over challenges to adverse employment actions, even those that concern "constitutional claims." *Id.* at 8. Under the Board's jurisdictional holding, however, district courts may determine that the Civil Service Reform Act does not cover the removal of executive officers and thus challenges in such cases may be filed in district court across the country, with appeals to the regional circuits. That mistaken approach would likely yield a patchwork of jurisdictional precedents and constitutional law governing the Executive Branch's removal decisions. The Department of Justice is strongly committed to the exclusivity of the administrative and judicial review scheme, and we urge the Court to make clear that all removals of federal employees under 5 U.S.C. § 7511(a)(1) belong before the Board and this Court.

The Federal Circuit Bar Association, as amicus, proposes a novel rule that the Board's jurisdiction turns on whether the Attorney General invoked a talismanic formulation of the reasons for petitioners' removals as grounded in Article II. That rule makes little practical sense. As explained, the Board had statutory jurisdiction to accept petitioners' appeals after the fact, and that administrative review is not itself unconstitutional. And neither the President nor the Attorney General is required to invoke the Constitution affirmatively to remove their subordinate officers. Nothing in that analysis deprives the Board of jurisdiction or requires particular facts to support its jurisdiction. In all events, the decision memoranda in the record explain that petitioners were removed, in part, because they were "inferior officers" and "[a]ny restrictions on the Attorney General's ability to remove Immigration Judges would conflict with Article II." Appx209-210, Appx255-256.

A determination that the Board possessed jurisdiction over the administrative appeals would not require the Court to remand to the Board for a new decision. Sometimes a tribunal will decide an issue as "a question of subject-matter jurisdiction" and dismiss the case on that ground, when the issue is actually "a merits question." *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 253-54 (2010) (addressing extraterritorial reach of

federal law). Remand in such cases is “unnecessary,” as “a remand would only require a new [merits] label for the same [jurisdictional] conclusion.” *Id.* at 254. The Court may thus “address whether petitioners’ allegations state a claim.” *Id.*

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,


BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
*/s/ Daniel Aguilar*
DANIEL AGUILAR
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5432*
*Daniel.J.Aguilar@usdoj.gov*


August 2026

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the word limit of Federal Circuit Rule 32(b)(1) because, excluding the parts of the document exempted by Federal Circuit Rule 32(b)(2), it contains 13,761 words. I further certify that this response complies with Fed. R. App. P. 32(a)(5)-(6), because it was prepared using Word for Microsoft 365 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar

## CERTIFICATE OF SERVICE

I certify that on August 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court by using the appellate CM/ECF system. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel Aguilar*
Daniel Aguilar