No. 26-1575

IN THE

# United States Court of Appeals for the Federal Circuit

MEGAN JACKLER, BRANDON JAROCH,

*Petitioners*,

v.

MERIT SYSTEMS PROTECTION BOARD,

*Respondent*,

DEPARTMENT OF JUSTICE,

*Intervenor*.

On Petition for Review from the Merit Systems Protection Board

## REPLY BRIEF FOR PETITIONERS

ROBERT P. ERBE
LAW OFFICE OF ROBERT P. ERBE, PLLC
Federal Employment Law Office
3361 E. Terra Alta Blvd.
Tucson, AZ 85716
520-309-0763
robert.erbe@erbelawoffice.com

NATHANIEL A.G. ZELINSKY
SYDNEY FOSTER
JAMES I. PEARCE
ROSA L. BAUM
FRAN SWANSON
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, DC 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

*Counsel for Petitioners*

September 28, 2026

## CERTIFICATE OF INTEREST

Counsel for Petitioners certifies the following pursuant to Federal Circuit Rule 47.4:

1. Represented Entities (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.
   **Megan Jackler**
   **Brandon Jaroch**

2. Real Party in Interest (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.
   **Not Applicable.**

3. Parent Corporations and Stockholders (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.
   **Not Applicable.**

4. Legal Representatives – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).
   **In addition to the law firms, partners, and associates that have entered an appearance in this Court, Samantha Bateman and Kyle Freeny appeared on the papers in the Merit Systems Protection Board.**

5. Related Cases – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).
   **Not Applicable.**

6. Organizational Victims and Bankruptcy Cases – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

**Not Applicable.**

Dated: September 28, 2026

/s/ Nathaniel A.G. Zelinsky
Nathaniel A.G. Zelinsky

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

ARGUMENT .......... 4

I. THE GOVERNMENT DEFIES LONGSTANDING SUPREME COURT PRECEDENT .......... 4

A. Civil Service Laws Are Constitutional Under *Perkins* And *Arthrex* .......... 5

B. This Court Cannot Overrule *Perkins* And *Arthrex* .......... 6

C. Petitioners Also Prevail Under The Government's Strained Reading Of *Seila Law* .......... 19

II. RULING FOR THE GOVERNMENT WOULD HAVE DEVASTATING CONSEQUENCES .......... 25

CONCLUSION .......... 30

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

### CASES

*14 Penn Plaza LLC v. Pyett*,
556 U.S. 247 (2009) .......... 23

*Agostini v. Felton*,
521 U.S. 203 (1997) .......... 7

*Decker Coal Co. v. Pehringer*,
8 F.4th 1123 (9th Cir. 2021) .......... 20

*Elgin v. Dep't of Treasury*,
567 U.S. 1 (2012) .......... 30

*Free Enter. Fund v. PCAOB*,
561 U.S. 477 (2010) .......... 5, 6, 13, 20, 24, 28

*Humphrey's Ex'r v. United States*,
295 U.S. 602 (1935) .......... 10

*Kennedy v. Braidwood Mgmt., Inc.*,
606 U.S. 748 (2025) .......... 6, 13, 14, 28

*Leachco, Inc. v. CPSC*,
103 F.4th 748 (10th Cir. 2024) .......... 20

*Levinsky v. DOJ*,
208 Fed. Appx. 925 (Fed. Cir. 2006) .......... 15

*Lucia v. SEC*,
585 U.S. 237 (2018) .......... 22, 28

*Morrison v. Olson*,
487 U.S. 654 (1988) .......... 1, 2, 5, 7, 9, 10, 15, 20, 21, 22, 24, 25

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 23

*Myers v. United States*,
272 U.S. 52 (1926) .......... 1, 5, 7, 8, 9, 10, 11, 12

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989) .......... 7

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ........................................ 1, 6, 7, 8, 9, 19, 21, 22

*Thomas v. GSA*,
794 F.2d 661 (Fed. Cir. 1986) ........................................ 23

*Trump v. Cook*,
146 S. Ct. 2234 (2026) ........................................ 18

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) ........................................ 6, 7, 8, 9, 10, 13

*Trump v. United States*,
603 U.S. 593 (2024) ........................................ 3

*U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
413 U.S. 548 (1973) ........................................ 26

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ........................................ 1, 5, 6, 11, 12, 13, 14, 25

*United States v. Fausto*,
484 U.S. 439 (1988) ........................................ 17, 18

*United States v. Perkins*,
116 U.S. 483 (1886) ........................................ 1, 5, 6, 7, 8, 9, 10, 11, 21, 25

*United States v. Rahimi*,
602 U.S. 680 (2024) ........................................ 18

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ........................................ 18

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025) ........................................ 4

*Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*,
144 F.4th 1315 (11th Cir. 2025) ........................................ 13, 20, 23

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. II, § 2, cl. 2 ........................................ 14

U.S. Const. art. II, § 3 ........................................ 3

**STATUTES**

5 U.S.C. § 7511(a)(1) ........ 30

5 U.S.C. § 7512(1) ........ 30

Administrative Procedure Act,
Pub. L. No. 79-404, 60 Stat. 237 (1946) ........ 18

**OTHER AUTHORITIES**

Administrative Procedure: Hearings before the H. Comm. on the Judiciary,
79th Cong. 98 (1945) ........ 18

Brief for Petitioners, *Trump v. Slaughter*,
146 S. Ct. 2283 (2026) (No. 25-332) ........ 9, 10

Brief for Respondent, *Urias-Orellana v. Bondi*,
607 U.S. 537 (2026) (No. 24-777) ........ 20

David Thomas, *Lawyers Leaving US Government Drive Workforce Shift*,
Reuters (Jan. 29, 2026), https://perma.cc/R8TD-H5Y2 ........ 28

Drew DeSilver, *What The Data Says About Federal Workers*,
Pew Rsch. Ctr. (Jan. 7, 2025), https://perma.cc/CU6W-5WHQ ........ 28

3 Joseph Story, *Commentaries on the Constitution of the United States*
(1st ed. 1833) ........ 8, 16, 17

Rebecca Santana, *Justice Department Targets Slow Judges As Trump Pushes Faster Deportations*, Wash. Post (May 6, 2026),
https://perma.cc/3PZV-7739 ........ 15

Sirce E. Owen, Acting Director, Executive Office of Immigration Review,
U.S. Dep't of Justice, *Neutrality and Impartiality in Immigration Court Proceedings* (June 27, 2025), https://perma.cc/8FFA-J7WB ........ 19, 20

## INTRODUCTION

Before this Court, the Department of Justice embraces a maximalist view of the Article II removal power. In the government's view, all "inferior officers"—and really, it seems, everyone in the executive branch—must be "removable at will." DOJ Br. 38.

This is wrong. *United States v. Perkins*, 116 U.S. 483 (1886), held that Congress may enact civil service laws for inferior officers, and *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), recently confirmed that the Civil Service Reform Act (CSRA) is constitutional with respect to administrative adjudicators. Even the most ardent proponents of the removal power, Chief Justice Taft in *Myers v. United States*, 272 U.S. 52 (1926), and Justice Scalia in *Morrison v. Olson*, 487 U.S. 654 (1988), rejected the government's caricaturish conception of the Constitution.

The government arrives at a contrary conclusion by elevating a snippet of dicta in *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), while simultaneously ignoring clear pronouncements that civil service laws are constitutional in cases like *Perkins*, *Myers*, *Morrison*, and *Arthrex*. The government's interpretive gymnastics are a thinly veiled request to overturn the Supreme Court's precedent, something this Court cannot do.

The government does not dispute—because it cannot—that affirming the Merit Systems Protection Board (MSPB) would have devastating consequences. If

the government prevails, the executive branch would have free rein not only to dismiss employees without any notice, but also to discriminate against its workers based on race, gender, religion, partisan affiliation, or veteran status—and neither courts nor Congress could do anything about it.

At times, the government gestures at containing the blast radius of its theory, claiming this Court need only invalidate civil service laws for inferior officers, leaving for another day the question of whether an ill-defined collection of federal "employees" remains protected by the CSRA. But the category of civil servants who qualify as inferior officers for constitutional purposes is extremely broad. As a result, even if the government's sweeping vision of the removal power applies to inferior officers only, swaths of the civil service will lose legal protections in a blink.

More fundamentally, however, the government's limitless conception of the removal power has no logical end. The government asserts that Petitioners are not similarly situated to "a GS-9 legal assistant or a GS-13 program analyst," DOJ Br. 47, but that is a red herring. The government's sweeping Article II argument plainly extends to such employees, and—tellingly—the government never argues otherwise. That is unsurprising, given the government has already asserted Article II authority to fire such workers, including civil servants with "grades as low as GS-9." Lab. Orgs. Amicus Br. 7. "[T]his wolf comes as a wolf." *Morrison*, 487 U.S.

at 699 (Scalia, J., dissenting). Ruling for the government will pour accelerant on the Administration's efforts to gut the civil service.

Precedent alone resolves this case. But the government's underlying theory of our constitutional democracy is flawed for other reasons. The government repeatedly states the President must be able to fire everyone, regardless of the laws Congress enacts, to control the executive branch. This is a canard. The Department of Justice fired Petitioners *by mistake* after it failed to give them the most minimal process, not because the President sought to control the executive branch. The government fails to explain why providing Petitioners—and other civil servants—with minimal pre-removal process deprives the President of control over the executive branch.

Indeed, the government's position is fundamentally incompatible with Article II. Ruling for the government would fatally undermine the civil service and rob future Presidents of the career professionals necessary to "faithfully execute[]" "the Laws." U.S. Const. art. II, § 3; *see* Opening Br. 60-61. This, in turn, would damage "the institution of the Presidency." *Trump v. United States*, 603 U.S. 593, 632 (2024).

In short, the executive branch has embraced a vision of the removal power that has no end, lacks any basis in precedent, and would do violence to the executive branch. The Court should swiftly reverse the decision below. The Administration

has been defying the law since January 2025, has fired numerous additional civil servants without regard to their statutory rights, and is threatening millions more with the Damocles' sword of removal. The government will likely not desist until the Supreme Court puts this matter to rest. Petitioners respectfully request that the Court issue a decision as quickly as possible so that the Supreme Court may hear this case in its current Term, should that be necessary.[1]

## ARGUMENT

### I. The Government Defies Longstanding Supreme Court Precedent.

The government's Article II theory runs headlong into precedent old and new. It is so extreme that it was rejected by Chief Justice Taft and Justice Scalia, the fiercest judicial advocates of the presidential removal power. The government invites this Court to overrule binding Supreme Court precedent, distorts the Supreme Court's decisions, and ignores what it cannot explain away.[2]

---

[1] By analogy, this Court heard *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc), on July 31, 2025, and issued its decision on August 29, 2025. That enabled the Supreme Court to hold argument in November 2025 and issue a decision in February 2026. If this Court issues its decision in January 2027, the Supreme Court could potentially decide this case by the end of its current Term. If the Supreme Court cannot hear this case until the following Term, it would likely not issue its decision until 2028. In that scenario, the government would have successfully defied the law for over three years.

[2] Because the Department takes the laboring oar in defending the decision below, we focus on the Department's brief. The MSPB's similar arguments fail for the same reasons.

**A. Civil Service Laws Are Constitutional Under *Perkins* And *Arthrex*.**

There is "no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest." *Perkins*, 116 U.S. at 485. That is why Chief Justice Taft in *Myers* repeatedly stressed the constitutionality of "civil service" laws "in respect to inferior offices," *Myers*, 272 U.S. at 173, and why the modern Supreme Court has taken pains to avoid "cast[ing] doubt on" the "civil service system," *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 507 (2010).

It is simply not true that "every officer of the United States exercising any part of the executive power must serve at the pleasure of the President and be removable by him at will." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting) (citation modified). Principal officers supervise inferior officers and may remove them for cause, and principal officers are removable at will by the President. As Justice Scalia explained in *Morrison*, this system of "supervision" by the President's principal officers ensures the President controls the executive branch. *Id*. The government has no response to this critical point.

*Arthrex* puts the final nail in the coffin. When it comes to administrative adjudicators removable for cause, any Article II concerns regarding the President's control of the executive branch are satisfied so long as a principal officer can review the adjudicators' decisions. *See Arthrex*, 594 U.S. at 27. "In this way, the President

remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Id.*; *see Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 775 (2025); *cf. Free Enter. Fund*, 561 U.S. at 507 n.10.

None of this is new. Modern civil service laws reflect a settled history and tradition. *See* Opening Br. 38-41. Meanwhile, immigration judges fall squarely within this longstanding framework. They are inferior officers, supervised by the Attorney General. Everything immigration judges do is reviewable and reversible by the Attorney General—a fact the government notably does not dispute. That supervision and review ensure "the President remains responsible for the exercise of executive power." *Arthrex*, 594 U.S. at 27.

**B. This Court Cannot Overrule *Perkins* and *Arthrex*.**

**1.** The government primarily argues the Supreme Court's recent decisions in *Seila Law LLC v. CFPB* and *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), narrowed *Perkins* and its progeny into oblivion. The government not-so-subtly suggests *Perkins* no longer "remain[s] good law," invites this Court to confine *Perkins* to its "precise holding[]," and asks this Court to invalidate the CSRA in the process. DOJ Br. 42, 49; *see also* MSPB Br. 34-36.

This is a request to overrule Supreme Court precedent. Lower courts, however, cannot announce that "more recent cases have, by implication, overruled

an earlier" Supreme Court "precedent." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Instead, a "Court of Appeals should follow the case which directly controls." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Only the Supreme Court possesses "the prerogative of overruling its own decisions." *Id*. To be clear, the Supreme Court should not take that step here. The government, however, is asking this Court to defy binding precedent.

**2.** Even if this Court could entertain the government's verboten mode of analysis, its arguments are meritless. Under *Seila Law*, *Slaughter*, and *Myers*—a decision *Slaughter* extolled—the civil service remains constitutional.

**a.** Start with *Seila Law*. The government doubles down on the theory that a half-sentence in that decision "construed" prior precedent and invalidated civil service laws for anyone but "inferior officers with limited duties and no policymaking or administrative authority." DOJ Br. 44 (quoting *Seila Law*, 591 U.S. at 218).

The government suggests this half-sentence was not "dicta," yet it plainly was. *Id*.; *see also* MSPB Br. 34-35. *Seila Law* involved distinct questions concerning the removal of a *principal officer*, and its brief discussion of how *Perkins* and *Morrison* apply to *inferior officers* had no bearing on the case. It is risible to think that the Supreme Court demolished our nation's civil service laws with a drive-by statement.

The government meanwhile ignores everything else *Seila Law* said that confirms civil service laws are constitutional. *Seila Law* stressed the importance of "history" and "tradition" in the Court's analysis. *Seila Law*, 591 U.S. at 220-222. Under that rubric, the civil service system passes in spades. *See infra* pp. 16-19; Opening Br. 52-53. *Seila Law* also lauded *Myers* as a "landmark decision," 591 U.S. at 204, and *Myers* repeatedly recognized the constitutionality of the civil service, Opening Br. 29-30. To be clear, if *Seila Law* announced a new test, Petitioners satisfy it. *See infra* pp. 19-25. But *Seila Law* neither overruled *Perkins* nor invalidated the nation's civil service laws in a breezy aside.

**b.** The government similarly suggests that *Slaughter* eviscerated any limits on the executive's ability to fire civil servants. *See, e.g.*, DOJ Br. 4, 21. This stretches *Slaughter* beyond the breaking point.

As we explained, *Slaughter* supports our argument. *See* Opening Br. 36-38. *Slaughter* relied on a section of Justice Story's treatise that, in turn, confirmed Congress can regulate the removal of inferior officers. *Slaughter* also wrapped its arms around *Myers*, which repeatedly endorsed *Perkins* and the civil service. And Justice Gorsuch, who joined the majority in *Slaughter*, concurred and took as a given that the CSRA was constitutional. The government declines to engage with our arguments, a sign that it cannot refute them.

The government instead argues that, because the *Slaughter* majority "omitted any mention of the *Perkins/Morrison* exception," there must now be no limit on "the President's removal power." DOJ Br. 41; *see* MSPB Br. 29 n.4. But *Slaughter* had no need to discuss the removal of inferior officers because the case involved a principal officer. *Slaughter* declined to opine on "the fate of officials not before" the Court and addressed only the President's power to remove principal officers who "derive their offices from his appointment." *Slaughter*, 146 S. Ct. at 2306, 2294.

The government likewise tries to read tea leaves in Justice Sotomayor's dissent to argue that *Slaughter* overruled *Perkins*. *See* DOJ Br. 41. But that is simply not what the majority said in *Slaughter*. Again, *Slaughter* extolled *Myers*, which in turn repeatedly confirmed that the civil service is constitutional.[3]

**c.** Perhaps the government's worst misreading of precedent, however, is its distortion of *Myers*, that "landmark decision" that *Slaughter* confirmed is the Supreme Court's "best word on th[is] subject." *Slaughter*, 146 S. Ct. at 2298-2299; *see Seila Law*, 591 U.S. at 204.

When it litigated *Slaughter*, the government leaned on *Myers* and praised "Chief Justice Taft's 'carefully researched and reasoned 70-page opinion.' " Brief

[3] The *Slaughter* dissent, however, demolishes the government's reading of *Seila Law*. If the government were correct that *Seila Law* effectively overturned *Perkins*, Justice Sotomayor would have had no need to express concern for the civil service in *Slaughter*.

for Petitioners at 31, *Trump v. Slaughter*, 146 S. Ct. 2283 (2026) (No. 25-332) (quoting *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting)). Now the government runs away from *Myers*. According to the government, *Myers* narrowly addressed only the question of "*who* holds the removal power" and explained that Congress may vest "an inferior officer's removal [in] someone *other* than the President." DOJ Br. 50.

That is wrong. Chief Justice Taft's opinion for the Court was clear: Once Congress vests appointments of inferior officers "in the heads of departments," "they could be entirely removed from politics." *Myers*, 272 U.S. at 174. *Myers* did not endorse the civil service lightly either. Chief Justice Taft repeatedly embraced *Perkins* and confirmed the constitutionality of the nation's civil service laws. Opening Br. 29-30 (collecting numerous cites in *Myers*).

The government prevailed in *Slaughter*, and invalidated independent agencies, in large part by invoking *Myers*. What's sauce for the goose is sauce for the gander. The government's attempt to turn tail and abandon *Myers* is precisely the kind of "shabby treatment of *Myers*" that *Slaughter* rejected. *Slaughter*, 146 S. Ct. at 2310; *cf. Humphrey's Ex'r v. United States*, 295 U.S. 602, 627 (1935) (dismissing *Myers*'s analysis as "dicta," a view repudiated by *Slaughter*).

The Supreme Court has spoken clearly. "*Myers* was right all along." *Slaughter*, 146 S. Ct. at 2316 (Gorsuch, J., concurring). This Court should reject the

government's gamesmanship, follow *Myers*, and confirm the constitutionality of the nation's civil service laws.

**3.** *Perkins* and its progeny alone resolve this case. But *Arthrex* dispels any doubt.

Before this Court, the government does not dispute that *every* decision immigration judges issue is reviewable and reversible by the Attorney General. *See* DOJ Br. 51 (agreeing "[t]he Attorney General has statutory authority to review decisions"). As *Arthrex* teaches, the Attorney General's review ensures "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Arthrex*, 594 U.S. at 27.[4]

The government argues that *Arthrex* had nothing to do with "separation of powers principles that require the President to retain necessary supervision over the Executive Branch," and that *Arthrex* concerned only the Appointments Clause, not the Vesting and Take Care Clauses. DOJ Br. 52; *see also* MSPB Br. 40-41. This is manifestly incorrect.

---

[4] Below, the Department half-heartedly disputed the Attorney General's ability to review a handful of actions immigration judges undertake. *See* Opening Br. 56 n.10. The MSPB, in turn, distinguished *Arthrex* based solely on the MSPB's unsupported assertion that executive branch review of immigration judges' decisions was "limited and conditional." Appx015 n.6. The Department and the MSPB tellingly abandon this analysis now.

*Arthrex* expressly addressed separation-of-powers principles, repeatedly. *See, e.g.*, *Arthrex*, 594 U.S. at 18 (explaining that the decision was animated by a concern about the "President's ability to 'discharge his own constitutional duty of seeing that the laws be faithfully executed' " (quoting *Myers*, 272 U.S. at 135)). Meanwhile, the introduction to the opinion framed *Arthrex* as involving not just the principles furthered by the Appointments Clause, but also the principles animating the Vesting and Take Care Clauses. *Id.* at 6.

Significantly, the dissent in *Arthrex* advanced the argument the government trials now, *i.e.*, that *Arthrex* narrowly involved a technical question about the Appointments Clause, not any "separation of powers principles" regarding presidential control of the executive branch. DOJ Br. 52; *see Arthrex*, 594 U.S. at 57-58 (Thomas, J., dissenting). But the majority rejected the dissent's parsing of the decision—again, the precise argument the government advances here—because the argument artificially "pigeonhole[d]" "consideration[s]" regarding presidential control of the executive branch "as the sole province of the Vesting Clause." *Arthrex*, 594 U.S. at 17.

In the end, *Arthrex* could not have been clearer: So long as a principal officer may review an administrative judge's decision, "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Id.* at 27. That language is similar to

how *Slaughter* characterized the political accountability values that Article II furthers. *Slaughter*, 146 S. Ct. at 2310 ("[Principal officers] who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people."). It cannot be that review in *Arthrex* provided political accountability for Article II purposes—but the same review cannot provide the same political accountability in this case. *See Walmart, Inc. v. Chief Admin. L. Judge of Off. of Chief Admin. Hearing Officer*, 144 F.4th 1315, 1344 (11th Cir. 2025) (holding review ensures the President can "take care that the laws are faithfully executed").

In short, the government is wrong. Questions of presidential control did not "merely lurk in the record" in *Arthrex*. DOJ Br. 52. They were front and center, and *Arthrex* cannot be dismissed as a narrow Appointments Clause case. Meanwhile, the government tellingly ignores that *Braidwood Management* confirmed "higher-level agency reconsideration by the agency head is the standard way to maintain political accountability and effective oversight for adjudication." *Braidwood Mgmt., Inc.*, 606 U.S. at 775 (citation modified).[5]

---

[5] The government suggests (at 55) that *Free Enterprise Fund* "rejected the notion" that review by principal officers provides political accountability. But in that case, the SEC lacked "plenary" control over the PCAOB. *Free Enter. Fund*, 561 U.S. at 504. Regardless, *Free Enterprise Fund* was a "highly unusual" case involving "two layers of for-cause removal," including one layer that was unusually "rigorous." *Id.* at 505. Moreover, the Court approved of the "civil service system" and removal protections for "administrative law judges." *Id*. at 507 & n.10. Were there any

So the government retreats and suggests that *Arthrex* is distinguishable because immigration judges complete "73,371 removal cases per month" and the Attorney General could not possibly review all those decisions. DOJ Br. 53. But *Arthrex* rejected that argument too. As the Court explained, a principal officer "need not review every decision" to ensure political accountability. *Arthrex*, 594 U.S. at 27. "What matters is that the" principal officer has "the discretion to review decisions." *Id*. Under *Arthrex*, the possibility of review where necessary—not actual review by a principal officer in every case—is enough "to maintain political accountability." *Braidwood Mgmt.*, 606 U.S. at 775 (citation modified).

The government suggests the Attorney General will "disclaim responsibility" for the immigration judges he supervises by asserting that "individualized review is simply not practical and that immigration judges enjoy protection from removal." DOJ Br. 54. This is beyond cavil. The role of "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2, is to manage what occurs within their respective domains. The Attorney General may not only personally review any decision, but he may also delegate review to subordinates and issue precedential decisions and policies that govern all cases in the immigration system. Armed with that vast authority, the

---

doubt, *Arthrex* addressed circumstances nearly identical to this case, and made clear that a principal officer's plenary review ensures democratic accountability. *See Arthrex*, 594 U.S. at 27.

Attorney General cannot so easily wash his hands of his Department. As one amicus underscores, "immigration judges" today "are on notice that all their substantive decisions may be reviewed, including decisions they make on apparently 'minor' docket management issues." Am. Immigr. Laws. Ass'n Amicus Br. 6. Recently, the Attorney General even stated that the Department is actively "watch[ing]" immigration judges to ensure they follow the law. Rebecca Santana, *Justice Department Targets Slow Judges As Trump Pushes Faster Deportations*, Wash. Post (May 6, 2026), https://perma.cc/3PZV-7739.

It is similarly risible to suggest that a disloyal "immigration judge" will "try to capitalize on the difficulties of review[]" "to defy the Attorney General, on the theory that he simply couldn't catch 'em all." DOJ Br. 55-56 (citation modified). To be clear: Under the CSRA, if an immigration judge defies the Attorney General, for example by refusing to follow precedential decisions issued by him, the Attorney General may fire that immigration judge for cause. *See Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting); *cf. Levinsky v. DOJ*, 208 Fed. Appx. 925, 929 (Fed. Cir. 2006) (affirming removal of immigration judge).

As a practical matter, an immigration judge cannot sneak decisions by the executive branch. The Department of Homeland Security actively participates in every immigration case and may challenge immigration judges' decisions within the Department of Justice. And it bears repeating: Petitioners were not disobedient civil

servants. They were military veterans who were exemplary employees and whom the Department fired by accident after it failed to follow the most minimal procedures before terminating them.

**4.** The history underpinning civil service laws further confirms their constitutionality, and the government tellingly declines to engage with it.

The government ignores, for example, Founding-era sources such as Justice Story's famous treatise, which confirmed that Congress could regulate "the term of office" and "the manner" of "removal" for "inferior officers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531 (1st ed. 1833); *see* Opening Br. 38-39. It likewise ignores the fact that, at the Founding, "even absent congressional action, the tenure in most of the civil service was de facto during good behavior rather than at will." Fisk, Rosenblum, & Shaw Amicus Br. 4 (internal quotation marks omitted); *see* Opening Br. 38 (discussing Washington's presidency). And it ignores everything from the Pendleton Act to twentieth-century jurisprudence protecting the constitutional rights of public employees. Opening Br. 39-41; *accord* Fisk, Rosenblum, & Shaw Amicus Br. 10-19. Ruling for the government requires running roughshod over that history.

What little the government offers fails to move the needle. The government invokes the Decision of 1789. *See* DOJ Br. 29; MSPB Br. 17-19. But the Decision of 1789 was understood by its contemporaries to address solely the question of the

"presidential removal power" of "officers appointed by the President and confirmed by the Senate"—not inferior officers appointed by department heads. Const. Accountability Ctr. Amicus Br. 12. Take Justice Story. He concluded the Decision of 1789 settled the question of the removability of presidential appointees but simultaneously explained that Congress could regulate the removal of inferior officers. Story, *supra* § 1531 & n.1; *see* Const. Accountability Ctr. Amicus Br. 9-15 (collecting sources showing the Decision of 1789 was limited to removal of presidential appointees).

The government's only other historical argument is its suggestion that, because attorneys historically fell within the excepted service—and so until 1990 fell "outside the provisions of the civil service laws that restrict removal"—government attorneys cannot *ever* receive civil service protections. DOJ Br. 57. This argument is wrong for three independent reasons.

*First*, this case involves civil service protections for veterans. As the government acknowledges, this nation has long granted veterans like Petitioners civil service protections, regardless of whether those veterans fell in the "competitive" or the "excepted service." DOJ Br. 58 n.4. The precise veteran protections Petitioners received are thus a "traditional feature of the civil service system," not a novelty. *United States v. Fausto*, 484 U.S. 439, 449 (1988).

*Second*, the government's historical account of civil service protections for attorneys is incomplete. For example, in 1946, the Administrative Procedure Act (APA) afforded statutory removal protections to administrative law judges. Administrative Procedure Act, Pub. L. No. 79-404, § 11, 60 Stat. 237, 244 (1946). Congress enacted these protections because it "heard 'a good deal of complaint' that pre-APA hearing examiners were 'not free to make an independent report' because of behind-the-scenes pressure from agency superiors." Ass'n of Admin. L. Judges Amicus Br. 13 (quoting Administrative Procedure: Hearings before the H. Comm. on the Judiciary, 79th Cong. 98-99 (1945) (question of Rep. Hatton Sumners, Chairman)).

More broadly, prior to the enactment of the CSRA, an "excepted service employee," including an attorney, could seek redress in court if "discharged in violation of applicable agency regulations." *Fausto*, 484 U.S. at 457 (1988) (Stevens, J., dissenting); *cf. Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) (ordering reinstatement of employee fired in violation of regulations). As a result, civil service protections for federal attorneys are not novelties either.

*Third*, even if the government's historical account were accurate, it is legally irrelevant. What matters is that our nation has a rich tradition of civil service laws. Article II does not fossilize specific federal job classifications "in amber." *Trump v. Cook*, 146 S. Ct. 2234, 2254 (2026) (quoting *United States v. Rahimi*, 602 U.S. 680,

691 (2024)). No one doubts, for instance, that Congress may today afford a small-town postmaster civil service protections—even though that position historically required Senate confirmation and was therefore exempt from the civil service laws.

* * *

The government asks this Court to overturn long-settled precedent, throw out centuries of history, and invalidate landmark laws. This Court should reject this radical invitation.

### C. Petitioners Also Prevail Under The Government's Strained Reading Of *Seila Law*.

The Court can stop here. But Petitioners still prevail even if *Seila Law* announced a new test under which civil service laws apply only to those "inferior officers with limited duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218.

Start with the most obvious point. Immigration judges do not make immigration policy or "exercise policymaking authority." DOJ Br. 46. The government ignores its memorandum—issued in the early days of the new Administration—which stressed that immigration judges must *not* decide cases based on "policy" but instead engage in "an evenhanded application of the law." Sirce E. Owen, Acting Director, Executive Office of Immigration Review, U.S. Dep't of Justice, *Neutrality and Impartiality in Immigration Court Proceedings*, 2 n.1 (June 27, 2025), https://perma.cc/8FFA-J7WB. In the government's words,

immigration judges "who would prefer to be policy advocates" "should consider transitioning to alternate career paths." *Id*. at 2. Elsewhere, the government has similarly stressed that immigration judges apply settled law to facts. *See* Brief for Respondent at 4, *Urias-Orellana v. Bondi*, 607 U.S. 537 (2026) (No. 24-777) ("The vast majority of those decisions turn on factual assessments, not on making new law about the legal standard."). It is chutzpah for the government to suggest now that immigration judges are policymakers.

The Supreme Court, moreover, has emphasized that an administrative judge's humdrum adjudication of routine cases is not policymaking. *See Free Enter. Fund*, 561 U.S. at 507 n.10 ("[A]dministrative law judges of course perform adjudicative rather than enforcement or policymaking functions."); *Leachco, Inc. v. CPSC*, 103 F.4th 748, 764 (10th Cir. 2024) ("ALJ Young performed a purely adjudicatory function" (quotation marks omitted)); *Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1133 (9th Cir. 2021) (similar). "[T]o the extent that the outcomes of individual adjudications may ultimately shape policy, this is incidental to" immigration judges' "function as adjudicators." *Walmart*, 144 F.4th at 1343. If any specific case presents unique policy ramifications, it is also always referable to and reviewable by the Attorney General.

Nor do immigration judges exercise impermissible *administrative* duties because they are *administrative* judges. *Contra* DOJ Br. 45. As used in *Morrison*,

the term "administrative duties" appears to refer to high-level control over an agency, largely synonymous with policymaking. *See Morrison*, 487 U.S. at 671-672 (explaining that a statute creating an independent counsel did not provide "authority to formulate policy for the Government or the Executive Branch, nor [did] it give appellant any administrative duties outside of those necessary to operate her office").

The government stresses that immigration proceedings have serious consequences. *See* DOJ Br. 35-37, 46. But so do numerous government functions. It cannot be that everyone who touches anything of consequence in the federal government must be removable at will. Precedent teaches the opposite. The independent counsel in *Morrison* prosecuted high-ranking government officials, and "exercise[d] no small amount of discretion and judgment in deciding how to carry out" "her duties." *Morrison*, 487 U.S. at 691. Meanwhile, the naval officer in *Perkins* served in the military chain of command. *See Perkins*, 116 U.S. at 483-484. Yet *Seila Law* expressly approved of removal restrictions in both cases. *Seila Law*, 591 U.S. at 204. The Court should reject the government's facile suggestion that the "solemn duties" performed by the inferior officers in *Perkins* and *Morrison* were any less significant than the routine adjudications Petitioners performed. DOJ Br. 45; *see* MSPB Br. 33.

The government likewise errs when it suggests that Petitioners performed "more than 'limited' duties" simply because Petitioners filled a "permanent" position. DOJ Br. 44. This argument elides two distinct concepts: (i) "limited tenure" and (ii) "limited duties." In *Morrison*, the Court explained that the independent counsel was "limited in tenure" because she was "appointed essentially to accomplish a single task, and when that task is over the office is terminated." *Morrison*, 487 U.S. at 672. By contrast, the independent counsel performed "limited duties" because she was "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id*. at 671.

In the passage in *Seila Law* the government cites, the Supreme Court used only the phrase "limited duties"—not limited tenure. *Seila Law*, 591 U.S. at 218. As a result, to the extent *Seila Law* created some kind of new test (to be clear: it did not), it would ask whether an officer's *duties* are limited, not whether *tenure* is limited. Indeed, it would make no sense for the lawfulness of removal protections to turn on whether a federal worker occupied a permanent position. The overwhelming majority of civil servants have permanent jobs, and a defining feature of inferior officers generally is the permanency of their position. *See Lucia v. SEC*, 585 U.S. 237, 254 (2018) (Thomas, J., concurring).

To be sure, an immigration judge's *duties* are limited. As the Eleventh Circuit has explained, an administrative judge's duties pertain to only a narrow band of

adjudication, limited by agency regulations and precedent. *Walmart*, 144 F.4th at 1343 ("The[] limitations and enumerations of the ALJs' limited powers make clear that the ALJs' duties are, in fact, only adjudicative functions.").

For the first time in this case, the government argues that Petitioners had additional, modest managerial obligations as assistant chief immigration judges, which the government thinks should come into the calculus. DOJ Br. 46-47. But the Department of Justice never so much as hinted at this argument before the MSPB administrative judge or the full Board, and it appears nowhere in the decisions below. It is conclusively forfeited "and accordingly cannot be presented here." *Thomas v. GSA*, 794 F.2d 661, 666 (Fed. Cir. 1986); *see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009); *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept appellate counsel's *post hoc* rationalizations for agency action.").[6]

Regardless, assistant chief immigration judges are not policymakers. Petitioners were, at most, quintessential middle managers. They wrote "performance reviews" for colleagues, Appx339; helped with "docket management

[6] The government itself places little stock in Petitioners' role as assistant chief immigration judges. For example, the Department characterizes the issue before the Court as whether Congress may "restrict the Attorney General's authority to remove immigration judges." DOJ Br. 7; *see also, e.g.*, *id*. at 2 ("Petitioners here were immigration judges.").

to ensure cases were processed timely and efficiently," Appx340; "fill[ed] in on the bench for absent judges," Appx340; and helped lead a "move into [a] new court space," including by ensuring "the proper functioning of access cards," Appx417; *see also, e.g.*, Appx352, Appx355 (praising Jackler for, among other things, creating an "Immigration Court Helpdesk with a local non-profit clinic" and "an outlook calendar for the court"); Appx406 (praising Jaroch for, among other things, submitting a legal assistant for a special award).

Petitioners performed these tasks exceptionally well, which makes their arbitrary firings senseless. But day-to-day middle management—streamlining dockets, praising fellow staff, and helping move offices—is neither policymaking nor significant administrative duties. After all, the independent counsel possessed far greater "administrative" authority "to operate her office," and that did not tip the balance in *Morrison*, 487 U.S. at 671-672. In the end, if helping move offices and writing performance reviews means Petitioners must be removable at will, nearly every federal worker will lose civil service protections, from the janitorial supervisor on down.[7]

* * *

[7] Moreover, to the extent the Attorney General really thought Petitioners should not serve as middle managers, the Attorney General could simply have, at any time, "reassigned" Petitioners to serve as garden-variety immigration judges. *Free Enter. Fund*, 561 U.S. at 506.

The easiest route to resolving this case is to apply *Perkins* and *Arthrex* and reject the invitation to invalidate our nation's civil service laws. But to the extent the Court decides to impose the government's new test, Petitioners still prevail.

## II. Ruling For The Government Would Have Devastating Consequences.

Until now, no modern President—including President Trump in his first term—has argued that the President must be able to fire civil servants en masse to control the executive branch. There is a reason: This theory is baseless.

Instead, for generations, millions of non-partisan civil servants have worked under the direction of political superiors selected by the President. Under our constitutional structure, the supervision and review of the civil service have ensured "the President remains responsible for the exercise of executive power—and through him, the exercise of executive power remains accountable to the people." *Arthrex*, 594 U.S. at 27; *see Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

The facts of this case underscore how untethered from reality the government's constitutional theory is. As the government does not dispute, Petitioners were exemplary employees whom the government fired *by mistake* after it failed to provide them with the most minimal notice before their termination. This case has nothing to do with presidential control over the executive branch. It is about a government that acted arbitrarily and that believes there are no limits on its actions. Indeed, the government offers no explanation as to why it could not afford

Petitioners the modest CSRA rights at issue here—minimal notice and process before removal—while retaining full control over the executive branch.

Ruling for the government will hamstring the executive branch—undermining the Article II values the government purports to vindicate. Presidents can execute the laws only because they can turn to the career federal "workforce" with "expertise, institutional knowledge, integrity, and efficiency" to implement policies. Fisk, Rosenblum, & Shaw Amicus Br. 20; *see id*. at 18 (quoting *U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 557 (1973) ("[I]t is in the best interest of the country, indeed essential, that federal service should depend upon meritorious performance rather than political service.")).

The unfortunate reality, however, is that the government already struggles "to fill critical positions across agencies." Former Director and Acting Director of Office of Pers. Mgmt. Amicus Br. 4. If the government prevails in undermining basic protections for civil servants, it would become exceedingly difficult, if not outright impossible, to recruit the qualified career workers who are essential to the functioning of the executive branch.

In short, ruling for the government would rob all presidents of the "expert workforce that modern administrative governance demands." Bednar & Wildermuth Amicus Br. 31. This would do "a grave disservice to" future chief executives, who would face obstacles in executing the laws. Fisk, Rosenblum, & Shaw Amicus Br.

27. In the worst-case scenario, an outgoing President could gut entire agencies to rob the incoming chief executive of the personnel needed to effectuate policy.

We explained this in our opening brief (at 60-61), and amici have underscored the point as well. But the government is notably silent. Indeed, the government does not meaningfully contest that—if it prevails—it will strip *all* legal protection from countless federal workers. This is not a hypothetical worry. It is happening right now. In cases across the country, federal workers have alleged that they were fired based on their race, sex, age, and partisan affiliation. The government has advanced the same Article II theory to argue that even bedrock antidiscrimination protections for federal workers are unconstitutional.[8] The stakes could not be higher: Accepting the government's theory means eviscerating rights for millions of federal public servants. There is no doubt this would hollow out the civil service and harm the Presidency as an institution.

At times, the government gestures at limiting its theory by observing that this Court need address only whether its Article II argument applies to inferior officers. *See, e.g.*, DOJ Br. 3. This is cold comfort. The dividing line between inferior officers and employees is paper thin, and countless civil servants qualify as inferior

[8] *See, e.g.*, *Nemer v. Blanche*, No. 25-cv-4170 (D.D.C.); *Billings v. Blanche*, No. 26-cv-4086 (S.D.N.Y.); *Pappas v. Blanche*, No. 26-cv-12194 (D. Mass.); *Lilien v. Blanche*, No. 3:26-cv-3965 (N.D. Cal.); *Chamberlin v. Blanche*, No. 4:26-cv-4390 (N.D. Cal.).

officers. *See Lucia*, 585 U.S. at 254 (Thomas, J., concurring); *Free Enter. Fund*, 561 U.S. at 538 (Breyer, J., dissenting).

By any metric, ruling for the government will have tectonic ramifications and change the rules for the many civil servants to whom our nation provided an assurance of continued employment. For example, if the ruling is limited to the "excepted service," DOJ Br. 57-59, some 735,000 federal workers will lose their rights, *see* Drew DeSilver, *What The Data Says About Federal Workers*, Pew Rsch. Ctr. (Jan. 7, 2025), https://perma.cc/CU6W-5WHQ. Meanwhile, if the ruling applies just to "[g]overnment attorneys," DOJ Br. 57, then "38,000 lawyers" working in the executive branch will become at-will employees, David Thomas, *Lawyers Leaving US Government Drive Workforce Shift*, Reuters (Jan. 29, 2026), https://perma.cc/R8TD-H5Y2. Even if the ruling is just limited to administrative judges, it would represent a sea change for thousands of executive branch adjudicators, and would radically undermine public confidence in the fairness of their rulings. *See* Opening Br. 49-51.[9]

---

[9] The government's due process arguments are wrong. Petitioners agree that "[p]olitically accountable adjudications are consistent with due process." DOJ Br. 60. Here, Congress has permissibly chosen to preserve political accountability and further due process by "authorizing inferior-officer adjudicators in the Executive Branch to make initial, independent decisions" with the benefit of CSRA protections and providing for "review by a superior officer." *Braidwood Mgmt.*, 606 U.S. at 774.

More fundamentally, the government's constitutional argument has no logical limit, and the government tellingly does not contend otherwise. If Article II provides the President "plenary authority" to fire anyone who exercises a "portion" of executive power, then it does not matter whether a federal worker is, in the constitutional sense, an inferior officer or employee. DOJ Br. 22. Significantly, the government is currently firing personnel based on precisely this understanding. Right now, the executive branch is invoking Article II to justify summarily terminating "employees in positions such as Grants Management Analyst, Information Technology Specialist, Management and Program Analyst," with "grades as low as GS-9." Lab. Orgs. Amicus Br. 7. So make no mistake: This is not an isolated case about immigration judges. The civil service is on the line.

Time is of the essence. Every day, the Administration fires more civil servants based on its extraordinary Article II theory. In the meantime, the MSPB adjudicatory process has broken down. The Administration is dictating how the MSPB must rule in Article II cases, and the MSPB has stopped processing additional Article II appeals. *See* Opening Br. 17. Before this Court, the MSPB's own administrative judges warn that the MSPB's decision puts them at great risk and "urges the Court to resolve this matter as quickly as possible." MSPB Pro. Ass'n Amicus Br. 15. They are joined by a diverse collection of amici, from public sector unions to

concerned scientists. The Court should issue its decision as soon as possible, with an eye toward facilitating any necessary Supreme Court review in its current Term.[10]

## CONCLUSION

For the foregoing reasons and those in the opening brief, this Court should reverse the decision of the Merit Systems Protection Board.

[10] The Federal Circuit Bar Association (FCBA) argues that the Court should remand to determine whether the government invoked Article II at the time of Petitioners' terminations. FCBA Amicus Br. 11, 14. Although not entirely clear, the FCBA seems to believe that this fact bears on whether the Department mounted an as-applied or facial constitutional challenge to the CSRA, and thus whether the MSPB had jurisdiction to resolve the challenge. *Id.* at 5-10. This is wrong. First, the memoranda justifying Petitioners' firings invoked Article II. *Accord* DOJ Br. 66. Second, an executive branch official need not cite Article II in a decisional memorandum to preserve an as-applied challenge based on Article II in litigation. *Accord id.* Third, irrespective of whether the MSPB may pass on a facial challenge, this Court has complete authority to do so on review. *Elgin v. Dep't of Treasury*, 567 U.S. 1, 17-18, 18 n.8 (2012). The MSPB had jurisdiction over the appeals below because Petitioners were covered employees, 5 U.S.C. § 7511(a)(1), who suffered "removal[s]," *id*. § 7512(1). The case—and the constitutional question it presents—is thus properly before this Court, regardless of whether the MSPB's decision is categorized as facial or as-applied.

September 28, 2026

Respectfully submitted,

/s/ Nathaniel A.G. Zelinsky
NATHANIEL A.G. ZELINSKY
SYDNEY FOSTER
JAMES I. PEARCE
ROSA L. BAUM
FRAN SWANSON
WASHINGTON LITIGATION GROUP
1717 K St., NW, Suite 1120
Washington, DC 20006
202-521-8750
nzelinsky@washingtonlitigationgroup.org

ROBERT P. ERBE
LAW OFFICE OF ROBERT P. ERBE, PLLC
Federal Employment Law Office
3361 E. Terra Alta Blvd.
Tucson, AZ 85716
520-309-0763
robert.erbe@erbelawoffice.com

*Counsel for Petitioners*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit through the appellate CM/ECF system on September 28, 2026. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Nathaniel A.G. Zelinsky
Nathaniel A.G. Zelinsky

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. Cir. R. 32(b)(1). Excluding the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2), this brief contains 6,971 words.

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman, a proportionally spaced font.

/s/ Nathaniel A.G. Zelinsky
Nathaniel A.G. Zelinsky